### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN SISTRICT OF TEXAS
### GALVESTON DIVISON

| | | |
|---|---|---|
| **DENNIS REYNARD BENSON** | § | |
| **Plaintiff** | § | |
| | § | |
| **V.** | § | **CIVIL CASE NO. 3:21-CV-00200** |
| | § | **JURY DEMANDED** |
| **COUNTY OF GALVESTON** | § | |
| **EDWARD BENAVIDEZ, Individually** | § | |
| **HENRY TROCHESSET, In his official capacity** | § | |
| **Defendants.** | § | **OF GALVESTON COUNTY TEXAS** |

### PLAINTIFF FIRST AMENDED COMPLAINT

**TO THE HONORABLE JUDGE OF SAID COURT:**

**NOW COMES** Dennis Reynard Benson, hereinafter called Plaintiff, complaining of and about the County of Galveston, Henry Trochesset and Edward Benavidez, hereinafter called Defendants, and for cause of action shows unto the Court the following:

### I. DISCOVERY CONTROL PLAN LEVEL

1. Plaintiff intends that discovery be conducted under Discovery Level 2.

### II. PARTIES AND SERVICE Street

2. Plaintiff, Dennis Benson, is an Individual whose address is 1016 63rd Galveston, Texas 77551.

3. The last three numbers of Dennis Benson's social security number are 736.

1

4. Defendant County of Galveston, an entity, may be served with process by serving Galveston County Commissioners Court, at 722 Moody Avenue Galveston, Texas 77550 and Paul Ready County Attorney at 1300 McGowen St. ste.120 Harris County, Texas 77004.

5. Henry Trochesset, an individual, may be served with process by serving Henry Trochesset, Sheriff Chief of said entity, at 601 54th Street Galveston, Texas 77591.

6. Defendant, Edward Benavidez, is an individual who may be served with process at 7010 Avenue Q ½ Galveston, Texas 77550

## III. JURISDICTION AND VENUE

7. The subject matter in controversy is within the jurisdictional limits of this court.

8. Plaintiff seeks: a. monetary relief over $1,000,000.00.

9. Defendant County of Galveston, hereinafter "Defendant County" is a Texas municipal corporation and is the legal entity responsible for itself and for the Galveston County Sheriff Department. This Defendant is also the employer of the individual Defendants and is a proper entity to be sued under 42 U.S.C. § 1983.

10. This court has jurisdiction over the parties because Defendants are Texas entities.

11. At all times relevant hereto, Defendant Henry Trochesset was a citizen of the United States and a resident of the State of Texas. Defendant Henry Trochesset is sued in his official capacity as the Chief of the Galveston County Sheriff Department, employed by the Defendant County and/or the Galveston County Sheriff Department, and was acting under color of state law.

12. As the Chief of the Galveston County Sheriff Department, Defendant Trochesset both exercised and delegated his municipal final decision-making power to the Office of Professional Standards and others. He also was responsible for the training and supervision of individual Defendant Edward Benavidez.

13. Defendant County and Defendant Trochesset are properly sued directly under 42 U.S.C. § 1983 for their own and their delegated deliberately indifferent unconstitutional decisions, policies, practice, habits, customs, usages, training and derelict supervision, ratification, acquiescence, and intentional failures which were moving forces in the complained of constitutional and statutory violations and resulting injuries.

14. The Defendant County is also properly sued under 42 U.S.C. § 1983 for the challenged delegated final decisions of Defendant Trochesset in his official capacity as the Chief of the Galveston County Sheriff Department, and for those of any final delegated decision makers, with respect to the hereinafter challenged deliberately indifferent policies, decisions, widespread habits, customs, usages, and practices.

15. At all times relevant hereto, Defendant Edward Benavidez was a citizen of the United States and a resident of the State of Texas and was acting under color of state law in his capacity as a law enforcement officer employed by the Defendant County and/or the Galveston County Sheriff Department. Defendant Benavidez is sued individually.

16. Venue in Galveston County is proper in this cause under Section 15.002(a)(1) of the Texas Civil Practice and Remedies Code because all or a substantial part of the events or omissions giving rise to this lawsuit occurred in this county.

3

## IV. FACTS

### A.  Dennis Benson Incident

17. Our investigation of the facts and circumstances reveals the following.  On Thursday, July 11th, 2019, at around 9:30 a.m., Deputy Steadham observed Dennis Benson sitting in the back of the 405th court room.

18. Deputy Steadham advised Mr. Benson that there was an active warrant for his arrest, and he would be taken into custody.

19. Mr. Benson was transported to the jail around 10:15 a.m. by Deputy Minetti.

20. Deputy Minetti stated that as they walked through the tunnel, Mr. Benson confessed that he had swallowed a baggy of ecstasy.

21. By the time Deputy Minetti dropped off the last person, Mr. Benson was complaining of chest pains and dryness of the mouth.

22. Upon entering booking, Mr. Benson was placed where new arrestees are kept prior to being medically cleared for incarceration.

23. Deputy Minetti stated by this time Mr. Benson was complaining of shortness of breath.

24. Deputy Minetti advised jail medical staff, Jared Head, that Mr. Benson stated that he had swallowed a baggy of ecstasy.

25. Mr. Head took Mr. Benson's vitals, during which time he kept complaining about shortness of breath and dryness of mouth.

26. Mr. Head advised Deputy Minetti that he did not believe that Mr. Benson would be accepted into the jail, but he had to get confirmation from the doctor.

27. Deputy Minetti then advised his supervisor, Sergeant Campbell, that jail medical might refuse Mr. Benson.

28. After speaking with Sergeant Campbell, Deputy Minetti then spoke with booking Sergeant Drewes.

29. He advised Sergeant Drewes that medical might refuse Mr. Benson and asked if she had a pair of shackles in case he needed to be sent to the hospital.

30. Deputy Minetti received a pair of shackles from Sergeant Drewes and waited for medical to confirm the refusal of Mr. Benson.

31. At approximately 10:55 a.m., Mr. Head advised that Mr. Benson would not be accepted into the jail and that he would be transported via ambulance to University Texas Medical Branch Galveston (UTMB).

