**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**GALVESTON DIVISION**

| | | |
|---|---|---|
| **DENNIS REYNARD BENSON** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **No. 3:21-CV-00200** |
| **v.** | § | |
| | § | |
| **COUNTY OF GALVESTON,** | § | |
| **EDWARD BENAVIDEZ, Individually** | § | |
| **HENRY TROCHESSET, In his** | § | |
| **Official Capacity** | § | |
| | § | |
| **Defendants** | § | |

**DEFENDANTS', GALVESTON COUNTY'S AND HENRY TROCHESSET'S, IN**
**HIS OFFICIAL CAPACITY, MOTION FOR SUMMARY JUDGMENT**

TO THE HONORABLE DISTRICT JUDGE JEFFREY V. BROWN:

Defendants, County of Galveston and Henry Trochesset, in his official capacity, [1]
(collectively, "County Defendants"), file this Motion for Summary Judgment, and in
support thereof, respectfully show as follows:

## I. CASE AND PROCEDURAL SUMMARY

1.      Plaintiff, Dennis Benson, ("Benson") sued County Defendants, and ex-
Deputy Edward Benavidez ("Benavidez") under 42 U.S.C. §1983 ("Section 1983") related
to injuries he sustained when he escaped from custody and was shot by Benavidez. [ECF

---

[1] As noted earlier by this Court [ECF No. 34, at 4], a claim against the Sheriff in his
official capacity is simply a suit against the County. *Goodman v. Harris Cnty.*, 571 F.3d
388, 394 (5th Cir. 2009); s*ee also, Chavez v. Alvarado*, 550 F. Supp. 3d 439, 450 (S.D.
Tex. 2021) ("Because the plaintiffs are suing the City of Houston, their official-capacity
claims against the individual officers are redundant and are dismissed."); *Holland v. City
of Houston*, 41 F. Supp. 2d 678, 689 (S.D. Tex. 1999).

No. 12].  As noted in the Court's Minute Order of June 16, 2022 relating to Defendants' Motion to Dismiss, Benson reduced his various "claims" in his First Amended Complaint ("FAC") against the County Defendants to one Section 1983 claim.[2] [Minute Entry – June 16, 2022].  He now maintains that County Defendants have an alleged policy, custom and practice of permitting excessive force and that Benson was injured due to the County Defendants' policy of failing to train peace officers in the use of force and/or refusing to investigate and discipline peace officers.

2.      Discovery closed in this case on August 12, 2022. [ECF No. 18].   Trial is to be set within sixty (60) days of December 9, 2022. *Id*.

3.      No genuine issues of material fact exist here.  Benson cannot produce evidence that remotely suggests he can meet the heavy burdens required to prove his Section 1983 Municipal Liability claim.  Benson cannot present sufficient evidence to show a genuine issue of fact that any alleged unconstitutional policy, custom or practice of Galveston County exists, that any Galveston County policymaker was deliberately indifferent or that any policy was the moving force of his injury.  Based on the absence of law or fact supporting Plaintiff's claims, summary judgment is warranted.

## II. <u>UNDISPUTED FACTS</u>

---

[2] The relevant text of that Minute Entry states: "Plaintiff agreed to dismiss without prejudice the direct claims for excessive force (Fourth Claim for Relief) and retaliation (Fifth Claim for Relief) against Galveston County and Henry Trochesset. The direct claims for excessive force (Fourth Claim for Relief) and retaliation (Fifth Claim for Relief) remain against Defendant Edward Benavidez.  The parties also agreed that the Sixth, Seventh, and Eighth Claims for Relief in Plaintiffs First Amended Complaint will be consolidated into a Sixth Claim for Relief: Violation of Section 1983 Against Galveston County and Henry Trochesset. There will be no separate Seventh or Eighth Claim for Relief."

A. **Benson Escapes Custody And Is Injured During Pursuit.**

4.      On July 11, 2019, Benson was arrested at the County Courthouse due to an outstanding warrant and taken to the Galveston County Jail for booking. (FAC [ECF No. 12] at ¶¶ 17-19).  When Benson told officers he swallowed a baggy of ecstasy he was taken to UTMB and monitored there by doctors and Galveston County Sheriff's Office ("GCSO") Deputy Steadham. (*Id*. at ¶¶ 20, 23, 33-37).

5.      Later in the day, Deputy Benavidez relieved Steadham watching Benson at UTMB. (Ex. 4 (*Benavidez Dep.*) at 32:12-33:5).  On two occasions, Benson asked to use the restroom to "defecate" and Benavidez uncuffed Benson and accompanied him to the facilities.  (*Id*. at 37:9-37:24).

6.      After the second trip to the bathroom, Benson pushed Benavidez back and broke away from him. (*Id*. at 39:1-5).  Benson headed down the hallway, but Benavidez was able to grab him when Benson ran into a dead-end room. (*Id*. at 41:4-11).  When Benavidez attempted to secure Benson, the two scuffled and fell down with Benson on top of Benavidez. (*Id*. at 41:12-20).  Benson then got up and ran out of the emergency room and out of the exit. (FAC [ECF No. 12] at ¶¶ 55-56).

7.      Benavidez followed Benson out of UTMB and drew his weapon at which time it discharged. (Ex. 4 (*Benavidez Dep.*) at 43:5-25).  Fatigued by the altercation in the hospital room, Benson stopped running but continued to walk quickly away from Benavidez who followed him. (*Id*. at 45:16-46:3).  Benavidez continued shouting orders at Benson to "stop", "get on the ground" and "please stop" during the entire chase. (*Id*. at 113:20-114:24).  Benson eventually climbed over cement barriers and fell into a parking

garage area. (*Id*. at 46:4-11; FAC [ECF No. 12] at ¶ 60).     Benavidez once again ordered Benson to stay on the ground; when he did not, Benavidez fired a shot hitting Benson in the leg.  (*Id*. at 46:16-47:5).

8.     When notified of the shooting, Sheriff Trochesset contacted the Texas Rangers to request an independent investigation of it. (Ex. 1 (*Trochesset Decl.*) at ¶ 19).

