NO. 3:21-CV-00200

---

IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS

---

DENNIS BENOSN,

Plaintiff

v.

COUNTY OF GALVESTON
EDWARD BENAVIDEZ, Individually
HENRY TROCHESSET, In his official capacity

Defendants.

---

PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Jarvis D. Rice
Bar No. 24103597
Attorney for Plaintiff Dennis Benson
3306 Manzanita Lane, Manvel Texas 77578
P: (409) 888-0006
F: (832) 336-5954
Attorneyjarvisrice@gmail.com

## TABLE OF CONTENTS

TABLE OF AUTHORITIES…..............................................................................3

STATEMENT OF ISSUES……………………..........................................................6

SUMMARY OF THE ARGUMENT.......................................................................6

REPLY TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS................................7

PLAINTIFF'S STATEMENT OF FACTS.................................................................9

SUMMARY JUDGEMENT EVIDENCE.................................................................15

LEGAL STANDARD......................................................................................15

PROCEDURAL HISTORY…..............................................................................16

ARGUMENT................................................................................................16

   1.  WHETHER BENSON'S CLAIMS ARE BARRED BY HECK V. HUMPHERY……………………...........................................................16

       A.  Action Under the Color of State Law...................................19

       B.  Deprivation of a Federal Right.........................................19

   2.  WHETHER THE FORCE WAS AUTHORIZED BY TEXAS PENAL CODE §9.52.....................................................................................25

   3.  WHETHER BENSON'S CLAIMS ARE BARRED BY QUALIFIED IMMUNITY……………………..................................................33

       A.  Violation of A Constitutional Rights…………………………………....34

       B.  Cleary Established Rights…………………………………..…..................... 36

   4.  WHETHER COUNTS 1-3 AGAINST BENAVIDEZ ARE BARRED BY TEXAS TORT CLAIMS ACT……………………..................................................39

   5.  WHETHER BENSON CAN RECOVER UNDER COUNT 5 FOR RETALIATION IN VIOLATION OF THE FIRST AMENDMENT. …………….………....………..40

REQUEST FOR LEAVE……………………………………………………………....42

PRAYER…................................................................................................42

## **TABLE OF AUTHORITIES**

<u>**CASES**</u>

Alexander v. City of Round Rock, 854 F.3d 298, 308 (5th Cir. 2017) ......................................40

Arnold v. Town of Slaughter, 100 Fed.Appx. 321 (5th Cir.2004) ............................................23

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)............................................................................15

Bell v. Wolfish, 441 U.S. 520, 540, 547, 99 S.Ct. 1861, 60 L.Ed.2d 447…………………………...…30

Block v. Rutherford, 468 U. S. 576, 585–586…………………………………………………...............30

Brumfield v. Hollins, 551 F.3d 322,326(5th Cir. 2008) ...........................................................35

Brothers v. Klevenhagen, 28 F.3d 452 (5th Cir. 1994)……………………………...…………………31

Cass v. City ofAbilene, 814 F.3d 721, 731 (5th Cir. 2016)……………………………………………34

Curtis v. Mosher, No. 3:1 2-CV-4866-B, 2014 WL 2452571....................................................34

Deville v. Marcantel, 567 F.3d 156, 167 (5th Cir. 2009) (per curiam) .....................................36

Edionwe v. Bailey, 860 F.3d 287, 291 (5th Cir. 2017).............................................................15

Freeman v. Gore, 483 F.3d 404, 417 (5th Cir. 2007) .............................................................34

Garrison v. Porch, 376 Fed.App'x 274 (3d Cir. 2010)……………………………………...…………25

Graham v. Connor, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443…............................30

Grawey v. Drury, 567 F.3d 302, 314 (6th Cir……………………………………………………...…38

Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co., 313 F.3d 305, 312 (5th Cir. 2002) .............15

Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)…………………………………………………….33

Heck v. Humphrey, 512 U.S. 477 (1994)…………………………………….……………...………15

Hope v. Pelzer, 536 U.S. 730, 741 (2002) ............................................................................38

Hudson v. McMillian, 503 U.S. 1, 6 (1992).............................................................................22

Jackson v. Culbertson, 984 F.2d 699, 700 (5th Cir. 1993)) .......................................32

Johnson v. Johnson, 385 F.3d 503, 529 (5th Cir. 2004)...........................................15

Johnson v. Ganim, 342 F.3d 105, 117 (2d Cir. 2003) …………….............................32

Johnson v. Glick, 481 F.2d 1028 (CA2),……………………………...…………………………29

Kingsley v. Hendrickson, 135 S.Ct. 2466, 2473 (2015) ..........................................35

Lytle v. Bexar Cty., 560 F.3d 404, 410 (5th Cir. 2009) ...........................................35

Malley v. Briggs, 475 U.S. 335,341(1986) ...........................................................31

Marsilio v. Vigluicci, 924 F. Supp. 2d 837, 847 (N.D. Ohio) ...................................14

Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) ......................................................36

Nelson v. Jashurek, 109 F.3d 142 (3d Cir. 1997)....................................................22

Poole v. City of Shreveport, 691 F.3d 624, 628 (5th Cir. 2012) ...............................35

Salim v. Proulx, 93 F.3d 86, 89 (2d Cir. 1996)………………………………………...….33

Saucier v. Katz, 533 U.S. 194, 202 (2002) ...........................................................36

Schmidt v. Gray, 399 F. App'x 925, 928 (5th Cir.) .................................................22

Simpson v. City of Pickens, 887 F. Supp. 126 (S.D. Miss. 1995) ............................21

Tarver v. City of Edna, 410 F.3d 745, 753 (5th Cir. 2005) .....................................32

Tennessee v. Garner 471 U.S. 1 (1985)………………………………………………………...15

Thore v. Howe, 466 F.3d 173, 175 (1st Cir.2006) .................................................21

Turner v. Baylor Richardson Med. Ctr., 476 F.3d 337, 343 (5th Cir. 2007)………......................16

Valencia v. Wiggins, 981 F.2d 1440 (5th Cir. 1993.....................................….…31

Van Gilder v. Baker, 435 F.3d 689, 692 (7th Cir.2006) .........................................21

Whitley v. Albers, 475 U.S. 312, 320–21 (1986) ..................................................15

Williams v. Bramer, 180 F.3d 699, 703 (5th Cir. 1999) ........................................33

Wisneski v. Denning, 2014 WL 1758118, at *12 (W.D. Pa. 2014) ..........................17

## **STATUTES**

Statutes Fed. R. Civ. P. 12(b)(6) ..................................................................................................13

Fed. R. Civ. P. 56(a) ....................................................................................................................14

Title 42 U.S.C. § 1983 ..................................................................................................................15

Texas Penal Code 38.06 ...............................................................................................................17

Texas Penal Code § 101.106(f) ....................................................................................................37

Texas Penal Code 9.51 .................................................................................................................23

Texas Penal Code 9.52 .................................................................................................................24

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**GALVESTON DIVISON**

| | | |
|---|---|---|
| **DENNIS REYNARD BENSON** | § | |
| **Plaintiff** | § | |
| | § | |
| **V.** | § | **CIVIL CASE NO. 3:21-CV-00200** |
| | § | **JURY DEMANDED** |
| **COUNTY OF GALVESTON** | § | |
| **EDWARD BENAVIDEZ, Individually** | § | |
| **HENRY TROCHESSET, In his official capacity** | § | |
| **Defendants.** | § | **OF GALVESTON COUNTY TEXAS** |

**PLAINTIFF'S RESPONSE TO DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

Plaintiff, through his counsel, Jarvis Rice, submits his response to the Defendants'

Motion for Summary Judgment and requests that such Motion be denied.

