NO. 3:21-CV-00200

---

**IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS**

---

**DENNIS BENOSN,**

**Plaintiff**

v.

**COUNTY OF GALVESTON**
**EDWARD BENAVIDEZ, Individually**
**HENRY TROCHESSET, In his official capacity**

**Defendants.**

---

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

**Jarvis D. Rice**
**Bar No. 24103597**
**Attorney for Plaintiff Dennis Benson**
**3306 Manzanita Lane**
**Manvel, Texas 77578**
**P: (409) 888-0006**
**F: (832) 336-5954**
**Attorneyjarvisrice@gmail.com**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES…........................................................................................3

STATEMENT OF ISSUES…………………......................................................6

SUMMARY OF THE ARGUMENT.........................................................................7

REPLY TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS.................................7

PLAINTIFF'S STATEMENT OF FACTS........................................................13

SUMMARY JUDGEMENT EVIDENCE.............................................................18

PROCEDURAL HISTORY…........................................................................18

ARGUMENT.........................................................................................19

   1.  WHETHER BENSON'S CLAIMS CAN SURVIVE SUMMARY
      JUDGEMENT…………………………......................................................19

   2.  WHETHER BENSON CAN PROVE MUNICIPAL LIABILTY ..................................21

   3.  WHETHER THE COUNTY OF GALVESTON TRAINING POLICY IS FACIALLY
      LAWFUL AND CONSTITUTIONALLY SOUND…………..……………………48

   4.  WHETHER THE COUNTY OF GALVESTON AND HENRY TROCHESSET
      FAILED TO DISCIPLINE AND SUPERVISED………..……………………………60

   5.  WHETHER THE COUNTY OF GALVESTON AND HENRY TROCHESSETT
      TOLERATED THE USE OF FORCE AND OTHER POLICIES………………………66

REQUEST FOR LEAVE…………………………………………………………………...75

PRAYER…........................................................................................75

Excess Risk Underwriters, Inc. v. LaFayette Life Ins. Co., 208 F. Supp. 2d 1310, 1313

(S.D. Fla. 2002)(citing Marshall County Bd. of Educ. v. Marshall County Gas Dist., 992 F.2d

1171, 1174 (11th Cir. 1993)).


## <u>TABLE OF AUTHORITIES</u>

Cases Board of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 403 (1997) ......................24

Brady v. Maryland, 373 U.S. 83 (1963). Connick, 563 U.S. at 57............................................................53

Brown v. Bryan Cnty., 219 F.3d 450, 457 (5th Cir. 2000) .......................................................................61

Cal. V. Hodari D., 499 U.S. 621, 627-628 (U.S. 1991) ...........................................................................26

City of Canton, Ohio v Harris 489 U.S. 378 (1989) ................................................................................48

Connick v. Thompson, 563 U.S. 51, 62 (2011); see Brown, 520 U.S. at 407. ..........................................53

Davis v. Scheuer, 468 U.S. 183 (1984);……………………………………………………...…….20

Edionwe v. Bailey, 860 F.3d 287, 291 (5th Cir. 2017)…………………………………………..19

Excess Risk Underwriters, Inc. v. LaFayette Life Ins. Co., 208 F. Supp………………….……...22

Farmer v. Brennan, 511 U.S. 825, 843 (1994) .......................................................................................25

Fraire v. City of Arlington, 957 F.2d 1268 (5th Cir. 1992) .....................................................................36

Gabriel v. City of Plano, 202 F.3d 741, 745 (5th Cir. 2000) ..................................................................25

Great Plains Tr. Co. v. Morgan Stanley ., 313 F.3d 305, 312 (5th Cir. 2002)…………………19

James v. Harris County, 577 F.3d 612, 617-18 (5th Cir. 2009) ..............................................................21

Johnson v. Johnson, 385 F.3d 503, 529 (5th Cir. 2004)……………….……………..……….19

Kitchen v. Dallas Cty., 759 F.3d 468, 484 (5th Cir. 2014) ....................................................24

Lawson v. Dallas Cnty., 286 F.3d 257, 263 (5th Cir. 2002) ...............................................36

Marshall County Bd. of Educ. v. Marshall County Gas Dist., 992...............................22

Milan v. City of San Antonio, 113 F. App'x 622.............................................................23

Miller v. City of Texas, 3:18-CV-00284 (S.D. Tex. May. 21, 2019) ...............................36

Monell v. New York City Dept. of Social Services, 436 U.S. 658 (1978) .......................21

Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986) ...............................................37

Pineda v. City of League City, 124 F. Supp. 2d 1057, 1078 (S.D. Tex. 2000) ...............25

Piotrowski v. City of League City, 237 F.3d 567, 578 (5th Cir. 2001) ..........................21

Roberts v. City of Shreveport, 397 F.3d 287, 292 (5th Cir. 2005) ..................................24

Sanders-Burns v. City of Plano, 594 F.3d 366, 381 (5th Cir. 2010) ..............................25

Santibanes v. City of Tomball, Tex., 654 F. Supp. 2d 593, 611 (S.D. Tex. 2009) ..........37

Scheuer v. Rhodes, 416 U.S. 232, 236 (1974) ...............................................................20

Taylor v. Ledbetter, 818 F.2d 791, 794 n.4 (11 Cir. th 1987..........................................20

Tennessee V. Garner, 471 U.S. (1985)............................................................................28

Turner v. Upton County, 915 F.2d 133, 136 (5th Cir. 1990) .........................................23

United States v. Mendenhall, 446 U.S. 544 (1980) .......................................................26

Webster v. City of League City, 735 F.2d 838, 841 (5th Cir.1984) .................................36

Whitehead v. Keyes, 85 Mass. 495, 501 (1862) .............................................................26

Young v. City of Providence,301 F. Supp.2d 163 (D.R.I 2004) ........................................................58

Zarnow v. City of Wichita Falls, 614 F.3d 161 (5th Cir. 2010) ........................................................36

Zuchel v. City and County of Denver, Colorado, 997 F. 2d 730 (1993) ...........................................56

Statutes Fed. R. Civ. P. 12(b)(6)........................................................................................................19

<u>IN THE UNITED STATES DISTRICT COURT</u>
<u>FOR THE SOUTHERN DISTRICT OF TEXAS</u>
<u>GALVESTON DIVISON</u>

| | | |
|---|---|---|
| **DENNIS REYNARD BENSON** | § | |
| **Plaintiff** | § | |
| | § | |
| **V.** | § | **CIVIL CASE NO. 3:21-CV-00200** |
| | § | **JURY DEMANDED** |
| **COUNTY OF GALVESTON** | § | |
| **EDWARD BENAVIDEZ, Individually** | § | |
| **HENRY TROCHESSET, In his official capacity** | § | |
| **Defendants.** | § | **OF GALVESTON COUNTY TEXAS** |

<u>PLAINTIFF'S RESPONSE TO DEFENDANTS'</u>
<u>MOTION FOR SUMMARY JUDGMENT</u>

Plaintiff, through his counsel, Jarvis Rice, submits his response to the Defendants'

Motion for Summary Judgment and requests that such Motion be denied.

## I.    <u>STATEMENT OF ISSUES</u>

1. Whether Benson's claims can survive summary judgement.

2. Whether Benson can prove municipal liability.

3. Whether the county's training policy is facially lawful and constitutionally sound.

4. Whether the County of Galveston and Henry Trochesset failed to discipline and supervise

their deputies.

5. Whether the County of Galveston and Henry Trochesset tolerated the use of force and other

policies.

## II.   SUMMARY OF THE ARGUMENT

Much of what transpired on the morning of July 11, 2019, remains uncertain and is hotly contested among the parties in this case. What is certain is that Dennis Benson suffered physical and emotional trauma at the hands of a Galveston County Sheriff Deputy who was assigned to escort him from the hospital. Benson had swallowed a baggie of ecstasy and was in need of medical attention. Due to this need Benson was denied entry into the county jail and transported to UTMB by ambulance. Shortly after the first deputy was relieved Benson made an attempt to flee from the deputy guarding him. During this attempt Benson was shot by deputy Benavidez. Due to being shot Benson right foot was amputated.

Benavidez claimed that he followed his excessive force training that he learned from the police academy, Galveston County Sheriff Department along with his TCOLE courses and Texas Penal Code 9.52, when handling the escape incident.

The County of Galveston fired Deputy Benavidez for violating their use of force policy along with Texas Penal Code 9.52

Our system of justice does not rely on courts to make determinations of credibility and fact; rather, it relies on the collective wisdom of a jury. Dennis Benson urges the court not to extinguish his right to have issues of fact decided by a jury by denying the Defendants' motion for summary judgment.

## III.   REPLY TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS

With regard to alleged "undisputed material fact" 6. After the second trip to the bathroom, Benson pushed Benavidez back and broke away from him. (Id. at 39:1-5). Benson headed down the hallway, but Benavidez was able to grab him when Benson ran into a dead-end

room. (Id. at 41:4-11). When Benavidez attempted to secure Benson, the two scuffled and fell down with Benson on top of Benavidez. (Id. at 41:12-20). Benson then got up and ran out of the emergency room and out of the exit. (FAC [ECF No. 12] at ¶¶ 55-56).

DISPUTE: 52. Kelli Allen stated that Benson headed down the emergency room hallway shackled and turned down the DECON hallway, which led to a dead end. 53. While coming back towards Deputy Benavidez, Ms. Allen stated that Benson gave sort of a football move avoiding Deputy Benavidez. 54. Ms. Allen stated that the ordeal in the DECON hallway lasted about two seconds.

With regard to alleged "undisputed material fact" 7. Benavidez followed Benson out of UTMB and drew his weapon at which time it discharged. (Ex. 4 (Benavidez Dep.) at 43:5-25). Fatigued by the altercation in the hospital room, Benson stopped running but continued to walk quickly away from Benavidez who followed him. (Id. at 45:16-46:3). Benavidez continued shouting orders at Benson to "stop," "get on the ground" and "please stop" during the entire chase. (Id. at 113:20-114:24). Benson eventually climbed over cement barriers and fell into a parking (Id. at 46:4-11; FAC [ECF No. 12] at ¶ 60). Benavidez once again ordered Benson to stay on the ground; when he did not, Benavidez fired a shot hitting Benson in the leg. (Id. at 46:16-47:5).

DISPUTE: Deputy Benavidez first shot was intentional and aimed at Benson. 56. Briana Menzies stated as Benson exited through the emergency room doors, Deputy Benavidez fired a shot that struck near Benson. 57. This intentional shot was confirmed by Preston Huff who stated he saw the officer fire the shot at Benson on the UTMB video camera.

With regard to alleged "undisputed material fact" 8. When notified of the shooting, Sheriff Trochesset contacted the Texas Rangers to request an independent investigation of it. (Ex. 1 (Trochesset Decl.) at ¶ 19).

**DISPUTE**: Henry Trochesset stated that once he found out the Rangers was handling the case he recused himself. He stated that it was a completely independent investigation but claim not to know that his internal affairs investigator was in the room with the Texas ranger doing interviews. Which would have made the investigation not independent.

With regard to alleged "undisputed material fact" 9. Benavidez felt justified in using deadly force as he believed Benson was an immediate threat to the public as an escaped felon under heavy narcotics and due to Benson's unpredictable behavior. (Ex. 4 (Benavidez Dep.) at 51:25-52:20). Benavidez testified that he was trained on the use of force standard at the "police academy" with follow up training from GCSO and reviewing its policies. (Id. at 51:6-24, 100:13-101:12).

**DISPUTE**: Benavidez stated that at the time he shot Benson, Benson was not a threat to him and there was no one that he could visually see from the public. Benavidez stated that he shot Benavidez because he could have potentially encountered a member from the public. *(Ex.1 (Benavidez) 44:20-25, 45:1-25,46:1-25,47:1-25,48:1-25,49:1-25,50:1-10)*

With regard to alleged "undisputed material fact"13. GCSO assures that each of its peace officers satisfactorily meet TCOLE training guidelines and requirements before performing any peace officer functions. (Ex. 1 (Trochesset Decl.) at ¶ 11; Ex. 2 (Martinez Decl.) at ¶ 12). Each GCSO peace officer must have and maintain their peace officer license in accordance with TCOLE and State of Texas Case 3:21-cv-00200 Document 39 Filed on 08/23/22 in TXSD Page

4 of 30 5 peace officer training standards. (Ex. 1 (Trochesset Decl.) at ¶ 11). Among many other things, the basic peace officer course specifically instructs candidates on the Constitution and criminal justice system, the Texas Code of Criminal Procedure and Penal Code, use of force, mechanics of arrest and use of firearms. (Ex. 2 (Martinez Decl.) at ¶ 8); (Ex. 3 (Rowe Decl.) at ¶ 15). Peace officer candidates are trained on the legal standards applied in use of force situations including guides on when and how much force is permissible. (Id.; Ex. 4-A (Basic Peace Officer Training Materials) at Benson002214-22213 ). Only after completing full course requirements and passing a TCOLE licensing exam is a candidate, like Benavidez, licensed and allowed to work as a peace officer at GCSO. (Ex. 1 (Trochesset Decl.) at ¶ 12; Ex. 3 (Rowe Decl.) at ¶ 12). At the time he was hired by GCSO in 2011, Benavidez had completed 81 hours of peace officer coursework at Galveston College, passed the TCOLE peace officer licensing exam and was professionally licensed through TCOLE. (Ex. 2-A (Benavidez TCOLE Status Report) at Benson 000249; Ex. 3 (Rowe Decl.) at ¶ 12; Ex. 4 (Benavidez Dep.), at 115:12-116-15).