32. Deputy Minetti contacted Deputy Steadham and informed him that Mr. Benson was being taken to UTMB and advised him that Sergeant Campbell needed him to accompany Mr. Benson.

33. Deputy Minetti stated that the EMS arrived at approximately 11:03a.m. and loaded Mr. Benson onto the stretcher where he was shackled and double locked.

34. Deputy Minetti stated that Deputy Steadham put his handcuffs on Mr. Benson.

35. Once Mr. Benson arrived at the emergency room, he was assigned to ER room #5.

36. Mr. Benson was moved onto the hospital stretcher from the ambulance stretcher.

37. Once on the hospital bed, Deputy Steadham readjusted the handcuffs on Mr. Benson, by removing the cuff from his left wrist while his right wrist was still handcuffed.

38. Deputy Steadham then moved the open cuff and secured it to the bed rail.

39. While in the emergency room Mr. Benson continuously complained to hospital staff, that his stomach was hurting due to him ingesting a large quantity of drugs.

40. Mr. Benson then stated that he needed to use the restroom for a bowel movement.

41. Deputy Steadham and Mr. Benson walked to the restroom just west of the east nurse's station in the ER.

42. Mr. Benson was shackled the entire time.

43. Mr. Benson went into the restroom and once he was finished, he was escorted back to ER room #5 by Deputy Steadham.

44. Mr. Benson got back onto the hospital bed and Deputy Steadham secured the handcuff back to his right wrist.

45. Deputy Steadham spoke with Sergeant Drewes on the phone sometime close to 4 p.m. and advised her that the doctor was probably going to be releasing Mr. Benson at some point in the day.

46. Sergeant Drewes advised Deputy Steadham that she would have someone come and relieve him around 5 p.m.

47. Deputy Steadham stated that Deputy Benavidez arrived at the room around 5 p.m., to relieve him of duty.

48. Deputy Steadham stated that he updated Deputy Benavidez on Mr. Benson's' condition then recommended for Deputy Benavidez to put his handcuffs on Mr. Benson.

49. Deputy Steadham stated that Deputy Benavidez showed him that he did not have any handcuffs in his cuff case.

50. Deputy Steadham stated he got into a conversation with Deputy Benavidez about how to properly secure Mr. Benson, due to the fact he was known runner.

51. At some point after Deputy Benavidez arrived, video shows Mr. Benson shuffling out the room shackled, followed by Deputy Benavidez.

52. Kelli Allen stated that Mr. Benson headed down the emergency room hallway shackled and turned down the DECON hallway, which led to a dead end.

53. While coming back towards Deputy Benavidez, Ms. Allen stated that Mr. Benson gave sort of a football move avoiding Deputy Benavidez.

54. Ms. Allen stated that the ordeal in the DECON hallway lasted about two seconds.

55. Mr. Benson, shackled, was able to make it down the hall, through the emergency room and out the emergency room door exit.

56. Briana Menzies stated as Mr. Benson exited through the emergency room doors, Deputy Benavidez fired a shot that struck near Mr. Benson.

57. This intentional shot was confirmed by Preston Huff who stated he saw the officer fire the shot at Mr. Benson on the UTMB video camera.

58. At that point Ms. Menzies states that Mr. Benson puts his hands up and continued to move away from Deputy Benavidez.

59. UTMB video cameras confirm that Mr. Benson was walking away from Deputy Benavidez with his hands up.

60. Mr. Benson crosses over a cement barrier and falls.

61. As Mr. Benson is trying to push up off the ground, he is shoot by Deputy Benavidez for no apparent reason.

62. Deputy Benavidez admitted, in his statement, that he shot Mr. Benson because he was exhausted.

63. Ms. Allen, who was attending to Mr. Benson gunshot wound, told the police that he needed to be transported back up the emergency room ramp, which was in full range of the UTMB cameras.

64. Ms. Allen was told by campus police to take Mr. Benson through the unrecorded passageway, that was for wheelchairs only.

65. Mr. Benson stretcher got stuck and he lay bleeding until an ambulance arrived from the upper level.

66. Charge nurse Janelle Mallet stated that Ms. Menzies came to her visibly shaken by the fact, that the inmate was not properly secured to the bed.

67. Ms. Menzies stated that when she entered the room, the handcuffs where still on the bed and there was a full urinal bottle on the floor.

68. Ms. Mallet stated that was not good and she should report that to the detectives and her hospital superiors.

69. Deputy Benavidez gave several conflicting statements pertaining to this incident, none of which match the eyewitness testimony.

70. He even went as far as to try and cover up the crime by stating, that he accidentally discharged his firearm as he exited the emergency room.

71. Until this day, the Galveston County District Attorney Office has refused to turn over all of the videos in this case.

72. If you take the fact that Deputy Benavidez gave false statements to investigators, combined with the failed Texas Rangers investigation, and the Galveston County District Attorney's office failure to prosecute Deputy Benavidez, it could easily be considered a cover up.

73. A cover up, which we believe is motivated by Deputy Benavidez parents who are lifelong local police officials.

74. The above-described acts were done by the Defendants intentionally, knowingly, willfully, wantonly, maliciously and/or recklessly in disregard for Mr. Benson's federally protected rights and were done pursuant to the preexisting and ongoing deliberately indifferent official custom, practice, decision, policy, training, and supervision of the Defendant County and Defendant Trochesset acting under color of state law.

75. With deliberate indifference to the rights of citizens to be free from excessive force by police, the Defendant County and Defendant Trochesset have ongoingly encouraged, tolerated, ratified, and acquiesced to a dangerous environment of police brutality by:

a. failing to conduct sufficient training or supervision with respect to the constitutional limitations on the use of force;

 b. by failing to adequately punish unconstitutional uses of force;

c. by tolerating the use of unconstitutional force;

d. by ongoingly failing to investigate inmate complaints of excessive force properly or neutrally; and,

e. by tolerating, encouraging, and permitting collusive statements by involved officers in such situations.