9.     Benavidez felt justified in using deadly force as he believed Benson was an immediate threat to the public as an escaped felon under heavy narcotics and due to Benson's unpredictable behavior. (Ex. 4 (*Benavidez Dep.*) at 51:25-52:20).  Benavidez testified that he was trained on the use of force standard at the "police academy" with follow up training from GCSO and reviewing its policies. (*Id*. at 51:6-24, 100:13-101:12).

10.     After the Texas Rangers completed their investigation, the matter was presented to a grand jury in Galveston County, Texas which "no billed" Benavidez on or about May 4, 2021. (Ex. 1 (*Trochesset Decl.*) at ¶ 19).

11.     Benson pled guilty to a charge of escaping while in custody for a felony under Texas Penal Code 38.06(c), a third degree felony.

12.     After a final review, Benavidez was terminated from GCSO in connection with the Benson matter. (*Id*. at ¶ 20).

**B.  GCSO TCOLE Training Requirements for GCSO Peace Officers.**

13.     GCSO assures that each of its peace officers satisfactorily meet TCOLE training guidelines and requirements before performing any peace officer functions. (Ex. 1 (*Trochesset Decl.*) at ¶ 11; Ex. 2 (*Martinez Decl.*) at ¶ 12).  Each GCSO peace officer must have and maintain their peace officer license in accordance with TCOLE and State of Texas

peace officer training standards. (Ex. 1 (*Trochesset Decl.*) at ¶ 11).  Among many other things, the basic peace officer course specifically instructs candidates on the Constitution and criminal justice system, the Texas Code of Criminal Procedure and Penal Code, use of force, mechanics of arrest and use of firearms. (Ex. 2 (*Martinez Decl.*) at ¶ 8); (Ex. 3 (*Rowe Decl.*) at ¶ 15).  Peace officer candidates are trained on the legal standards applied in use of force situations including guides on when and how much force is permissible. (*Id.*; Ex. 4-A (*Basic Peace Officer Training Materials*) at Benson002214-2221[3]).  Only after completing full course requirements and passing a TCOLE licensing exam is a candidate, like Benavidez, licensed and allowed to work as a peace officer at GCSO. (Ex. 1 (*Trochesset Decl.*) at ¶ 12; Ex. 3 (*Rowe Decl.*) at ¶ 12).  At the time he was hired by GCSO in 2011, Benavidez had completed 81 hours of peace officer coursework at Galveston College, passed the TCOLE peace officer licensing exam and was professionally licensed through TCOLE. (Ex. 2-A (*Benavidez TCOLE Status Report*) at Benson 000249; Ex. 3 (*Rowe Decl.*) at ¶ 12; Ex. 4 (*Benavidez Dep.*), at 115:12-116-15).

14.    TCOLE also requires continued education of at least 40 hours every two years, part of which typically involves updates on the law. (Ex. 2 (*Martinez Decl.*) at ¶ 10).  GCSO monitors continuing compliance of its peace officers through GCSO records and a TCOLE system, which tracks officer compliance and informs GCSO if an officer fails to maintain compliance. (Ex. 2 (*Martinez Decl.*) at ¶ 12).  GCSO also provides use of force

---

[3] References to documents attached to each declaration refer to the bates number appearing at the bottom right of the document.

training through GCSO's continuing education training program, providing guidance to officers on how to apply their training in the performance of their duties. (*Id*. at ¶ 15).

15.     TCOLE standards of qualification and training are generally regarded by law enforcement agencies and courts as meeting constitutional requirements for employing peace officers. (Ex. 1 (*Trochesset Decl.*) at ¶ 12; Ex. 2 (*Martinez Decl.*) at ¶¶ 13-14).

**C.     Description of GCSO Policies and Procedures.**

16.     GCSO has policies ("Policies") and standards of operation procedures ("Procedures") to provide supervision and control over the agency. (Ex. 1 (*Trochesset Decl.*) at ¶ 3, 5).  The Policies and Procedures provide resources to GCSO deputies in performing their duties. (*Id*.).  GCSO officers are provided and instructed to read the Policies and Procedures, are required to follow them, are checked for compliance by supervisors, and are subject to discipline if they fail to do so. (*Id*. at ¶¶ 3, 6).

17.     GCSO Policy GC 201 pertains to Use of Force. (Ex. 3 (*Rowe Decl.*) at ¶ 5). Section 201.2 informs GCSO officers that officers shall use only force necessary to effectively bring an individual or incident under control, while protecting the lives of the officer and others.  (*Id*.).  Section 201.01 informs officers of the purpose of the use of force policy*,* which is to provide officers with guidelines concerning the appropriate use of deadly and non-deadly force. (*Id*.).  Section 201.03.C states that in deciding whether to use a level of force, the officer should evaluate each situation in light of the known circumstances, and 201.04.A.2 states that decisions are based on an "objectively reasonable" standard. (*Id*.; Ex. 1 (*Trochesset Decl.*) at ¶ 7).  Section 201.04.B.1 further informs officers they are authorized to use deadly force to protect the officer or others from

what is reasonably perceived to be an imminent threat of death or serious bodily injury to the officer or another. (*Id.*).

18.     Under GCSO's Procedures Section 400.10 Section III.B concerning Security and Control during an Escape, officers are to use the Section 201 Use of Force policy and procedures in dealing with an escapee. (Ex. 3 (*Rowe Decl.*) at ¶ 7; Ex. 1 (*Trochesset Decl.*) at ¶ 8).

19.     The use of force Policy instructs on the standards required to protect detainees and escapees and under proper application safeguards them against violations of their constitutional rights or application of excessive force. (Ex. 1 (*Trochesset Decl.*) at ¶ 10).

20.     GCSO monitors compliance with and enforces policies and procedures through several supervisory ranks within GCSO which provides direct supervision of GCSO officers. (*Id.* at ¶ 18).  This GCSO system of hierarchy provides for supervision of subordinate officers and Benavidez was also subject to supervision and review by his superiors. (*Id.*).  Through supervision and training at various levels, including field training, GCSO's officers and supervisors are informed that violation of law, or GCSO policy or procedures will likely subject an offending officer or supervisor to disciplinary action, including suspension, demotion or termination in appropriate circumstances. (*Id.*).  Sheriff Trochesset is not aware of any information which suggests GCSO's supervision or training programs were or are inadequate to guide officers and inform them that they were required to perform their duties within constitutional requirements. (*Id.*).