## I.   STATEMENT OF ISSUES

1. Whether Benson's claims are barred by Heck v. Humphrey.

2. Whether the force was authorized by Texas Penal Code § 9.52.

3. Whether Benson's claims are barred by qualified immunity.

4. Whether counts 1-3 against Benavidez are barred by the Texas Tort Claims Act.

5. Whether Benson can recover under count 5 for retaliation in violation of the First Amendment.

## II.   SUMMARY OF THE ARGUMENT

Much of what transpired on the morning of July 11, 2019, remains uncertain and is hotly

contested among the parties in this case. What is certain is that Dennis Benson suffered physical

and emotional trauma at the hands of a Galveston County Sheriff Deputy who was assigned to

escort him from the hospital. Benson had swallowed a baggie of ecstasy and was in need of

medical attention. Due to this need Benson was denied entry into the county jail and transported to UTMB by ambulance. Shortly after the first deputy was relieved Benson made an attempt to flee from the deputy guarding him. During this attempt Benson was shot by deputy Benavidez. Due to being shot Benson right foot was amputated.

Our system of justice does not rely on courts to make determinations of credibility and fact; rather, it relies on the collective wisdom of a jury. Dennis Benson urges the court not to extinguish his right to have issues of fact decided by a jury by denying the defendants' motion for summary judgment.

### III.   REPLY TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS

With regard to alleged "undisputed material fact" #1. Benson ran into an enclosed room or closet where Benavidez tried to physically tackle and restrain him. The two physically scuffled before Benson overcame Benavidez and ran from the room.

**DISPUTE**: 52. Kelli Allen stated that Benson headed down the emergency room hallway shackled and turned down the DECON hallway, which led to a dead end. 53. While coming back towards Deputy Benavidez, Ms. Allen stated that Benson gave sort of a football move avoiding Deputy Benavidez. 54. Ms. Allen stated that the ordeal in the DECON hallway lasted about two seconds.

With regard to alleged "undisputed material fact" #2, During this time Benavidez removed his gun from his holster for the first time and accidentally discharged a round, but not aimed at Benson.

**DISPUTE**: Deputy Benavidez first shot was intentional and aimed at Benson. 56. Briana Menzies stated as Benson exited through the emergency room doors, Deputy Benavidez fired a

shot that struck near Benson. 57. This intentional shot was confirmed by Preston Huff who stated he saw the officer fire the shot at Benson on the UTMB video camera.

With regard to alleged "undisputed material fact" #3, A second surveillance video captures Benson increasing his lead as he ran down the ramp as Benavidez continues to chase him with his gun drawn.

**DISPUTE:** Briana Menzies stated as Benson exited through the emergency room doors, Deputy Benavidez fired a shot that struck near Benson. 58. At that point Ms. Menzies states that Benson puts his hands up and continued to move away from Deputy Benavidez. 59. UTMB video cameras confirm that Benson was walking away from Deputy Benavidez with his hands up.

With regard to alleged "undisputed material fact" #4, A third video from a bystander's cell phone captures the events leading up to the shooting. Despite repeated commands to stop, to get on the ground, and finally warnings that Benavidez would shoot, Benson crawled over two walls to gain entrance to a parking garage. There were numerous cars in the parking lot.

**DISPUTE:** There is no video that shows Benson climbing a wall and gaining access to the garage.

With regard to alleged "undisputed material fact" #5, Benson had fallen after scaling the second wall and was getting up and leaning on a car.

**DISPUTE:** Benavidez statement to investigators differs from this fact. Benavidez in his statement stated that he shot Benson as he was pushing up off the ground. Benson had crossed over a cement barrier and fallen.

With regard to alleged "undisputed material fact" #6, Benavidez believed that Benson was resting with the intent to reengage him physically, or to continue to run into the parking garage to further his escape.

**DISPUTE:** Benavidez does not mention anything about believing that Mr. Benson was about to reengage him in his initial statement. Benavidez stated that Benson crossed over a cement barrier and falls. As Benson was trying to push up off the ground, he was shoot by Benavidez for no apparent reason. Benavidez admitted, in his statement, that he shot Benson because he was exhausted.

## IV.    PLAINTIFF'S STATEMENT OF FACTS

17. Our investigation of the facts and circumstances reveals the following. On Thursday, July 11th, 2019, at around 9:30 a.m., Deputy Steadham observed Dennis Benson sitting in the back of the 405th court room.

18. Deputy Steadham advised Mr. Benson that there was an active warrant for his arrest, and he would be taken into custody.

19. Mr. Benson was transported to the jail around 10:15 a.m. by Deputy Minetti.

20. Deputy Minetti stated that as they walked through the tunnel, Mr. Benson confessed that he had swallowed a baggy of ecstasy.

21. By the time Deputy Minetti dropped off the last person, Mr. Benson was complaining of chest pains and dryness of the mouth.

22. Upon entering booking, Mr. Benson was placed where new arrestees are kept prior to being medically cleared for incarceration.

23. Deputy Minetti stated by this time Mr. Benson was complaining of shortness of breath.

24. Deputy Minetti advised jail medical staff, Jared Head, that Mr. Benson stated that he had swallowed a baggy of ecstasy.

25. Mr. Head took Mr. Benson's vitals, during which time he kept complaining about shortness of breath and dryness of mouth.

26. Mr. Head advised Deputy Minetti that he did not believe that Mr. Benson would be accepted into the jail, but he had to get confirmation from the doctor.

27. Deputy Minetti then advised his supervisor, Sergeant Campbell, that jail medical might refuse Mr. Benson.

28. After speaking with Sergeant Campbell, Deputy Minetti then spoke with booking Sergeant Drewes.

29. He advised Sergeant Drewes that medical might refuse Mr. Benson and asked if she had a pair of shackles in case he needed to be sent to the hospital.

30. Deputy Minetti received a pair of shackles from Sergeant Drewes and waited for medical to confirm the refusal of Mr. Benson.

31. At approximately 10:55 a.m., Mr. Head advised that Mr. Benson would not be accepted into the jail and that he would be transported via ambulance to University Texas Medical Branch Galveston (UTMB).

32. Deputy Minetti contacted Deputy Steadham and informed him that Mr. Benson was being taken to UTMB and advised him that Sergeant Campbell needed him to accompany Mr. Benson.

33. Deputy Minetti stated that the EMS arrived at approximately 11:03a.m. and loaded Mr. Benson onto the stretcher where he was shackled and double locked.

34. Deputy Minetti stated that Deputy Steadham put his handcuffs on Mr. Benson.

35. Once Mr. Benson arrived at the emergency room, he was assigned to ER room #5.

36. Mr. Benson was moved onto the hospital stretcher from the ambulance stretcher.

37. Once on the hospital bed, Deputy Steadham readjusted the handcuffs on Mr. Benson, by removing the cuff from his left wrist while his right wrist was still handcuffed.

38. Deputy Steadham then moved the open cuff and secured it to the bed rail.

39. While in the emergency room Mr. Benson continuously complained to hospital staff, that his stomach was hurting due to him ingesting a large quantity of drugs.