**DISPUTE:** Defendant Benavidez TCOLE transcript only had a couple classes oner ten years in use of force. Defendant Benavidez stated that he could remember what he had learned pertaining to deadly force at the academy. *(Ex.1 (Benavidez) 13:23-25,14:1-25,15:1-25,16:1-25,17:1-15)* He could not recite any policy or law related to deadly force. His answer was the same. Defendant Trochosset just as Defendant Benavidez could recite any policy of law related to deadly force his answer was (look)

With regard to alleged "undisputed material fact" 16. GCSO has policies ("Policies") and standards of operation procedures ("Procedures") to provide supervision and control over the agency. (Ex. 1 (Trochesset Decl.) at ¶ 3, 5). The Policies and Procedures provide resources to GCSO deputies in performing their duties. (Id.). GCSO officers are provided and instructed to

read the Policies and Procedures, are required to follow them, are checked for compliance by supervisors, and are subject to discipline if they fail to do so. (Id. at ¶¶ 3, 6).

      **DISPUTE**: Defendant Trochesset stated that deputies are not required to know the policy off hand, and they are not tested on policy. Trocheset himself stated that he did not know the policy. (look)

      With regard to alleged "undisputed material fact" GCSO Policy GC 201 pertains to Use of Force. (Ex. 3 (Rowe Decl.) at ¶ 5). Section 201.2 informs GCSO officers that officers shall use only force necessary to effectively bring an individual or incident under control, while protecting the lives of the officer and others. (Id.). Section 201.01 informs officers of the purpose of the use of force policy, which is to provide officers with guidelines concerning the appropriate use of deadly and non-deadly force. (Id.). Section 201.03.C states that in deciding whether to use a level of force, the officer should evaluate each situation in light of the known circumstances, and 201.04.A.2 states that decisions are based on an "objectively reasonable" standard. (Id.; Ex. 1 (Trochesset Decl.) at ¶ 7). Section 201.04.B.1 further informs officers they are authorized to use deadly force to protect the officer or others from Case 3:21-cv-00200 Document 39 Filed on 08/23/22 in TXSD Page 6 of 30 7 what is reasonably perceived to be an imminent threat of death or serious bodily injury to the officer or another. (Id.).

      **DISPUTE:** Defendant Trochesset who is in charge of implementing the policy did not know what the objective reasonably standard was. (Trochesset dep)

      With regard to alleged "undisputed material fact" 19. The use of force Policy instructs on the standards required to protect detainees and escapees and under proper application safeguards

them against violations of their constitutional rights or application of excessive force. (Ex. 1 (Trochesset Decl.) at ¶ 10).

**DISPUTE:** There is now where in the use of force policy where it addresses safeguards for protecting escapes and detainees.

With regard to alleged "undisputed material fact" 22. There is no policy, procedure, custom or practice, written or unwritten, at GCSO allowing, tolerating, or encouraging the use of excessive force. (Id. at ¶ 21; see also, Ex. 2 (Martinez Decl.) at ¶ 22; Ex. 4 (Benavidez Dep.) at 76:23-78:1). GCSO does not have any policy that directs, or even authorizes, its peace officers to violate state or federal law or constitutional protections. (Ex. 1 (Trochesset Decl.) at ¶ 21; Ex. 2 (Martinez Decl.) at ¶ 22). To the contrary, GCSO demands through its policies and procedures that GCSO's peace officers comply with the requirements of constitutions and laws of the United States and Texas. (Id.). The documented GCSO Policies and Procedures are very clear on this issue and every GCSO officer is required to take an oath of office pledging compliance with constitutional principles. (Id.). GCSO has never condoned or permitted excessive force by any GCSO officer over the last 38 years. (Id.).

**DISPUTE:** Galveston County's Sheriff's Office Policy number 201.4 and Texas Penal Code 9.52 is unconstitutional.

## IV.   PLAINTIFF'S STATEMENT OF FACTS

17. Our investigation of the facts and circumstances reveals the following. On Thursday, July 11th, 2019, at around 9:30 a.m., Deputy Steadham observed Dennis Benson sitting in the back of the 405th court room.

18. Deputy Steadham advised Mr. Benson that there was an active warrant for his arrest, and he would be taken into custody.

19. Mr. Benson was transported to the jail around 10:15 a.m. by Deputy Minetti.

20. Deputy Minetti stated that as they walked through the tunnel, Mr. Benson confessed that he had swallowed a baggy of ecstasy.

21. By the time Deputy Minetti dropped off the last person, Mr. Benson was complaining of chest pains and dryness of the mouth.

22. Upon entering booking, Mr. Benson was placed where new arrestees are kept prior to being medically cleared for incarceration.

23. Deputy Minetti stated by this time Mr. Benson was complaining of shortness of breath.

24. Deputy Minetti advised jail medical staff, Jared Head, that Mr. Benson stated that he had swallowed a baggy of ecstasy.

25. Mr. Head took Mr. Benson's vitals, during which time he kept complaining about shortness of breath and dryness of mouth.

26. Mr. Head advised Deputy Minetti that he did not believe that Mr. Benson would be accepted into the jail, but he had to get confirmation from the doctor.

13

27. Deputy Minetti then advised his supervisor, Sergeant Campbell, that jail medical might refuse Mr. Benson.

28. After speaking with Sergeant Campbell, Deputy Minetti then spoke with booking Sergeant Drewes.

29. He advised Sergeant Drewes that medical might refuse Mr. Benson and asked if she had a pair of shackles in case he needed to be sent to the hospital.

30. Deputy Minetti received a pair of shackles from Sergeant Drewes and waited for medical to confirm the refusal of Mr. Benson.

31. At approximately 10:55 a.m., Mr. Head advised that Mr. Benson would not be accepted into the jail and that he would be transported via ambulance to University Texas Medical Branch Galveston (UTMB).

32. Deputy Minetti contacted Deputy Steadham and informed him that Mr. Benson was being taken to UTMB and advised him that Sergeant Campbell needed him to accompany Mr. Benson.

33. Deputy Minetti stated that the EMS arrived at approximately 11:03a.m. and loaded Mr. Benson onto the stretcher where he was shackled and double locked.

34. Deputy Minetti stated that Deputy Steadham put his handcuffs on Mr. Benson.

35. Once Mr. Benson arrived at the emergency room, he was assigned to ER room #5.

36. Mr. Benson was moved onto the hospital stretcher from the ambulance stretcher.

37. Once on the hospital bed, Deputy Steadham readjusted the handcuffs on Mr. Benson, by removing the cuff from his left wrist while his right wrist was still handcuffed.

14

38. Deputy Steadham then moved the open cuff and secured it to the bed rail.

39. While in the emergency room Mr. Benson continuously complained to hospital staff, that his stomach was hurting due to him ingesting a large quantity of drugs.

40. Mr. Benson then stated that he needed to use the restroom for a bowel movement.

41. Deputy Steadham and Mr. Benson walked to the restroom just west of the east nurse's station in the ER.

42. Mr. Benson was shackled the entire time.

43. Mr. Benson went into the restroom and once he was finished, he was escorted back to ER room #5 by Deputy Steadham.

44. Mr. Benson got back onto the hospital bed and Deputy Steadham secured the handcuff back to his right wrist.

45. Deputy Steadham spoke with Sergeant Drewes on the phone sometime close to 4 p.m. and advised her that the doctor was probably going to be releasing Mr. Benson at some point in the day.

46. Sergeant Drewes advised Deputy Steadham that she would have someone come and relieve him around 5 p.m.

47. Deputy Steadham stated that Deputy Benavidez arrived at the room around 5 p.m., to relieve him of duty.

48. Deputy Steadham stated that he updated Deputy Benavidez on Mr. Benson's' condition then recommended for Deputy Benavidez to put his handcuffs on Mr. Benson.

49. Deputy Steadham stated that Deputy Benavidez showed him that he did not have any handcuffs in his cuff case.

50. Deputy Steadham stated he got into a conversation with Deputy Benavidez about how to properly secure Mr. Benson, due to the fact he was known runner.

51. At some point after Deputy Benavidez arrived, video shows Mr. Benson shuffling out the room shackled, followed by Deputy Benavidez.

52. Kelli Allen stated that Mr. Benson headed down the emergency room hallway shackled and turned down the DECON hallway, which led to a dead end.

53. While coming back towards Deputy Benavidez, Ms. Allen stated that Mr. Benson gave sort of a football move avoiding Deputy Benavidez.

54. Ms. Allen stated that the ordeal in the DECON hallway lasted about two seconds.

55. Mr. Benson, shackled, was able to make it down the hall, through the emergency room and out the emergency room door exit.

56. Briana Menzies stated as Mr. Benson exited through the emergency room doors, Deputy Benavidez fired a shot that struck near Mr. Benson.

57. This intentional shot was confirmed by Preston Huff who stated he saw the officer fire the shot at Mr. Benson on the UTMB video camera.

58. At that point Ms. Menzies states that Mr. Benson puts his hands up and continued to move away from Deputy Benavidez.

59. UTMB video cameras confirm that Mr. Benson was walking away from Deputy Benavidez with his hands up.

16

60. Mr. Benson crosses over a cement barrier and falls.

61. As Mr. Benson is trying to push up off the ground, he is shoot by Deputy Benavidez for no apparent reason.

62. Deputy Benavidez admitted, in his statement, that he shot Mr. Benson because he was exhausted.

63. Ms. Allen, who was attending to Mr. Benson gunshot wound, told the police that he needed to be transported back up the emergency room ramp, which was in full range of the UTMB cameras.

64. Ms. Allen was told by campus police to take Mr. Benson through the unrecorded passageway, which was for wheelchairs only.

65. Mr. Benson stretcher got stuck and he lay bleeding until an ambulance arrived from the upper level.

66. Charge nurse Janelle Mallet stated that Ms. Menzies came to her visibly shaken by the fact, that the inmate was not properly secured to the bed.

67. Ms. Menzies stated that when she entered the room, the handcuffs where still on the bed and there was a full urinal bottle on the floor.

68. Ms. Mallet stated that was not good and she should report that to the detectives and her hospital superiors.

69. Deputy Benavidez gave several conflicting statements pertaining to this incident, none of which match the eyewitness testimony.

17

70. He even went as far as to try and cover up the crime by stating, that he accidentally discharged his firearm as he exited the emergency room.

71. Until this day, the Galveston County District Attorney Office has refused to turn over all of the videos in this case.

72. If you take the fact that Deputy Benavidez gave false statements to investigators, combined with the failed Texas Rangers investigation, and the Galveston County District Attorney's office failure to prosecute Deputy Benavidez, it could easily be considered a cover up.

73. A cover up, which we believe is motivated by Deputy Benavidez's parents who are lifelong local police officials.

## V.   SUMMARY JUDGMENT EVIDENCE

Benson relies upon the following evidence to support his motion for summary judgment:

EXHIBIT 1 Defendant Benavidez Deposition

EXHIBIT 2 Defendant Trochesset Deposition

EXHIBIT 3 Benavidez Personnel File

EXHIBIT 4 Benavidez Statement on the incident.

## VI.   PROCEDURAL HISTORY

On July 6, 2021, Plaintiff, filed his Complaint for Civil Rights Violations against the County of Galveston, Galveston County Sheriff Department, Henry Trochesset and Edward Benavidez. On August 2, 2021, Defendants removed the case to federal court. On August 30, 2021, Defendants filed a Motion to dismiss plaintiff original petition. Plaintiff thereafter filed a response and a First Amended Complaint on September 20, 2021. The County moved to strike

the First Amended Complaint. On March 7, 2022, the Court denied the County's Motion to

Strike, accepted Plaintiff's First Amended Complaint, and directed the County to file a response

by April 1, 2022. On June 16, 2022, the Defendants Motion to Dismissed was ruled on and the

County of Galveston turned over discovery on June 30, 2022. The Defendants' responses from

discovery request and Defendant Benavidez responses in his deposition identified a party and a

cause of action that was previously unavailable to the Plaintiff.