76. It is the longstanding widespread deliberately indifferent custom, habit, practice and/or policy of the Defendant County and Defendant Trochesset sheriff deputies to use excessive force against individuals when such use is unnecessary and unjustified, as well as fail to supervise and to train deputies in the appropriate constitutional limits on the use of force, knowing that these members of law enforcement therefore pose a significant risk of injury to the inmates.

77. The Defendant County and Defendant Trochesset have attempted to publicly minimize and cover up the egregious record of excessive force by the Galveston County Sheriff Department by repeatedly informing County officials and the public that the Galveston County Sheriff Department use of force per incident is less than most major sheriff departments, whereas in fact the Galveston County Sheriff department has a practice of not following up on such complaints.

78. With deliberate indifference to the rights of inmates to be free from retaliation, the Defendant County and Defendant Trochesset have ongoingly encouraged, tolerated, ratified, and acquiesced to a dangerous environment of sheriff retaliation by:

a. failing to conduct sufficient training or supervision with respect to the protected rights of people in custody;

b. by failing to adequately punish retaliation by deputies against people in custody;

c. by tolerating the use of retaliation; and

d. by ongoingly failing to properly investigate the people who here in custody complaints.

79. It is the longstanding widespread deliberately indifferent custom, habit, practice and/or policy of the Defendant County and Defendant Trochesset to permit deputies to retaliate against individuals for exercising their constitutional rights, as well as to fail to supervise and to train deputies in the constitutional rights of individuals.

80. With deliberate indifference to the rights of individuals to be free from malicious prosecution, the Defendant County and Defendant Trochesset have ongoingly encouraged, tolerated, ratified, and acquiesced to the malicious prosecution and cover up efforts by sheriff deputies by failing to investigate inmate's complaints of deputy misconduct, instead accepting deputies accounts of events without question.

81. It is the longstanding widespread custom, habit, practice and/or policy of the Defendant County and Defendant Trochesset, to find no fault with deputy conduct as long as any story is given by the deputy, regardless of how incredible.

82. These final policy decisions by Defendant Trochesset in his role as the final delegated policy decision maker with respect to reviewing deputy misconduct create liability for Defendant County and Defendant Trochesset. They are also further evidence of the ongoing deliberately indifferent custom, habit, policy, decision, practice, training and supervision of the Galveston County Sheriff Department, the Defendant County and Defendant Trochesset of tolerating and encouraging lawlessness and disregard for the federal rights of inmates in their custody and citizens in their community.

83. As a direct and proximate result of the wrongful conduct of each of the Defendants, Plaintiff has been substantially injured. These injuries include, but are not limited to, loss of constitutional and federal rights, physical injuries, impairments and disfigurement, great pain, and emotional distress, and/or aggravation of pre-existing conditions, and ongoing special damages for medically/psychologically related treatment caused by the unconstitutional and moving forces concerted conduct of all these Defendants.

84. Mr. Benson is now an amputee from these injuries, with a large scare on his leg and all five of his toes cut off.

85. Mr. Benson also suffers persisting neurological damage and severe pain from his amputation, the extent of which has not yet been fully ascertained. Plaintiff also continues to suffer ongoing emotional distress, with significant PTSD type symptoms, including sadness, anxiety, stress, anger, depression, frustration, sleeplessness, nightmares, and flashbacks from being shot.

86. Plaintiff is also entitled to punitive damages on all of his claims against the individual Defendants personally to redress their willful, malicious, wanton, reckless and fraudulent conduct.

**B.  The County of Galveston's Notice of Prior Incidents of Excessive Force**

87.   The city had notice of a 2008 incident wherein a Galveston County Sheriff deputy used excessive force against an inmate.  Mr. Lacey filed suit against the County, alleging that his head was slammed into the cell bars, after he stopped to talk to another inmate.  Civil Action No. 3-06-0441 Lacey V. Galveston County Sheriff Department

88.   According to media sources, a federal jury concluded that four Galveston County Police Officers used excessive force while arresting Brandon Backe at a wedding.  Mr. Backe alleged that over twenty officers abused their positions of authority when they engaged in or fail to prevent multiple acts of unprovoked and unwarranted force on the very population they were sworn to protect.  In the Backe lawsuit it explains that the police department inherited by chief Wiley in 2008 was plagued with activities that were illegal and most of the time unethical.  Use of force was a big issue within the department itself and within the city administration more generally; earlier in 2008, the city council discussed numerous complaints against the department including police brutality.  In Backe the events of a single night provide, in essence, a self-contained case study on how and when numerous Galveston officers used force in the course of their discretionary duties. This incident while in some sense a single "episode" is properly conceived of as a laboratory for evaluating how pervasively and recklessly constitutional norms were disregarded by a sizable portion of the Galveston police force. With thirteen alleged victims, twenty alleged perpetrators or accomplices, and forty-nine separate alleged acts of police brutality, Plaintiff has identified a constellation of evidence from which a jury may divine

12

a pattern. This is more than sufficient to raise a fact issue on the existence of a custom or practice. Brandon Backe v. City of Galveston Civil No. 10-cv-388

89.   The city had notice of a 2009 incident wherein Galveston County Sheriff deputies used excessive force against an inmate.  Mr. Richardson filed suit against the County, alleging that he was assaulted by James Hobes after an altercation in the administrative segregation area. After that incident Mr. Richardson alleges that he was assaulted by Deputy William Kilburn, while being transported to medical for injuries he sustained from the first assault. Civil Action No. G-07-0039 Richardson V. Simmons.

90.   The city had notice of a 2009 incident wherein a Galveston County Sheriff deputy used excessive force while executing an arrest warrant.  Mr. Adolphus filed suit against the County, alleging that he was assaulted during his arrest.  Mr.  Adolphus claims that he was unnecessarily slammed to the ground.  Current police chief Henry Trochesset was charged with supervisory liability in the lawsuit, as he was present on the scene.  Civil Action No. 3-11-238.