21.     GCSO officers are also subject to both independent investigation and discipline for alleged misconduct. (*Id*. at ¶ 19).  Sheriff Trochesset contacted the Texas Rangers and personally requested an independent investigation of the Benson matter. (*Id*.). GCSO has specific policies on discipline and complaint review processes. (*Id*. at ¶ 20). GCSO Office of Professional Standards conducted an internal review of the shooting involving Benavidez and Benson. (*Id*.).  The matter was further reviewed by a GCSO Administrative Action Committee which recommended that Benavidez be terminated as a result of the incident, and his GCSO employment was terminated. (*Id*.).

22.     There is no policy, procedure, custom or practice, written or unwritten, at GCSO allowing, tolerating or encouraging the use of excessive force. (*Id*. at ¶ 21; *see also*, Ex. 2 (*Martinez Decl.*) at ¶ 22; Ex. 4 (*Benavidez Dep.*) at 76:23-78:1).  GCSO does not have any policy that directs, or even authorizes, its peace officers to violate state or federal law or constitutional protections. (Ex. 1 (*Trochesset Decl.*) at ¶ 21; Ex. 2 (*Martinez Decl.*) at ¶ 22).  To the contrary, GCSO demands through its policies and procedures that GCSO's peace officers comply with the requirements of constitutions and laws of the United States and Texas. (*Id*.).  The documented GCSO Policies and Procedures are very clear on this issue and every GCSO officer is required to take an oath of office pledging compliance with constitutional principles. (*Id*.).  GCSO has never condoned or permitted excessive force by any GCSO officer over the last 38 years. (*Id*.).

23.     There is no policy, written or unwritten, of refusing to investigate and/or discipline GCSO officers when circumstances warrant it. (Ex. 1 (*Trochesset Decl.*) at ¶ 22). In fact, officers are subject to both internal investigations and investigation by outside

entities and, as was the case with Benavidez, are subject to discipline including termination. (*Id*.).

**D.   Expert's Agreement On Adequacy Of TCOLE Training And Policies.**

24.     Lubbock County Sheriff, Kelly Rowe, is an expert in jail operations and standards having served as the Commissioner to the Texas Commission on Jail Standards, past president of the Texas Jail Association. (Ex. 3 (*Rowe Decl.*) at ¶ 1).

25.     He concluded that Galveston County training requirements follow the proscribed standards set forth by TCOLE which meet and/or exceed the requirements for adequate training.  (*Id*. at ¶ 11).

26.     He confirms that TCOLE is mandated by the State of Texas to provide guidance to law enforcement agencies on peace officer training, and TCOLE appropriately does so within constitutional requirements which have been upheld by federal courts. (*Id*. at ¶¶ 13-14).  He further confirms that TCOLE basic peace officer training regarding use of force issues is primarily based upon applying state statutory standards like the Penal Code and Code of Criminal Procedure and judicial decisions interpreting the Supreme Court decisions of *Graham v. Connor* and *Tennessee v. Garner*. (*Id*. at ¶ 15).

27.     Based on his review, GCSO Policies and Procedures comply with standard law enforcement practices and procedures and are an appropriate policy for the use of force in a law enforcement setting. (*Id*. at ¶ 10).  He further opined that GCSO was not deliberately indifferent in its adoption and implementation of such policies, procedures or in the training or supervision of Benavidez. (*Id*. at ¶ 19).  Moreover, the policies reflect the best practices within the law enforcement community and amongst the various law

enforcement agencies as the same policies, procedures and training are accepted by accrediting organizations. (*Id.*). Such policies, procedures and training are deemed reasonably prudent and effective to ensure the safety of detainees, arrestees and the public. (*Id.*).

28.     Finally, Rowe opines that the specific shooting incident in question in this case was not a result of or caused by inadequate policies, procedures or training at GCSO. (*Id.* at ¶ 20). Rather, the case involves a claimed dispute over interpreting the level of threat Benson's actions posed to others, which is a question of perception, evaluation and decision. (*Id.* at ¶ 21). Indeed, Benavidez's position that he fired while having a reasonable belief that he should fear for the life of others makes clear that he was aware of use of force policy requirements and applicable standards. (*Id.*). A question of perception is not a matter of training and should not be attributed to GCSO's training or supervision program. (*Id.*).

### III. <u>ARGUMENT</u>

### A. <u>Summary Judgment Standard Generally.</u>

29.     Summary judgment is appropriate when the pleadings, affidavits and other summary judgment evidence show that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party can identify those portions of the record it believes demonstrate the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 322-25. Once a movant makes a properly supported motion, the burden shifts to the nonmovant to show that summary judgment should not be granted. *Id.*

30.     A moving party may also meet its summary judgment burden by pointing out the absence of evidence to support a nonmovant's case. *Celotex,* 477 U.S. at 325. Summary judgment is appropriate if there is a failure of proof concerning an essential element of the plaintiff's case on which plaintiff bears the burden of proof. *Id.* at 323. In this situation, the movant need not support its motion with affidavits negating the plaintiff's claim. *Id.* While any evidence and reasonable inferences are viewed in the light most favorable to the nonmovant on summary judgment, the nonmovant may not rest upon allegations in the pleadings, but must support the response to the motion with summary judgment evidence showing the existence of a genuine fact issue for trial. *Celotex*, 477 U.S. at 324; *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255-57 (1986).  Additionally, when a nonmovant fails "to address or respond to a fact raised by the moving party and supported by evidence," then the fact is undisputed. *Broad. Music, Inc. v. Bentley*, No. SA-16-CV-394-XR, 2017 WL 782932, at *2 (W.D. Tex. Feb. 28, 2017). "Such undisputed facts may form the basis for summary judgment." *Id.*

**B.  <u>Showing Municipal Liability Is A Heavy Burden.</u>**

31.     The summary judgment record establishes that County Defendants did not deprive Benson of any federally protected right even if, *arguendo,* he was so deprived of a constitutional right.  Accordingly, County Defendants cannot be held liable. *See Monell v. New York City Department of Social Services*, 436 U.S. 658, 694 (1978); *Snyder v. Trepagnier*, 142 F.3d 791, 795 (5th Cir.1998). "[U]nder § 1983, local governments are responsible only for 'their *own* illegal acts.'" *Connick v. Thompson*, 563 U.S. 51, 60 (2011). Galveston County cannot be held vicariously liable for its employees' actions. *Id*. To

11

support a claim against the County Defendants, Benson must **identify evidence** which shows: (1) an existing unconstitutional County policy;[4] (2) an actual connection between the identified policy and a County policymaker; and (3) that Benson was subjected to and injured by a constitutional violation (i.e. use of excessive force) because of the execution of the particular County policy identified. *Id*.; *Bennett v. City of Slidell*, 728 F.2d 762, 767 (5th Cir.) (en banc), *cert. denied*, 472 U.S. 1016 (1985).