40. Mr. Benson then stated that he needed to use the restroom for a bowel movement.

41. Deputy Steadham and Mr. Benson walked to the restroom just west of the east nurse's station in the ER.

42. Mr. Benson was shackled the entire time.

43. Mr. Benson went into the restroom and once he was finished, he was escorted back to ER room #5 by Deputy Steadham.

44. Mr. Benson got back onto the hospital bed and Deputy Steadham secured the handcuff back to his right wrist.

45. Deputy Steadham spoke with Sergeant Drewes on the phone sometime close to 4 p.m. and advised her that the doctor was probably going to be releasing Mr. Benson at some point in the day.

46. Sergeant Drewes advised Deputy Steadham that she would have someone come and relieve him around 5 p.m.

47. Deputy Steadham stated that Deputy Benavidez arrived at the room around 5 p.m., to relieve him of duty.

48. Deputy Steadham stated that he updated Deputy Benavidez on Mr. Benson's' condition then recommended for Deputy Benavidez to put his handcuffs on Mr. Benson.

49. Deputy Steadham stated that Deputy Benavidez showed him that he did not have any handcuffs in his cuff case.

50. Deputy Steadham stated he got into a conversation with Deputy Benavidez about how to properly secure Mr. Benson, due to the fact he was known runner.

51. At some point after Deputy Benavidez arrived, video shows Mr. Benson shuffling out the room shackled, followed by Deputy Benavidez.

52. Kelli Allen stated that Mr. Benson headed down the emergency room hallway shackled and turned down the DECON hallway, which led to a dead end.

53. While coming back towards Deputy Benavidez, Ms. Allen stated that Mr. Benson gave sort of a football move avoiding Deputy Benavidez.

54. Ms. Allen stated that the ordeal in the DECON hallway lasted about two seconds.

55. Mr. Benson, shackled, was able to make it down the hall, through the emergency room and out the emergency room door exit.

56. Briana Menzies stated as Mr. Benson exited through the emergency room doors, Deputy Benavidez fired a shot that struck near Mr. Benson.

57. This intentional shot was confirmed by Preston Huff who stated he saw the officer fire the shot at Mr. Benson on the UTMB video camera.

58. At that point Ms. Menzies states that Mr. Benson puts his hands up and continued to move away from Deputy Benavidez.

59. UTMB video cameras confirm that Mr. Benson was walking away from Deputy Benavidez with his hands up.

60. Mr. Benson crosses over a cement barrier and falls.

61. As Mr. Benson is trying to push up off the ground, he is shoot by Deputy Benavidez for no apparent reason.

62. Deputy Benavidez admitted, in his statement, that he shot Mr. Benson because he was exhausted.

63. Ms. Allen, who was attending to Mr. Benson gunshot wound, told the police that he needed to be transported back up the emergency room ramp, which was in full range of the UTMB cameras.

64. Ms. Allen was told by campus police to take Mr. Benson through the unrecorded passageway, which was for wheelchairs only.

65. Mr. Benson stretcher got stuck and he lay bleeding until an ambulance arrived from the upper level.

66. Charge nurse Janelle Mallet stated that Ms. Menzies came to her visibly shaken by the fact, that the inmate was not properly secured to the bed.

67. Ms. Menzies stated that when she entered the room, the handcuffs where still on the bed and there was a full urinal bottle on the floor.

68. Ms. Mallet stated that was not good and she should report that to the detectives and her hospital superiors.

69. Deputy Benavidez gave several conflicting statements pertaining to this incident, none of which match the eyewitness testimony.

70. He even went as far as to try and cover up the crime by stating, that he accidentally discharged his firearm as he exited the emergency room.

71. Until this day, the Galveston County District Attorney Office has refused to turn over all of the videos in this case.

72. If you take the fact that Deputy Benavidez gave false statements to investigators, combined with the failed Texas Rangers investigation, and the Galveston County District Attorney's office failure to prosecute Deputy Benavidez, it could easily be considered a cover up.

73. A cover up, which we believe is motivated by Deputy Benavidez's parents who are lifelong local police officials.

## V.   SUMMARY JUDGMENT EVIDENCE

Benson relies upon the following evidence to support his motion for summary judgment:

EXHIBIT 1 Plaintiff Third Amended Complaint

DEFENDANT'S EXHIBIT 2 The affidavit of Edward Benavidez

DEFENDANT'S EXHIBIT 3 Video of Benson's escape from the emergency room

DEFENDANT'S EXHIBIT 4 Video of Benson running down the ramp from the emergency room

DEFENDANT'S EXHIBIT 5 Video of the final stages of the pursuit and the gunshot

DEFENDANT'S EXHIBIT 6 Benson's conviction for Escape, Texas Penal Code 38.06(c)

## VI.   LEGAL STANDARD

The Defendant seeks judgment against the Plaintiff under Rules 12(c) and 56. The purpose of a motion under Rule 12(c) is to test the sufficiency of the complaint when material facts are not in dispute. Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co., 313 F.3d 305, 312 (5th Cir. 2002). "The standard for dismissal under Rule 12(c) is the same as that for dismissal for failure to state a claim under Rule 12(b)(6)." Johnson v. Johnson, 385 F.3d 503, 529 (5th Cir. 2004). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation marks omitted); see also Edionwe v. Bailey, 860 F.3d 287, 291 (5th Cir. 2017). If discovery will not help the court to resolve the motion, a Rule 12(c) motion should be brought sooner to avoid the expense of further discovery. See Marsilio v. Vigluicci, 924 F. Supp. 2d 837, 847 (N.D. Ohio 2013).

Under Rule 56, summary judgment may be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When assessing whether a dispute to any material fact exists, the court should consider all

of the evidence in the record and draw all reasonable inferences in favor of the nonmoving party. Turner v. Baylor Richardson Med. Ctr., 476 F.3d 337, 343 (5th Cir. 2007) (citations omitted).

## VII.    PROCEDURAL HISTORY

On July 6, 2021, Plaintiff, filed his Complaint for Civil Rights Violations against the County of Galveston, Galveston County Sheriff Department, Henry Trochesset and Edward Benavidez. On August 2, 2021, Defendants removed the case to federal court. On August 30, 2021, Defendants filed a Motion to dismiss plaintiff original petition. Plaintiff thereafter filed a response and a First Amended Complaint on September 20, 2021. The County moved to strike the First Amended Complaint. On March 7, 2022, the Court denied the County's Motion to Strike, accepted Plaintiff's First Amended Complaint, and directed the County to file a response by April 1, 2022. On June 16, 2022, the Defendants Motion to Dismissed was ruled on and the County of Galveston turned over discovery on June 30, 2022. The Defendants' responses from discovery request and Defendant Benavidez responses in his deposition identified a party and a cause of action that was previously unavailable to the Plaintiff.

## VIII.    ARGUMENT

1. **Whether Benson's claims are barred by Heck v. Humphrey.**

### A.  Heck v. Humphrey Does Not Bar Benson claims

Title 42 U.S.C. § 1983 allows plaintiffs to seek damages from persons who violate their constitutional rights while acting under color of state law. Ordinarily, use of force by a prison officer would qualify for § 1983 liability based on the Eighth Amendment if the force were not applied "in a good faith effort to maintain or restore discipline" but rather "maliciously and sadistically for the very purpose of causing harm." Hudson v. McMillian, 503 U.S. 1, 6 (1992) (quoting Whitley v. Albers, 475 U.S. 312, 320–21 (1986)).