## VII.   ARGUMENT

I.   **Whether Benson's claims survive summary judgement.**
   **A. Benson's claims can survive summary judgement.**

The Defendant seeks judgment against the Plaintiff under Rules 12(c) and 56. The

purpose of a motion under Rule 12(c) is to test the sufficiency of the complaint when material

facts are not in dispute. Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co., 313 F.3d

305, 312 (5th Cir. 2002). "The standard for dismissal under Rule 12(c) is the same as that for

dismissal for failure to state a claim under Rule 12(b)(6)." Johnson v. Johnson, 385 F.3d 503,

529 (5th Cir. 2004). "To survive a motion to dismiss, a complaint must contain sufficient factual

matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal,

556 U.S. 662, 678 (2009) (internal quotation marks omitted); see also Edionwe v. Bailey, 860

F.3d 287, 291 (5th Cir. 2017).

Under Rule 56, summary judgment may be granted if "there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). When assessing whether a dispute to any material fact exists, the court should consider all

of the evidence in the record and draw all reasonable inferences in favor of the nonmoving party.

On a motion to dismiss, the Court must also accept the plaintiff's well pled facts as true and construe the complaint in the light most favorable to the plaintiff. Twombly, 550 U.S. at 555. "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

A motion to dismiss a complaint should not be granted if the factual allegations are "enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. A complaint will survive a motion to dismiss "even if it appears that a recovery is very remote and unlikely." Id. at 556.

The issue to be decided by the Court is not whether the plaintiff will ultimately prevail, but "whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds by Davis v. Scheuer, 468 U.S. 183 (1984); Taylor v. Ledbetter, 818 F.2d 791, 794 n.4 (11 Cir. th 1987), cert. denied, 489 U.S. 1065 (1989). It is only "when on the basis of a dispositive issue of law no construction of the factual allegations will support the cause of action [that] dismissal of the complaint is appropriate." Excess Risk Underwriters, Inc. v. LaFayette Life Ins. Co., 208 F. Supp. 2d 1310, 1313 (S.D. Fla. 2002)(citing Marshall County Bd. of Educ. v. Marshall County Gas Dist., 992 F.2d 1171, 1174 (11th Cir. 1993)).

When a party moves for summary judgment, that party carries the "burden of showing that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law." Estate of Kimmell ex rel. Kimmell v. Seven Up Bottling Co., 993 F.2d 410, 412 (4th Cir. 1993). Defendant County and Defendant Trochesset has failed to carry this burden, as required by Rule 56(a)

II.   **Whether Benson can prove municipal liability.**

A.  **Benson can prove municipal liability.**

Plaintiff pleads viable Claims of municipal liability. Municipalities are liable under §1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." Monell v. New York City Dept. of Social Services, 436 U.S. 658, 694 (1978).

Monell and its progeny are designed to guard against precisely the kind of municipal acquiescence to officer misconduct as happened here. Monell, 436 U.S. at 691. Where a law enforcement agency has tacitly authorized misconduct by failing to meaningfully train, investigate, or discipline unconstitutional acts by its officers, a jury may find it liable for Plaintiff's injuries.

Plaintiff may establish municipal liability under §1983 by proving that their constitutional rights were violated by an "action pursuant to official municipal policy" or misconduct so pervasive among nonpolicy making employees of the municipality "as to constitute a 'custom or usage' with the force of law." Monell, 436 U.S. at 691.

The question is whether Defendant Benavidez's misconduct was committed pursuant to a policy or custom of the Galveston County Sheriff Department that was the "moving force" behind the constitutional violations. Piotrowski v. City of League City, 237 F.3d 567, 578 (5th Cir. 2001) (citing Monell, 436 U.S. at 694); James v. Harris County, 577 F.3d 612, 617-18 (5th Cir. 2009)).

In Monell, the U.S. Supreme Court established the fundamental principle in the law of municipal liability under Section 1983 that local governments may be held liable only for their own conduct and not merely for the conduct of their employees.

That is, the government entity is not vicariously liable for the actions of its police officers simply because it employed the officer, and the harm was caused while the officer was acting within the scope of his or her employment.

Instead, liability only attaches to the county or city for injury caused by actions or omissions attributable to the government itself. Government (as opposed to individual) liability under Section 1983 is restricted only to those cases in which the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted or promulgated by that body's officers.

Government conduct by way of its policy, in addition to the individual employee's conduct that directly resulted in the harm, must be identified as causing a violation of a recognized constitutional right.

A plaintiff seeking to find a city or county government liable under Section 1983 must establish a causal connection between the injury and a government policy or custom. Locating a policy ensures that liability attaches only for those deprivations of constitutional rights resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the government itself.

City or County government liability under Section 1983 attaches "where and only where a deliberate choice to follow a course of action is made from among various alternatives by the

official or officials responsible for establishing final policy with respect to the subject matter in question."

## B.  Identification of a "Policy"

Generally, three possible avenues are open to plaintiffs to show the existence of a "policy" that allegedly caused a constitutional violation:

1) An express written policy or an actual directive from a policy making official that, when enforced, causes a constitutional violation, in short, an unconstitutional policy. Where a plaintiff can demonstrate that an existing policy is itself unconstitutional when applied as intended or that a specific action taken or directed by the government itself violated a citizen's constitutional rights, resolving the issues of fault and causation is relatively straight forward.

In these cases, there is clear governmental action that can be attributed as the cause, or moving force, behind the injury of which the plaintiff complains. A policy also can be inferred even from a single decision made by the highest official responsible for setting policy within that area of a governments' business.

2) Widespread conduct that results in violations of constitutional rights, although not authorized by any written law or policy, which is so permanent and well settled as to constitute a custom or practice with the force of law may serve as the functional equivalent of a written policy.

Essentially, a practice of condoning constitutional violations must be established. Because a custom or practice must be established, evidence of only a single alleged incident,

particularly if it involved only actors below policy-making level, will typically not be sufficient.

3) An inadequate written policy or a practice that is not unconstitutional itself, but which reflects deliberate indifference to persons' constitutional rights because the deficiency causes officers to violate constitutional rights. For example, a county or municipality will rarely have an express written or oral policy permitting the excessive use of force.

Thus, for liability to attach, it is necessary to establish the existence of a custom or practice a policy that permitted excessive force to occur by demonstrating that the municipality deliberately failed to adequately train its police officers in a relevant respect.

## C.  Monell Policy Liability

An inadequate written policy or a practice that is not unconstitutional itself, but which reflects deliberate indifference to persons' constitutional rights because the deficiency causes deputies to violate constitutional rights, is a violation of that person's constitutional rights.

First, a plaintiff can make out a Monell claim by pointing to an official municipal policy that precipitated the alleged injury. Ordinances, regulations, and statutes can constitute "policies."

Actions taken by a board or an agency, like a police commission or similar oversight body with delegated authority from a legislature, can also count as "policies" under Monell.

Similarly, actions taken by individuals with final policymaking authority concerning the relevant area or issue can constitute a municipal policy.

24

For example, a plaintiff who has sustained a Fourth Amendment excessive force injury might be able to make out a policy under this theory if a court found that a chief of police had final policymaking authority and had promulgated a policy encouraging excessive force.

The Supreme Court has also emphasized that Monell attaches under a final policymaker theory only where "a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question."

For example, in Garner v. Memphis Police Department, the U.S. Court of Appeals for the Sixth Circuit recognized that a use-of-force policy signed by the director of the Memphis Police Department was an official policy under Monell.

Even if the policymaker did not directly cause the violation, a plaintiff may still be able to show that the policy attaches to the municipality if the policymaker directed the violation to occur, authorized the violation or ratified a subordinate's decision that ultimately led to the violation.

Defendant Tropchesset is the final policymaking authority for the Galveston County Sheriff 's Office. Trochesset stated in his deposition that he was the person who made the final decisions when it came to policymaking. Trochesset was responsible for implementing Galveston County Sheriff's Office use of deadly force policy. *(Trochessett Depo. 10:16-21)*

Galveston county officials rely on two items to form their standard for the use of deadly force. The first is the Galveston County's Sheriff Office Policy manual and the second is the TCOLE, which relies on the Texas Code of Criminal Procedure for the use of deadly.

1. **The force authorized by Galveston County Sheriff's office policy number 201.04 (B) is unconstitutionally vague and ambiguous.**

A. **Galveston County Sheriff Office Policy Number 201.01(B)**

Galveston County Sheriff department use of force policy states: Law enforcement officers are authorized to use deadly force to:

**1**. Protect the officer or others from what is reasonably believed to be an immediate threat of death or serious bodily harm.

**2**. To apprehend an armed and dangerous person whom the officer has probable cause to believe will pose a significant threat of death or serious physical injury to the officer or others and when an alternative means of apprehension would involve a substantial risk of death or serious bodily harm and the safety of others would not be jeopardized by the officer's actions.

Principal factors which could make an armed subject so dangerous as to justify the use of deadly force include, but are not limited to:

**1**. The subject has recently shot, shot at, killed, or attempted to kill another person;

**2**. The subject has recently committed an assault that resulted in serious bodily injury to a law enforcement officer, fireman, or emergency medical technician acting in the line of duty; and

**3**. The subject is actually armed and reasonably appears capable of inflicting death or serious injury to any other person, giving consideration to the dangerousness of the weapon involved, the isolation or potential to isolate the subject, and his proximity to other persons.

It should be considered that a subject armed with a weapon other than a firearm may be apprehended without a substantial risk of death or serious injury by using a degree of force other than deadly force except to defend against an immediate threat of deadly force by the subject.

26

Where practicable, prior to discharge of a firearm, officers shall identify themselves as law enforcement officers.

**B.   The restrictions place on the use of Deadly Force are as followed:**

**1**. Officers may use deadly force to destroy an animal that represents a threat to public safety, or as permitted by law and as a humanitarian measure when the animal is seriously injured when the officer reasonably believes that deadly force can be used without harm to the officer or others.

**2**. No warning shots may be fired.

**3**. A roadblock shall not be used as a method of stopping a vehicle. "Stop Sticks" or similar agency-issued deflation devices are permitted, and agency personnel assigned to Patrol functions shall receive training in the use of such devices.

**4**. Discharging a firearm at or from a moving vehicle in an attempt to disable a vehicle is prohibited, because it presents an unreasonable risk to the officer or others. Because of the low probability of penetrating a vehicle with a handgun, officers threatened by an oncoming vehicle should attempt to move out of its path, if possible, instead of discharging a firearm at it or any of its occupants.

However, if an officer reasonably believes that a person is immediately threatening the officer or another person with deadly force by means of a vehicle, an officer may utilize deadly force against the driver of the vehicle.

The problem with this law is that is vague and ambiguous when it comes to the use force when dealing with a suspect that is fleeing.

The first and third restrictions are not a restriction at all. The first restriction gives the deputy the power to destroy someone else's property, by the allowing the killing of an animal, and the third restrictions allows an officer to destroy someone else's property, while endangering their lives by using stop sticks.

The second restriction disallows warning shots from the deputy and the fourth restrictions limits the deputy from firing from a moving vehicle. Due to the risk a stray bullet injuring the public.

The reason that this policy is vague and ambiguous is because it pertains to all sheriff deputies, even though there are different types of deputies. The Galveston Sheriff's Office consist of sheriff's deputies and sheriffs' jailers. Sheriff deputies work on the street and sheriff jailers work in the jail.

A sheriff deputies jobs calls for interaction with the public outside the jail. They perform what is commonly refereed to as regular policing duties. Whereas sheriff jailers only work inside the jail housing inmates.

Naturally, there is a big difference between the two because one carries a gun all of the time and the other does not. A sheriff deputy has their gum on 99 percent of the time they are at work where a jailer is totally the opposite.

Therefore, the blanket policy for the use deadly force that Galveston County provided to its different deputies is vague and ambiguous. If you are a deputy apprehending an escaping felon you are bond the constraints of Tennessee V. Garner, whereas if you are jailer chasing that same fleeing inmate you could easily be confused by your TCOLE training which refers Texas Penal Code 9.52.

28

The fact that there is no refence to guide a deputy on when to use deadly force on a fleeing suspect makes this policy unconstitutionally vague. Furthermore, the facts that a restriction was put in for the shooting of and animal, and not for a fleeing person, proves that Galveston County Policy makers were deliberately indifference to the rights of citizens to be free of harm.

2. **<u>The force authorized by Texas Penal Code § 9.52 is unconstitutional.</u>**

In 1985, the Supreme Court of the United States rejected the categorical use of deadly force to arrest a fleeing felon. Prior to that decision in Tennessee v. Garner, Texas had already abandoned the "fleeing felon" rule in favor of the later adopted approach in Garner.

Section 9.51 of the Texas Penal Code creates a justification for the use of deadly force to make an arrest, or to prevent escape after arrest, if the use of non-deadly force would have been justified, and either the crime for which the arrest is being made involved the use or attempted use of deadly force, or the officer reasonably believed that the person to be arrested would cause death or serious bodily injury if the arrest was delayed. .