91.   According to media sources, a Galveston County Sheriff Deputy was indicted for using excessive force against an inmate.  Deputy Jimmy Gillane was charged with official oppression for the 2010 incident. Chron.com

92.   The city had notice of a 2011 incident wherein a Galveston County Sheriff deputy used excessive force against an undercover officer in a drug sting.  Donnie Miller filed suit against the County, alleging that his nose was broken by members of a Special Crime Unit.  Mr. Miller claims, as he went to knees, one of the officers entering the house struck him in the face, with the butt of the shot gun.  Current police chief Henry Trochesset was named as one of the officers in the lawsuit.  Civil Action No. 3:2010cv00030- Document 30 (S.D. Tex. 2011)

93. According to media sources, Galveston County Police Officers used excessive force while arresting Reginal Davis for camping without a permit in 2013. Mr. Davis alleges that he was savagely beaten as his head held under water. Reginald Davis filed the federal lawsuit against the city of Galveston and officers Archie Chapman Jr. and Jose Santos for excessive force. The suit accuses the city of failing to properly train its officers. Chron.com "Reginald Davis Filles Lawsuit Alleging Police Brutality"

94. The city had notice of a 2016 incident wherein Galveston County Sheriff deputies used excessive force against an inmate. Mr. Springer filed suit against the County, alleging that he was assaulted by two guards after having a disagreement with one. Mr. Springer claims that he was thrown to the ground, repeatedly kicked, and punched, all why being handcuffed and shackled.   Civil Action No. 3:14-CV-300

95. According to media sources, a Galveston County Police Officer used excessive force while asking a Houston woman to leave a bar. Kaylie Gentry alleges that he was attacked by a uniform officer, while at Tsunami's bar. Ms. Gentry suffered a break in her Fibula and her Tibia. Ms. Gentry, who was a nurse, underwent two surgeries and had a half of dozen medal screws placed in her legs. ABC 13 Woman Claims Police Brutality: "I just couldn't stop crying. I was in pain. I couldn't walk"

96. According to media sources, in 2017, Jeronimo Zamora Jr., died after an altercation with sheriff deputies. Zamora wife called 911 because Mr. Zamora was having a medical emergency. Mr. Zamora eventually got scared and tried to get away from the deputies, but they would not let him leave. Mr. Zamora was severely beaten by the deputies, and he died from his injuries. ABC 13 "Family claims deputy killed a man having an anxiety attack"

97.   According to media sources, in 2020, Ariel Ledesma, was killed by Galveston County Sheriff Deputy Johnathan Wuneburger.  The indictment reads that Wuneburger recklessly caused the death of Ledesma, by pushing him with his hand or hands.  The other public account of what happened between the two men came from a custodial death report the sheriff's office filed with the Texas Attorney General's office.  The death report claims Ledesma attempted to leave his jail cell while its door was closed.  Wuneburger pushed Ledesma out of the doorway, causing him to fall backwards and hit his head.  Galveston County Sheriff Henry Trochesset decline to say whether he stood by the initial report of Ledesma's death.  Trochesset did not fire Wuneburger until the indictment was handed down.  Chron.con "Galveston County Sheriff Deputy indicted in 2020 death of jail inmate"

98.   According to media sources, Galveston County Police Officers used excessive force while arresting Andre Malone for having expired tags in 2021.  Mr. Malone alleges that he was pulled from his car, thrown to the ground, tased while being held by four officers, one of which beat him in his back repeatedly.  ABC 13 "Galveston Police accused of excessive force in traffic stop of Black Man over SLAB weekend"

## V. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELEIF
**Benson's claim for Assault - Offensive Physical Contact**
**(Against Defendant Edward Benavidez)**
**Benson would show:**

99. The defendant acted intentionally or knowingly:  Deputy Benavidez intentionally shot Benson, causing his toes to be amputated.

100. The defendant made contact with Benson's person:  Deputy Benavidez fired his gun causing his bullet to strike Benson's leg.

101. The defendant knew or reasonably should have believed that Benson would regard the contact as offensive or provocative:  Deputy Benavidez knew or should have believed that Benson would find being shot to be offensive contact.

102. The defendant contact caused injury to Benson:  Benson toes were amputated, and he has a large scar on his leg.

**SECOND CLAIM FOR RELEIF**
**Benson's claim for Intentional Infliction of Emotional Distress**
**(Against Defendant Edward Benavidez)**
**Benson would show:**

103. The defendants acted intentionally or recklessly:  Deputy Benavidez intentionally shot Benson causing serious bodily injury.

104.  The emotional distress suffered by Benson is sever:  Benson must live the rest of his life as an amputee.  Benson also has a scare from his knee to his foot. He now suffers from embarrassment, humiliation, and fear every time he leaves the house.

105. The defendants conduct was extreme and outrageous:  Deputy Benavidez shooting Benson was both extreme and outrageous.

106. The defendants conduct proximately caused Benson's emotional distress; and

107. No alternative cause of action would provide a remedy for the severe emotional distress caused by defendants.

16

## THIRD CLAIM FOR RELEIF
**Benson's claim for Negligence**
**(Against Defendant Edward Benavidez)**
**Benson would show:**

108. The defendant owed a legal duty to Benson:  The officer had a duty to keep Benson safe before and during his transport.

109. The defendant breached that duty:  The officer breached that duty when he assaulted Benson, shooting him in the leg; and

110. The breach proximately caused Benson's injuries:  The officer, in breaching his duty to Benson as stated above, caused Benson's injuries.

## FOURTH CLAIM FOR RELIEF
**42 U.S.C. § 1983 – Excessive Force in violation of the Fourth and Fourteenth Amendments**
**(Against Defendants Edward Benavidez, Defendant County, Henry Trochesset)**

111. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

112. 42 U.S.C. § 1983 provides that:

**Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .**

17

113.  Plaintiff in this action is a citizen of the United States and all of the individual sheriff deputy Defendants to this claim are persons for purposes of 42 U.S.C. § 1983.

114. All individual Defendants to this claim, at all times relevant hereto, were acting under the color of state law in their capacity as Galveston County Sheriff deputies and their acts or omissions were conducted within the scope of their official duties or employment.