32.     Importantly, "a plaintiff seeking to establish municipal liability on the theory that a facially lawful governmental action has led an employee to violate a plaintiff's rights [] must demonstrate that governmental action was taken with 'deliberate indifference' as to its known or obvious consequences." *Board of County Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 407, 117 S. Ct. 1382, 1390 (1997). "[P]roof of an inadequate policy, without more, is insufficient to meet the threshold requirements of § 1983." *Gonzalez v. Ysleta Independent School District*, 996 F.2d 745, 757 (5th Cir. 1993). "[M]unicipal liability must be predicated upon a showing of 'fault,' not merely 'responsibility.'" *Id*.

33.     "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a [governmental] actor disregarded a known or obvious consequence of his action." *Brown*, 520 U.S. at 410, 117 S. Ct. at 1391.  Mere negligence is insufficient to establish a

---

[4] "It is imperative that the policies for which municipal section 1983 liability is sought be specified in the trial court." *Piotrowski v. City of Houston*, 237 F.3d 567, 578-580 (5th Cir. 2001).  County Defendants object to Benson creating challenges to policies or claiming new policies or customs exist which are not clearly and specifically identified in the FAC.

constitutional deprivation. *Daniels v. Williams*, 474 U.S. 327, 328, 106 S. Ct. 662, 663 (1986); *Campbell v. City of San Antonio*, 43 F.3d 973, 977 (5th Cir.1995). To establish a claim, Benson must identify evidence showing not only an unconstitutional decision, but a decision by the County to violate the Constitution. *See Gonzalez*, 996 F.2d at 759. No such evidence exists in this case.

**C.** **Failure To Train: The County's Training Policy Is Facially Lawful And Constitutionally Sound.**

34.    While the Constitution provides protections from a governmental agency *causing a constitutional deprivation*, it does not, and could not, effectively require a governmental entity to enact a transcendent policy that would always prevent law enforcement officers from using excessive force. *See Roberts v. City of Shreveport*, 397 F.3d 287, 293 (5th Cir. 2005); *Pineda v. City of Houston*, 291 F.3d 325, 333 (5th Cir. 2002). Only when a governmental entity's failure to train an officer actually causes an injury, may it, in *certain very limited circumstances*, fairly be said to represent a policy for which a governmental entity may be held responsible. *Canton v. Harris*, 489 U.S. 378, 390 (1989). The basis for liability against a County under such circumstances is dependent upon the degree of fault evidenced by the government's action or inaction. *Brown v. Bryan County*, 219 F.3d 450, 459 (5th Cir. 2000).

35.    "To prevail on a failure to train theory a plaintiff must demonstrate: (1) that the municipality's training procedures were inadequate, (2) that the municipality was deliberately indifferent in adopting its training policy and (3) that the inadequate

training policy directly caused the violations in question." *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 170 (5th Cir. 2010) (internal quotations omitted).

> **1.     The training required by GCSO (and which Benavidez had) and GCSO's written policies relating to use of force have consistently been found to be legally adequate.**

36.     For evaluation of the adequacy of a policy and training program, "the focus must be on the adequacy of the training program in relation to the tasks the particular officers must perform." *Snyder*, 142 F.3d at 798.  "[F]or liability to attach based on an 'inadequate training' claim, a plaintiff must allege with specificity how a particular training program is deficient." Roberts, 397 F.3d at 293.  "In this inquiry, mere proof that the injury could have been prevented if the officer had received better or additional training cannot, without more, support liability." *Id*.  Benson has identified no specific deficiency with GCSO's training of peace officers, which should end the inquiry here.

37.     The Supreme Court has specifically determined that "[a] municipality's culpability for a deprivation of rights is **at its most tenuous** where a claim turns on a **failure to train**." *Connick*, 563 U.S. at 61 (emphasis added). [T]he 'policy' that [Benson] seeks to rely upon is far more nebulous, and a good deal further removed from the constitutional violation in *Monell* [*v. New York City Department of Social Services*, 436 U.S. 658, 98 S. Ct. 2018 (1978)]." *Oklahoma City v. Tuttle*, 471 U.S. 808, 822 (1985). The basis for liability against a County under such circumstances is dependent upon the degree of fault evidenced by the governmental entity's action or inaction. *Brown v, Bryan Cnty.*, 219 F.3d 450, 459 (5th Cir. 2000).

38.     *Tolan v. Cotton*, is instructive on analyzing adequacy of TCOLE training in this case. No. 4:09-CV-1324; 2015 WL 5310801, *2-3 (S.D. Tex, Sep. 11, 2015).  There the Court took judicial notice of Texas statutes finding that all peace officers in Texas are required by law to complete training and licensing requirements of the Texas Commission on Law Enforcement before serving as a peace officer. *See Id.*  The licensing and training standards established by TCOLE have been found to comply with constitutional requirements and are adequate to enable Texas peace officers to deal with usual and recurring situations peace officers encounter. *See Tolan*, No. 4:09-CV-1324; 2015 WL 5310801, *3 (citing *Benavides v. County of Wilson*, 955 F.2d 968, 973 (5th Cir. 1992)). TCOLE is required to establish and maintain training programs for peace officers. *Tolan,* 2015 WL 5310801, *3 (citing Tex. Occ. Code § 1701.251).  In order to obtain, and thereafter maintain, a peace officer license in Texas, each officer must satisfactorily meet TCOLE standards. *Id*.  Through section 1701.253 of the Texas Occupations code, the Texas Legislature has mandated that TCOLE establish a statewide comprehensive education and training program on civil rights [and use of force] which covers the laws of the state of Texas and of the United States pertaining to peace officers for all licensed law enforcement officers in Texas. *Id*.  Therefore, all law enforcement officers in Texas receive that training the State of Texas deems adequate to prepare officers to competently perform the duties of their office.  *Id*.  The Court eventually concluded the TCOLE training was adequate. *Id*.