But Heck v. Humphrey, 512 U.S. 477 explained that a prisoner may not "seek damages in a § 1983 suit" if "a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence." Heck, 512 U.S. at 487.

In Heck, the Supreme Court held that, in order to recover damages for an allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that "the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such a determination, or called into question by a federal court's issuance of a writ of habeas corpus." Id. at 486–87. "A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983." Id. at 487.

A court faced with a suit for damages under § 1983 must first "consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his sentence." Heck, 512 U.S. at 487. If so, the complaint must be dismissed "unless the plaintiff can demonstrate that the sentence has already been invalidated." The court must undertake an analysis of whether a judgment in favor of Plaintiff on his current claims of excessive force would invalidate his underlying conviction of Escape.

Accordingly, we look to the state court records relating to Plaintiff's underlying criminal conviction, and then compare those crimes for which Plaintiff was convicted to the elements of the present claims. See generally Nelson v. Jashurek, 109 F.3d 142 (3d Cir. 1997); Wisneski v. Denning, 2014 WL 1758118, at *12 (W.D. Pa. 2014) ("Application of the Heck rule is, of necessity, a fact-intensive inquiry by which a court must determine what essential facts were determined by the jury in the criminal trial, and what affect those decisions have on a later §

17

1983 claim."). State Court Records reflects that Plaintiff was charged with Escape Texas Penal Code Sec. 38.06 (C). Court records show that the Plaintiff plead guilty to the crime of Escape.

Plaintiff's Escape charge was based on Texas Penal Code 38.06 which provides that "a person commits this offense:

(A) if the person escapes from custody when the person is (1) under arrest for, lawfully detained for, charge with, or convicted of an offense; (2) in custody pursuant to an lawful order of the court; (3) detained in a secure detention facility, as that term is defined by section 51.02 (Definitions), family code; or (4) in custody of a juvenile probation officer for violating an order imposed by a juvenile court under Section 52.01 (Taking into Custody; Issuance of Warning Notice), Family Code.

(B) except as provided in subsection (c), (d), and (e), an offense under this section is a class A misdemeanor.

(C) an offense under this section is a felony of the third degree if the actor is (1) under arrest for, charged with, or convicted of a felony; (2) is confined or lawfully detained in a secure correctional facility or law enforcement facility; or (3) is committed to or lawfully detained in a secure correctional facility, as defined by Section 51.02 (Definitions), family code, other than a halfway house, operated by or under contact with the Texas Juvenile Justice Department.

(D) an offense under this section is a felony of the second degree if the actor to effect his escape causes bodily injury.

(E) an offense under this section is a felony of the first degree if to effect his escape the actor: (1) causes serious bodily injury; or (2) uses or threatens to use a deadly weapon.

The elements of Plaintiff's present claim for a Fourth Amendment Excessive Force Claim under 42 U.S.C. § 1983 requires a plaintiff to show: 1) defendant acted under state law; 2) while acting under color of state law, defendant deprived plaintiff of a federal constitutional right.

### A.  Action Under Color of State Law

The first element of Benson's claim is that Deputy Benavidez acted under color of state law. Deputy Benavidez was guarding Benson at the hospital in his official capacity as a sheriff deputy.

A person can act under color of state law even if the act violates state law. The question is whether the person was clothed with the authority of the state, by which I mean using or misusing the authority of the state.

By "state law," I mean any statute, ordinance, regulation, custom or usage of any state. And when I use the term "state," I am including any political subdivisions of the state, such as a county or municipality, and any state, county, or municipal agencies.

### B.  Deprivation of a Federal Right

The second element of Benson's claim is that Deputy Benavidez deprived him of a federal constitutional right to be free of excessive force.

The Fourth Amendment to the United States Constitution protects persons from being subjected to excessive force while being apprehended by police officials. In other words, a law enforcement official may only use the amount of force necessary under the circumstances to

make the arrest. Every person has the constitutional right not to be subjected to excessive force while being arrested, even if the arrest is otherwise proper.

In this case, Benson claims that Deputy Benavidez used excessive force when he shot him. In order to establish that Deputy Benavidez used excessive force, Benson must prove both of the following by a preponderance of the evidence:

(1) Deputy Benavidez intentionally committed certain acts; and

(2) The act of shooting Benson violated his Fourth Amendment right not to be subjected to excessive force.

In determining whether Deputy Benavidez's acts constituted excessive force, you must ask whether the amount of force the defendant used was the amount which a reasonable officer would have used in making the arrest under similar circumstances.

The reasonableness of the defendant's acts must be judged from the perspective of a reasonable officer on the scene. The law permits the officer to use only that degree of force necessary to make the arrest. If the force the defendant used was unreasonable, it does not matter whether the defendant had good motivations. And an officer's improper motive will not establish excessive force if the force used was objectively reasonable.

Deputy Benavidez was fired by the sheriff department for violating their departments policy on the use of deadly force. The law on shooting an escaping felon has long been decided in Tennessee v. Garner, 471 U.S. 1 (1985).

The applicability of Heck to excessive force claims has often been a controversial issue, with a number of circuits concluding that the decision is inapplicable to such claims. For example, in Thore v. Howe, 466 F.3d 173, 175 (1st Cir.2006), the Third Circuit held that: A §1983 excessive force claim brought against a police officer that arises out of the officer's use of force during an arrest does not necessarily call into question the validity of an underlying state conviction and so is not barred by Heck. *See, e.g.,* Van Gilder v. Baker, 435 F.3d 689, 692 (7th Cir.2006).

There seems to be universal agreement, for example, that a plaintiff who concedes that he resisted arrest but nevertheless contends that excessive force was used against him would not find his Fourth Amendment claim barred by Heck.

In such a case, the plaintiff would not be challenging the foundation of his prior conviction, and the Heck analysis would simply not apply. In this case, the allegations of plaintiff's §1983 claims are not in fundamental conflict with his prior criminal conviction, and, as such, those claims are not barred by Heck.

In reaching our result we take note of Simpson v. City of Pickens, 887 F. Supp. 126 (S.D. Miss. 1995). The district court in Simpson held that even if a defendant in a criminal action was convicted validly of resisting arrest, the criminal defendant was not necessarily barred from bringing a section 1983 excessive force action under the Fourth and Fourteenth Amendments because "it is possible for a finding that the defendant was resisting arrest to coexist with a finding that the police used excessive force to subdue him." We are in accord with the Simpson analysis.

The facts in Simpson case are similar to the facts in our case. Benson admits to trying to escape but alleges that Deputy Benavidez used excessive force in subduing him.

In Nelson v. Jashurek, 109 F.3d 142 (3d Cir. 1997), Nelson was convicted for resisting arrest in violation of section 5104 which provides that a person is guilty of resisting arrest if "with the intent of preventing a public servant from effecting a lawful arrest he creates a substantial risk of bodily injury to the public servant or employs means justifying or requiring substantial force to overcome the resistance."

The court decided the fact that Jashurek was justified in using "substantial force" to arrest Nelson does not mean that he was justified in using an excessive amount of force and thus does not mean that his actions in effectuating the arrest necessarily were objectively reasonable. In short, there undoubtedly could be "substantial force" which is objectively reasonable and "substantial force" which is excessive and unreasonable.