Justifications for the Use of Force in Policing starts in Section 9.51 of the Texas Penal Code, which also provides a limited justification for the use of deadly force to arrest or prevent escape after arrest.

Not so many years ago, police officers routinely were authorized to use deadly force to apprehend fleeing felons. Even without knowing more about the contours of this rule, the "fleeing felon" rule was facially problematic.

Whereas felonies once carried the connotation of very serious criminality punished in the harshest ways, including by death, the proliferation of crimes denominated as felonies have created offenses that are not violent or dangerous or even particularly harmful to property.

Only one capital felony exists in Texas, so the notion that all or most felonies carry the death penalty is simply wrong. Without further consideration, it is obvious that the use of deadly force to apprehend perpetrators of non-violent crimes is excessive.

Even for the most serious felonies, an officer who kills a suspect to apprehend them or prevent their escape has, as an agent of the state, executed a person who has not been tried, convicted, or sentenced.

The justification in Section 9.51 overlaps to some extent with that found in Section 9.52 of the Texas Penal Code. While Section 9.51 applies to the use of deadly force to make an arrest, or to prevent escape after arrest, Section 9.52 pertains to force used to prevent the escape of an arrested person from custody.

Section 9.52 of the Penal Code ("Prevention of Escape from Custody") provides: The use of force to prevent the escape of an arrested person from custody is justifiable when the force could have been employed to effect the arrest under which the person is in custody, except that a guard employed by a correctional facility or a peace officer is justified in using any force, including deadly force, that he reasonably believes to be immediately necessary to prevent the escape of a person from the correctional facility.

The language used in these two statutory provisions may have been intended to distinguish between the status of a person who has been arrested but not yet placed in "custody,"

and a person who is incarcerated or otherwise in a custodial setting. If so, the distinction is undefined and unclear.

A person who has been arrested is "seized" for purposes of the Fourth Amendment and is said to have been taken into "custody." All incarcerated persons have been arrested, so the Section 9.51 justification for use of force or deadly force to prevent escape applies. Also applicable are the limitations on the use of deadly force mandated by Tennessee v. Garner.

Statute 9.52 is rife with contradictions of state and constitutional standards. Most obvious is the abandonment of the usual limitations imposed on justifications in Texas law, including the "when and to the degree" language.

While Section 9.51 allows the use of non-deadly force only to the degree an officer reasonably believes it to be immediately necessary to prevent escape after arrest, and much more strictly limits the use of deadly force for that purpose, once a person is in "custody" in a "correctional facility," that same officer is free of the constraints that would have applied to the use of deadly force while the arrestee was in custody (under arrest).

3. **Galveston County Sheriff Office Policy 201.4 and Texas Penal Code 9.52 are unconstitutional**

The most striking and serious problem with Section 9.52 and Galveston County's Sheriff Office Policy Number 201.4, of course, is that it violates the constitutional norms explicated in Tennessee v. Garner.

The plain language of these statutes permits a correctional officer or peace officer to use deadly force if, for example, the officer reasonably believes he will not be able to apprehend an escapee otherwise.

No regard is paid to whether the person escaping has been convicted of a crime, whether any alleged crime involved violence, or whether the escapee poses a danger to others if apprehension is delayed.

In Garner, pursuant to a statute that allowed the use of deadly force to apprehend all felony suspects, a police officer shot a burglary suspect as he tried to escape.

The Supreme Court determined that the Tennessee statute was unconstitutional as applied to unarmed, non-dangerous fleeing suspects because it violated the Fourth Amendment's prohibition against unreasonable searches and seizures. Id. 471 U.S. at 11, 105 S.Ct. at 1701.

Accordingly, the Court held the Tennessee statute was invalid insofar as it purported to give the officer the authority to act as he did. Id. at 22, 105 S.Ct. at 1707.

In so holding, the Court stated that: The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. It is not better that all felony suspects die than that they escape. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so.

The Tennessee statute stated: A Tennessee statute provides that, if, after a police officer has given notice of an intent to arrest a criminal suspect, the suspect flees or forcibly resists, "the officer may use all the necessary means to effect the arrest."

Texas Penal Code 9.52 and Galveston County Sheriff Office Policy Number 201.4 just as the Tennessee statute in Garner is facially unconstitutional. They all authorized the use of deadly

force on a nonviolent suspect, who does not pose a threat to the community of the officers. Accordingly, the Fourth Amendment is applicable to the instant case.

Based on the ruling in Tennessee V. Garner, and the considerations outlined in Kingsley, the use of force was not justified. Benson wash shot as he attempted to push up off the ground. At that time, Benson was not a threat to the deputy or to the public. Therefore, Defendant's motion to dismiss under Texas Penal Code 9.52 and Galveston County Sheriff Office Policy 210.4 should be denied.

In short, the justification afforded by Section 9.52 and Galveston County Sheriff Office Policy Number 201.4, like the discredited "fleeing felon" rule, sweeps too broadly. In doing so, it runs afoul of the U.S. Constitution. No reported case in Texas has addressed this concern, presumably because none has been decided since Tennessee v. Garner.

Section 9.52 and Galveston County Policy 201.4 also is inconsistent with Section 5.05 of the American Law Institute's (ALI) Principles of the Law, Policing. A portion of that principle provides that, "deadly force should not be used except in response to an immediate threat of serious physical harm or death to officers, or a significant threat of serious physical harm or death to others.

This best practice standard would not allow the use of "any force, including deadly force" to prevent escape from a correctional facility. The use of deadly force is reserved in principle 5.05 for self-defense or defense of others, and Texas law provides justifications for those usages in statutes independent of Section 9.52.

Policy-wise, it is difficult to fathom why this extraordinary grant of authority to use deadly force to prevent escape from custody should be justified. In Texas, "correctional facilities" include municipal and county jails.

These jails typically house misdemeanants and persons awaiting trial, some of whom have not been formally charged by information or indictment. Granted, the jail population also includes persons convicted of crime and serving sentences, as well as prisoners who have felony convictions and are waiting to be transferred to state prisons.

The problem with Section 9.52 and Galveston County Policy is that they make no attempt to differentiate between felons and misdemeanants or the convicted and the merely suspected. It treats all prisoners as sufficiently dangerous to merit the use of deadly force in their apprehension, without regard for the nature of the crime for which the prisoners are being held.

If, for instance, an out of shape, slow-moving deputy were to see a prisoner in a county jail who had been taken into custody for public intoxication running from the jail, the deputy might reasonably conclude that it was immediately necessary to shoot the fleeing prisoner in order to prevent his escape because the deputy could not apprehend him otherwise. The literal language of Section 9.52 and Galveston County Sheriff Department Section () would justify that deputy's actions.

This what exactly happened in this case. Deputy Benavidez after a short jog became so tired that he shot Benson who was intoxicated to prevent him from escaping. This was admitted by Deputy Benavidez in the statement he gave pertaining to the incident.

In Kingsley v. Hendrickson, the United States Supreme Court considered what the appropriate standard was for determining whether a use of force on a pretrial detainee was excessive under the Constitution.

The Court concluded that use of force on a pretrial detainee would be judged by an objective reasonableness standard. In doing so, the Court cleared up several variations among the Circuits as to the appropriate use of force standard when dealing with a person who was no longer a free citizen but was also not a sentenced prisoner.

Up until this decision, the various U.S. Circuit Courts of Appeal would determine the appropriate Constitutional standard based on the status of the prisoner. The Court has now made clear that until an inmate is sentenced the objective reasonableness standard applies.

Under 42 U.S.C. § 1983, a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable to prevail on an excessive force claim. This determination must be made from the perspective of a reasonable officer including what the officer knew at the time, see Graham v. Connor, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443, and must account for the legitimate interests stemming from the government's need to manage the facility in which the individual is detained, appropriately deferring to  policies and practices that in the judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security," Bell v. Wolfish, 441 U.S. 520, 540, 547, 99 S.Ct. 1861, 60 L.Ed.2d 447.

Defendant Trochesset who is the head policy maker stated that most every inmate is his jail is pretrial detainee. He stated that he is not aware of the difference between a pretrial detainee and convicted inmates. He stated that he did not know if there was a difference in the

escalation of the use of force and he did not train his deputies on it. Defendant Trochesset stated that he had one blanket use of force policy and that went for everyone. (Trochessett Depo 47:19-25, 48:1-25, 49:1-4)

Based on the ruling in Tennessee V. Garner, and the considerations outlined in Kingsley, the use of force was not justified. Benson wash shot as he attempted to push up off the ground. At that time, Benson was not a threat to the deputy or to the public. Therefore, Defendant's motion to dismiss under Texas Penal Code 9.52 should be denied.

### D.  Monell Custom Liabilty

These allegations are sufficient to bring claims against Defendant County of Galveston under Monell. An "official policy" for Monell liability may be alleged through "a persistent widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy." Lawson v. Dallas Cnty., 286 F.3d 257, 263 (5th Cir. 2002) (quoting Webster v. City of League City, 735 F.2d 838, 841 (5th Cir.1984) (en banc)); Zarnow v. City of Wichita Falls, 614 F.3d 161, 166 (5th Cir. 2010); James, 577 F.3d at 617-18.

A cognizable policy for purposes of §1983 liability may, therefore, be evidenced by custom "even though such a custom has not received formal approval through the body's official decision-making channels," Milan v. City of San Antonio, 113 F. App'x 622, 625 (5th Cir. 2004) (quoting Monell, 436 U.S. at 691).

Moreover, a custom may be alleged by a claim that "serious incompetence or misbehavior was general or widespread throughout the police force." Fraire v. City of Arlington,

957 F.2d 1268, 1278 (5th Cir. 1992). It is hardly surprising that the customs that Plaintiff alleges failing to control deputies' excessive uses of deadly force was never formally adopted.

Plaintiff can bring proper claims that Galveston County may be liable if its policymakers condone or otherwise adopt the creation of a custom by knowingly ratifying the illegal or unconstitutional actions of subordinate, non-policymaking employees. Santibanes v. City of Tomball, Tex., 654 F. Supp. 2d 593, 611 (S.D. Tex. 2009) (citing Turner v. Upton County, 915 F.2d 133, 136 (5th Cir. 1990)).

A persistent, widespread practice of officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents the municipal policy.

Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority." Webster v. City of League City, 735 F.2d 838, 841 (5th Cir. 1984) (en banc). This type of municipal policy is premised on the principle that the municipal action is paramount:

"If the decision to adopt a particular course of action is properly made by that government's authorized decision makers, it surely represents an act of official government 'policy' as that term is commonly understood." Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986).

"More importantly, where action is directed by those who establish government policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly." Id.

In a recent case decided in the U.S. District Court for the Northern District of Illinois, the court denied the defendant officers' motion to dismiss on grounds that the plaintiffs had plausibly stated a Monell custom claim for "fail[ing] to investigate citizen complaints and abdicated its responsibility to train, supervise, discipline, and control its officers." In their complaint, the plaintiffs provided "concrete examples of acts of retaliation" and other incidents supporting their custom claim.

Defendant Trochesset is the policy making authority for the Galveston County Sheriff's Office. He is the one that established the policy. Defendant Trochesset when asked what policy guided his deputies in using deadly force, he said his deadly force policy. When ask was the use deadly forced defined in detail in the policy. Defendant Trochesset responded that it is defined. (Trochesset depo. 47:19-25, 48:1-25, 49:1-4)

When asked could he recite the deadly force policy he is responsible for implementing he stated for the officer's protection, or the protection of others where deadly force may be needed or something to that affect. I can't remember the exact verse. *(Trochesset depo. 47:19-25, 48:1-25, 49:1-4)*

When Defendant Trochesset was asked as the head sheriff are not your required to know your use of deadly force policy? He responded I could read it to you if you want to hand it to me. When asked again does he know it off of hand he said no. *(Trochessett depo. 57:7-25, 58:1-10)*

As you can see Defendant Trochesset incorrect interpretation of the deadly force is the same as his deputy's interpretation. Defendant Trochesset could not define what the objective reasonable standard when it pertains to pretrial detainees, neither could Deputy Benavidez.

Defendant Trochesset defined the reasonable belief officer as every situation that occurs, and every employee would have to come up with belief themselves. When asked is it base a what a reasonable officer believed he replied that he believes every officer is reasonable. *(Trochessett depo. 58:12-25, 59:1-25, 60:1-10)*

When asked did he believe Deputy Benavidez was unlawful for shooting Benson Trochesset stated no. Which is exactly how Benavidez describing his own actions.

Plaintiff proved liability by claiming above that an informal, nonwritten custom caused the constitutional violation. A custom is a practice that is so well settled and followed that it has the force of law, or constitutes the local government's standard operating procedure.

The use of force policy stated by Chief Trochesset and Deputy Benavidez qualifies as an informal nonwritten policy. If the head policy maker states, the same exact informal unwritten policy as his Deputy's. that policy becomes a custom. Especially if that policy was carried out in the course of his duties by the deputy. That is what exactly happen in our case with Benavidez use of deadly force policy. Therefore, the defendant motion to dismiss should be denied.