115. At the time of the complained of events, Plaintiff had a clearly established constitutional right under the Fourth Amendment to be secure in his person from unreasonable seizure through excessive force.

116. Plaintiff also had the clearly established Constitutional right under the Fourteenth Amendment to bodily integrity and to be free from excessive force by law enforcement.

117. Any reasonable police officer knew or should have known of these rights at the time of the complained of conduct as they were clearly established at that time.

118. Defendant Benavidez's actions and use of force, as described herein, were objectively unreasonable considering the facts and circumstances confronting them and violated these Fourth Amendment rights of Plaintiff.

119. Defendant Benavidez's actions and use of force, as described herein, were also malicious and/or involved reckless, callous, and deliberate indifference to Mr. Benson's federally protected rights. The force used by Defendant Benavidez shocks the conscience and violated these Fourteenth Amendment rights of Plaintiff.

120. Defendant Benavidez unlawfully seized Mr. Benson by means of objectively unreasonable, excessive, and conscious shocking physical force, thereby unreasonably restraining Mr. Benson of his freedom.

121. The force used constituted deadly force in that it could have caused death and did cause serious bodily injury.

122. In this case, the Defendant used his authority to seize the Plaintiff. Specifically, Defendant, Benavidez, used excessive force and Mr. Benson was unreasonably seized.

123. The Defendant shot the Plaintiff in his leg, as he pushed up off the ground, hitting his femoral artery causing his toes to be amputated. The Defendant stated in his written statement that he shot Mr. Benson because he was tired.

124. The Defendant clearly used his show of authority to use physical force against the Plaintiff, and the Plaintiff's liberties were restrained.

125. Under the Fourth Amendment, when a law enforcement officer is pursuing a fleeing suspect, the officer may not use deadly force to prevent escape unless the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.

126. The use of deadly force to prevent escape is an unreasonable seizure under the Fourth Amendment, in the absence of probable cause that the fleeing suspect posed a physical danger.

127. Neither of the Defendants, Defendant County or Henry Trochesset, took reasonable steps to protect Plaintiff from the objectively unreasonable and conscience shocking excessive force of Defendant Edward Benavidez.

128. They are each therefore liable for the injuries and damages resulting from the objectively unreasonable and conscience shocking force of the deputy.

129. Defendants engaged in the conduct described by this Complaint willfully, maliciously, in bad faith, and in reckless disregard of Mr. Benson's federally protected constitutional rights.

130. They did so with shocking and willful indifference to Plaintiff's rights and their conscious awareness that he would cause Plaintiff severe physical and emotional injuries.

131. The acts or omissions of all individual Defendants were moving forces behind Plaintiff's injuries.

132. These individual Defendants acted in concert and joint action with each other.

133. The acts or omissions of Defendants as described herein intentionally deprived Plaintiff of his constitutional rights and caused him other damages.

134. These individual Defendants are not entitled to qualified immunity for the complained of conduct.

135. The Defendants to this claim at all times relevant hereto were acting pursuant to municipal/county custom, policy, decision, ordinance, regulation, widespread habit, usage, or practice in their actions pertaining to Plaintiff.

136. As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered actual physical and emotional injuries, and other damages and losses as described herein entitling him to compensatory and special damages, in amounts to be determined at trial. As a further result of the Defendants' unlawful conduct, Plaintiff has incurred special damages, including medically related expenses and may continue to incur further medically and other special damages related expenses, in amounts to be established at trial.

137. Plaintiff may suffer lost future earnings and impaired earnings capacities from the not yet fully ascertained sequelae of his amputated foot, in amounts to be ascertained in trial. Plaintiff is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs as allowable by federal law. There may also be special damages for lien interests.

138. In addition to compensatory, economic, consequential, and special damages, Plaintiff is entitled to punitive damages against Defendants Edward Benavidez under 42 U.S.C. § 1983, in that the actions of each of this individual Defendant have been taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Plaintiff.

**FIFTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Retaliation in Violation of the First Amendment**
**(Against Defendants Edward Benavidez, County of Galveston)**

139. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

140. 42 U.S.C. § 1983 provides that:

**Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be**

**subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .**

141. Plaintiff in this action is a citizen of the United States and all of the individual sheriff deputies Defendants to this claim are persons for purposes of 42 U.S.C. § 1983.

142. All individual Defendants to this claim, at all times relevant hereto, were acting under the color of state law in their capacity as Galveston County Sheriff Deputies and their acts or omissions were conducted within the scope of their official duties or employment.

143. At the time of the complained of events, the Plaintiff clearly established a constitutional right to be free from retaliation for the exercise of protected speech.

144. Any reasonable sheriff deputy knew or should have known of this right at the time of the complained of conduct as it was clearly established at that time.

145. Mr. Benson exercised his constitutionally protected right to be arrested without harm when he raised his hands.

146. Retaliatory animus for Ms. Benson fleeing was a substantially motivating factor in the excessive force used by individual Defendant Benavidez.

147. The excessive force used against Plaintiff in retaliation for his protected conduct would deter a person of ordinary firmness from continuing to engage in the protected conduct.

148. Defendant Edward Benavidez participated in this use of force as a means of retaliation for Mr. Benson taunting him while fleeing and the Defendant County and Defendant Trochesset did not take reasonable steps to protect Plaintiff from this retaliation.

149. They are each therefore liable for the injuries and damages resulting from the objectively unreasonable and conscience shocking force of the deputy.

150. Defendants engaged in the conduct described by this Complaint willfully, maliciously, in bad faith, and in reckless disregard of Mr. Benson's federally protected constitutional rights.

151. The acts or omissions of all individual Defendants were moving forces behind Plaintiff's injuries.

152. These individual Defendants acted in concert and joint action with each other by trying to cover up the details of the shooting incident.

153. The acts or omissions of Defendants as described herein intentionally deprived Plaintiff of his constitutional and statutory rights and caused him other damages.

154. Defendants are not entitled to qualified immunity for the complained of conduct.

155. The Defendants to this claim at all times relevant hereto were acting pursuant to municipal/county custom, policy, decision, ordinance, regulation, widespread habit, usage, or practice in their actions pertaining to Plaintiff.