39.     In this case, in addition to the training required through Texas statutes, the undisputed facts cited above demonstrate that GCSO officers, including Benavidez, must have TCOLE training, be professionally licensed peace officers, and also shows the

15

sufficiency of additional training through GCSO Policy reviews on use of force and use of deadly force. (*See* paras. 13-18, *supra*; Ex. 2-A (*Benavidez TCOLE Training Report*) at Benson 000249; Ex. 3 (*Rowe Decl.*) at ¶ 12; Ex. 4 (*Benavidez Dep.*), at 115:12-116-15). The summary judgment evidence undisputedly proves that Benavidez, like all other GCSO officers that are permitted to carry a weapon, was adequately trained through TCOLE in the use of firearms and use of force or deadly force standards, as well as many other job aspects.[5]  Standing alone, Benson's failure to identify any evidence showing the relevant GCSO training program is inadequate to train officers to perform the duties required of them is fatal to his failure to train claim. *See Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1950 (2009).  As in *Tolan*, summary judgment is appropriate here.

### 2. There is no evidence of County Defendants' deliberate indifference in adopting the training policies regarding use of force.

40.    Under the second prong of a failure to train case, Benson must show deliberate indifference by identifying evidence that a policy-making governmental official has knowledge of an alleged unconstitutional policy. *Pineda*, 291 F.3d at 330.  "The knowledge requirement applies with equal force where a section 1983 claim is premised on a failure to train or to act affirmatively." *Burge*, 336 F.3d at 370.  Moreover, where the official policy itself is facially valid, it ". . . must have been adopted 'with deliberate indifference to the known or obvious fact that such constitutional violations would result.'" *James v. Harris County*, 577 F.3d 612, 617 (5th Cir. 2009).

---

[5] (*See e.g.*, Ex. 4-A; Ex. 2 at ¶ 8; Ex. 3 at ¶ 15).

41.     Separate and apart from showing multiple instances of misconduct to support the existence of a practice or custom, Benson must demonstrate deliberate indifference through knowledge by a County policymaker of multiple events of unconstitutional conduct similar to what Benson experienced. *Pineda*, 291 F.3d at 330. As in *Pineda*,

> The plaintiffs argue that there is no distinction between proof of a pattern of unconstitutional conduct sufficient to constitute a customary policy and proof of constructive knowledge of such a policy. The cases do not support this argument. *Pineda*, 291 F.3d at 330 n. 13.

Awareness of multiple instances of unconstitutional conduct is the only way to establish the "deliberate indifference" prong.

42.     Evidence of Benson's single incident, being subjected to deadly force, cannot support a deliberate indifference finding.  "The Fifth Circuit held in *Thompson v. Upshur County*, 245 F.3d 447, 459-60 (5th Cir. 2001), that Fifth Circuit precedent makes clear that deliberate indifference on the part of a governmental policymaker cannot generally be shown from a single violation of constitutional rights or expert testimony." *Tolan v. Cotton*, No. 4:09-CV-1324; 2015 WL 5310801, *5 (S.D. Tex, Sep. 11, 2015).  The exception allowing a single incident is "extremely narrow." *Valle v. City of Houston*, 613 F.3d 536, 542 (5th Cir. 2010).  Indeed, in a failure to train case, a single-incident exception is generally reserved for egregious instances where the state actor was provided no training whatsoever. *Anokwuru v. City of Houston*, 990 F.3d 956, 966 (5th Cir. 2021) (citing *Peña v. City of Rio Grande City*, 879 F.3d 613, 624 (5th Cir. 2018)).  As summed up by the *Tolan* Court:

in 30 years the **only** case in which the Fifth Circuit Court upheld a finding of municipal liability based upon a single incident exception—a case **not involving** alleged merely *inadequate* training but absolutely *no training at all*—the court found a sheriff "had full notice of the full extent of [Deputy] Burns's exuberant and reckless background" and "his record of on-the-job conduct" which included force against "a number of arrest subjects," but the sheriff nonetheless provided Burns with **no training at all**.

*Tolan*, No. 4:09-CV-1324, 2015 WL 5310801, *5 (citing *Brown v. Bryan County*, 219 F.3d 450, 462 (5th Cir. 2000).

43.     This is not a case of "no" training permitting application of a single-incident exception.  To the contrary, expert Kelly Rowe's declaration proves the County reasonably relied on the fact that TCOLE has been declared by the State of Texas as the preeminent authority regarding peace officer training and that the County's officers are licensed and trained in accordance with TCOLE standards. (Ex. 3 (*Rowe Decl.*) at ¶¶ 11, 13-14, 19). Moreover, through that TCOLE training GCSO officers are provided specific instruction regarding the very matters at issue in this litigation, when force or deadly force may be used. (*Id*. at ¶ 15).  Additionally, although not mandated by law, GCSO officers routinely reviewed the use of force policy as part of annual qualifications.[6] (*Id*. at ¶ 18).

44.     Since GCSO deputies were provided substantial relevant training, the "unmistakable culpability" required under *Brown's* precedent does not exist in this case. *See Roberts*, 397 F.3d at 296.  In sum, only evidence of multiple and repeated instances of

---

[6] Statements of Expert Rowe's declaration related to the extensive training required by GCSO are incorporated by reference here.

a failure to train leading to shootings under circumstances similar to those Benson experienced can support a deliberate indifference finding.