The court ruled that a finding that Jashurek used excessive "substantial force" would not imply that the arrest was unlawful and thus the Supreme Court's example of how Heck v. Humphrey can bar a civil action is not applicable here.

Rather, we believe that the Supreme Court intended to demonstrate that a civil suit for an unreasonable seizure predicated on a false arrest would be barred so long as a conviction for resisting the same arrest remained unimpaired.

Nelson does not charge that Jashurek falsely arrested him. Instead, Nelson charges that Jashurek effectuated a lawful arrest in an unlawful manner. Accordingly, we do not see why a judgment in his favor would throw the validity of his conviction into doubt. Smithart v.

Towery, 79 F.3d 951, 952 (9th Cir. 1996) ("Because a successful section 1983 action for excessive force would not necessarily imply the invalidity of Smithart's arrest or conviction for assault with a deadly weapon during a traffic stop, Heck does not preclude Smithart's excessive force claim."). Consequently, Heck v. Humphrey does not bar this case.

The facts in our case is similar to the facts in Nelson. Benson is not alleging that Deputy Benavidez falsely arrested him, instead, Benson is saying that Deputy Benavidez made a lawful arrest in an unlawful manner. Therefore, a judgement in Benson favor in his civil case, will have no effect on the validity of his escape conviction.

Arnold v. Town of Slaughter, 100 Fed.Appx. 321 (5th Cir.2004) represent a more robust application of Heck preclusion which looks to whether the allegations in the complaint (and not merely a civil judgment in the plaintiff's favor) are "inconsistent with the conviction's having been valid." These decisions are based upon the principle that a § 1983 plaintiff who has not seen fit to have a prior conviction reversed or otherwise expunged should not be able to turn around and make allegations in a civil lawsuit which are inconsistent with his prior conviction.

The difference between the Arnold approach and the more plaintiff-friendly approach followed by most circuits appears to be the extent to which courts are willing to give plaintiffs the "benefit of the doubt" regarding whether the prior guilty plea and subsequent lawsuit may be harmonized with each other.

In Arnold, the Fifth Circuit considered a case where, a plaintiff who had been convicted of resisting an officer subsequently brought a Fourth Amendment excessive force claim against him. In considering the applicability of Heck in this context, the Fifth Circuit in Arnold noted that courts had often disagreed on this issue:

How Heck applies to excessive force claims is not always clear. By proving an excessive force claim, a plaintiff will not invariably invalidate his conviction. See Hudson v. Hughes, 98 F.3d 868, 873 (5th Cir.1996). Other circuits have emphasized the conceptual difference between an excessive force claim and a challenge to a conviction.

Both the Ninth and Third Circuits have indicated that an excessive force claim would not necessarily challenge a plaintiff's conviction for assault during a stop. *Nelson v. Jashurek,* 109 F.3d 142, 145–46 (3d Cir.1997); Smithart v. Towery, 79 F.3d 951,952 (9th Cir. 1996). While recognizing this distinction, these circuits also recognized that certain convictions would prevent a plaintiff from bringing an excessive force claim.

Ultimately, the Fifth Circuit in Arnold concluded that whether Heck bars excessive force claims on the basis of a prior conviction for resisting arrest depends on whether the allegations in the subsequent civil case are consistent with the prior criminal conviction.

In Arnold, the Court noted that the plaintiff's allegations were not consistent with his prior conviction for resisting arrest, writing that: Arnold's claims are not that the police used excessive force after he stopped resisting arrest or even that the officers used excessive and unreasonable force to stop his resistance.

Instead, Arnold claims that he did nothing wrong, but was viciously attacked for no reason. He provides no alternative pleading or theory of recovery. In this way, Arnold's claims are distinguishable from excessive force claims that survive Heck 's bar.

The facts in Arnold are different from the facts in our case. Arnold claimed that he did nothing wrong which would be in direct contradiction of his criminal charge. Benson admitted to

escaping therefore the validity of his criminal conviction will not be challenge by his civil suit for excessive force.

Here, none of Plaintiff's present claims negates or calls into question any element of the crime of escape and none challenges the validity of Plaintiff's convictions. See Garrison v. Porch, 376 Fed.App'x 274 (3d Cir. 2010) (holding that arrestee's § 1983 and state law claims were not barred by the Heck doctrine despite his guilty plea to assaulting a police officer). Accordingly, Plaintiff's claims of excessive force are not barred by the favorable termination requirement of Heck v. Humphrey. Therefore, Defendants' motion to dismiss should be denied in this regard.

### 2. Whether the force was authorized by Texas Penal Code § 9.52.

### A. The force authorized by Texas Penal Code § 9.52 is unconstitutional.

In 1985, the Supreme Court of the United States rejected the categorical use of deadly force to arrest a fleeing felon. Prior to that decision in Tennessee v. Garner, Texas had already abandoned the "fleeing felon" rule in favor of the later adopted approach in Garner.

Section 9.51 of the Texas Penal Code creates a justification for the use of deadly force to make an arrest, or to prevent escape after arrest, if the use of non-deadly force would have been justified, and either the crime for which the arrest is being made involved the use or attempted use of deadly force, or the officer reasonably believed that the person to be arrested would cause death or serious bodily injury if the arrest was delayed. .

Justifications for the Use of Force in Policing starts in Section 9.51 of the Texas Penal Code, which also provides a limited justification for the use of deadly force to arrest or prevent escape after arrest.

Not so many years ago, police officers routinely were authorized to use deadly force to apprehend fleeing felons. Even without knowing more about the contours of this rule, the "fleeing felon" rule was facially problematic.

Whereas felonies once carried the connotation of very serious criminality punished in the harshest ways, including by death, the proliferation of crimes denominated as felonies have created offenses that are not violent or dangerous or even particularly harmful to property.

Only one capital felony exists in Texas, so the notion that all or most felonies carry the death penalty is simply wrong. Without further consideration, it is obvious that the use of deadly force to apprehend perpetrators of non-violent crimes is excessive.

Even for the most serious felonies, an officer who kills a suspect to apprehend them or prevent their escape has, as an agent of the state, executed a person who has not been tried, convicted, or sentenced.

The justification in Section 9.51 overlaps to some extent with that found in Section 9.52 of the Texas Penal Code. While Section 9.51 applies to the use of deadly force to make an arrest, or to prevent escape after arrest, Section 9.52 pertains to force used to prevent the escape of an arrested person from custody.

Section 9.52 of the Penal Code ("Prevention of Escape from Custody") provides: The use of force to prevent the escape of an arrested person from custody is justifiable when the force could have been employed to effect the arrest under which the person is in custody, except that a guard employed by a correctional facility or a peace officer is justified in using any force, including deadly force, that he reasonably believes to be immediately necessary to prevent the escape of a person from the correctional facility.

The language used in these two statutory provisions may have been intended to distinguish between the status of a person who has been arrested but not yet placed in "custody," and a person who is incarcerated or otherwise in a custodial setting. If so, the distinction is undefined and unclear.

A person who has been arrested is "seized" for purposes of the Fourth Amendment and is said to have been taken into "custody." All incarcerated persons have been arrested, so the Section 9.51 justification for use of force or deadly force to prevent escape applies. Also applicable are the limitations on the use of deadly force mandated by Tennessee v. Garner.