### E.  **Failure to Train**

An inadequate written policy or a practice that is not unconstitutional itself, but which reflects deliberate indifference to persons' constitutional rights because the deficiency causes deputies to violate constitutional rights, is a violation of that person's constitutional rights.

Moreover, Plaintiff has sufficiently alleged that Defendant County of Galveston is deliberately indifferent because there was an obvious, substantial risk to the public from its inaction. See Farmer v. Brennan, 511 U.S. 825, 843 (1994) ("A prison official may not escape

liability by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific individual.

Failure to train liability **may attach** where a local government failed to train, supervise, discipline or screen its employees. This quasi-independent theory of Monell liability arose in 1989 out of the landmark Supreme Court decision of City of Canton, Ohio v. Harris.

In Canton, plaintiff Geraldine Harris was arrested by Canton officers and transported to a police station. Upon arrival, Harris was found sitting on the floor of the police vehicle and was asked if she needed medical attention. Harris remarked something unintelligible, but officers continued to process her without affirmatively providing medical care. Officers roused Harris, but after being brought inside for processing, Harris "slumped to the floor" two more times. Police left Harris lying on the floor "to prevent her from falling again." Upon Harris's release from custody, she was transported to a local hospital and diagnosed with several emotional ailments. Harris filed suit against the City of Canton, alleging that the city had failed to adequately train its police force to provide arrestees medical attention while in custody.

The Supreme Court held that a city's failure to train its employees could constitute a "policy" under Monell. However, this policy would attach only where the "failure to train reflects deliberate indifference to the constitutional rights of its inhabitants."

## 1. Deliberate Indifference as Policy and Standard and Failure to Train (Canton)

Courts have already balanced permissible and impermissible uses of municipal liability for inadequate-training claims under Monell. Under Monell, when the "moving force" of a

constitutional violation was an employees' training, the municipality can be liable if a policymaker chose the training program with "deliberate indifference" toward the rights of people with whom employees would interact. Canton, 489 U.S. at 388; Monell, 436 U.S. at 694.

A training program demonstrates the requisite deliberateness if the right at issue is the "sort" of right implicated by the tasks employees perform in "usual and recurring situations with which they must deal," and if the training would lead employees to violate rights of that "sort." Canton, 489 U.S. at 388, 391; Connick v. Thompson, 563 U.S. 51, 62 (2011); see Brown, 520 U.S. at 407.

In Canton, the Court provided an example of a broad class of rights to which a municipality can be held deliberately indifferent to. The Court recognized that police officers deal with fleeing felons, are tasked with arresting them and are equipped with firearms to help do so, and thus face situations implicating citizens' rights not to be subjected to deadly force. 489 U.S. at 390 n.10.

If a municipality did not train officers about limits on the constitutional use of deadly force, it demonstrated deliberate indifference toward the constitutional "rights" of fleeing felons not to be subjected to deadly force. Id. Courts have distinguished between Canton and Connick.

In Connick, a district attorney had not trained prosecutors about defendants' constitutional rights under Brady v. Maryland, 373 U.S. 83 (1963). Connick, 563 U.S. at 57. But junior prosecutors were already familiar with Brady based on their legal training, so the absence of training by the district attorney did not demonstrate deliberate indifference toward all Brady rights. Id. at 67.

The "stark contrast" between these examples' springs from the extensive legal training attorneys receive. Id. at 64. The class of rights in this case is closer to Canton.

Unlike the prosecutors in Connick, Galveston County Sheriff deputies do not have extensive legal training or continuing legal education obligations. And yet, Defendant County policymakers chose not to train their officers about the seriousness of people's right to be free from unreasonable deadly force.

Instead, Defendant County's policymakers did the opposite. They provided their deputies with a vague half a page policy that did not even mention how to handle a fleeing inmate. Even though their deputies are armed for that very reason.

Defendant County deputies do not carry firearms while transporting and dealing with thousands of inmates inside the county jail facility. Most of the time these deputies are in close contact with inmates, outnumbered at 50 to 1, and they are not provided with a firearm.

The only time a firearm is provided to a deputy is when they are transporting an inmate outside of the jail, which is a usual and recurring situation with which they must deal. The reason that they are provided with a firearm, is because there is a higher chance that an inmate might try to escape, and Galveston County's' policy makers understood that.

Galveston County's policymakers demonstrated deliberate disregard for people's rights not to be subjected to excessive force by not training its deputies on dealing with a fleeing inmate, and Dennis Benson's injuries resulted from officers' disregard of the same "sort" of right.

Defendant Trochesset stated that he was in charge of overseeing the policy manual. When asked did the policy manual tell the deputies to perform their jobs, he said that was correct.

When asked did the deputies have to know the policy manual front to back Defendant Trochessett said no. *(Tochesset Depo 10:16-25, 11:1-11)*

If a sheriff deputy is not required to know the policy manual, then there is no way that he cannot how to properly do his job. Defendant Trochesset acknowledge as the head sheriff that he does not know the policy manual front to back. *(Trochesset Depo 10:16-25, 11:1-11)*

Defendant Trochesset also stated that deputies are not tested annually on the policy, and he does not know when the last time their policy was updated. *(Trochesset11:12-25, 12:1-25, 13:1-25)*

The Court in Canton used training on deadly force to illustrate the standard of deliberate indifference. The Court noted that "city policy makers know to a moral certainty that their police officers will be required to arrest fleeing felons. "Moreover, "the city has armed its officers with firearms, in part to accomplish this task.

"In such a situation, "the need to train officers in the constitutional limitations on the use of deadly force can be said to be 'so obvious' that a failure to do so would properly be characterized as 'deliberate indifference' to constitutional rights. This is the exact same facts in our case. As a result, under municipal-liability decisions, the "deliberate indifference" standard is met.

Even where the need to train would not be obvious to a stranger to the situation, a particular context such as a documented pattern of violations might make the need for training or supervision so obvious to a policymaker that a failure to do so would constitute deliberate indifference.

Thus, the Court suggested that "it could also be that the police, in exercising their discretion, so often violate constitutional rights that the need for further training must have been plainly obvious to the city policy makers, who nevertheless, are 'deliberately indifferent' to the need." With the shooting of unarmed fleeing suspects garnering so much national attention, Galveston County not addressing this issue with their deputies is deliberately indifferent.

In Zuchel v. City and County of Denver, Colorado, 997 F. 2d 730 (1993) the U.S. Court of Appeals for the Tenth Circuit, found that a city police department was deliberately indifferent due to its inadequate training of police officers as to the practical aspects regarding use of deadly force.

The court concluded that the circumstances giving rise to an unconstitutional shooting of a suspect by a police officer represented a usual and recurring situation with which city police officers were required to deal, so that the city could be liable under Section 1983 for the officer's actions.

An expert testified that it was predicable in large cities that police officers would encounter situations in which they would have to make judgements as to whether to shoot. Prior to the incident, the department's shoot doesn't shoot training consisted of a lecture and a movie presented to officers during basic training at the police academy.

The inadequacies of that training program were identified by an expert witness as the cause of the shooting in question. The witness offered the opinion that strategic judgement cannot be taught in a classroom, particularly based only on the showing of a single film and that the officer, due to lack of training, handled the situation with the suspect as a layperson, rather than a trained professional.

The city argued that as a matter of law, it could not be found deliberately indifferent because it had some shoot don't shoot training and, thus, recognized the problem and was addressing it. The court rejected this argument, finding that the city did not properly apply the definition of deliberate indifference under Canton.

In establishing deliberate indifference, focus must be placed on whether the need for more or different training is so obvious, and the inadequacy so likely to result in the deprivation of constitutional rights, that the policymakers can be said to have been deliberately indifferent to the need. "Thus, a city is deliberately indifferent if 1) its training program is inadequate and 2) the city deliberately or recklessly made the choice to ignore its deficiencies.

" In Zuchel, the court concluded that the testimony underscored the obviousness of the deficiency of the existing training program. The district attorney's letter expressly recommended that the police department institute expanded training in the areas of "strategic skills development; how to analyze situations, develop options, and select the option that minimizes the likelihood of a violent confrontation" and "periodic target course 'shoot don't shoot' live training under street conditions.

" Because the police department presented no evidence of any attempt to address the deficiencies of its training program, the court found that the evidence was sufficient to permit a jury to reasonably infer that the city's failure to implement some form of periodic live training constituted deliberate indifference to the constitutional rights of the city's citizens.

Plaintiff further alleges that these failures were the driving force behind Defendant Benavidez's misconduct. Galveston County officials are in charge of training, supervising, and discipline their deputies. They establish how the inmate is trained to handle certain situations,

while at the outside facility. Most importantly they are in charge of instructing their deputies on the proper use of deadly force.

Galveston County officials knew for a certainty that an inmate might try to escape from their facility. They knew that chance of an escape attempt was heightened when an inmate was being transferred outside. For this reason, Galveston County policy makers armed their deputies with guns. This was done for the protection of the deputy and the public.

They knew that there was a chance that their deputy could potentially unlawfully discharge his weapon injuring the public. Due to the fact Galveston County Policy makers did not provide their deputies with the any legal and physical training on the use of deadly force, when apprehending a fleeing, which is deliberately indifference to the rights of that citizens to be free of harm.

## 2. **Municipal Liability with no evidence of Prior Similar Constitutional Violation**

In Young v. City of Providence,301 F. Supp.2d 163 (D.R.I 2004), the First Circuit Court of Appeals recently addressed the issue of municipal liability in a Section 1983 action in which there was no evidence of a prior similar constitutional violation.

Young involved a wrongful death action alleging excessive force after the victim, who was an off-duty officer responding to an incident under the city's always armed/always on-duty policy, was shot by two other officers who were responding to the same incident.

The city had a use of force training program in place that included judgmental shooting. This training consisted of interactive video simulation and live range exercises that included don't shoot scenarios.

However, the city did not provide training that specifically addressed identification of officers responding under its' always armed/always on-duty policy and had no protocols in place governing off duty officer response situations.

Although there was no evidence of a past friendly fire shooting, the court concluded that a jury could find deliberate indifference because "the department knew that there was a high risk that absent particularized training on avoiding off-duty misidentifications, and given the department's always armed/always on duty policy, friendly fire shootings were likely to occur."

Young illustrates a number of factors that are considered when imputing government knowledge of an obvious risk of harm as required to show deliberate indifference. Even when there have been no prior violations, where a policy or practice of a police department creates an obvious risk of harm, where training would tend to reduce that specific type of harm, and where the wrong decision of an untrained officer will likely result in flagrant violations of constitutional rights, a municipality may be deemed deliberately indifferent if it does not afford some training that specifically addresses the particular potential for harm.

In Young, there was evidence presented that the always armed/always on duty policy was inherently dangerous because without specific training, it was likely that off duty officers would intervene unwisely and that on duty officers may mistake them for suspects.

Indeed, the city also changed its always armed/always on duty policy after the friendly fire incident such that officers were not required to carry firearms while off duty and provided a specific protocol for any off-duty action that was taken.

The facts in Young are similar to the facts in our case. Even though there were no past incidents of inmates being shot, giving Galveston County's policy of having only one deputy to watch an inmate, they knew that an escape attempt could likely occur.

### III.   Whether the county's training policy is facially lawful and constitutionally sound.

Plaintiff alleges in his Complaint that Defendant County of Galveston, Galveston County Sheriff Department and Defendant Trochesset is liable for failing to train and supervise its officers regarding the use of force generally and the use of deadly force in particular.

Police agencies have an obligation to train its police officers for the recurring tasks that officers will face during their career. Where it is foreseeable that a police officer will face a particular task that may result in harm to another person, the officers' agency must provide training in how to conduct that task in a manner which is consistent with generally accepted practices in law enforcement. What is "generally accepted" is defined by the law enforcement profession and by court decisions analyzing police conduct.

The Foundation case on failure to train is City of Canton, Ohio v. Harris 489 U.S. 378 (1989). Officers in Canton arrested Geraldine Harris on April 26,1978 and brought her to the police station. Upon arrival, the officers found Harris sitting on the floor of the patrol wagon. They asked if she needed medical attention, and she responded incoherently.

Inside the station, Harris twice slumped to the floor, and the officers eventually left her lying on the floor. She received no medical care. An hour later, Harris was released and taken to a nearby hospital in an ambulance her family provided.

Harris was diagnosed with various emotional conditions and hospitalized. Harris sued the city of Canton for violating her Fourteenth Amendment right to Due Process by denying her medical attention when she was in police custody.

During the Harris' trial evidence was established that shift commanders had the sole discretion to determine whether or not a detainee needed medical attention. It was further established that the shift commanders were given no training to assist them in making these medical evaluations.