156. As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered actual physical and emotional injuries, and other damages and losses as described herein entitling him to compensatory and special damages, in amounts to be determined at trial. As a further result of

the Defendants' unlawful conduct, Plaintiff has incurred special damages, including medically related expenses and may continue to incur further medically and other special damages related expenses, in amounts to be established at trial.

157. Plaintiff may suffer lost future earnings and impaired earnings capacities from the not yet fully ascertained sequelae of his foot amputation, in amounts to be ascertained in trial. Plaintiff is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs as allowable by federal law. There may also be special damages for lien interests.

158. In addition to compensatory, economic, consequential, and special damages, Plaintiff is entitled to punitive damages against each of the individually named Defendants under 42 U.S.C. § 1983, in that the actions of each of these individual Defendants have been taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Plaintiff.

## SIXTH CLAIM FOR RELIEF

**Violation of 42 U.S.C. § 1983 – Deliberately Indifferent Policies, Practices, Customs, Training, and Supervision in violation of the Fourth and Fourteenth (Against Defendant County and Defendant Trochesset)**.

159. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

160. 42 U.S.C. § 1983 provides that:

**Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction**

24

**thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .**

161. Plaintiff in this action is a citizen of the United States and Defendants to this claim are persons for purposes of 42 U.S.C. § 1983.

162. The Defendants to this claim at all times relevant hereto were acting under the color of state law.

163. Plaintiff had the following clearly established rights at the time of the complained of conduct:

a. the right to be secure in his person from unreasonable seizure trough excessive force, under the Fourth Amendment;

b. the right to bodily integrity and to be free from excessive force by law enforcement under the Fourteenth Amendment;

c. the right to exercise his constitutional rights of free speech under the First Amendment without retaliation; and,

d. the right to be free from malicious prosecution under the Fourth and Fourteenth Amendments.

164. Defendant Trochesset and Defendant County knew or should have known of these rights at the time of the complained of conduct as they were clearly established at that time.

165. The acts or omissions of these Defendants, as described herein, deprived Mr. Benson of his constitutional and statutory rights and caused his other damages.

166. The acts or omissions of Defendants as described herein intentionally deprived Plaintiff of his constitutional and statutory rights and caused his other damages.

167. Defendants are not entitled to qualified immunity for the complained of conduct.

168. Defendant Trochesset, and Defendant County were, at all times relevant, policymakers for the County of Galveston and the Galveston County Sheriff Department, and in that capacity established policies, procedures, customs, and/or practices for the same.

169. These Defendants developed and maintained policies, procedures, customs, and/or practices exhibiting deliberate indifference to the constitutional rights of inmate and citizens, which were moving forces behind and proximately caused the violations of Mr. Benson's constitutional and federal rights as set forth herein and in the other claims, resulted from a conscious or deliberate choice to follow a course of action from among various available alternatives.

170. Defendant Trochesset and Defendant County have created and tolerated an atmosphere of lawlessness, and have developed and maintained long-standing, department-wide customs, law enforcement related policies, procedures, customs, practices, and/or failed to properly train and/or supervise its deputies in a manner amounting to deliberate indifference to the constitutional rights of Plaintiff and of the public.

171. Considering the duties and responsibilities of those sheriff deputies that participate in transporting inmates and preparation of inmates reports on alleged crimes by deputies, the need for specialized training and supervision is so obvious, and the inadequacy of training and/or supervision is so likely to result in the violation of constitutional and federal rights such as those

described herein that the failure to provide such specialized training and supervision is deliberately indifferent to those rights.

172. The deliberately indifferent training and supervision provided by Defendant County and Defendant Trochesset resulted from a conscious or deliberate choice to follow a course of action from among various alternatives available to Defendant County and Defendant Trochesset and were moving forces in the constitutional and federal violation injuries complained of by Plaintiff.

173. "Deliberate indifference" is a standard of fault that requires a showing that government policy makers acted with conscious disregard for the obvious consequences of their actions.

174. If a training program does not prevent constitutional violations and a pattern of injuries develops, officials charged with the responsibility of formulating policy for the agency may be put on notice that a new program is needed and a failure to address the problem may constitute deliberate indifference.

175. In the absence of a pattern of violations, deliberate indifference may be inferred from the policy makers' continued adherence to a training program that they knew or should have known would fail to prevent violations in usual or recurring situations.

176. In such cases, the constitutional violation must be a highly predictable or plainly obvious consequence of the failure to train.

177. It is possible to discern three closely related requirements that must be met before a failure to train will constitute deliberate indifference to the constitutional rights of citizens.

178. First, the Plaintiff must show that policy makers know to a moral certainty that their employees will confront a given situation as opposed to rare or unforeseen events.

179. Second, the Plaintiff must show that the situation either presents the employee with a difficult exercise of judgement that training will make less difficult, or that there is a history of employees mishandling the situation.

180. There must be awareness of a problem that is susceptible to improvement through training.

181. Third, the Plaintiff must show that the wrong choice by the employee is likely to cause the deprivation of a citizen's constitutional rights.

182. Where a Plaintiff can establish all three elements, then it can be said that the policy maker should have known that inadequate training was "so likely to result in the violation of constitutional rights, that the policy makers can reasonably be said to have been deliberately indifferent to the need."

183. Mr. Bensons' case satisfies all three requirements.

184. First Defendant County and Defendant Trochesset new for a certainty that their deputies would encounter a situation where a person would try to escape their custody.

185. Defendant County and Defendant Trochesset knew that this situation was heightened when inmates were transported out of their facilities.

186. To protect the sheriff deputies and the public, deputies who are unarmed 90% percent of the time, are provided with a firearm.

187. Second the choice of when to use that firearm is left up to the deputy, whose guidance is a vague half of page policy on the use of deadly force, even though the issue shooting a fleeing suspect was decided in Tennessee v. Garner, 471 U.S. 1 (1985).

188. Finally, **Defendant County and Defendant Trochesset** knew that a fleeing suspect being unlawfully shot would deprive that suspect of their constitutional rights.

189. Apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the fourth amendment, and that its use to prevent the escape of all felony suspects is constitutionally impermissible.

190. Defendant County and Defendant Trochesset chose not to train their officers about the seriousness of people's right to be free from unreasonable deadly force.

191. Instead, Defendant County and Defendant Trochesset did the opposite. They provided their sheriff deputies with a vague policy that did not even mention how to handle a fleeing inmate.

192. Even though their deputies are armed for that very reason.

193. Galveston County Sheriff deputies do not carry firearms while transporting and dealing with thousands of inmates inside the county jail facility.

194. Most of the time these deputies who are in close contact with inmates, are outnumbered at 50 to 1, and they are not provided with a firearm.

195. The only time a firearm is provided to a deputy is when they are transporting an inmate outside of the jail, which is a usual and recurring situation they must deal with.

196. The reason that they are provided with a firearm, is because there is a higher chance that an inmate might try to escape, and Defendants County's' policy makers understood that.

197. Defendant County's' policymakers demonstrated deliberate disregard for people's rights not to be subjected to excessive force by not training its deputies on dealing with a fleeing inmate, and Dennis Benson's injuries resulted from officers' disregard of the same "sort" of right.

198. As a direct result of Defendants' County unlawful conduct, Plaintiff has suffered actual physical and emotional injuries, and other damages and losses as described herein entitling him to compensatory and special damages, in amounts to be determined at trial. As a further result of the Defendants' unlawful conduct, Plaintiff has incurred special damages, including medically related expenses and may continue to incur further medically or other special damages related expenses, in amounts to be established at trial.

199. Plaintiff may suffer lost future earnings and impaired earnings capacities from the not yet fully ascertained sequelae of his amputated foot, in amounts to be ascertained in trial. Plaintiff is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs as allowable by federal law. There may also be special damages for lien interests.

200. Finally, Plaintiff seeks appropriate declaratory and injunctive relief pursuant to 42 U.S.C. § 1983 to redress Defendants' above described ongoing deliberate indifference in policies, practices, habits, customs, usages, training and supervision with respect to the rights described herein, and with respect to the ongoing policy and/or practice of the Galveston County Sheriff Department of failing to investigate or appropriately handle complaints of the same,

which Defendants have no intention for voluntarily correcting despite obvious need and requests for such correction.

**SEVENTH CLAIM FOR RELIEF**
**Violation of 42 U.S.C. § 1983 – Monell Liability**
**(Against Defendant County and Defendant Trochesset)**.

201.  Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

202. Galveston County Sheriff Department, the County Judge and the Commissioners Court is "vested with all the powers of said Defendant County connected with an incident to the establishment, maintenance, appointment, removal, discipline, control, and supervision of its sheriff department, subject to the limitations herein contained and the provisions of the Defendant County's policy, and may make all needful rules and regulations for the efficiency and discipline, and promulgate and enforce general and special orders for the government of the same, and have the care and custody of all public property connected with the Sheriff Department of the Defendant County.

203. The County Judge, Commissioners Court, and the Chief of the Sheriff Department had final policymaking authority with regard to establishing written policies and training programs governing the conduct of Galveston County Sheriff deputies performing policing functions on behalf of the Defendant County.

204. The County Judge, Commissioners Court, and the Chief of the Sheriff Department established and/or approved of Galveston County Sheriff Department's written policies and training governing the conduct of Defendant County deputies performing policing functions.

205. The written policies and training established and/or approved by the County Judge, Commissioners Court, and the Chief of the Sheriff Department constitute the official policy of the Defendant County and were the moving force behind and caused Plaintiff's injuries.

206. The Defendant County, acting by and through its County Judge, Commissioners Court and/or other policymakers, had knowledge of Galveston County Sheriff Department's unconstitutional patterns and practices and knowledge that the same gave rise to a risk of violations of citizens' federal rights.

207. The Defendant County, acting by and through its County Judge, Commissioners Court and/or other policymakers, made a deliberate and/or conscious decision to disregard the known risk that would result from Galveston County Sheriff Department's unconstitutional patterns and practices and was deliberately indifferent to and/or tacitly authorized the same.

208. On or prior to June 11, 2019, Defendant County, with deliberate indifference to the rights of arrestees, detainees, and the like, tolerated, permitted, failed to correct, promoted, or ratified a number of customs, patterns, or practices that failed to provide for the safety of arrestees, detainees, and the like during arrest and transport, including but not limited to the handcuffing and restraint process.

209. On or prior to June 11, 2019, Defendant County, with deliberate indifference to the rights of arrestees, detainees, and the like, tolerated, permitted, failed to correct, promoted, or ratified a number of customs, patterns, or practices that condoned and required officers to turn a blind eye to and not intervene with the use of excessive force by Galveston County Sheriff deputies.

210. On or prior to June 11, 2019, Defendant County, with deliberate indifference to the rights of arrestees, detainees, and the like, tolerated, permitted, failed to correct, promoted, or ratified a number of customs, patterns, or practices that shall be further identified in discovery.

211. Defendant County, with deliberate indifference to the rights of arrestees, detainees, and the like, continued to employee Edward Benavidez despite knowledge of his unconstitutional, unlawful, or other improper conduct.

212. Defendant County had to the power to terminate or appropriately discipline Deputy Benavidez for his misconduct but failed to do so despite the County's knowledge of his unlawful use of excessive force.

213. By refusing to terminate Deputy Benavidez, Defendant County caused Benavidez and other deputies to act with impunity and without fear of retribution.

214.  Defendant Counties' failure to terminate or properly discipline Deputy Benavidez is part of its larger custom, police, or practice of failing to supervise, terminate, or properly discipline its officers for unconstitutional, unlawful, or otherwise improper conduct, and thereby encouraged Benavidez, to engage in this unlawful act towards Mr. Benson.

215. On or prior June 11, 2019, Defendant County, with deliberate indifference to the rights of arrestees, detainees, and the like, tolerated, permitted, failed to correct, promoted, or ratified its agents, including Defendant Trochesset providing improper and harmful training to deputies.