45.     Benson fails the requirements of showing "deliberate indifference" by a County policymaker.  Failure to train claims have been consistently dismissed in this District where the plaintiff failed to show deliberate indifference through proof of a pattern of constitutional violations that has occurred in spite of the training program. *See Marshall v. Russell*, 391 F.Supp.3d 672, 695 (S.D. Tex. 2018); *see also*, *Chavez v. Alvarado*, 550 F.Supp3d 439, 459 (S.D. Tex. 2021)("plaintiff must 'demonstrate a pattern of conduct' consisting of 'at least a pattern of similar incidents in which the citizens were injured.'"); *Tolan*, No. 4:09-CV-1324, 2015 WL 5310801, *4-5 (S.D. Tex, Sep. 11, 2015).  The same proof is absent here.

46.     There is nothing showing a pattern of the same or similar conduct to be presented in the record of Benson's case, other than conclusory allegations.[7]  But, conclusory allegations are insufficient to defeat summary judgment. *Marshall*, 391 F.Supp.3d at 695. And, as in *Roberts* "[t]here is no evidence that [Benavidez himself] has been involved in any cases involving the improper use of deadly force." *See Roberts*, 397 F.3d at 295.  There is simply no supported evidence which indicates a County policymaker "was aware of any risk of injury" due to GCSO's training program on use of force, which is required to satisfy the element of deliberate indifference in the Fifth Circuit. *See Peterson v. City of Fort Worth*, 588 F.3d 838, 849 (5th Cir. 2009).

---

[7] To the extent Benson attempts to provide evidence of other incidents, such evidence must meet the standards discussed in Section III.E.1 and 2 (paragraphs 57-64), below.

47.    The record here fails to show a County policymaker was deliberately indifferent to a known need for training regarding any area at issue in this case.  Under the controlling legal standard as applied to the uncontroverted evidence, no jury could reasonably find an inadequacy in GCSO's training that is "so obvious" that a County policymaker could be said to be deliberately indifferent here. *Snyder*, 142 F.3d at 799. Summary judgment is appropriate.

**D.    Failure to Discipline or Supervise: The County/Sheriff Disciplinary and Supervision Policies Are Constitutionally Sound.**

48.    To the extent that Benson's vague references in the FAC can be read to assert a failure to supervise or discipline claim,[8] similar standards to those required of a failure to train claim must be met. *See e.g.*, *Piotrowski*, 237 F.3d at 581-582; *Marshall*, 391 F.Supp.3d at 695 ("A § 1983 claim for municipal liability is based on failure to supervise is evaluated in the same way as a claims based on a failure to train"); *Tolan*, No. 4:09-CV-1324, 2015 WL 5310801, *5-6 (S.D. Tex, Sep. 11, 2015). Benson cannot identify evidence showing that GCSO's supervision program was constitutionally deficient.  In order to support this claim, Benson must, but cannot, identify evidence which shows that the County Sheriff systematically failed to supervise its deputies, a causal connection existed between the alleged chronic failure to supervise officers and deprivation of Benson's constitutionally protected rights, and also that such failure to supervise was done by the County's policymaker through deliberate indifference. *Southard v. Texas Board of*

---

[8] *See* footnote 4, *supra*, stating County Defendants' objection to unpled matters.

*Criminal Justice*, 114 F.3d 539, 551 (5th Cir. 1997); *Baker v. Putnal*, 75 F.3d 190, 199 (5th Cir. 1996).

49.     The summary judgment evidence proves the contrary.  Adequate officer supervision begins with a sound foundation of adequate officer training and additionally extends from that solid footing.  As previously established, GCSO requires its peace officers to be certified through TCOLE, meaning they have attended many training courses that pertain to supervision of a law enforcement agency and officer training. (Ex. 1 at ¶ 11; Ex. 2 at ¶ 12).  Consistent with TCOLE requirements, GCSO requires that its supervising officers complete State mandated training and comply with GCSO Policy and Procedures. (Ex. 2 at ¶ 11).  Specifically, within a 24-month period of appointment as a supervisor, supervisors receive training regarding supervising officers. (*Id*.).  GCSO monitors compliance with and enforces its Procedures through several supervisory ranks within GCSO which provide supervision of officers. (Ex. 1 at ¶ 18).  Through supervision and training at various levels GCSO officers, and supervisors, are informed that violation of law, Policy, or Procedure will likely subject an offending officer or supervisor to disciplinary action, including suspension, demotion or termination in appropriate circumstances. (*Id*.).  Based on this undisputed evidence, GCSO's supervision program is constitutionally sound.

50.     As relates to Benson's failure to discipline or investigate allegations, the results of the investigation and discipline in the case at hand demonstrate that GCSO discipline and investigation processes are also sound.  First, the Policies in place at GCSO. GCSO officers are tracked with an employee conference record for personnel deficiencies

and are subject to Administrative Action Reports for more serious infractions of polices or involvement in illegal actions. (Ex. 1-C at Benson 000344-345).   Accordingly, GCSO officers know they may be subject to internal investigations and discipline for alleged misconduct. (Ex. 1 at ¶ 19).  Secondly, officers may be subject to independent investigation for their conduct. (*Id*.).  Thirdly, GCSO Policies were followed after the Benson shooting resulting in both independent and internal investigations.  Benavidez was subject to both an outside investigation by Texas Rangers, brought in by Sheriff Trochesset, and investigation by an internal GCSO administrative action committee in this case. (*Id*. at ¶¶ 19-20).  The independent investigation led to Benavidez being "no billed" by a Galveston, Texas grand jury, but Benavidez was terminated from GCSO through its internal review. (*Id*.).  Finally, GCSO is unaware of any prior complaints against Benavidez where he was alleged to have shot or used excessive force against another. (*Id*. at ¶ 17).  Benavidez has not been subject to investigation or discipline for excessive force in the past. (Ex. 4 at 18:16-19:15).  Benavidez' personnel records give no notice or expectation that Benavidez would be involved in allegations of an unjustified shooting. (Ex. 1 at ¶ 17).