Statute 9.52 is rife with contradictions of state and constitutional standards. Most obvious is the abandonment of the usual limitations imposed on justifications in Texas law, including the "when and to the degree" language.

While Section 9.51 allows the use of non-deadly force only to the degree an officer reasonably believes it to be immediately necessary to prevent escape after arrest, and much more strictly limits the use of deadly force for that purpose, once a person is in "custody" in a "correctional facility," that same officer is free of the constraints that would have applied to the use of deadly force while the arrestee was in custody (under arrest).

The most striking and serious problem with Section 9.52, of course, is that it violates the constitutional norms explicated in Tennessee v. Garner. The plain language of the statute permits a correctional officer or peace officer to use deadly force if, for example, the officer reasonably believes he will not be able to apprehend an escapee otherwise. No regard is paid to whether the person escaping has been convicted of a crime, whether any alleged crime involved violence, or whether the escapee poses a danger to others if apprehension is delayed.

In short, the justification afforded by Section 9.52, like the discredited "fleeing felon" rule, sweeps too broadly. In doing so, it runs afoul of the U.S. Constitution. No reported case in Texas has addressed this concern, presumably because none has been decided since Tennessee v. Garner.

Section 9.52 also is inconsistent with Section 5.05 of the American Law Institute's (ALI) Principles of the Law, Policing. A portion of that principle provides that, "deadly force should not be used except in response to an immediate threat of serious physical harm or death to officers, or a significant threat of serious physical harm or death to others.

This best practice standard would not allow the use of "any force, including deadly force" to prevent escape from a correctional facility. The use of deadly force is reserved in principle 5.05 for self-defense or defense of others, and Texas law provides justifications for those usages in statutes independent of Section 9.52.

Policy-wise, it is difficult to fathom why this extraordinary grant of authority to use deadly force to prevent escape from custody should be justified. In Texas, "correctional facilities" include municipal and county jails.

These jails typically house misdemeanants and persons awaiting trial, some of whom have not been formally charged by information or indictment. Granted, the jail population also includes persons convicted of crime and serving sentences, as well as prisoners who have felony convictions and are waiting to be transferred to state prisons.

The problem with Section 9.52 is that it makes no attempt to differentiate between felons and misdemeanants or the convicted and the merely suspected. It treats all prisoners as

sufficiently dangerous to merit the use of deadly force in their apprehension, without regard for the nature of the crime for which the prisoners are being held.

If, for instance, an out of shape, slow-moving deputy were to see a prisoner in a county jail who had been taken into custody for public intoxication running from the jail, the deputy might reasonably conclude that it was immediately necessary to shoot the fleeing prisoner in order to prevent his escape because the deputy could not apprehend him otherwise. The literal language of Section 9.52 would justify that deputy's actions.

This what exactly happened in this case. Deputy Benavidez after a short jog became so tired that he shot Benson who was intoxicated to prevent him from escaping. This was admitted by Deputy Benavidez in the statement he gave pertaining to the incident.

In Kingsley v. Hendrickson, the United States Supreme Court considered what the appropriate standard was for determining whether a use of force on a pretrial detainee was excessive under the Constitution.

The Court concluded that use of force on a pretrial detainee would be judged by an objective reasonableness standard. In doing so, the Court cleared up several variations among the Circuits as to the appropriate use of force standard when dealing with a person who was no longer a free citizen but was also not a sentenced prisoner.

Up until this decision, the various U.S. Circuit Courts of Appeal would determine the appropriate Constitutional standard based on the status of the prisoner. The Court has now made clear that until an inmate is sentenced the objective reasonableness standard applies.

Under 42 U.S.C. § 1983, a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable to prevail on an excessive force claim.

This determination must be made from the perspective of a reasonable officer including what the officer knew at the time, see Graham v. Connor, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443, and must account for the legitimate interests stemming from the government's need to manage the facility in which the individual is detained, appropriately deferring to  policies and practices that in the judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security," Bell v. Wolfish, 441 U.S. 520, 540, 547, 99 S.Ct. 1861, 60 L.Ed.2d 447.

The court in Johnson v. Glick, 481 F.2d 1028 (CA2), stated that a malicious-and-sadistic-purpose-to-cause-harm factor was not suggested as a necessary condition for liability, but as a factor, among others, that might help show that the use of force was excessive.

Several considerations lead to this conclusion. An objective standard is consistent with precedent. In Bell v. Wolfish, 441 U. S. 520, 540, 547, for instance, this Court held that a pretrial detainee could prevail on a claim that his due process rights were violated by providing only objective evidence that the challenged governmental action was not rationally related to a legitimate governmental objective or that it was excessive in relation to that purpose. 441 U. S., at 541–543. Cf. Block v. Rutherford, 468 U. S. 576, 585–586.

Experience also suggests that an objective standard is workable. It is consistent with the pattern jury instructions used in several Circuits, and many facilities train officers to interact with detainees as if the officers' conduct is subject to objective reasonableness.

Finally, the use of an objective standard adequately protects an officer who acts in good faith, by acknowledging that judging the reasonableness of the force used from the perspective and with the knowledge of the defendant officer is an appropriate part of the analysis.

None of the cases the defendant points to provides significant support for a subjective standard. Brothers v. Klevenhagen, 28 F.3d 452 (5th Cir. 1994), lack relevance in this context because its decision was made pre-Kingsley.

I disagree with the majority's conclusion in Brothers that the Due Process Clause and not the Fourth Amendment provides the applicable standard of law. The majority relies on Valencia v. Wiggins, 981 F.2d 1440 (5th Cir. 1993), cert. denied, U.S., 113 S.Ct. 2998, 125 L.Ed.2d 691 (1993), to conclude that Brothers was not protected by the Fourth Amendment; however, I do not believe that Valencia is dispositive of the instant issue.

In Valencia, the Court held that the Due Process Clause and not the Fourth Amendment provided the applicable legal standard to adjudicate claims of excessive force. Valencia, 981 F.2d at 1445. However, the Valencia court rooted its decision primarily in the fact that the plaintiff had been in custody for three weeks before the disputed incident, a fact not emphasized by the majority opinion in Brothers.

Noting that the Supreme Court had been reluctant to extend Fourth Amendment protection beyond the initial arrest, this Court concluded that when a suspect has been in custody for an extended period of time, the Due Process Clause and not the Fourth Amendment provided the applicable constitutional standard to analyze claims of excessive force.

However, the crucial factor in the Valencia analysis, the extended period of time between the arrest and the challenged use of force is absent in this case. Thus, Valencia does not apply to the present case where Brothers was killed shortly after his arrest.

The facts in Valencia is also different from the facts in our case. There was no extended period of time between the arrest and the challenged use of force. Benson was shot hours after his arrest.

Tennessee v. Garner, 471 U.S. 1, 7, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985), compels a judgment in Brothers' favor regarding the constitutionality of the policy Harris County used. In Garner, pursuant to a statute that allowed the use of deadly force to apprehend all felony suspects, a police officer shot a burglary suspect as he tried to escape. The Supreme Court determined that the Tennessee statute was unconstitutional as applied to unarmed, non-dangerous fleeing suspects because it violated the Fourth Amendment's prohibition against unreasonable searches and seizures. Id. 471 U.S. at 11, 105 S.Ct. at 1701. Accordingly, the Court held the Tennessee statute was invalid insofar as it purported to give the officer the authority to act as he did. Id. at 22, 105 S.Ct. at 1707.