The Court held that municipalities may be liable for inadequate training of employees, but only when "the failure to train amounts to deliberate indifference" to the constitutional rights of the people with whom the employees will interact. A municipality is then only liable when the failure to train is a deliberate choice on the part of the city.

If a training program does not prevent constitutional violations and a pattern of injuries develops, officials charged with the responsibility of formulating policy for the agency may be put on notice that a new program is needed and a failure to address the problem may constitute deliberate indifference.

In the absence of a pattern of violations, deliberate indifference may be inferred from the policy makers' continued adherence to a training program that they knew or should have known would fail to prevent violations in usual or recurring situations. In such cases, the constitutional violation must be a highly predictable or plainly obvious consequence of the failure to train.

"Deliberate indifference" is a standard of fault that requires a showing that government policy makers acted with conscious disregard for the obvious consequences of their actions. A pattern of constitutional violations by officers may indicate that a lack of proper training, rather

than a one-time negligent administration of the training program or factors peculiar to the officer involved in a single incident, is responsible for the plaintiffs' injury.

It is possible to discern three closely related requirements that must be met before a failure to train will constitute deliberate indifference to the constitutional rights of citizens.

First, the Plaintiff must show that policy makers know to a moral certainty that their employees will confront a given situation as opposed to rare or unforeseen events.

Second, the Plaintiff must show that the situation either presents the employee with a difficult exercise of judgement that training will make less difficult, or that there is a history of employees mishandling the situation. There must be awareness of a problem that is susceptible to improvement through training.

Third, the Plaintiff must show that the wrong choice by the employee is likely to cause the deprivation of a citizen's constitutional rights. Where a Plaintiff can establish all three elements, then it can be said that the policy maker should have known that inadequate training was "so likely to result in the violation of constitutional rights, that the policy makers can reasonably be said to have been deliberately indifferent to the need."

Mr. Bensons' case satisfies all three requirements. First Galveston County officials knew for a certainty that their deputies would encounter a situation where a person would try to escape their custody. County officials knew that this situation was heightened when inmates were transported out of their facilities. To protect themselves and the public, deputies who are unarmed 90% percent of the time, are provided with a firearm when transporting an inmate outside of the facility.

Defendant Trochesset stated that transporting inmates to the medical facility is a regular function that the sheriff's office routinely performs. *(Trochesset Depo. 50:21-24)* Defendant Trochesset stated that he was aware that inmates my try to escape from his facility. *(Trochesset Depo. 50:25, 51:1-2)* He agreed that escape could be heightened when transporting inmates outside the facility. *(Trochesset Depo. 50:15-18)* Defendant Troche set stated that when deputies are transporting inmates to outside medical facility, they are required to carry a gun. *(Trochesset Depo. 49:15-18)* Lastly Defendant Trochesset agreed that the deputies were required to carry a gun to protect themselves and the public in case an escape attempt happens. *(Trochesset Depo. 51:7-25, 52: 1-25, 53:1-10)*

Second the choice of when to use that firearm is left up to the deputy, whose guidance is a vague half of page policy on the use of deadly force, even though the issue shooting a fleeing suspect was decided in Tennessee v. Garner, 471 U.S. 1 (1985).

In Tennessee v. Garner the police were summoned to stop a suspected burglary. As the police arrived, the victim was seen fleeing the scene of the alleged burglary. An officer saw victim, and could see that victim possessed no weapon, and yelled at him to stop. Victim continued to climb the wall to escape at which point he was shot and killed. Victim's father brought action seeking damages for a violation of the Victim's constitutional rights.

The Supreme Court of the United States held that, under the Fourth Amendment, when a law enforcement officer is pursuing a fleeing suspect, the officer may not use deadly force to prevent escape unless "the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.

" It was found that use of deadly force to prevent escape is an unreasonable seizure under the Fourth Amendment, in the absence of probable cause that the fleeing suspect posed a physical danger. Mr. Benson who the deputy knew was unarmed was shot after climbing over a wall similar to the Plaintiff in Garner.

Defendant Trocshesset could not point to a policy that guided the officer use of the gun that he was required to carry while transporting inmates outside the facility. When asked what guides an officer decision on how to use the weapon outside the jail facility, Defendant Trochesset stated the policy manual.

When ask would he be surprised if his policy manual did not explain how to use the weapon, he replied explain that again, and I am confused. When ask specifically is there a policy that guides the deputy use of their weapon once outside the jail facility, he stated no. (*Trochesset Depo. 49:19-25, 50:1-20*)

Finally, Galveston County officials knew that a fleeing suspect being unlawfully shot would deprive that suspect of their constitutional rights. Apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the fourth amendment, and that its use to prevent the escape of all felony suspects is constitutionally impermissible.

## A.  Deliberate Indifference as Policy and Standard and Failure to Train

Courts have already balanced permissible and impermissible uses of municipal liability for inadequate-training claims under Monell. Under Monell, when the "moving force" of a constitutional violation was an employees' training, the municipality can be liable if a policymaker chose the training program with "deliberate indifference" toward the rights of people with whom employees would interact. Canton, 489 U.S. at 388; Monell, 436 U.S. at 694.

A training program demonstrates the requisite deliberateness if the right at issue is the "sort" of right implicated by the tasks employees perform in "usual and recurring situations with which they must deal," and if the training would lead employees to violate rights of that "sort." Canton, 489 U.S. at 388, 391; Connick v. Thompson, 563 U.S. 51, 62 (2011); see Brown, 520 U.S. at 407.

In Canton, the Court provided an example of a broad class of rights to which a municipality can be held deliberately indifferent to. The Court recognized that police officers deal with fleeing felons, are tasked with arresting them and are equipped with firearms to help do so, and thus face situations implicating citizens' rights not to be subjected to deadly force. 489 U.S. at 390 n.10.

If a municipality did not train officers about limits on the constitutional use of deadly force, it demonstrated deliberate indifference toward the constitutional "rights" of fleeing felons not to be subjected to deadly force. Id. Courts have distinguished between Canton and Connick.

In Connick, a district attorney had not trained prosecutors about defendants' constitutional rights under Brady v. Maryland, 373 U.S. 83 (1963). Connick, 563 U.S. at 57. But junior prosecutors were already familiar with Brady based on their legal training, so the absence of training by the district attorney did not demonstrate deliberate indifference toward all Brady rights. Id. at 67.

The "stark contrast" between these examples' springs from the extensive legal training attorneys receive. Id. at 64. The class of rights in this case is closer to Canton.

Unlike the prosecutors in Connick, Galveston County Sheriff deputies do not have extensive legal training or continuing legal education obligations. And yet, Defendant County

53

policymakers chose not to train their officers about the seriousness of people's right to be free from unreasonable deadly force, even though Defendant Trochesset admitted that he knew the risk of an inmate escaping, and he armed his deputies for that reason.

Instead, Defendant County's policymakers did the opposite. They provided their deputies with a vague half a page policy that did not even mention how to handle a fleeing inmate. Even though their deputies are armed for that very reason.

Defendant Trochesset when asked if he was familiar with Tennessee V. Garner he stated the names rings a bell, but I cannot remember. *(Trochesset Depo. 66:14-17)*. When asked was he familiar with deliberate indifference he stated herd of it but had no answer. *(Trochesset Depo. 66:18-20)* The fact the head policy maker in the county is not familiar with the one of the main cases when dealing with excessive force automatically proves deliberate indifference.

Defendant County deputies do not carry firearms while transporting and dealing with thousands of inmates inside the county jail facility. Most of the time these deputies are in close contact with inmates, outnumbered at 50 to 1, and they are not provided with a firearm.

The only time a firearm is provided to a deputy is when they are transporting an inmate outside of the jail, which is a usual and recurring situation with which they must deal. The reason that they are provided with a firearm, is because there is a higher chance that an inmate might try to escape, and Galveston County's' policy makers understood that.

Galveston County's policymakers demonstrated deliberate disregard for people's rights not to be subjected to excessive force by not training its deputies on dealing with a fleeing inmate, and Dennis Benson's injuries resulted from officers' disregard of the same "sort" of right.

The Court in Canton used training on deadly force to illustrate the standard of deliberate indifference. The Court noted that "city policy makers know to a moral certainty that their police officers will be required to arrest fleeing felons. "Moreover, "the city has armed its officers with firearms, in part to accomplish this task.

"In such a situation, "the need to train officers in the constitutional limitations on the use of deadly force can be said to be 'so obvious' that a failure to do so would properly be characterized as 'deliberate indifference' to constitutional rights. This is the exact same facts in our case. As a result, under municipal-liability decisions, the "deliberate indifference" standard is met.

Even where the need to train would not be obvious to a stranger to the situation, a particular context such as a documented pattern of violations might make the need for training or supervision so obvious to a policymaker that a failure to do so would constitute deliberate indifference.

Thus, the Court suggested that "it could also be that the police, in exercising their discretion, so often violate constitutional rights that the need for further training must have been plainly obvious to the city policy makers, who nevertheless, are 'deliberately indifferent' to the need." With the shooting of unarmed fleeing suspects garnering so much national attention, Galveston County not addressing this issue with their deputies is deliberately indifferent.

In Zuchel v. City and County of Denver, Colorado, 997 F. 2d 730 (1993) the U.S. Court of Appeals for the Tenth Circuit, found that a city police department was deliberately indifferent due to its inadequate training of police officers as to the practical aspects regarding use of deadly force.

The court concluded that the circumstances giving rise to an unconstitutional shooting of a suspect by a police officer represented a usual and recurring situation with which city police officers were required to deal, so that the city could be liable under Section 1983 for the officer's actions.

An expert testified that it was predicable in large cities that police officers would encounter situations in which they would have to make judgements as to whether to shoot. Prior to the incident, the department's shoot don't shoot training consisted of a lecture and a movie presented to officers during basic training at the police academy.

The inadequacies of that training program were identified by an expert witness as the cause of the shooting in question. The witness offered the opinion that strategic judgement cannot be taught in a classroom, particularly based only on the showing of a single film and that the officer, due to lack of training, handled the situation with the suspect as a layperson, rather than a trained professional.

The city argued that as a matter of law, it could not be found deliberately indifferent because it had some shoot do not shoot training and, thus, recognized the problem and was addressing it. The court rejected this argument, finding that the city did not properly apply the definition of deliberate indifference under Canton.

In establishing deliberate indifference, focus must be placed on whether the need for more or different training is so obvious, and the inadequacy so likely to result in the deprivation of constitutional rights, that the policymakers can be said to have been deliberately indifferent to the need. "Thus, a city is deliberately indifferent if 1) its training program is inadequate and 2) the city deliberately or recklessly made the choice to ignore its deficiencies.

56

" In Zuchel, the court concluded that the testimony underscored the obviousness of the deficiency of the existing training program. The district attorney's letter expressly recommended that the police department institute expanded training in the areas of "strategic skills development; how to analyze situations, develop options, and select the option that minimizes the likelihood of a violent confrontation" and "periodic target course 'shoot don't shoot' live training under street conditions.

" Because the police department presented no evidence of any attempt to address the deficiencies of its training program, the court found that the evidence was sufficient to permit a jury to reasonably infer that the city's failure to implement some form of periodic live training constituted deliberate indifference to the constitutional rights of the city's citizens.

A finding of deliberate indifference requires that the government has disregarded a known or obvious risk of harm caused by its failure to develop an adequate training program. However, a showing of specific incidents that establish a pattern of constitutional violations is not necessary to put a municipality on notice that its training program is inadequate.

A single violation of constitutional rights combined with a failure to train officers to handle that situation is sufficient to trigger municipal liability if the situation was likely to occur and presented an obvious potential for a constitutional violation.

In Young v. City of Providence, 301 F. Supp.2d 163 (D.R.I 2004), the First Circuit Court of Appeals recently addressed the issue of municipal liability in a Section 1983 action in which there was no evidence of a prior similar constitutional violation.

Young involved a wrongful death action alleging excessive force after the victim, who was an off-duty officer responding to an incident under the city's always armed/always on-duty policy, was shot by two other officers who were responding to the same incident.

The city had a use of force training program in place that included judgmental shooting. This training consisted of interactive video simulation and live range exercises that included don't shoot scenarios.

However, the city did not provide training that specifically addressed identification of officers responding under its' always armed/always on-duty policy and had no protocols in place governing off duty officer response situations.

Although there was no evidence of a past friendly fire shooting, the court concluded that a jury could find deliberate indifference because "the department knew that there was a high risk that absent particularized training on avoiding off-duty misidentifications, and given the department's always armed/always on duty policy, friendly fire shootings were likely to occur."

Young illustrates a number of factors that are considered when imputing government knowledge of an obvious risk of harm as required to show deliberate indifference. Even when there have been no prior violations, where a policy or practice of a police department creates an obvious risk of harm, where training would tend to reduce that specific type of harm, and where the wrong decision of an untrained officer will likely result in flagrant violations of constitutional rights, a municipality may be deemed deliberately indifferent if it does not afford some training that specifically addresses the particular potential for harm.