216. Defendant County had to the power to terminate or appropriately discipline Defendant Trochesset but failed to do so despite the County's knowledge of Defendant Trochesset's perpetuation of dangerous ideology to deputies.

217. By refusing to terminate or discipline Defendant Trochesset or denounce his ideology, Defendant County caused deputies to act with impunity and without fear of retribution.

218. The unconstitutional policies, practices, and customs defined herein were the moving force behind Mr. Benson's injuries.

219. Mr. Benson was injured as a direct and proximate result of the acts and omissions by Galveston County.

220. As a direct and proximate result of the acts and omissions described herein, Mr. Benson suffered compensatory and special damages as defined under federal common law and in an amount to be determined by jury.

221. Plaintiff is entitled to recovery of costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## EIGHTH CLAIM FOR RELIEF
**Violation of 42 U.S.C. § 1983 – Canton Liability**
**(Against Defendants County and Defendant Trochesset)**.

222.  Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

223. Galveston County failed to properly train or modify its training to Defendant Deputies and its other deputies, including but not limited to, matters related to the proper transport of inmates outside the jail facility along with the reasonable and appropriate use of force when arresting a fleeing inmate.

224.  Subduing an inmate, using force to capture an inmate, and transporting and maintaining control of an inmate outside the facility is a usual and recurring situation with which Galveston Sheriff deputies and other agents encounter on a regular basis.

225. The Defendant County policy makers know to a moral certainty that their police sheriff deputies will be required to arrest fleeing inmates.

226. The Defendant County has armed its deputies with firearms, in part to accomplish this task.

227. The need to train officers in the constitutional limitations on the use of deadly force can be said to be 'so obvious' that a failure to do so would properly be characterized as 'deliberate indifference' to constitutional rights.

228. Galveston County policymakers chose not to train their officers about the seriousness of people's right to be free from unreasonable deadly force.

229. Instead, Galveston County's policymakers did the opposite.

230. They provided their deputies with a vague policy that did not even mention how to handle a fleeing inmate.

231. Even though their deputies are armed for that very reason.

232. Galveston County Sheriff deputies do not carry firearms while transporting and dealing with thousands of inmates inside the county jail facility.

233. Most of the time these deputies who are in close contact with inmates, are outnumbered at 50 to 1, and they are not provided with a firearm.

234. The only time a firearm is provided to a deputy is when they are transporting an inmate outside of the jail, which is a usual and recurring situation they must deal with.

235. The reason that they are provided with a firearm, is because there is a higher chance that an inmate might try to escape, and Defendant County's' policy makers understood that. Defendant county's' policymakers demonstrated deliberate disregard for people's rights not to be subjected to excessive force by not training its deputies on dealing with a fleeing inmate, and Dennis Benson's injuries resulted from officers' disregard of the same "sort" of right.

236. As such, Defendant County was aware of a need for more and different training. Galveston County specifically knew that its officers needed training regarding the use of deadly force and was required to provide its officers with such training.

237. Defendant County also specifically knew that its deputies needed specific training on the use of deadly force when apprehending a fleeing inmate, because it provided its deputies with firearms for that particular reason, therefore it has been deemed so obvious.

238. With deliberate indifference to the rights of citizens and inmates, Defendant County failed to provide adequate training to its deputies on the use of deadly force when apprehending a fleeing inmate.

239. Defendant County was aware that deprivation of the constitutional rights of citizens was likely to result from its lack of training and the failure to modify its training.

240. As such, Defendant County was deliberately indifferent and exhibited reckless disregard with respect to the potential violation of constitutional rights.

241. The failure to train and/or to appropriately modify training constituted official Galveston County Sheriff policies, practices, or customs.

242. Defendant County's failure to train and/or to modify training was behind the acts and omissions the Defendant deputy made toward Mr. Benson.

243. As a direct and proximate result of Defendant county's acts and omissions, Mr. Benson suffered injuries, experienced pain and suffering, and is now an amputee.

244. As a direct and proximate result of the acts and omissions described herein, Mr. Benson suffered compensatory and special damages as defined under federal common law and in an amount to be determined by jury.

245. Plaintiff is entitled to recovery of costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## VI. DAMAGES FOR PLAINTIFF, DENNIS BENSON

246. As a direct and proximate result of the occurrence made the basis of this lawsuit, Plaintiff, Dennis Benson, was caused to suffer physically and emotionally, and to incur the following damages:

A. compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

B. economic losses on all claims allowed by law;

C. special damages in an amount to be determined at trial;

D. punitive damages on all claims allowed by law against Defendant Edward and in an amount to be determined at trial; and

E. attorneys' fees and the costs associated with this action under 42 U.S.C. § 1988.

## VII. JURY DEMAND

247. Benson demands a jury trial and tenders the appropriate fee with this petition.

## VIII. REQUEST FOR DISCLOSURE

248. Under Texas Rule of Civil Procedure 194, Benson requests that the defendants disclose, within 50 days of the service of this request, the information or material described in Rule 194.2.

## IX. OBJECTION TO ASSOCIATE JUDGE

249. Benson objects to the referral of this case to an associate judge for hearing a trial on the merits or presiding at a jury trial.

## PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff, Dennis Benson, respectfully prays that the Defendants be cited to appear and answer herein, and that upon a final hearing of the cause, judgment be entered for the Plaintiff against Defendants, jointly and severally, for damages in an amount within the jurisdictional limits of the Court; together with pre-judgment interest at the maximum rate allowed by law; post-judgment interest at the legal rate, costs of court; and such other and further relief to which the Plaintiff may be entitled at law or in equity.

**PLAINTIFF HEREBY DEMANDS TRIAL BY JURY**

Respectfully Submitted,


\_\_\_/s/ Jarvis Rice_____

Jarvis Rice
State Bar Number:  24103597
3306 Manzanita Lane
Manvel, TX 77578
Tel. (409) 888-0006
Fax (832) 336-5954
attorneyjarvisrice@gmail.com
ATTORNEY FOR DENNIS BENSON