51.     Again, cases analyzing a failure to investigate focus on instances where "purely formalistic investigations in which little evidence was taken, the file was bare and conclusions of the investigator were perfunctory." *Piotrowski*, 237 F.3d at 582.   Courts also look for evidence of patterns of complaints against the officer in question. *See Id.* Benson's case simply falls short.  An investigation resulting in termination can hardly be considered formalistic.  Moreover, there is no pattern of similar excessive use of force complaints against Benavidez. (Ex. 1 at ¶ 17).  The consistent evidence of GCSO practices

from those who have worked at GCSO and from the events resulting from Benson's shooting is that excessive force is not tolerated and is subject to investigation and discipline. (Ex. 1 at ¶¶ 20-22; Ex. 2 at ¶ 20, 22; Ex. 4 at 76:23-78:11).   In short, the undisputed facts leave no grounds under law applicable to Section 1983 municipal liability claims for a claim that GCSO failed to investigate or discipline here.

**E.**     **Tolerating Use of Excessive Force or Other Policies: No Evidence Supports Existence of a Policy or Custom Under *Monell* Municipal Liability Standards.**

52.     Benson vaguely alleges in conclusory fashion that GCSO has a policy or custom of tolerating the use of excessive force against individuals like Benson. (*See* [ECF No. 12] at ¶¶ 1, 75).  These allegations are simply not supported by material disputed facts permitting Benson's case to survive summary judgment.  As Benavidez was terminated after investigation, Benson's own experience cannot even be considered an example of GCSO "tolerating" excessive force.

53.     Galveston County has no policy or custom of allowing deputies to use excessive force. (Ex. 1 at ¶¶ 20-22; Ex. 2 at ¶ 20, 22; Ex. 4 at 76:23-78:11).  Rather, as aptly demonstrated above, GCSO has a Policy of requiring employees that perform peace officer functions to have and maintain a professional peace officer license through TCOLE, and to utilize the Policies and Procedures of GCSO along with updates, including the use of force Policy in Section 201.[9] (Ex. 1-A at Benson 000528).

54.     Contrary to Benson's allegations, GCSO's policy regarding excessive force speaks plainly as to when and what level of force can be used and does not permit excessive

---

[9] *See* Paras. 13-18, *supra*.

force. (Ex. 1 (*Trochesset Decl.*) at ¶ 7; Ex. 2 (*Martinez Decl.*) at ¶ 17; Ex. 3 (*Rowe Decl.*) at ¶ 5 ).  Accordingly, summary judgment is appropriate for County Defendants on a claim that Galveston County maintains a policy or custom tolerating the use excessive force.

55.    "Under the decisions of the Supreme Court and [the Fifth Circuit Court of Appeals, governmental] liability under Section 1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski*, 237 F.3d at 578. These attribution principles "are necessary to distinguish individual violations perpetrated by local government employees from those that can be fairly identified as actions of the government itself." *Id*. As the *Piotrowski* Court specifically discussed, "this is not an opaque requirement" and "[m]istakes in analyzing section 1983 [governmental] liability cases frequently begin with a failure to separate the three attribution principles and to consider each in light of relevant case law." *Piotrowski*, 237 F.3d at 578-79.

56.    To support a claim that the County violated Benson's rights, he must - but cannot - identify evidence which shows that the County had a constitutionally deficient policy, the Sheriff knew of the inadequate policy but nonetheless deliberately decided not to remedy the identified deficiency, and that the inadequate, uncorrected, known policy actually caused a deprivation of Benson's rights. *Id*. at 580.

### 1.    *No custom arises from an isolated incident like Benson's and no proof of widespread or pattern of similar events exists.*

57.    Benson's claims against the County Defendants must be dismissed because he complains of an isolated instance of alleged unconstitutional conduct of Benavidez, not

a County policy that could conceivably support liability. *See City of Oklahoma v. Tuttle*, 471 U.S. 808, 824, 105 S. Ct. 2427, 2436 (1985).  But, a County policy cannot be inferred from the isolated alleged constitutional deprivations evidenced by the record in this suit. *Webster v. City of Houston*, 735 F.2d 838, 851 (5th Cir. 1984) (en banc).  "Isolated violations are not the **persistent, often repeated, constant violations**, that constitute custom and policy as required for municipal § 1983 liability." *Bennett v. City of Slidell*, 728 F.2d 762 at 768 n. 3 (5th Cir. 1986) (emphasis added). Absent sufficient evidence to create a genuine issue of material fact showing a widespread and persistent policy, custom or practice summary judgment is appropriate. *Marshall*, 391 F.Supp3d. at 692.

58.    Benson must show a widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy. *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 847 (5th Cir. 2009).  Further,

> Where prior incidents are used to prove a pattern, they must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees.  It is thus clear that a plaintiff must demonstrate a pattern of *851 abuses that transcends the error made in a single case.  A pattern requires similarity and specificity; [p]rior indications cannot simply be for any and all bad or unwise acts, but rather must point to the specific violation in question.

*Id*. at 850-51 (internal citations and quotes omitted).

59.    The Fifth Circuit has identified "no rigid rule regarding numerosity to prove a widespread pattern of unconstitutional acts," *Jackson v. Valdez*, 852 F. App'x 129, 135 (5th Cir. 2021).  What is clear, however, is that a pattern and practice sufficient to give rise to a custom cannot be shown by reciting prior "bad or unwise acts" or incidents of conduct

without context. *See, e.g., Peterson,* 588 F.3d at 851  (twenty-seven alleged instances of excessive force over a four-year period were insufficient for the court to conclude that "the City maintained an official policy of condoning excessive force"); *Gonzales v. Nueces Cty., Tex.*, 227 F.Supp.3d 698, 705 (S.D. Tex. 2017) ("The lists of internal investigations of police misconduct charges that [Plaintiff] includes are devoid of any details to show that they share any facts similar to those involved here.").  Showing a pervasive pattern is a heavy burden. *Chavez v. Alvarado*, 550 F.Supp3d 439, 457 (S.D. Tex. 2021).  Benson can provide no context or otherwise meet the heavy burden of showing a widespread pattern here.

60.     Further, in addition to citing other incidents, there must be "similarity and specificity" of those incidents that point to the specific violation in question. *Peterson*, 588 F.3d at 851; *Kitchen v. Dallas Co.*, 759 F.3d 468, 484-85 (5th Cir. 2014), *abrogated on other grounds by Kingsley v. Hendrickson*, 576 U.S. 389 (2015) (conduct not demonstrated to be fairly similar).  Here, there is no evidence of GCSO tolerating excessive force incidences similar to Benson's where a detainee escaped from custody while outside the jail facility.  Moreover, it is absolutely indisputable that there were no prior complaints leading to a finding that Benavidez had previously used excessive force against anyone, let alone by using deadly force without justification, so there was no notice he was likely to shoot Benson, or anyone else without justification. (Ex. 1 (*Trochesset Decl.*) at ¶ 17; Ex. 2 (*Martinez Decl.*) at ¶ 20).  Absent proof of sufficient similarity, a prior incident should not support evidence of a custom. *Id*.