In so holding, the Court stated that: The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. It is not better that all felony suspects die than that they escape. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so.

Texas Penal Code 9.52 just as the Tennessee statute in Garner is facially unconstitutional. Accordingly, the Fourth Amendment is applicable to the instant case.

Based on the ruling in Tennessee V. Garner, and the considerations outlined in Kingsley, the use of force was not justified. Benson wash shot as he attempted to push up off the ground.

At that time, Benson was not a threat to the deputy or to the public. Therefore, Defendant's motion to dismiss under Texas Penal Code 9.52 should be denied.

### 3.  Whether Benson's claims are barred by qualified immunity.

### A. The Defendant Is Not Entitled To Summary Judgment On The Basis Of Qualified Immunity.

Qualified immunity shields government officials whose conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

The scope of qualified immunity is broad, and it protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986).

"A qualified immunity defense is established if (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." Salim v. Proulx, 93 F.3d 86, 89 (2d Cir. 1996). "Where a factual issue exists on the issue of motive or intent, a defendant's motion for summary judgment on the basis of qualified immunity must fail." Johnson v. Ganim, 342 F.3d 105, 117 (2d Cir. 2003).

In moving for summary judgment, Deputy Benavidez argue Plaintiff cannot establish an excessive force claim as a matter of law and Deputy Benavidez is entitled to qualified immunity. Thus, the Court first examines whether Plaintiff can show a violation of his constitutional right to be free from excessive force and then considers whether that right was clearly established at the time of the Deputy's alleged misconduct.

A.   <u>Violation of a Constitutional Right</u>

The Fourth Amendment confers a right to be free from excessive force during an arrest, investigatory stop, or other "seizure" of person. Graham v. Connor, 490 U.S. 386, 388 (1989). To establish a claim of excessive force under the Fourth Amendment, a plaintiff must show "(1) an injury (2) which resulted directly and only from the use of force that was clearly excessive to the need and (3) the force used was objectively unreasonable." Cass v. City of Abilene, 814 F.3d 721, 731 (5th Cir. 2016).

First, "the court requires a plaintiff to have 'suffered at least some sort of injury." Curtis v. Mosher, No. 3:1 2-CV-4866-B, 2014 WL 2452571, at *8 (N.D. Tex. June 2,2014) (quoting Jackson v. Culbertson, 984 F.2d 699, 700 (5th Cir. 1993)). The "injury must be more than a de minimis injury and must be evaluated in the context in which the force was deployed." Tarver v. City of Edna, 410 F.3d 745, 753 (5th Cir. 2005).

In this case the Plaintiff suffered a severe injury. His foot had to be amputated due to the gunshot wound he suffered.

When evaluating Plaintiff's alleged injuries in the context of his arrest, the Plaintiff must point to sufficient evidence to raise a fact issue on the injury element. Plaintiff's alleged injuries are more than the "minor, incidental injuries that occur in connection with the use of force needed to effectuate an arrest." See Freeman v. Gore, 483 F.3d 404, 417 (5th Cir. 2007). Relatively "insignificant injuries may 'qualify as a cognizable injury when the victim is maliciously assaulted by a police officer." Schmidt v. Gray, 399 F. App'x 925, 928 (5th Cir. 2010) (quoting Williams v. Bramer, 180 F.3d 699, 703 (5th Cir. 1999)). At the time of Plaintiff's alleged injury, he was attempting to push up of the ground after falling over a wall and he was

shot. Viewing the facts in the light most favorable to Plaintiff, a reasonable jury could find Plaintiff's amputated foot qualifies as a legally cognizable injury.

The remaining two inquiries, whether Plaintiff's injury resulted from the use of clearly excessive and objectively unreasonable force, are "often intertwined." See Poole v. City of Shreveport, 691 F.3d 624, 628 (5th Cir. 2012).

The Supreme Court has long recognized the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion of threat thereof to effect it. Graham, 490 U.S. at 396.

Determining whether force is excessive or unreasonable "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight." Id.

Additional considerations that "may bear on the reasonableness or unreasonableness of the force used include: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiffs injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." Kingsley v. Hendrickson, 135 S.Ct. 2466, 2473 (2015).

Moreover, the "reasonableness" of a particular use of force is judged from the perspective of an officer at the scene, rather than the 20/20 vision of hindsight. Graham, 490 U.S. at 396.

It is well-established that an officer may consider a suspect's refusal to comply with instructions in assessing whether physical force is needed to effectuate the suspect's compliance. Deville v. Marcantel, 567 F.3d 156, 167 (5th Cir. 2009) (per curiam).

In sum, excessive force claims are "necessarily fact-intensive" and whether the force used was excessive "depends on the facts and circumstances of each particular case." Id.

Material fact disputes preclude judgment as a matter of law. Under Plaintiff's version of the facts, in combination with the few undisputed facts, a reasonable jury could find Deputy Benavidez's use of force was excessive and objectively unreasonable.

It is undisputed that Deputy Benavidez shot Mr. Benson as he attempted to push up off the ground after falling over a wall. Benavidez admitted to shooting him because he was tired. It is also undisputed that no one's life was in danger at the time Deputy Benavidez shot Benson.

A jury could conclude that a reasonable deputy would have found Deputy Benavidez's use of force clearly excessive and objectively unreasonable. Under the totality of the circumstances as alleged by Plaintiff, Deputy Benavidez shooting him while he was attempting to push up off the ground, because he was tired is unreasonable. Thus, a fact issue exists on whether Deputy Benavidez violated the Plaintiff's constitutional right to be free from excessive force.

ii.   Clearly Established Right

The Court also concludes Plaintiff's constitutional right was clearly established at the time of the Deputy's alleged misconduct. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Lytle v. Bexar Cty., 560 F.3d 404, 410

(5th Cir. 2009) (quoting Saucier v. Katz, 533 U.S. 194, 202 (2001) overruled in part by Pearson v. Callahan, 555 U.S. 223 (2009)).

If officers of reasonable competence could differ on the lawfulness of defendant's actions, the defendant is entitled to qualified immunity. See Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) ("Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law." (quoting Malley v. Briggs, 475 U.S. 335,341(1986)).

At the time of the incident at issue, it was clearly established law that an officer violates the Fourth Amendment if he unlawfully shots a person attempting to flee. Under Plaintiffs version of the facts, Deputy Benavidez unlawfully shot Benson because he was tired. A reasonable deputy would have known the constitutional implications of Tennessee v. Garner when using deadly force on a fleeing suspect. Deputy Benavidez was fired due to his actions being unreasonable.

Genuine material fact issues preclude a determination of whether Deputy Benavidez is entitled to qualified immunity on Plaintiffs excessive force claim. Viewing the facts in the light most favorable to Plaintiff, a reasonable jury could find Deputy Benavidez violated Plaintiffs right to be free from excessive use of force, a right clearly established at the time of Plaintiff's arrest.

Consequently, we request that the Court denies the Deputy's motion for summary judgment on Defendant Benavidez's entitlement to qualified immunity concerning Plaintiffs excessive force allegation

The Defendant should be denied qualified immunity because the Fourth Amendment requirements to be free from excessive force was clearly established at the time of the shooting

incident and the deputy's actions were objectively unreasonable in light of this clearly established law.