In Young, there was evidence presented that the always armed/always on duty policy was inherently dangerous because without specific training, it was likely that off duty officers would intervene unwisely and that on duty officers may mistake them for suspects.

Indeed, the city also changed its always armed/always on duty policy after the friendly fire incident such that officers were not required to carry firearms while off duty and provided a specific protocol for any off-duty action that was taken.

The facts in Young are similar to the facts in our case. Even though there were no past incidents of inmates being shot, giving Galveston County's policy of having only one deputy to watch an inmate, they knew that an escape attempt could likely occur.

The facts in Miller v. City of Tex. City, Tex., Civ., No. 18-CV-00284, 2019 WL 2189262, *2 (S.D. Tex. Mar. 21, 2019) is closer to the facts in Connick, then it is to the facts in Canton. In Miller, the officers attacked the suspect while he was on the ground.

The attack consisted of strikes with the butt of the officer's gun and the use of a taser. Deadly forced was not used. The assault by the Texas City Police officers was not an obvious risk of harm, that Texas City Officials could have anticipated.

Therefore, there was no failure to train. If the officers would have shot Mr. Miller as he fled, then the facts would line up more closely with Canton and the Plaintiff's case. As noted by the court in Canton "city policy makers know to a moral certainty that their police officers will be required to arrest fleeing felons.

"Moreover, "the city has armed its officers with firearms, in part to accomplish this task. "In such a situation, "the need to train officers in the constitutional limitations on the use of deadly

force can be said to be 'so obvious' that a failure to do so would properly be characterized as 'deliberate indifference' to constitutional rights.

These are the same facts in the Plaintiff's case. The Galveston County policy makers knew to a moral certainty that their deputies would be required to arrest fleeing inmates. Moreover, the county armed its deputies with firearms in part to accomplish this task.

Galveston County failure to train its officers in the constitutional limitations on the use of deadly force can be said to be 'so obvious' that a failure to do so would properly be characterized as 'deliberate indifference' to constitutional rights.

The only training the deputies received was via a vague one-page instruction in the policy manual that had not been updated since 2014. For the reasons above, the Defendants' Motion to Dismiss should be denied.

## IV.     Whether the County of Galveston and Henry Trochesset failed to discipline and supervise their deputies.

"Texas has long recognized an employer's duty to make inquiry into the competence and qualifications of those considered for employment, and an employer may be guilty of negligently hiring an incompetent employee and thus be held liable for damages." McDorman ex rel. Connelly v. Texas-Cola Leasing Co. LP, LLP, 288 F. Supp. 2d 796, 803 (N.D. Tex. 2003) (citing Arrington v. Fields, 578 S.W.2d 173, 179 (Tex. Civ. App.—Tyler 1979, writ ref'd n.r.e.).

The failure to adequately investigate instances of misconduct is an independently viable claim of municipal liability: "continued adherence to an approach that they know or should have known has failed to prevent tortious conduct by employees." Brown, 520 U.S. at 408. See also

Piotrowski, 237 F.3d at 581-82 (acknowledging that failure to investigate and discipline police officers can be basis of failure to supervise liability).

The basic duty of an employer is to investigate the background of that individual for fitness for the position, to remain knowledgeable of that fitness and is liable if another person is injured in some manner related to his employment because of a lack of fitness. *See C. J. Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472 (Tex. 1995); *see also Missouri K. & T. Ry. Co. of Texas v. Day*, 104 Tex. 237, 136 S.W. 435, 440 (1911); *Texas & P. Ry. Co. v. Johnson*, 89 Tex. 519, 35 S.W. 1042 (1896).

This is a duty owed by the employer to his other employees as well as to the public. Thus, the tort of negligent hiring is an exception to the general rule that a person does not have a duty to protect another person from the conduct of a third person. *See C. J. Doe v. Boys Clubs of Greater Dallas*, 868 S.W.2d at 950, aff'd, 907 S.W.2d at 472.

Under Texas law, negligent hiring, retention, and supervision claims are all simple negligence causes of action based on an employer's direct negligence rather than on vicarious liability. Phillips v. Super Servs. Holdings, LLC, 189 F. Supp. 3d 640, 648 (S.D. Tex. 2016) (citing Guidry v. Nat'l Freight, Inc., 944 S.W.2d 807, 810 (Tex. App.—Austin 1997, no writ).

Like all simple negligence claims, the elements are duty, breach, and damages proximately caused by the breach. Id.

A plaintiff can recover for "negligent hiring and supervision in cases where the employer's direct negligence in hiring or retaining an incompetent employee whom the employer knows, or by the exercise of reasonable care should have known, was incompetent or unfit, thereby creating an unreasonable risk of harm to others." Garcia v. Hospice of El Paso, 2003 WL

21961177 at *5 (W.D. Tex. 2003) (citing *Wise v. Complete Staffing Services, Inc.*, 56 S.W.3d 900, 902 (Tex. App.—Texarkana 2001, no pet.)).

The elements of a negligent hiring, supervision, and retention claim are stated as: (1) the duty to hire, supervise, and retain competent employees; (2) the employer breaches that duty; and (3) the employer's breach of that duty proximately causes damages the plaintiff. *THI of Tex. at Lubbock I, LLC v. Perea*, 329 S.W.3d 548, 573 (Tex. App.—Amarillo 2010, pet. denied); *LaBella v. Charlie Thomas, Inc.,* 942 S.W.2d 127, 137 (Tex. App.--Amarillo 1997, writ denied).

An employer is liable for negligent hiring, supervision, or retention when proof is presented that the employer hired an incompetent or unfit employee whom it knew or, by the exercise of reasonable care, should have known was incompetent or unfit, thereby creating an unreasonable risk of harm to others. *Dangerfield v. Ormsby*, 264 S.W.3d 904, 912 (Tex.App.--Fort Worth 2008, no pet. h.).

### A.  <u>Negligent Hiring</u>

Negligence in hiring requires that the employer's "failure to investigate, screen, or supervise its employees proximately caused the injuries the plaintiffs allege."

To impose liability for negligent hiring, there must be evidence that the plaintiff's injuries were brought about by reason of the employment of the incompetent servant. *Dieter v. Baker Service Tools*, 739 S.W.2d 405, 408 (Tex. App.--Corpus Christi 1987, writ denied).

The defendants owed a legal duty to Mr. Benson: The defendant owed a duty to use ordinary care in hiring deputies. The Defendant had a duty to hire competent employees.

The defendant breached that duty: The Defendants violated its duty by hiring an incompetent employee who it new or should have known were incompetent or unfit, and it was foreseeable that the employee created an unreasonable risk of harm to Plaintiff.

The evidence will show that the Defendant's hired an employee that they knew had failed a required exam to become a sheriff deputy, as a favor to his parents who were lifelong peace officer workers.

Defendant Benavidez was mailed the standard rejection letter after he failed the examination, before a family friend intervened on his behalf. Defendant Trochesset admitted to hiring people he knew who had failed their required exam. This exam was described as an aptitude test.

The evidence will also show that Defendant Benavidez had been involved in a felony Driving While intoxicate hit and run accident, which was also covered up as a favor to his parent's. A felony hit and run accident that Defendant Benavidez failed to mention on two different law enforcement applications. (email)

The evidence will show that Defendant Benavidez failed to mention his use of marijuana on his sheriff department application.

Finally, the evidence will show that Defendant Poore had knowledge of all the above information and choose to hire Defendant Benavidez, even though he was an obvious risk of harm to the public. He failed a required exam, covered up a crime and failed to mention it on two different applications, along with his use of illegal drugs.

The breach proximately caused Benson's injuries: The Defendant's, in breaching their duty to Benson as stated above, caused Mr. Benson's injuries.

Freddie Poore, who was the Chief, hired Defendant Benavidez despite the fact he had failed a required exam, been involved in a hit, and run Driving While Intoxicated incident that was covered up and lied on his application.

Defendant Trochesset stated that he was made aware of Defendant Benavidez's failed exam along with the Driving While Intoxicated incident. Defendant Trochesset admitted that he himself has hired deputies who had failed the sheriff exam. When asked had he hired any as favor to someone he said he could not remember. 9Depo)

**B. Negligent Training, Supervising and Retention**

The defendants owed a legal duty to Mr. Benson: The defendant owed a duty to use ordinary care in supervising, training, and retaining deputies.

The Defendant had a duty to supervise, train, and retain only competent employees.

The defendant breached that duty: The Defendants violated its duty by failing to supervise and train Defendant Benavidez on the use of deadly force.

The Defendant's also violated its duty by retaining Deputy Benavidez after he had already allowed an inmate to escape.

The evidence will show that this was not the first time Defendant Benavidez allowed and inmate to escape.

The evidence will show that Defendant Benavidez failed to do his rounds timely, which could have led to another inmate escaping.

The evidence will show that Defendant Benavidez was wrote up for making derogatory remarks towards his coworkers. It will show that even after Defendant Benavidez was spoke to about the remarks, he continued to make them.

The evidence will show that even though Defendant Benavidez had already allowed an inmate to escape, he was assigned to watch an inmate outside the facility unsupervised.

The evidence will show that the Defendant County did not provide any special training to Defendant Benavidez after each incident he was wrote up for.

Finally, the evidence will show that even though Defendant County, Defendant Trochesset, and Defendant Poore had knowledge of all the above incidents, Defendant Benavidez was not terminated even though he was an obvious risk of harm to the public.

The breach proximately caused Benson's injuries: The Defendant's, in breaching their duty to Benson as stated above, caused Benson's injuries.

An employer is liable for negligent hiring, supervision, or retention when proof is presented that the employer hired an incompetent or unfit employee whom it knew or, by the exercise of reasonable care, should have known was incompetent or unfit, thereby creating an unreasonable risk of harm to others.

Defendant Trochesset knew that Defendant Benavidez had been cited for several serious infractions. He was reprimanded for making disparaging remarks to fellow coworkers not once but twice. He was also written up for missing rounds but worst he had previous been involved in allowing another inmate to escape.

Defendant Benavidez failed to check the identification wrist band of an inmate releasing the wrong inmate from custody. The name of the inmate is located on the inmate wristband. Either Defendant Benavidez did not check the wrist band or as his aptitude test scores show he had trouble reading. Even after this cataphoric mistake that cost several agencies thousands of dollars and man hours Defendant Benavidez still was not fired. Not only was he not fired he was

allowed to escort inmates outside the facility, which led to Benson escaping and being shot. Record

Considering the facts above, the Plaintiff properly alleges Defendant County of Galveston and Defendant Trochesset liability for failing to supervise, discipline, or train by deliberately choosing not to supervise, discipline, or train its officers despite being on notice that its policy, supervision, discipline, and training regimen failed to prevent tortious conduct by its deputies. See Gabriel v. City of Plano, 202 F.3d 741, 745 (5th Cir. 2000) (citing Board of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 403 (1997)); Pineda v. City of League City, 124 F. Supp. 2d 1057, 1078 (S.D. Tex. 2000). Therefore, the Defendant's motion to dismiss should be denied.

### V.     Whether the County of Galveston and Henry Trochesset tolerated the use of force and other policies.

Defendant County and Defendant Trochesset have ongoingly encouraged, tolerated, ratified, and acquiesced to a dangerous environment of police brutality by:

a. failing to conduct sufficient hiring, training, or supervision with respect to the constitutional limitations on the use of force;

b. by failing to adequately punish unconstitutional uses of force;

c. by tolerating the use of unconstitutional force;

d. by ongoingly failing to investigate inmate complaints of excessive force properly or neutrally, and;

e. by tolerating, encouraging, and permitting collusive statements by involved officers in such situations.

It is the longstanding widespread deliberately indifferent custom, habit, practice and/or policy of the Defendant County and Defendant Trochesset sheriff deputies to use excessive force against individuals when such use is unnecessary and unjustified, as well as fail to supervise and to train deputies in the appropriate constitutional limits on the use of force, knowing that these members of law enforcement therefore pose a significant risk of injury to the inmates.

The Defendant County and Defendant Trochesset, have attempted to publicly minimize and cover up the egregious record of excessive force by the Galveston County Sheriff Department by repeatedly informing County officials and the public that the Galveston County Sheriff Department use of force per incident is less than most major sheriff departments, whereas in fact the Galveston County Sheriff department has a practice of not following up on such complaints.

With deliberate indifference to the rights of inmates to be free from retaliation, the Defendant County and Defendant Trochesset have ongoingly encouraged, tolerated, ratified, and acquiesced to a dangerous environment of sheriff retaliation by: a. failing to conduct sufficient hiring, training, or supervision with respect to the protected rights of people in custody; b. by failing to adequately punish retaliation by deputies against people in custody; c. by tolerating the use of retaliation; and 12 d. by ongoingly failing to thoroughly investigate the people who here in custody complaints.