### 2. Sheriff Trochesset was not deliberately indifferent.

61.     Just as is required in a failure to train case, even if the record could reasonably be construed to evidence unconstitutional conduct that amounted to a policy of some sort, Benson's claims against the County still fail because the record disproves any culpability of the County's policymaker.  Municipal liability is limited to action for which *the government itself is responsible*, a dispositive point the Plaintiff fails to even address. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479, 106 S. Ct. 1292, 1298 (1986); *Spann v. Tyler Independent School District*, 876 F.2d 437, 438 (5th Cir. 1989).

62.     As stated earlier, the summary judgment evidence establishes that all the relevant GCSO policies and are facially constitutional.  Even where an alleged inadequate municipal policy exists, plaintiff still bears the burden of demonstrating knowledge of the policy by the municipality's policymaker. *Pineda*, 291 F.3d at 330.

63.     To the extent Benson relies on his single incident as proof of Sheriff Trochesset's deliberate indifference, his claim fails. *Thompson v. Upshur County*, 245 F.3d 447, 459-60 (5th Cir. 2001)(deliberate indifference on the part of a governmental policymaker cannot generally be shown from a single violation of constitutional rights or expert testimony").  Instead, Benson must show a pattern of similar excessive force situations. *See Marshall*, 391 F.Supp.3d at 692.  Short of that, deliberate indifference on the part of the government cannot be shown.

64.     The record fails to show that the Sheriff Trochesset was deliberately indifferent to a known policy of permitting excessive force in this case.  When the uncontroverted evidence is applied to the controlling legal standard, as enunciated by the Supreme Court and Fifth Circuit Court of Appeals *supra*, no jury could reasonably find

that Sheriff Trochesset (as policymaker) was deliberately indifferent so as to show the culpability required to support a claim against the County.  Thus, Benson's claims against the County fail because the evidence disproves the County's culpability.

## F.   There Is No Evidence That any Policy Or Custom Was The Moving Force Of A Constitutional Deprivation of Benson's Rights.

65.    The record also disproves any assertion that conduct by  Sheriff Trochesset or an existing unconstitutional policy or custom was a moving force that caused Benson to suffer a constitutional injury. *See James*, 577 F.3d at 618-19. It is crucial that the requirements of governmental culpability and governmental causation "not be diluted, for '[w]here a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into respondeat superior liability.'" *Piotrowski,* 237 F.3d at 579 (quoting *Snyder,* 142 F.3d at 798).  Benson cannot overcome summary judgment by arguing that,

> "an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal. *And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.*"

*See Pineda*, 291 F.3d at 333 (quoting *City of Canton v. Harris*).

66.    The record is barren of any evidence which shows that (a) the training or supervision programs implemented by Sheriff Trochesset, (b) failing to investigate or discipline, or (c) a policy of allowing excessive force *caused* – that is that they were a moving force behind – Benavidez' actions.  As explained, a decision on whether

justification exists for the use of force in this case is a question of Benavidez' perception, evaluation and decision, rather than training or supervision. (Ex. 3 at ¶ 21).  Moreover, there is no evidence that a lack of investigation or discipline existed, much less that they contributed to Benson's injuries.  Absent such evidence, municipal liability fails and summary judgment is appropriate.

**G.    Any Claim Against Henry Trochesset Is Redundant.**

67.    To the extent any part of Benson's case survives against County Defendants, claims against Henry Trochesset, in his official capacity, should be dismissed.  A claim against the Sheriff in his official capacity is simply a suit against the County. *Goodman v. Harris Cnty.*, 571 F.3d 388, 394 (5th Cir. 2009); s*ee also, Chavez v. Alvarado*, 550 F. Supp. 3d 439, 450 (S.D. Tex. 2021) ("Because the plaintiffs are suing the City of Houston, their official-capacity claims against the individual officers are redundant and are dismissed."); *Holland v. City of Houston*, 41 F. Supp. 2d 678, 689 (S.D. Tex. 1999).

## IV. <u>CONCLUSION</u>

Pursuant to Federal Rules of Civil Procedure 56 and based on the lack of legal and evidentiary support for Benson's claims, County Defendants asks that the Court grant summary judgment on each and every claim brought by Benson.  County Defendants further ask for all other relief to which they are entitled, whether at equity or law.

Respectfully submitted,

**GREER, HERZ & ADAMS, L.L.P.**

By: */s/ Joseph R. Russo, Jr.*

29

**Joseph R. Russo, Jr.**
Federal I.D. No. 22559
State Bar No. 24002879
**jrusso@greerherz.com**
**Jordan S. Raschke**
State Bar No. 24108764
Federal I.D. No. 3712672
**jraschkeelton@greerherz.com**
One Moody Plaza, 18th Floor
Galveston, Texas  77550
(409) 797-3200 (Telephone)
(866) 456-0170 (Fax)


**ATTORNEYS FOR DEFENDANTS, GALVESTON COUNTY AND SHERIFF HENRY TROCHESSET, IN HIS OFFICIAL CAPACITY**


## CERTIFICATE OF SERVICE

I hereby certify that on 23rd day of August 2022 the foregoing was served in accordance with the Federal Rules of Civil Procedure to the following counsel of record:

***Via electronic service***

Genevieve Bacak McGarvey
Bryan R. Lasswell
McLeod, Alexander, Powel & Apffel, P.C.
802 Rosenberg - P.O. Box 629
Galveston, Texas 77553
dwpoole@mapalaw.com
brlasswell@mapalaw.com

Jarvis Rice
3306 Manzanita Lane
Manvel, Texas 77578
attorneyjarvisrice@gmail.com

*/s/ Joseph R. Russo, Jr.*
Joseph R. Russo, Jr.