Qualified immunity must be denied "'if it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" Grawey v. Drury, 567 F.3d 302, 314 (6th Cir. 2009) (quoting Saucier v. Katz, 533 U.S. 194, 202 (2001)).

Once a plaintiff shows that his constitutional rights were violated, the qualified-immunity inquiry turns to whether the constitutional right at issue (1) "was clearly established at the time of the defendant's alleged misconduct," Saucier, 533 U.S. at 201, and (2) whether "what the official allegedly did was objectively unreasonable in light of the clearly established constitutional right," Grawey, 567 F.3d at 309.

"There need not be a case with the exact same fact pattern or even 'fundamentally similar' or 'materially similar' facts; rather, the question is whether the defendants had 'fair warning' that their actions were unconstitutional." Id. at 313-14 (quoting Hope v. Pelzer, 536 U.S. 730, 741 (2002).

As explained above, Plaintiffs' rights were clearly established by Garner therefore the Defendant deputy's conduct was objectively unreasonable in light of those rights. Therefore, qualified immunity should be denied.

Here, there are genuine factual disputes with respect to whether defendants' shooting of the plaintiff was unreasonable and whether Deputy Benavidez used excessive force when he shot Benson.

Benavidez was fired for not following the Sheriff's department policy when it came to using deadly force on a fleeing suspect. The Galveston County Policy manual is a guide to how a reasonable deputy should conduct himself.

Therefore, it could be said that Deputy Benavidez was fired for not following policy, then in that instance Deputy Benavidez did not act as a reasonable deputy should.

Further, considering the factual disputes outlined above, the defendant has not established it was objectively reasonable for him to believe his conduct did not violate those rights as a matter of law. Accordingly, plaintiff's request that his claims not be dismissed on the basis of qualified immunity.

### 4. Whether counts 1-3 against Benavidez are barred by the Texas Tort Claims Act.

### A. Counts 1-3 are not barred by the Texas Tort Claims Act

Defendants' basis for their motion to dismiss counts 1-3 is Texas Civil Practice and Remedies Code § 101.106(f), which reads: If a suit is filed against an employee of a governmental unit based on conduct within the general scope of that employee's employment and if it could have been brought under this chapter against the governmental unit, the suit is considered to be against the employee in the employee's official capacity only.

On the employee's motion, the suit against the employee shall be dismissed unless the Plaintiff files amended pleadings dismissing the employee and naming the governmental unit as Defendant on or before the 30th day after the date the motion is filed.

However, dismissal of the complaint is not appropriate. Plaintiff amended his complaint based on the Defendants' election of remedies and removed Defendant Benavidez. Galveston

County is replaced as the party to this lawsuit in counts 1-3 at the request of Defendant

Benavidez as required by Texas Civil Practice and Remedies Code § 101.106(f). Consequently,

this portion of Defendant's motion is moot. Accordingly, Defendants' Motion to Dismiss should

be denied.

5. **Whether Benson can recover under count 5 for retaliation in violation of the First Amendment.**

A. **Benson Can Recover for retaliation in Violation Of The First Amendment**

Benson can meet the legal standards to sustain a claim of retaliation. As the Fifth Circuit

has explained, to prevail on a first amendment retaliation claim, plaintiff must demonstrate that

(1) he was engaged in constitutionally protected activity, (2) the officers' action caused him to

suffer an injury that would chill a person of ordinary firmness from continuing to engage in that

activity, and (3) the officers' adverse actions were substantially motivated against plaintiff's

exercise of constitutionally protected conduct.'" Alexander v. City of Round Rock, 854 F.3d

298, 308 (5th Cir. 2017).

Mr. Benson was engaging in constitutionally protect free speech when he raised his hands

to surrender. The raising of the hands is a universal sign for I surrender, and I am unarmed.

By shooting Benson for exercising his constitutional right to surrender, by raising his

hand would chill a person of ordinary firmness. This is evident by the outrage the public shows

every time someone is shot while exercising their constitutional right to surrender.

Finally due to Deputy Benavidez being tired his action of shooting Benson were

substantially motivated against Benson constitutionally protected right to raise his hands and

surrender.

At the time of the incident, the Plaintiff clearly established a constitutional right to be free from retaliation for the exercise of protected speech. Any reasonable sheriff deputy knew or should have known of this right to surrender at the time of the complained of conduct as it was clearly established at that time.

Benson exercised his constitutionally protected right to be arrested without harm when he raised his hands. Retaliatory animus for Benson fleeing was a substantially motivating factor in the excessive force used by individual Defendant Benavidez.

The excessive force used against Plaintiff in retaliation for his protected conduct would deter a person of ordinary firmness from continuing to engage in the protected conduct. Defendant Benavidez participated in this use of force as a means of retaliation for Benson taunting him while fleeing by raising his hands. His anger can be herd on the video as he uses profanity to issue his orders to Benson.

Therefore, Defendant Benavidez is liable for the injuries and damages resulting from the objectively unreasonable and conscience shocking force of the deputy. Defendant Benavidez engaged in the conduct described by this Complaint willfully, maliciously, in bad faith, and in reckless disregard of Benson's federally protected constitutional rights.

The acts or omissions by Defendant Benavidez were moving forces behind Plaintiff's injuries. The acts or omissions of Defendant Benavidez as described herein intentionally deprived Plaintiff of his constitutional and statutory rights and caused him other damages.

Defendant Benavidez is not entitled to qualified immunity for the complained of conduct.

The Defendant to this claim at all times relevant hereto were acting pursuant to municipal/county custom, policy, decision, ordinance, regulation, widespread habit, usage, or practice in their actions pertaining to Plaintiff.

As a proximate result of Defendants' unlawful conduct, Plaintiff request that the Defendants motion for summary judgment be denied as it pertains to his First Amendment Retaliation Claim.

### IX.     IF THE COURT GRANTS DEFENDANT'S MOTION TO DISMISS, THE PLAINTIFF RESPECTFULLY REQUEST THAT THE COURT GRANT LEAVE TO AMEND HIS COMPLAINT

15(a) encourages Courts to look favorably upon requests to amend pleadings, stating that leave "shall be freely given when justice so requires." While granting or denying a request for leave to amend rests within the sound discretion of the Court, the Court should exercise that discretion in this case in favor of the Plaintiff, particularly considering the gravity of his allegations. Therefore, should the Court find deficiencies in any of those causes of action Case Plaintiff, respectfully request leave to amend his complaint to address any such deficiencies noted by the Court.

### X.     PRAYER WHEREFORE, PREMISES CONSIDERED,

Plaintiff prays that this Court deny Defendant's Motions For Summary Judgement.

Jarvis D. Rice
Bar No. 24103597
Attorney for Plaintiff Dennis Benson
3306 Manzanita Lane
Manvel Texas 77578
P: (409) 888-0006

F: (832) 336-5954
Attorneyjarvisrice@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 13th day of October 2022 the foregoing was served in accordance with the Federal Rules of Civil Procedure to the following counsel of record:

**Via electronic service**.

Genevieve B. McGarvey
Bryan R. Lasswell
McLeod, Alexander, Powel & Apffel,
P.C. 802 Rosenberg - P.O. Box 629 Galveston, Texas77553
dwpoole@mapalaw.com
brlasswell@mapalaw.com

Joseph R. Russo
Greer, Herz & Adams, LLP
One Moody Plaza, 18th Floor
Galveston TX 77550
JRusso@greerherz.com