It is the longstanding widespread deliberately indifferent custom, habit, practice and/or policy of the Defendant County and Defendant Trochesset to permit deputies to retaliate against

67

individuals for exercising their constitutional rights, as well as to fail to supervise and to train deputies in the constitutional rights of individuals.

With deliberate indifference to the rights of individuals to be free from malicious prosecution, the Defendant County and Defendant Trochesset have ongoingly encouraged, tolerated, ratified, and acquiesced to the malicious prosecution and cover up efforts by sheriff deputies by failing to investigate inmate's complaints of deputy misconduct, instead accepting deputies accounts of events without question.

It is the longstanding widespread custom, habit, practice and/or policy of the Defendant County and Defendant Trochesset, to find no fault with deputy conduct as long as any story is given by the deputy, regardless of how incredible.

These final policy decisions by Defendant in his role as the final delegated policy decision maker with respect to reviewing deputy misconduct create liability for Defendant County, and Defendant Trochesset.

They are also further evidence of the ongoing deliberately indifferent custom, habit, policy, decision, practice, training and supervision of the Galveston County Sheriff Department, the Defendant County and Defendant Trochesset of tolerating and encouraging lawlessness and disregard for the federal rights of inmates in their custody and citizens in their community. They even broke the rules themselves by hiring deputies who did not meet the minimum requirements to become a sheriff.

As a direct and proximate result of the wrongful conduct of each of the Defendants, Plaintiff has been substantially injured. These injuries include, but are not limited to, loss of constitutional and federal rights, physical injuries, impairments and disfigurement, great pain,

and emotional distress, and/or aggravation of pre-existing conditions, and ongoing special damages for medically/psychologically related treatment caused by the unconstitutional and moving forces concerted conduct of all these Defendants.

Defendant County, with deliberate indifference to the rights of arrestees, detainees, and the like, tolerated, permitted, failed to correct, promoted, or ratified a number of customs, patterns, or practices that condoned and required officers to turn a thirty-four blind eye to and not intervene with the use of excessive force by Galveston County Sheriff deputies.

Defendant County, with deliberate indifference to the rights of arrestees, detainees, and the like, tolerated, permitted, failed to correct, promoted, or ratified a number of customs, patterns, or practices that shall be further identified in discovery.

Defendant County, with deliberate indifference to the rights of arrestees, detainees, and the like, continued to employee Defendant Benavidez despite knowledge of his unconstitutional, unlawful, or other improper conduct.

Defendant County had the power to terminate or appropriately discipline Defendant Benavidez for his misconduct after the first inmate escaped but failed to do so despite the County's knowledge of his actions.

By refusing to terminate Defendant Benavidez, Defendant County caused Defendant Benavidez and other deputies to act with impunity and without fear of retribution.

Defendant Counties' failure to terminate or properly discipline Defendant Benavidez is part of its larger custom, police, or practice of failing to supervise, terminate, or properly discipline its officers for unconstitutional, unlawful, or otherwise improper conduct, and thereby encouraged Defendant Benavidez, to engage in this unlawful act towards Mr. Benson.

Defendant County, with deliberate indifference to the rights of arrestees, detainees, and the like, tolerated, permitted, failed to correct, promoted, or ratified its agents, including Defendant Trochesset and Freddie Poor providing improper and harmful training to deputies.

Defendant County had the power to terminate or appropriately discipline Defendant Trochesset but failed to do so despite the County's knowledge of Defendant Trochesset's perpetuation of dangerous ideology to deputies.

By refusing to terminate or discipline Defendant Trochesset or denounce their ideology, Defendant County caused deputies to act with impunity and without fear of retribution.

As a direct and proximate result of the acts and omissions described herein, Mr. Benson suffered compensatory and special damages as defined under federal common law and in an amount to be determined by jury.

Mr. Benson is now an amputee from these injuries, with a large scare on his leg and all five of his toes cut off.

Mr. Benson also suffers persisting neurological damage and severe pain from his amputation, the extent of which has not yet been fully ascertained. Plaintiff also continues to suffer ongoing emotional distress, with significant PTSD type symptoms, including sadness, anxiety, stress, anger, depression, frustration, sleeplessness, nightmares, and flashbacks from being shot.

**a. The County of Galveston's Notice of Prior Incidents of Excessive Force**

The city had notice of a 2008 incident wherein a Galveston County Sheriff deputy used excessive force against an inmate. Mr. Lacey filed suit against the County, alleging that his head was slammed into the cell bars, after he stopped to talk to another inmate. Civil Action No. 3-06-0441 Lacey V. Galveston County Sheriff Department

According to media sources, a federal jury concluded that four Galveston County Police Officers used excessive force while arresting Brandon Backe at a wedding. Mr. Backe alleged that over twenty officers abused their positions of authority when they engaged in or fail to prevent multiple acts of unprovoked and unwarranted force on the very population they were sworn to protect. In the Backe lawsuit it explains that the police department inherited by chief Wiley in 2008 was plagued with activities that were illegal and most of the time unethical. Use of force was a big issue within the department itself and within the city administration more generally; earlier in 2008, the city council discussed numerous complaints against the department including police brutality.

In Backe the events of a single night provide a self-contained case study on how and when numerous Galveston officers used force in the course of their discretionary duties. This incident while in some sense a single "episode" is properly conceived of as a laboratory for evaluating how pervasively and recklessly constitutional norms were disregarded by a sizable portion of the Galveston police force. With thirteen alleged victims, twenty alleged perpetrators or accomplices, and forty-nine separate alleged acts of police brutality, Plaintiff has identified a constellation of evidence from which a jury may divine a pattern. This is more than sufficient to raise a fact issue on the existence of a custom or practice. Brandon Backe v. City of Galveston Civil No. 10-cv-388

The city had notice of a 2009 incident wherein Galveston County Sheriff deputies used excessive force against an inmate. Mr. Richardson filed suit against the County, alleging that he was assaulted by James Hobes after an altercation in the administrative segregation area. After that incident Mr. Richardson alleges that he was assaulted by Deputy William Kilburn, while

being transported to medical for injuries he sustained from the first assault. Civil Action No. G-07-0039 Richardson V. Simmons.

The city had notice of a 2009 incident wherein a Galveston County Sheriff deputy used excessive force while executing an arrest warrant. Mr. Adolphus filed suit against the County, alleging that he was assaulted during his arrest. Mr. Adolphus claims that he was unnecessarily slammed to the ground. Current police chief Henry Trochesset was charged with supervisory liability in the lawsuit, as he was present on the scene. Civil Action No. 3-11-238.

According to media sources, a Galveston County Sheriff Deputy was indicted for using excessive force against an inmate. Deputy Jimmy Gillane was charged with official oppression for the 2010 incident. Chron.com

The city had notice of a 2011 incident wherein a Galveston County Sheriff deputy used excessive force against an undercover officer in a drug sting. Donnie Miller filed suit against the County, alleging that members of a Special Crime Unit broke his nose. Mr. Miller claims, as he went to knees, one of the officers entering the house struck him in the face, with the butt of the shot gun. Current police chief Henry Trochesset was named as one of the officers in the lawsuit.

According to media sources, Galveston County Police Officers used excessive force while arresting Reginal Davis for camping without a permit in 2013. Mr. Davis alleges that he was savagely beaten as his head held under water. Reginald Davis filed the federal lawsuit against the city of Galveston and officers Archie Chapman Jr. and Jose Santos for excessive force. The suit accuses the city of failing to properly train its officers. Chron.com "Reginald Davis Filles Lawsuit Alleging Police Brutality"

The city had notice of a 2016 incident wherein Galveston County Sheriff deputies used excessive force against an inmate. Mr. Springer filed suit against the County, alleging that he

was assaulted by two guards after having a disagreement with one. Mr. Springer claims that he was thrown to the ground, repeatedly kicked, and punched, all why being handcuffed and shackled. According to media sources, a Galveston County Police Officer used excessive force while asking a Houston woman to leave a bar. Kaylie Gentry alleges that a uniform officer attacked him, while at Tsunami's bar. Ms. Gentry suffered a break in her Fibula and her Tibia. Ms. Gentry, who was a nurse, underwent two surgeries and had a half of dozen medal screws placed in her legs. ABC 13 Woman Claims Police Brutality: "I just could not stop crying. I was in pain. I could not walk"

According to media sources, in 2017, Jeronimo Zamora Jr., died after an altercation with sheriff deputies. Zamora wife called 911 because Mr. Zamora was having a medical emergency. Mr. Zamora eventually got scared and tried to get away from the deputies, but they would not let him leave. The deputies severely beat Mr. Zamora, and he died from his injuries. ABC 13 "Family claims deputy killed a man having an anxiety attack"

According to media sources, in 2020, Ariel Ledesma, was killed by Galveston County Sheriff Deputy Johnathan Wuneburger. The indictment reads that Wuneburger recklessly caused the death of Ledesma, by pushing him with his hand or hands. The other public account of what happened between the two men came from a custodial death report the sheriff's office filed with the Texas Attorney General's office. The death report claims Ledesma attempted to leave his jail cell while its door was closed. Wuneburger pushed Ledesma out of the doorway, causing him to fall backwards and hit his head. Galveston County Sheriff Henry Trochesset decline to say whether he stood by the initial report of Ledesma's death. Trochesset did not fire Wuneburger 17 until the indictment was handed down. Chron.con "Galveston County Sheriff Deputy indicted in 2020 death of jail inmate"

According to media sources, Galveston County Police Officers used excessive force while arresting Andre Malone for having expired tags in 2021. Mr. Malone alleges that he was pulled from his car, thrown to the ground, tased while being held by four officers, one of which beat him in his back repeatedly. ABC 13 "Galveston Police accused of excessive force in traffic stop of Black Man over SLAB weekend"

A reasonable jury could find Defendant County of Galveston and Henry Trochesset liable. Another viable claim of liability made by Plaintiff is that Galveston County had "notice of a pattern of excessive force violations when Mr. Benson's own constitutional rights were violated. Kitchen, 759 F.3d at 481 (citing Sanders-Burns v. City of Plano, 594 F.3d 366, 381 (5th Cir. 2010)); see also Connick v. Thompson, 563 U.S. 51, 62 (2011) (pattern of similar constitutional violations can establish notice of need to address)

Plaintiff alleges sufficient claims that Defendant Galveston County and Henry Trochesset is liable here because: (1) it had a custom of failing to supervise, discipline and/or train its employees regarding the use of deadly force, on a fleeing inmate in particular and use of force in general; (2) it was in charge of establishing the policy for transporting inmates outside the facility; (3) it knew that inmates could make an attempt to escape custody (4) it maintained the custom with deliberate indifference to the risk it would result in the violations of clearly established constitutional rights knowing that its deputies were engaging in repeated acts of excessive deadly force against mostly unarmed citizens and inmates; and (5) the custom was the moving force behind the constitutional violation of Mr. Benson's right to be free from excessive force. See Kitchen v. Dallas Cty., 759 F.3d 468, 484 (5th Cir. 2014) (abrogated on other grounds); Roberts v. City of Shreveport, 397 F.3d 287, 292 (5th Cir. 2005); Brown v. Bryan

Cnty., 219 F.3d 450, 457 (5th Cir. 2000). Therefore, the Defendant's Motion for Summary Judgment should be denied in its entirety.

## VI.   IF THE COURT GRANTS DEFENDANT'S MOTION TO DISMISS, THE PLAINTIFF RESPECTFULLY REQUEST THAT THE COURT GRANT LEAVE TO AMEND HIS COMPLAINT

15(a) encourages Courts to look favorably upon requests to amend pleadings, stating that leave "shall be freely given when justice so requires." While granting or denying a request for leave to amend rests within the sound discretion of the Court, the Court should exercise that discretion in this case in favor of the Plaintiff, particularly considering the gravity of his allegations. Therefore, should the Court find deficiencies in any of those causes of action Case Plaintiff, respectfully request leave to amend his complaint to address any such deficiencies noted by the Court.

## VII.   PRAYER WHEREFORE, PREMISES CONSIDERED,

Plaintiff prays that this Court deny Defendant's Motions For Summary Judgement.

Jarvis D. Rice
Bar No. 24103597
Attorney for Plaintiff Dennis Benson
3306 Manzanita Lane
Manvel Texas 77578
P: (409) 888-0006
F: (832) 336-5954
Attorneyjarvisrice@gmail.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 17th day of October 2022 the foregoing was served in accordance with the Federal Rules of Civil Procedure to the following counsel of record:

**Via electronic service**.

Genevieve B. McGarvey
Bryan R. Lasswell
McLeod, Alexander, Powel & Apffel,
P.C. 802 Rosenberg - P.O. Box 629 Galveston, Texas 77553
dwpoole@mapalaw.com
brlasswell@mapalaw.com

Joseph R. Russo
Greer, Herz & Adams, LLP
One Moody Plaza, 18th Floor
Galveston TX 77550
JRusso@greerherz.com