UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

GALVESTON DIVISION

| | | |
|---|---|---|
| DENNIS REYNARD BENSON | § | |
|     Plaintiff, | § | |
| | § | |
| | § | |
| V. | § | |
| | § | Civil Action No. |
| | § |  3:21-cv-00200 |
| COUNTY OF GALVESTON, ET | § | |
| AL. | § | |
|     Defendants. | § | |
| | ) | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF

EDWARD STEVEN BENAVIDEZ JR.

JUNE 30, 2022

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF EDWARD STEVEN BENAVIDEZ JR.,
produced as a witness at the instance of the Plaintiff,
and duly sworn, was taken in the above-styled and
numbered cause on the 30th day of June, 2022, from
9:05 a.m. to 12:14 p.m., before John G. Rochelle, CSR in
and for the State of Texas, reported by machine
shorthand, at McLeod, Alexander, Powel & Apffel, P.C.,
802 Rosenberg, Galveston, Texas 77550, pursuant to the
Federal Rules of Civil Procedure and the provisions
stated on the record or attached hereto.

```
 1                    A P P E A R A N C E S
 2
 3    FOR THE PLAINTIFF, DENNIS REYNARD BENSON:
 4          Mr. Jarvis Rice
            attorneyjarvisrice@gmail.com
 5          Law Office of Jarvis Rice
            3306 Manzanita Lane
 6          Manvel, Texas 77578
            Phone: (409) 888-0006
 7
 8
 9    FOR THE DEFENDANTS, GALVESTON COUNTY AND HENRY
      TROCHESSET:
10
            Mr. Joseph R. Russo, Jr.
11          jrusso@greerherz.com
            Ms. Melissa E. Palmer
12          mpalmer@greerherz.com
            Greer, Herz & Adams, LLP
13          One Moody Plaza, 18th Floor
            Galveston, Texas 77550
14          Phone: (409) 797-3200
15
16
      FOR THE DEFENDANT, EDWARD STEVEN BENAVIDEZ JR.:
17
            Mr. Bryan R. Lasswell
18          brlasswell@mapalaw.com
            Ms. Genevieve Bacak McGarvey
19          gbmcgarvey@mapalaw.com
            McLeod, Alexander, Powel & Appfel, P.C.
20          802 Rosenberg
            Galveston, Texas 77550
21          Phone: (409) 763-2481
22
23
24
25
```

1                           INDEX

2                                                PAGE

    Appearances....................................... 2

3

    EDWARD STEVEN BENAVIDEZ JR.

4

         Examination by Mr. Rice..................... 5

5

         Examination by Mr. Russo................... 76

6

         Examination by Mr. Lasswell............... 117

7

         Examination by Mr. Rice.................. 119

8

    Signature and Changes................... 141-142

9

    Reporter's Certificate.......................... 143

10

11

                           EXHIBITS

12

    NO.  DESCRIPTION                                PAGE

13

    Exhibit 1....................................... 79

14       College transcript of Edward Benavidez Jr.,
         Bates labeled Benson 000091 Confidential

15

16  Exhibit 2....................................... 83
         Document entitled "Basic Peace Officer,

17       Chapter 28, Force Options," Bates labeled
         Confidential Benson 00214 through 002238

18

19  Exhibit 3....................................... 89
         Galveston County Sheriff's Office document

20       entitled "Use of Force," Bates labeled
         Confidential Benson 000528 through 000531

21

22  Exhibit 4....................................... 95
         Galveston County Sheriff's Office Standard

23       Operating Procedure, Chapter: Security and
         Control, Bates labeled Confidential

24       Benson 000774 through 000778

25

1    Exhibit 5......................................... 105
            Records of training and certificates for
2            Edward Benavidez Jr., Bates labeled Confidential
            Benson 000248 through 000317
3
4    Exhibit 6.........................................  115
            Texas Commission on Law Enforcement Officer
5            Standards and Education document for Edward
            Benavidez Jr., Bates labeled Benson 000092
6            Confidential through 000093
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1          **THE REPORTER:**  My name is John Rochelle.  I

2    am a court reporter for Worldwide Court Reporters, Inc.,

3    whose address is 3000 Weslayan, Suite 235, Houston,

4    Texas 77027.  Today's date is June 30, 2022.  We are at

5    the law firm of McLeod, Alexander, Powell & Apffel, P.C.,

6    for the deposition of Edward Steven Benavidez Jr.

7    Present for Mr. Benavidez is Bryan Lasswell and

8    Ms. Genevieve McGarvey.  And present for Galveston

9    County and Henry Trochesset is Mr. Joseph R. Russo, Jr.

10                EDWARD STEVEN BENAVIDEZ JR.,

11   having been first duly sworn, testified as follows:

12                      EXAMINATION

13   BY MR. RICE:

14        **Q.  What's your full legal name?**

15        A.  Edward Steven Benavidez Jr.

16        **Q.  Could you just spell that for the record,**

17   **please?**

18        A.  My last name?

19        **Q.  The whole name.**

20        A.  E-D-W-A-R-D; S-T-E-V-E-N; B-E-N-A-V-I-D-E-Z;

21   and Jr., J-R.

22        **Q.  What is your date of birth?**

23        A.  July 25th, 1983.

24        **Q.  Are you represented by an attorney today?**

25        A.  That's correct.

```
 1        Q.  Okay.  Have you ever taken a deposition before?
 2        A.  No, sir.
 3        Q.  Okay.  Do you understand that you're under
 4   oath?
 5        A.  Yes, sir.
 6        Q.  And that means you're sworn to tell the truth?
 7        A.  Yes, sir.
 8        Q.  Even though we're here in this office your
 9   answers will have the same effect as in a courtroom.
10   You understand that?
11        A.  Yes, sir.
12        Q.  Are you prepared to answer my questions today?
13        A.  Yes, sir.
14        Q.  There is nothing that would prevent you from
15   giving me your full attention today, like any medical
16   conditions or anything?
17        A.  No, sir.
18        Q.  You aren't taking any medications or suffering
19   any illnesses?
20        A.  No, sir.
21        Q.  If you don't understand my questions, just let
22   me know, and I'll repeat it or rephrase it for you.
23        A.  Yes, sir.
24        Q.  If at any time you need to take a break, just
25   tell me, and we'll take a break.  You know, it doesn't
```

1    matter, whenever.  Just let me know.

2         A.  Yes, sir.

3         Q.  Are you currently employed?

4         A.  No, sir.

5         Q.  Okay.  Where did you work before?

6         A.  Galveston County Sheriff's Office.

7         Q.  Okay.  And what was your reason for leaving

8    there?

9         A.  Violation of department policy, deadly force.

10        Q.  Okay.  Could you tell me -- okay.  You said

11   "deadly force."  When did you finish high school?

12        A.  2002.

13        Q.  What school was it?

14        A.  Ball High School.

15        Q.  Did you attend any additional school?

16        A.  After graduation a couple of semesters in

17   Galveston College.

18        Q.  Okay.

19        A.  And then the police academy.

20        Q.  What is your parents' names?

21        A.  Patricia and Edward Benavidez.

22        Q.  Okay.  And could you state their occupation for

23   the record?

24        A.  Both retired.

25        Q.  Okay.  What was the occupation before they

1  retired?

2      A.  My father was a Galveston police officer, and

3  my mother was a secretary for the chief of police for

4  Galveston.

5      Q.  Okay.  How many years was your father an

6  officer in Galveston?

7      A.  About 38.

8      Q.  And what was the highest rank that he ever

9  made?

10     A.  Captain.

11     Q.  Okay.  Have you watched any videos of the

12  incident that we're here about today?

13     A.  Yes.

14     Q.  Have you read any reports related to the

15  incident?

16     A.  My report.

17     Q.  Okay.  And just your report only, no other

18  reports?

19     A.  I mean, we -- yeah.  Like the investigation,

20  yes.

21     Q.  Okay.  So did you read any -- watch any of the

22  witnesses' interviews that they gave?

23     A.  No.

24     Q.  Okay.  What material did you use to prepare for

25  this deposition today?

```
 1        A.   The preparation, meetings with my attorneys.
 2        Q.   Okay.  And did y'all go over any material?
 3        A.   Yes.
 4        Q.   Okay.
 5        A.   My statement.
 6        Q.   Okay.
 7        A.   And the videos.
 8        Q.   Okay.  Okay.  Are you aware of any other
 9   excessive force allegations that happened against
10   Galveston County while you were working there?
11        A.   No.
12        Q.   Okay.  Just a little bit on your sheriff
13   background and training.  When did you apply for the
14   sheriff academy?
15        A.   2011.
16        Q.   Did you receive a referral from either your
17   mother or your father?
18        A.   No.
19        Q.   Do you believe that they had any help in
20   getting you into the academy?
21        A.   No, sir.
22        Q.   Okay.  How long did the sheriff academy last
23   approximately, like from start to finish?
24        A.   About three, four months.
25        Q.   Can you explain the stages you kind of went
```

1   through while at the academy?

2       A.  Well, the first portion was -- well, the

3   academy was a class, three, four months.

4       Q.  Okay.

5       A.  Graduate, passed TCOLE.  And then you get

6   training in the jail for about three weeks.

7       Q.  Okay.  So the mental requirements of the

8   Sheriff Department training consists of like classroom

9   courses and stuff where they taught you different

10  things?

11      A.  Correct.

12      Q.  Okay.  Was there a physical requirement that

13  you had to pass to become a sheriff?

14      A.  No, sir.

15      Q.  Okay.  So no physical requirement, like no

16  running, or sit-ups, push-ups, nothing like that?

17      A.  No.

18      Q.  Okay.  Let's just talk a little bit about the

19  deadly force training -- or just use of force training

20  to start off that you got at the academy.  What kind of

21  training did you receive at the academy dealing with

22  like just general use of force?

23      A.  In the correctional academy.

24      Q.  Okay.  And what -- can you go over what they

25  kind of taught you as far as use of force, maybe just

1   how many hours y'all spent on it?  Did you have a full

2   class or something that -- where they taught you?

3               MS. MCGARVEY:  Are you talking about in the

4   academy?

5               MR. RICE:  Yeah, the academy.

6               MR. RUSSO:  I'm going to object as

7   compound.

8        A.   Each category like three, four days pretty much

9   a week.

10       Q.   (BY MR. RICE)  Okay.  So did you spend three,

11   four days a week on use of force training or just

12   everything in general?

13       A.   Everything in general.

14       Q.   Can you estimate how much time y'all spent at

15   the academy on use of force training?

16       A.   Well, there was -- there was the textbook, and

17   then also we did some physical hands-on techniques.

18       Q.   Okay.  Could you describe those physical

19   hands-on techniques that they taught you?

20       A.   It was pretty much for our safety, techniques

21   to get out of holds for our safety.

22       Q.   Self-defense techniques basically?

23       A.   Exactly.  Correct.

24       Q.   Did they ever train you on any technique of

25   dealing with a fleeing person or anything like that?

```
 1        A.  No.
 2        Q.  Okay.  Now I'm just going to kind of just dig
 3   into like the deadly force training.  So you received
 4   no -- how much of the deadly force training did you
 5   receive that was legal wise, like explaining to you the
 6   consequences of using deadly force, when you can use
 7   deadly force, things like that?
 8        A.  In the police academy?
 9        Q.  Yes, sir.
10        A.  We -- since that was a one year course we
11   spent, you know, some time on it.
12        Q.  Okay.  So --
13        A.  I can't estimate how much time, but we spent
14   time on it.
15        Q.  Okay.  So you had a one year deadly force
16   course at --
17        A.  No.
18        Q.  Oh.
19        A.  The police academy --
20        Q.  Was one year?
21        A.  One year.  And so every single category of that
22   course we spent time on.
23        Q.  Okay.
24             MR. LASSWELL:  Slow down.  Let him finish
25   his question.
```

```
 1        Q.  (BY MR. RICE)  So what did you do after you
 2   left the academy?
 3        A.  The police academy?
 4        Q.  Yes, sir.
 5        A.  I applied for the Sheriff's Office.
 6        Q.  Okay.  Once hired at the Sheriff's Office what
 7   kind of training did you undergo to become a sheriff
 8   deputy?
 9        A.  Correctional academy.
10        Q.  The training you had before the Sheriff -- the
11   training that you had before you got to the Sheriff
12   Department is the training you had?  Correct?
13        A.  In addition -- that's the training I had before
14   entering the Sheriff's Office, and once I got hired for
15   the Sheriff's Office I went through the correctional
16   academy.
17        Q.  Oh, okay.
18        A.  Additional ed --
19        Q.  Additional academy once you got on there.  And
20   how long did the correctional academy last?
21        A.  About -- I can estimate, but -- three, four
22   weeks.
23        Q.  Okay.  And during that three, four weeks did
24   y'all go over any deadly force training?
25        A.  Yes.
```

1    Q.   Okay.  What kind of deadly force training did

2    y'all go over during those three or four weeks that you

3    were in the correctional academy?

4    A.   Well, the course was geared towards

5    correctional, so it was in the correctional setting.

6    Q.   Okay.  Did it deal with escaping inmates?

7    A.   I'm sure that it had.

8    Q.   But you can't remember?

9    A.   I can't remember.  I can't recall.

10   Q.   Okay.  Did they give you any legal training on

11   dealing with escaping inmates?

12   A.   We went over it.

13   Q.   Oh.

14   A.   Yes.

15   Q.   Okay.  But you can't remember it?

16   A.   No.

17   Q.   Okay.  Did y'all have any, say, like simulation

18   where you used paint balls, or anything, to kind of have

19   like a live scenario as far as dealing with escaped

20   inmates?

21   A.   No.

22   Q.   How often were y'all made to train using your

23   service weapon?

24   A.   Once a year.

25   Q.   And once a year you were tested on that?

1      A.  Yes.

2      Q.  Okay.  And you say you was taught the law on

3  deadly force, but you don't remember it?

4      A.  Yes.

5      Q.  Okay.  So --

6      A.  I don't remember the specifics.

7      Q.  Okay.  Well, could you describe to me what you

8  do remember that you learned from the correctional

9  academy on deadly force?

10     A.  No.

11     Q.  So you can't describe to me when or where

12 you're supposed to use deadly force as pertaining to

13 your academy courses?

14     A.  I know -- I can't recall.

15     Q.  Okay.  So you can't recall.  Have you ever

16 heard of Tennessee v. Garner, where you talked about

17 that court case?

18     A.  Yes.  In the police academy.

19     Q.  Okay.  Could you explain that court case to me?

20     A.  Not at this time.

21     Q.  Did you remember that court case at the time of

22 the shooting?

23     A.  No.

24     Q.  Did you remember your use of deadly force

25 training at the time of the shooting?

```
 1        A.   Yes.
 2        Q.   But you can't recall it now?
 3        A.   No.  I can recall.
 4        Q.   Okay.  Well, can you --
 5        A.   I --
 6        Q.   Go ahead.
 7        A.   I can't recall the specifics on that day when
 8   it happened.
 9        Q.   Okay.  So my question is -- you can't recall
10   your training on use of deadly force today to tell me
11   when you're able to use deadly force or not.  And I'm
12   asking you were you able that day to tell the same
13   thing, if you're able to use deadly force or not, on the
14   day of the shooting?
15        A.   Can you repeat that, please?
16        Q.   Okay.  So today I'm asking are you able to
17   explain to me the deadly force requirement that you had
18   learned in either the sheriff academy or the
19   correctional academy today?
20        A.   Yes.
21        Q.   Can you explain those to me, please?
22        A.   Yes.  To protect the public from a threat.
23        Q.   Okay.  So that's your -- to protect the public
24   from a threat?
25        A.   Correct.
```

1      Q.   Okay.  And what could be considered a threat?

2           MR. RUSSO:  I'm going to object as vague.

3      A.   Anyone who poses harm to the public.

4      Q.   (BY MR. RICE)  Okay.

5      A.   Potential harm to the public.

6      Q.   Okay.  Have you ever heard of the term

7  "deliberate indifference"?

8      A.   Not that I recall.

9      Q.   Okay.  Did the Sheriff Department give you any

10 extensive training on maybe, say, Tennessee v. Garner or

11 anything like that?

12     A.   I'm sure in courses that I've taken over the

13 years it's come up.

14     Q.   Okay.  But you just can't remember today?

15     A.   No.

16     Q.   Okay.  Are you familiar with the Michael Brown

17 case, a big national headline case, officer involved

18 shooting?

19     A.   No.

20     Q.   How about Trayvon Martin?  Are you familiar

21 with that case?

22     A.   I've heard of it.

23     Q.   Okay.  What about maybe a Philando Castile,

24 that was another police shooting that kind of made

25 national headlines?

```
 1          A.  No, sir.

 2          Q.  How about Breonna Taylor, another national

 3     headline, a police shooting?

 4          A.  I've heard of it.

 5          Q.  Okay.  And what about Joshua Feast?  That was

 6     one that happened here in Galveston County.

 7          A.  No.

 8          Q.  Okay.  Now I just want to go kind of a little

 9     bit over your -- kind of touch a little bit on your

10     record as a deputy.  Have you ever been in trouble as a

11     deputy?

12                    MR. LASSWELL:  Objection, form.

13          A.  A few times.

14          Q.  (BY MR. RICE)  Okay.  A few times?

15          A.  A few times.

16          Q.  Could you give me the instances that you got in

17     trouble as a deputy?

18                    MS. MCGARVEY:  So, you mean that he was

19     reprimanded?

20                    MR. RICE:  Yes, ma'am.

21          Q.  (BY MR. RICE)  A report was wrote on you, a

22     grievance was filed, you know.  Just anything where you

23     had gotten in trouble and action was taken.

24                    MS. MCGARVEY:  Disciplinary action?

25                    MR. RICE:  Yes.
```

1          **MS. MCGARVEY:**  Okay.

2      A.  In 2012 I got written up, an employee

3  conference record, for being late.

4      **Q.  (BY MR. RICE)  Okay.**

5      A.  In 2016 I missed a couple medical pipe rounds,

6  and I got written up for that, employee conference

7  record for that.  And also in 2016 I got an

8  administrative action report for not checking a

9  wristband.  And ultimately that inmate, he posed as

10  another inmate to escape from the jail.  That was in

11  2016.  And my last -- well, the -- excuse me.  In 2020 I

12  got written up, employee conference record, for

13  demeaning statements toward a deputy.  And in 2021 a

14  violation, an AAR violation of deadly force policy at

15  the Sheriff's Office.

16      **Q.  Okay.  I'll come back to kind of your record in**

17  **a little while.  I just want to kind of go and dig a**

18  **little bit deeper into your training at the Sheriff**

19  **Department.**

20              **So you say your correctional class lasted**

21  **three weeks or so once you got to the Sheriff**

22  **Department?**

23      A.  Correct.

24      **Q.  And you can't tell me how many hours was spent**

25  **on use of force and use of deadly force training or how**

```
 1   many classes you had to take for the Sheriff Department
 2   during that correctional time, during the correctional
 3   course you were taking?
 4        A.  Not for the individual categories that we went
 5   over.
 6        Q.  Okay.  And how much physical training did y'all
 7   have to do once you became a sheriff?
 8        A.  In the academy or --
 9        Q.  Just once you became a sheriff for the Sheriff
10   Department?
11        A.  None.
12        Q.  There was no physical requirements?
13        A.  No.
14        Q.  Let me just talk a bit about, a little bit
15   about your physical ability.  How often do you work out?
16        A.  Right now, no, I'm not.  I don't.
17        Q.  Okay.  What about during the incident -- at the
18   time that the incident happened?
19        A.  I was at my peak physical best.
20        Q.  Your peak physical best.  So would you consider
21   yourself at that point strong or weak?
22        A.  My strongest.
23        Q.  You was at your strongest.  And you answered
24   there is no physical requirement that must be met as a
25   sheriff, correct?
```

1      A.  Correct.

2      **Q.  Do you think to be a sheriff deputy you have to**

3  **be physically strong?**

4      A.  Not necessarily, no.

5      **Q.  Okay.  Now I want to kind of dig into this --**

6  **transfer and kind of get into what we're here about.  I**

7  **want to talk about transferring inmates inside the**

8  **facility, not outside the facility.  Are there**

9  **procedures for transporting inmates inside the facility?**

10      A.  Yes.

11          **MR. RUSSO:**  Object as vague.

12      **Q.  (BY MR. RICE)  Could you explain those**

13  **procedures to me?**

14      A.  Every situation is different.  Normally if, for

15  example, I'm transporting one to medical, they pose no

16  threat to medical, they cross their arms, you know, from

17  behind, and they're a few feet in front of me, I guide

18  them where to walk, no hand restraints or shackles, and

19  we just walk them to medical.

20      **Q.  Okay.  When would a person be required to have**

21  **handcuffs and shackles?**

22      A.  If they're on lockdown status, ad seg,

23  administrative segregation, or a two-man policy.

24      **Q.  Okay.  Basically any time they might be a**

25  **threat or a danger it's a two-man policy?**

```
 1        A.   Yes.
 2        Q.   Okay.  On the date in question, Mr. Benson was
 3   transported to the hospital due to ingesting a large
 4   amount of drugs, correct?
 5        A.   Correct.
 6        Q.   Would you consider him a threat at that point?
 7        A.   Well, protocol from the jail to a hospital,
 8   they are cuffed and shackled when transporting.
 9        Q.   Okay.  Okay.  No.  My question was would you
10   believe that Mr. Benson after ingesting a lot of drugs,
11   being transported to the hospital, would he be
12   considered a threat?
13        A.   I would say so.  I would believe so.
14        Q.   Okay.  What are your policy, procedures when it
15   comes to the use of weapons as a sheriff?
16        A.   How do you --
17             MR. LASSWELL:  I'm going to -- yeah.  Let
18   me just object to form.
19        Q.   (BY MR. RICE)  Okay.  When are you allowed to
20   use your weapon?
21        A.   When necessary.
22        Q.   And what does "when necessary" mean?
23        A.   When I feel that there's a threat that needs to
24   be stopped.
25        Q.   Okay.  So it's based on -- they leave it up to
```

```
 1    your personal feeling as a sheriff to decide when to use
 2    deadly force?
 3                MR. RUSSO:  Let me object to form.
 4        A.  Repeat --
 5        Q.  (BY MR. RICE)  They leave it --
 6        A.  -- your question.
 7        Q.  So the Sheriff Department leaves it up to you
 8    as a deputy for you to decide when you're able to use
 9    reasonable force based on your belief?
10        A.  Based on my training, yes.
11        Q.  Okay.  Okay.  And you stated that your training
12    was a three week course in total, correct, for the
13    Sheriff Department and --
14        A.  For the correction department.
15        Q.  -- for the correction department?
16                MR. RUSSO:  Object to form.
17        Q.  (BY MR. RICE)  Okay.  Do you know whether
18    transport procedures are kept, or the policy number for
19    them?
20        A.  No.
21        Q.  Are there procedures for transporting that you
22    could look up in your manual and it tells you exactly
23    what to do?
24        A.  No.
25        Q.  So the transporting training is also during
```

1    that three months correctional period, correct?   When

2    you take the three month class -- I mean, the three week

3    class, that's where they teach you about transportation

4    also, like transporting inmates?

5        A.  No.

6        Q.  So when do they teach you about transporting an

7    inmate inside the jail?

8        A.  When you're assigned to that detail.

9        Q.  Okay.  So once you get assigned to a detail

10   that's when the County teaches you about -- transporting

11   is not done during the class before you -- I mean,

12   before you're put into action?

13       A.  In the corrections academy not everyone is

14   certified.

15       Q.  Okay.

16       A.  Some are civilians becoming -- and some are

17   peace officers.  Some already are peace officers, and

18   some are civilians becoming jailers.

19       Q.  Okay.  Okay.  So what's the procedure on the

20   number of deputies required to transport an inmate?

21   When would it be one deputy, when would it be two

22   deputies?

23            MR. LASSWELL:  Objection, form.

24       A.  Two-man policy.

25       Q.  (BY MR. RICE)  Two-man policy when transporting

```
 1   inmates?

 2        A.  Yes.

 3        Q.  And on the day in question in this incident you

 4   were the only deputy that was there, correct?

 5        A.  Correct.

 6        Q.  Okay.  If there are two deputies, it would be

 7   easier to guard an inmate, correct?

 8        A.  Correct.

 9             MR. RUSSO:  Object to form.

10        Q.  (BY MR. RICE)  So now to just kind of transfer

11   to transporting an inmate outside a facility.  Are they

12   required to always be handcuffed and shackled when

13   outside a facility?

14        A.  Yes.

15        Q.  And is the policy when transporting an inmate

16   outside the facility to have two deputies?

17             MR. RUSSO:  Object to form.

18        A.  It depends on the situation.

19        Q.  (BY MR. RICE)  It depends on the situation.

20   Okay.  When a prisoner is outside a facility, is there a

21   special way that you're taught to guard the prisoner?

22   Like say, for instance, if they're in a room, you stand

23   here by the door, or if you're walking with them you

24   stay two or three feet behind?  Are you given any kind

25   of procedures for transporting inmates outside the
```

```
 1    facility?
 2         A.   No.
 3         Q.   So the County leaves it up to you to decide how
 4    you want to transport that inmate when outside the
 5    facility?
 6              MR. LASSWELL:  Objection, form.  Jarvis,
 7    can I ask for some clarification?  When you're saying
 8    "transporting," first off you were talking about like
 9    when they're in the -- I thought you were talking about
10    like when they're in the hospital or something.
11              MR. RICE:  Oh, okay.
12              MR. LASSWELL:  And when I'm thinking
13    "transport" I'm thinking like traveling someplace.
14              MR. RICE:  Okay.
15         Q.   (BY MR. RICE)  So just to clarify it, when I
16    mean "transportation" I'm saying the act of taking that
17    prisoner from the jail, once he gets outside the jail
18    every action that takes place after that, so getting him
19    out of the car at the hospital, walking him through the
20    hospital, just basic procedures of handling that inmate
21    once outside the jail.
22              So just to break it down, are they -- once
23    you put them in the van or once they're transported in
24    an ambulance are they required to be shackled at that
25    point, hands and feet?
```

```
 1        A.  Yes.  Unless a medical -- I at least have the
 2   shackles on.
 3        Q.  Okay.
 4        A.  But take off the hand restraints so the medical
 5   can -- especially in the EMS.
 6        Q.  Okay.  And once outside the EMS, say either
 7   a -- at the hospital facility are they required to be
 8   handcuffed and shackled?
 9        A.  Yes.
10        Q.  What about being transported from room to room
11   in the medical facility?  Are they required to be
12   handcuffed and shackled?
13        A.  It depends on the situation.
14        Q.  Okay.  What situation would not require them to
15   be handcuffed and shackled?
16        A.  If the inmate is off-balance.  You don't want
17   them to fall.
18        Q.  Okay.  So then --
19        A.  When they might need assistance in walking.
20        Q.  Okay.  Okay.  So -- let's see.  Is there any
21   procedure to inform you of the prisoner's condition or
22   history before you're assigned out to guard that
23   prisoner outside the facility?
24        A.  How do you mean?
25        Q.  So are you given a report that says "this
```

1    prisoner ingested drugs, we transported him to the

2    hospital," just a basic rundown of what happened and

3    why the prisoner is there?

4         A.   We are given a pass-over.   Yes.

5         Q.   A pass-over?

6         A.   Yes.

7         Q.   And what does that pass-over consist of?

8         A.   It consists of the information you just stated.

9         Q.   Okay.   And in that pass-over are you informed

10   of any prior history, such as maybe a history of fleeing

11   or evading before you're assigned to that duty?

12        A.   No.

13        Q.   So the County doesn't let you know that an

14   inmate might have a history of running before you're

15   assigned to guard them outside the facility?

16             MR. RUSSO:   I'm going to object to form.

17        A.   On a normal day you are getting a head sheet to

18   all that.

19        Q.   (BY MR. RICE)   Yes, sir.

20        A.   In the day of question, I didn't receive that

21   until I entered the hospital room, due to him being

22   detained in court and transported by EMS.

23        Q.   Okay.   So the County doesn't have a procedure

24   for facilitating a pass-over if the person is arrested

25   in court?   That's what you're saying?

1          MR. RUSSO:  Object to form.

2      A.  Not what I'm saying.

3      Q.  (BY MR. RICE)  Okay.  Could you explain it to

4  me again, what you were saying there?

5      A.  I received the pass-over -- on a normal day

6  when you go to the hospital you get his -- you get the

7  inmate's information before you leave the hospital.

8      Q.  Uh-huh.

9      A.  On this day in question, I didn't receive the

10  information before due to him being arrested or detained

11  in court, heading to -- heading to the hospital.  So

12  they never had a head sheet for me.

13      Q.  Okay.  And whose fault would that be, if a head

14  sheet wasn't created at that point for you?

15      A.  Say it again, please.

16      Q.  Whose fault would it be if the head sheet

17  wasn't created and given to you at that point?

18          MR. RUSSO:  I'm going to object to form.

19  It's speculating.

20      A.  The sergeant who assigned me to the --

21      Q.  (BY MR. RICE)  Detail?

22      A.  -- detail.

23      Q.  So the sergeant that assigned you to the detail

24  is responsible for giving you the head sheet before you

25  go on that detail, correct?

```
 1        A.  Correct.
 2        Q.  And in the day in question they didn't give you
 3   that head sheet, correct?
 4             MR. RUSSO:  Object to form.
 5        A.  Correct.
 6        Q.  (BY MR. RICE)  And people are routinely
 7   arrested when they show up for court, correct?
 8             MR. RUSSO:  Object to form.
 9        Q.  (BY MR. RICE)  I'll rephrase it for you.  So
10   it's not unusual for someone to show up in court and
11   have a warrant and be taken into custody, correct?  That
12   happens every day?
13        A.  I don't --
14             MR. RUSSO:  Objection --
15        A.  I don't work the bailiff division.  I don't
16   work it.  I don't work the court.
17             THE REPORTER:  And, sir, you just started
18   saying "objection."  Did you have anything else after
19   you said --
20             MR. RUSSO:  Huh-uh.
21             THE REPORTER:  Thank you.
22             MR. RICE:  Okay.
23             THE REPORTER:  Sorry, sir.
24             MR. RICE:  No.  That's fine.
25        Q.  (BY MR. RICE)  Is there official policy that
```

```
 1     guides your use of your equipment as far as your gun,

 2     mace, tasers, whatever they give you?  Is there a

 3     certain policy that you can pull up that tells you how

 4     to use each one of those things?

 5          A.   No.

 6          Q.   So the County leaves it up to you to decide how

 7     to operate the equipment they give you?

 8          A.   Yes.

 9                    MR. LASSWELL:  Objection, form.

10                    MR. RUSSO:  Object to form.

11                    (Ms. Melissa E. Palmer enters the

12                    deposition proceeding at this time.)

13          Q.   (BY MR. RICE)  Okay.  Are you trained on the

14     legal use of this equipment as far as case law,

15     statutes, things of that nature, that may guide the

16     use of your equipment?

17                    MR. LASSWELL:  Objection, form.

18          A.   How do you mean?

19          Q.   (BY MR. RICE)  So are you given -- once you're

20     given a gun by the Sheriff Department do they guide you

21     and give you legal information on how to properly use

22     that gun?

23                    MR. LASSWELL:  Objection, form.

24          A.   No.

25          Q.   (BY MR. RICE)  Do they train you how to fire a
```

1    gun at a fleeing suspect?

2         A.   No.

3         Q.   By firing you the Sheriff Department insinuated

4    that you did something wrong, correct?

5         A.   Yes.

6         Q.   Do you believe you were following their policy

7    when you fired a shot at Mr. Benson?

8         A.   Yes.

9         Q.   You believe you were following the training

10   they had given you, correct?

11        A.   Correct.

12        Q.   Okay.  So now I just want to kind of dig into

13   the day in question.  Can you kind of start explaining

14   to me what happened from the time you arrived at work

15   until the time you arrived at the hospital to relieve

16   Mr. Benson?  I mean, to relieve Deputy Steadham?

17        A.   I got a call early afternoon by -- Sergeant

18   Drews was asking if I wanted one hour of overtime

19   because the bailiff needs to be relieved by 5:00.  I

20   agreed to the detail.  I came in about 4:30.  That's

21   where she notified me that Mr. Benson ingested some

22   drugs and he got escorted -- he got transported by EMS.

23   And when I asked for the head sheet she stated that,

24   "Well, since he was arrested in court they all had that

25   information."  She gave me the room number.  I got the

1   keys from booking for the transport van, and got to the
2   hospital at five o'clock.
3       Q.  Okay.  When you arrived at the hospital, who
4   was watching Mr. Benson?
5       A.  Deputy Steadham.
6       Q.  Did you have a conversation with Deputy
7   Steadham about how Mr. Benson needs to be properly
8   restrained?
9       A.  He didn't mention anything, no.
10      Q.  Okay.  So Deputy Steadham never spoke with you
11  about Mr. Benson and his history for running and how you
12  probably need to kind of watch him closely?
13      A.  No.
14      Q.  Okay.  Did you have your handcuffs when you
15  showed up to the hospital that day?
16      A.  No.
17      Q.  Is your handcuffs a required part of your
18  uniform?
19      A.  No, but it's -- it's something you need to
20  have.
21      Q.  Okay.  So it's something that's important to
22  you doing your job?
23      A.  Yes.
24      Q.  So just to kind of go through everything --
25  well, tell me your version of how the escape happened

```
 1   and the shooting.
 2             MR. LASSWELL:  I think -- objection, form.
 3   I think we need to break that down.
 4             MR. RICE:  Okay.
 5        Q.  (BY MR. RICE)  So just -- so just to dig into
 6   it, you were informed that Mr. Benson was not booked
 7   into the jail because he showed up to court high and the
 8   judge revoked his bond, correct?
 9             MR. RUSSO:  Object to form.
10        A.  Yes.
11        Q.  (BY MR. RICE)  After reading the report, you
12   now know that's not the correct story of how Mr. Benson
13   ended up in custody, correct?
14             MR. LASSWELL:  Objection, form.
15        A.  Yes.
16        Q.  (BY MR. RICE)  Okay.  And that would be because
17   Sergeant Drews didn't provide you with the proper head
18   sheet or head -- the head sheet, correct?
19             MR. RUSSO:  Object to form.
20        A.  Correct.
21        Q.  (BY MR. RICE)  Okay.  You did say the Sheriff
22   Department has a system to getting the proper
23   information to you during a pass-over, but that day it
24   just didn't happen, correct?
25        A.  Not -- that's not what I said.
```

1    Q.  Okay.  Could you explain to me what you said?

2    A.  What I mean by "pass-over," it's deputy -- it's

3  a deputy to deputy --

4    Q.  Okay.

5    A.  -- conversation.

6    Q.  Okay.  The deputy to deputy conversation is

7  pass-over.  So that day there was a system in place to

8  get you that head sheet but --

9    A.  The head sheet -- he was -- he was an inmate

10  trying to get fit for incarceration by being cleared by

11  the hospital.  He wasn't -- he was an inmate, but he

12  hasn't officially went through booking because medical

13  wouldn't take him yet.

14    Q.  Okay.

15    A.  That's the reason why he didn't get the head

16  sheet -- I didn't get the head sheet.

17    Q.  Okay.

18    A.  If she could, she would have.

19    Q.  Okay.  So they don't have a procedure in place

20  for when an inmate is arrested during court and

21  transported to the hospital, there is no procedure for

22  making sure that head sheet gets to that -- gets to the

23  deputy for that inmate?

24    A.  That head sheet was --

25         MR. RUSSO:  Object to form.

1      A.   -- with Deputy Steadham.

2      **Q.   (BY MR. RICE)   Oh.   It was with Deputy**

3  **Steadham?**

4      A.   It was -- I -- yeah.   He had the information.

5  And during the pass-over he said when it was -- when

6  everything is clear and he's clear for -- fit for

7  incarceration, you hand that information to booking.

8      **Q.   Okay.   Okay.   So just to clarify, Deputy**

9  **Steadham had the head sheet at the hospital, and once**

10 **you get there he turns that head sheet over to you?**

11     A.   Yes.

12          **MR. RUSSO:**   Object to form.

13          **THE REPORTER:**   And, sir, if you could just

14 pause one second because he's going to be objecting, and

15 just so I can make sure I get him and then get you, sir,

16 please.

17          **MR. LASSWELL:**   Yeah.

18          **THE REPORTER:**   Thank you.

19          **MR. LASSWELL:**   Yeah.   Just take a little

20 break.

21     **Q.   (BY MR. RICE)   Okay.   So let's just -- while**

22 **Mr. Benson was in the hospital do you recall him**

23 **speaking to like a black male that may have came in the**

24 **room about employment?**

25     A.   Yes.

```
1        Q.  Okay.  You stated that Mr. Benson appeared

2   highly intoxicated?

3        A.  Yes.

4        Q.  You stated that Mr. Benson was acting kind of

5   erratic --

6        A.  Yes.

7        Q.  -- at some points?

8        A.  Yes.

9        Q.  You escorted Mr. Benson to the restroom the

10  first time unhandcuffed, correct?

11       A.  Yes.

12       Q.  By an open nurses' station, with nurses walking

13  around and everything, correct?

14       A.  Well, I was in between.

15       Q.  Okay.

16       A.  I made sure that I was in between.

17       Q.  Okay.  Is it department policy to transport an

18  inmate throughout the hospital who is high on drugs

19  unhandcuffed?

20       A.  Well, if the inmate is off-balance and can't --

21  can't keep balance, for his safety I would have to help

22  him walk, and to use -- he claimed he had to defecate,

23  and to use his functions I uncuffed him so he can use

24  the facilities.

25       Q.  Okay.  So you could have uncuffed him right
```

1    before he went into the restroom, correct?

2         A.  Well, he was off-balance.

3         Q.  Okay.

4         A.  At times he was off-balance to the point where

5    I needed to hold on to his shirt to make sure he didn't

6    fall because those shackles were never going to -- I was

7    never going to take off those shackles, but since -- I

8    escorted him without hand restraints due to his safety.

9         Q.  Okay.  So the Sheriff Department leaves it up

10   to you to decide when to handcuff and not handcuff an

11   individual outside the facility?

12              MR. RUSSO:  Object to form.

13        A.  Repeat, please.

14        Q.  (BY MR. RICE)  The Sheriff Department allows

15   you to decide when to handcuff and not handcuff an

16   individual outside the facility, correct?

17              MR. RUSSO:  Object to form.

18        A.  It depends on the situation.

19        Q.  (BY MR. RICE)  Okay.  So --

20        A.  If I feel -- if I feel that he would fall

21   handcuffed and shackled to a certain area, I want to

22   make sure he doesn't injure himself any further than --

23        Q.  Okay.  Would your priority be to the inmate

24   injuring himself or to the safety of the public?

25              MR. RUSSO:  Object to form.

```
 1        A.  All the above.
 2        Q.  (BY MR. RICE)  Okay.  You stated that
 3   Mr. Benson pushed you with two hands, and you stumbled
 4   back, correct?
 5        A.  Correct.
 6        Q.  Handcuffs are designed to limit a prisoner's
 7   hand movement, correct?
 8        A.  Correct.
 9        Q.  If Mr. Benson would have been handcuffed at
10   that point, he couldn't have pushed you as hard,
11   correct?
12              MR. RUSSO:  Object to form.
13        A.  He -- he could have still pulled away.
14        Q.  (BY MR. RICE)  He could have pulled away, but
15   he couldn't have pushed you --
16        A.  No.  He could --
17        Q.  -- at all, correct?
18        A.  He could have done both, but he would have
19   still had one cuff attached.  One cuff was attached to
20   the bed.  I was attempting to cuff his wrist to the bed.
21   If it was the other way around, he still could have had
22   ample time to push me.
23        Q.  Okay.  So -- no.  My question is if Mr. Benson
24   would have been handcuffed after he left out the
25   restroom once you-all made it back to the room he
```

```
 1   wouldn't have been able to push you with the same force
 2   as with two open hands, correct?
 3               MR. RUSSO:  Object to form.
 4        A.  I disagree.  He -- he could have.
 5        Q.  (BY MR. RICE)  Okay.
 6        A.  At any point in time he could have pushed me.
 7        Q.  So the handcuffs don't restrict, then, a
 8   prisoner's movement from what you're saying, if he could
 9   have made the same moves with handcuffs on as he made
10   without handcuffs, correct?
11               MR. RUSSO:  Object to form.
12        A.  Possible.  Correct.
13        Q.  (BY MR. RICE)  Okay.  When Mr. Benson pushed
14   you and you stumbled back, did he attack you by punching
15   you or anything like that?
16        A.  No.
17        Q.  Did Mr. Benson reach for your gun at that
18   point?
19        A.  No.
20        Q.  Did you feel your life was in danger at that
21   point?
22        A.  No.
23        Q.  Okay.  Mr. -- was Mr. Benson shackled at that
24   point?
25        A.  Yes, I believe so.
```

```
 1        Q.  After Mr. Benson pushed you, he tried to get
 2   away from you, correct?
 3        A.  Yes.
 4        Q.  Okay.  When he headed out the room shackled and
 5   headed down the hallway, you were not able to catch him
 6   at that point, correct?
 7        A.  No.
 8        Q.  Okay.  He makes it down the hallway, and y'all
 9   end up in some kind of dead-end, a room, correct, where
10   another incident occurred?
11        A.  Yes.  In the maintenance closet to the right.
12        Q.  Okay.  And you tried to you say grab
13   Mr. Benson, and he flailed his arms and kind of moved
14   his shoulders and got away from you?
15        A.  Yes.  He was trying to find another exit in the
16   room once I got in there.  And when he turned around I
17   attempted to secure his upper body, and he was just --
18   he was a lot stronger than I was.  And basically we both
19   fell.  And he was basically on top of me.  And that's
20   when he -- that's when he escaped.
21        Q.  Okay.  If Mr. Benson would have been
22   handcuffed, he wouldn't have been able to kind of shake
23   you off or flail his arms to get away from you?  It
24   would have made it harder for him during that second
25   encounter, correct?
```

```
 1              MR. RUSSO:  Object to form.
 2       A.  But not impossible.
 3       Q.  (BY MR. RICE)  Okay.  Not impossible.  But
 4  harder?
 5       A.  Yes.
 6       Q.  Okay.  When Mr. Benson was on top of you, did
 7  he punch you?  His hands were free.  Did he punch you?
 8       A.  No.
 9       Q.  Did he grab for your weapon?
10       A.  No.
11       Q.  He got up off of you and tried to escape,
12  correct?
13       A.  Yes.
14       Q.  Okay.  Mr. Benson then ran through the
15  emergency room passing by numerous employees and
16  civilians, correct?
17       A.  Yes.
18       Q.  He didn't try to take no one hostage, correct?
19       A.  No.
20       Q.  He didn't try to run towards nobody and use
21  them as a shield, correct?
22       A.  Not that I -- I don't know what his intentions
23  were.
24       Q.  He headed straight out the building towards the
25  exit door, correct?
```

```
 1        A.  Well, first the maintenance closet.
 2        Q.  Uh-huh.
 3        A.  And then from there he hit the button for the
 4   double -- the last double doors.
 5        Q.  Okay.  So once he exited that emergency room
 6   door you stated you accidentally fired your weapon,
 7   correct?
 8        A.  Correct.
 9        Q.  At this point Mr. Benson's back was to you when
10   that happened, correct?  He was headed down the ramp?
11        A.  Yes.  He was to my left.
12        Q.  Okay.  You can't say if that shot startled
13   Mr. Benson or not, correct?
14        A.  Repeat the question, please.
15        Q.  You can't say that the shot, the initial shot
16   that you said was a accident, you don't know if it
17   startled Mr. Benson or not, correct?
18        A.  No.  It was a misfire, human error --
19        Q.  Okay.
20        A.  -- and --
21        Q.  Okay.  So at that point after the shot
22   Mr. Benson puts his hands up and stops running and
23   begins to walk, correct?
24             MR. LASSWELL:  Objection, form.
25        A.  His -- his body movement never stopped.
```

1    Q.  (BY MR. RICE)  But he stopped running after the

2  shot, and it became a walk down the ramp, correct?

3    A.  Regardless if he was walking, he never stopped

4  body movement.

5    Q.  Was he walking?  Yes or no?  I understand his

6  body was moving.  But he was walking, correct?

7          MR. LASSWELL:  Objection, form.

8    A.  Correct.

9    Q.  (BY MR. RICE)  Was his hands up in the air at

10  some point during that time?  Correct?

11          MR. LASSWELL:  Objection, form.

12    A.  Yes.

13    Q.  (BY MR. RICE)  Okay.  If you were running and

14  you heard a gunshot, would it scare you?

15          MR. RUSSO:  Object to form.

16    A.  No.

17    Q.  (BY MR. RICE)  Okay.  You gave several commands

18  to Mr. Benson to stop, but he kept moving?

19    A.  Correct.

20    Q.  He was saying "okay, okay" if he was going to

21  surrender, correct?

22    A.  Correct.

23    Q.  You didn't believe he was going to surrender,

24  correct?

25    A.  Correct.

```
 1        Q.  You just stated earlier that as Mr. Benson ran
 2   out the hospital, when I asked you about him trying to
 3   take anyone as hostages, you stated that you didn't know
 4   what he believed, correct?
 5        A.  Correct.
 6        Q.  But when -- now when I asked you was he about
 7   to surrender, then you knew that -- you believed that he
 8   wasn't about to surrender, correct?
 9                MR. LASSWELL:  Objection, form.
10        A.  I don't know what his intentions were.
11        Q.  (BY MR. RICE)  So you don't know what his
12   intentions were --
13        A.  I don't know what --
14        Q.  -- at that point?
15        A.  No.
16        Q.  Okay.  You stated that you believed that he was
17   either gathering his breath to run or to fight, correct?
18        A.  Well, as the altercation in the -- in the
19   hospital maintenance room, I -- we were both heavily
20   fatigued, so we were -- and we were running.
21        Q.  Okay.
22        A.  So we were --
23        Q.  Y'all both were fatigued, correct?
24        A.  Correct.
25        Q.  Okay.  So at the point in time when you thought
```

1    to yourself that he was about to fight or run you was

2    exhausted?

3         A.   Yes.

4         Q.   Mr. Benson climbed over a brick wall and fell?

5         A.   No.  He leaned up against a vehicle in the

6    parking lot.

7         Q.   Okay.  No.  He initially climbed over a brick

8    wall and fell, correct?

9              MR. LASSWELL:  Objection, form.

10        A.   Once he got over those two pillars he was

11   leaning against a car.

12        Q.   (BY MR. RICE)  Okay.  If Mr. Benson would have

13   been handcuffed, it would have been harder for him to

14   make it over those pillars, correct?

15        A.   Not necessarily.

16        Q.   Okay.  You stated that Mr. Benson fell and was

17   on the ground, and you was giving him commands to stay

18   down, correct?

19        A.   Correct.

20        Q.   You stated that as Mr. Benson pushed up off the

21   ground you shot him, correct?

22        A.   When his attempt to get up --

23        Q.   You --

24        A.   Yes.

25        Q.   -- shot him, correct?

```
 1        A.  Correct.
 2        Q.  You don't know if Mr. Benson was getting up to
 3   surrender at that point, correct?
 4        A.  My commands was to stay down, and he got up.
 5   And that's when I shot him.
 6        Q.  So you don't know if Mr. Benson was getting up
 7   to surrender at that point, correct?
 8        A.  I don't know.
 9        Q.  So you don't know what Mr. Benson was about to
10   do at the point he started to push up off the ground,
11   correct?
12        A.  Due to -- due to Mr. Benson not following my
13   commands ever since leaving the hos -- ever since
14   pushing me he has not complied with any of my commands,
15   so I was not confident he was getting up to surrender.
16   He was -- my belief he was getting up to flee.
17        Q.  Okay.  So because you believed that he was
18   getting up to flee you shot him?
19        A.  Correct.
20        Q.  But you don't know if he was going to flee
21   because you don't know his intentions, correct?
22        A.  Correct.
23        Q.  He could have got up and surrendered, correct?
24        A.  I don't know.
25        Q.  He had the right to get up and surrender,
```

```
 1    correct?
 2                    MR. RUSSO:  Object to form.
 3                    MR. LASSWELL:  Same objection.
 4         A.   When given a command, he should have followed
 5    my command.
 6         Q.   (BY MR. RICE)  So if a person, an inmate, a
 7    prisoner don't follow your commands they get shot,
 8    correct, is what you're saying?
 9                    MR. LASSWELL:  Objection, form.
10                    MR. RUSSO:  Object to form.
11         A.   No.
12         Q.   (BY MR. RICE)  So what are you saying?
13         A.   He was a threat to the public at that point in
14    time.
15         Q.   Okay.  So did you shoot Mr. Benson when he
16    attacked you the first time inside the room?
17         A.   No.
18         Q.   Did you shoot Mr. Benson when he ran through
19    the hallway by the nurses?
20         A.   No.
21         Q.   Did you shoot Mr. Benson when he attacked you
22    the second time in the hallway, the closet, or whatever,
23    the closet, did you attack him then?  I mean, did you
24    shoot him then?
25         A.   No.
```

1      Q.  Did you shoot Mr. Benson when he was running

2  through the emergency room by employees and public

3  people?

4      A.  No.

5      Q.  But you shot Mr. Benson when nobody else was

6  around, correct?

7                MR. RUSSO:  Object to form.

8      A.  Not that I have seen.  It was a public parking.

9  Anybody could have been around.  It was a vehicle --

10  there was vehicles.  He potentially could have taken a

11  vehicle, fled.

12      Q.  (BY MR. RICE)  Okay.  So what you're saying is

13  that you believed he could have potentially stole a

14  vehicle, it could have potentially been someone in the

15  parking garage, correct, but --

16      A.  Yes.

17      Q.  -- you don't know?

18      A.  Not that I have seen at that time.

19      Q.  Okay.  And did you state that you looked around

20  and there was no one in sight and you were physically

21  tired, that's why you shot Mr. Benson?

22                MR. LASSWELL:  Objection, form.

23      A.  No.

24      Q.  (BY MR. RICE)  So you never made the statement

25  that you looked around and didn't see no one in the

```
 1    parking lot to help you before -- right before you shot

 2    Mr. Benson?

 3                  MR. LASSWELL:  Objection, form.

 4         A.  I was focused on Mr. Benson.

 5         Q.  (BY MR. RICE)  Okay.

 6         A.  Just because I didn't see anybody in the

 7    parking lot doesn't mean that people weren't there.

 8         Q.  So were you in immediate danger of Mr. Benson

 9    at that point?

10         A.  No.  But the public was.

11         Q.  Who in the public was?

12         A.  The public in general.

13         Q.  So --

14         A.  Anybody that potentially could have been in the

15    parking lot.  The public.

16         Q.  So just because someone could have potentially

17    been in the parking lot you're saying that that was an

18    immediate threat to the public?

19         A.  Yes.

20         Q.  Okay.  You've stated that you shot Mr. Benson

21    to prevent him from escaping, correct?

22         A.  Correct.

23         Q.  Do you believe you have the right to shoot a

24    person to stop them from escaping?

25         A.  To stop a potential threat, yes.
```

 1          Q.   No.   To stop them from escaping?

 2               MR. RUSSO:   Object to form.

 3          A.   Yes, in that -- in this situation, yes.

 4          Q.   (BY MR. RICE)   Okay.

 5          A.   I feel I was justified.

 6          Q.   What Galveston County policy can you point me

 7     to that says that you were justified in using deadly

 8     force at that point?

 9          A.   Any potential threat to the public I'm

10     justified.

11          Q.   Okay.   And where did you learn that at?   Did

12     you learn it in the sheriff academy or the correctional

13     class?   Where did you learn that information from?

14          A.   Police academy.

15          Q.   Okay.   So the police academy taught you your

16     use of deadly force -- the police academy taught you how

17     to logically reason to use deadly force, is what you're

18     saying, correct?

19          A.   Yes.

20          Q.   It wasn't taught at the Sheriff's Department?

21               MR. RUSSO:   Object to form.

22          A.   It was touched upon in the corrections.

23          Q.   (BY MR. RICE)   Okay.

24          A.   But I was taught in the police academy.

25          Q.   Okay.   Does there have to be an immediate

1    threat for you to use deadly force to protect the

2    public?

3        A.  Yes.

4        Q.  So what was the immediate threat when you shot

5    Mr. Benson to the public?

6        A.  He was in a parking lot, could have potentially

7    took a vehicle, anything -- a very unpredictable

8    situation.  I don't know what his intentions were.

9        Q.  Okay.  So there was no immediate threat, but

10   there could have potentially been a threat?  He could

11   have escaped seven blocks to the drugstore down the

12   street and kidnapped an old lady you're saying, correct?

13          MR. LASSWELL:  Objection, form.

14      A.  Once Mr. Benson left the hospital double doors

15   he was an immediate threat to the public.

16      Q.  (BY MR. RICE)  Why?

17      A.  Because he was an escaped felon, and he was

18   under heavy narcotics, and his behavior was so

19   unpredictable, that he was a threat to the public.

20   Anything could have happened.

21      Q.  Okay.  Are you familiar with the difference

22   between a pretrial detainee and an inmate?

23      A.  We treat them one and the same.  We treat them

24   the same.

25      Q.  So you wasn't taught at the sheriff academy

```
 1    that there's a difference legally between a pretrial
 2    detainee and an inmate?
 3                   MR. RUSSO:  Object to form.  Calls for a
 4    legal conclusion.
 5                   MR. LASSWELL:  Same objection.
 6       A.  As far as I'm concerned he was an inmate.
 7       Q.  (BY MR. RICE)  My question was you was not
 8    taught at the sheriff academy the difference between a
 9    pretrial detainee and an inmate, correct?
10       A.  Correct.
11                   MR. RUSSO:  Object to form.
12       Q.  (BY MR. RICE)  What about the sheriff's
13    correctional class?  Did they tell you the difference
14    between a pretrial detainee and an inmate?
15       A.  Not that I recall.
16       Q.  Do you know that there's a difference between a
17    pretrial detainee and an inmate?
18                   MR. RUSSO:  Object to form.
19       A.  I know about -- well, that's geared towards
20    booking.
21       Q.  (BY MR. RICE)  Are you aware that there is a
22    difference in the use of deadly force when it comes to a
23    pretrial detainee and an inmate?
24                   MR. LASSWELL:  Objection, form.
25                   MR. RUSSO:  Object to form.
```

```
 1        A.   Repeat the question.  Like, how do you mean?
 2        Q.   (BY MR. RICE)  Are you aware that there is a
 3   difference between using deadly force when dealing with
 4   a pretrial detainee and dealing with an inmate, it's
 5   different levels of deadly force dealing with each one
 6   of those people?
 7                MR. LASSWELL:  Objection, form.
 8                MR. RUSSO:  Object to form.
 9        A.   Regardless of status -- my actions were to
10   protect the public regardless on pretrial or -- or
11   inmate.
12        Q.   (BY MR. RICE)  Okay.  You sustained a 3 to
13   4 inch scrape, correct?
14        A.   Correct.
15        Q.   That was the entirety of your injuries,
16   correct?
17        A.   Correct.
18        Q.   You don't know when that scrape happened,
19   correct?
20        A.   When I -- after the shot, and I was rendering
21   aid, when I was going through the -- over the barricade.
22        Q.   Okay.  So you actually didn't sustain that
23   injury from Mr. Benson?
24        A.   No.
25        Q.   Okay.  Your injury was not life-threatening,
```

```
 1   correct?
 2        A.  No.
 3        Q.  Your life was never in danger, correct?
 4        A.  Not necessarily.
 5        Q.  Mr. Benson was laughing at some point when he
 6   was walking down the ramp, correct?
 7        A.  Incorrect.
 8        Q.  Okay.  You stated that you feared for the
 9   public safety, correct?
10        A.  Correct.
11        Q.  But you didn't shoot him inside the hospital
12   when he ran by the public when they were in most danger,
13   correct?
14             MR. RUSSO:  Object to form.
15        A.  Correct.
16        Q.  (BY MR. RICE)  Okay.  You didn't even pull out
17   your weapon at that point, correct?
18        A.  Correct.
19        Q.  You didn't pull your weapon out until
20   Mr. Benson made it out of the main doors, correct?
21        A.  Correct.
22        Q.  And that was because he was about to escape,
23   correct?
24        A.  Correct.
25        Q.  You intentionally fired that first shot when
```

```
 1    you came out the door, correct?
 2         A.   Incorrect.
 3              MR. RUSSO:   Object to form.
 4         Q.   (BY MR. RICE)  You placed the public and -- the
 5    public and hospital employees in harm by escorting
 6    Mr. Benson unhandcuffed, correct?
 7         A.   Incorrect.
 8         Q.   Okay.  You shot Mr. Benson because you were
 9    tired and embarrassed, correct?
10         A.   Incorrect.
11              MR. RUSSO:   Object to form.
12         Q.   (BY MR. RICE)  Mr. Benson could have got up and
13    put his hands out to be handcuffed, correct, by you?
14         A.   That's not what -- that's not what his actions
15    were leading to.
16         Q.   But you don't know?  He could have, correct?
17              MR. RUSSO:   Object to form.
18         A.   Possibly.
19         Q.   (BY MR. RICE)  Are you familiar with scenarios
20    where -- say like in Buffalo where they had a mass
21    shooting, and these people were allowed to surrender
22    unharmed to where the -- the guy who shot the people in
23    the church, and they took him to get a hamburger?
24              MR. RUSSO:   Object to form.
25              MR. LASSWELL:   Objection, form.
```

```
 1        A.  No.
 2        Q.  (BY MR. RICE)  Okay.  You're not familiar with
 3   that case?
 4        A.  (Moving head side to side.)
 5        Q.  Are you familiar -- well, let me ask you this.
 6   Does a person no matter what they've done have a right
 7   to surrender at any point and be taken in unharmed?
 8        A.  Repeat the question.
 9        Q.  Does a person no matter what kind of crime they
10   committed, if they've killed 15 people, have the right
11   at any point to surrender and be taken in without being
12   harmed?
13              MR. RUSSO:  Object to form.
14        A.  Yes.
15        Q.  (BY MR. RICE)  Okay.  You asked for the
16   hospital staff to help you when Mr. Benson was fleeing,
17   correct?
18        A.  Yes.
19        Q.  Was that putting the hospital staff in danger?
20        A.  No.  I was -- the first double doors were open.
21   I was asking anybody to stop -- anybody to assist.
22        Q.  So you said that you were worried about the
23   public safety, correct?
24        A.  Yes.
25        Q.  But you asked the public to intervene to help
```

1    you, correct?

2        A.  Yes.

3        Q.  Was that putting the public safety first?

4               MR. RUSSO:  Object to form.

5        A.  I would never put the public in harm's way, but

6    I asked the public for help.

7        Q.  (BY MR. RICE)  Because Mr. Benson wasn't a harm

8    to the public, correct?

9        A.  He was a harm to the public.

10       Q.  You just stated you would never put the public

11   in harm's way, correct?

12       A.  Correct.

13       Q.  So why would you ask the public to apprehend

14   Mr. Benson?  He had not to be a threat to them, correct?

15       A.  At that point in time.

16       Q.  Okay.  The shackles were initially on while

17   Mr. Benson tried to escape, correct?

18       A.  Yes.

19       Q.  This incident happened pretty quickly, correct?

20       A.  Yes.

21       Q.  Mr. Benson didn't have time to stop and take

22   his shackles off at any point, did he, correct?

23       A.  Not that I -- no.

24       Q.  You were in pretty close contact either

25   physically or chasing him the whole time, correct?

1      A.   Yes.

2      Q.   **The accidental shot could have hit his shackles**

3   **and that's what broke them loose, correct?**

4           MR. LASSWELL:  Objection, form.

5      A.   Incorrect.

6      Q.   **(BY MR. RICE)  You're not -- you're sure or**

7   **you're not sure that it could have happened?**

8      A.   That first discharge wasn't in his direction.

9      Q.   **What about a ricochet?**

10     A.   No.

11     Q.   **So you're saying it couldn't have happened, or**

12  **you just don't think it happened?**

13     A.   I don't think it happened.

14     Q.   **Okay.  Have you seen the picture of the**

15  **shackles?**

16     A.   No.

17     Q.   **Okay.**

18     A.   His shackles were already off when he left the

19  hospital.

20     Q.   **Okay.  So I'll dig just kind of a little bit**

21  **into the investigation.  Now, when -- do you remember**

22  **when you gave your first statement?**

23     A.   Yes.

24     Q.   **When was that?**

25     A.   A couple days after the incident.

1      Q.  Can you give me an exact date?

2      A.  No.

3      Q.  Okay.  If I told you it was six days after the

4  incident, would that surprise you in any way?

5           MR. LASSWELL:  Objection, form.

6      A.  No.

7      Q.  (BY MR. RICE)  Okay.  What took you so long to

8  give this statement?

9           MR. LASSWELL:  Objection, form.

10     A.  That's when they asked for it.

11     Q.  (BY MR. RICE)  So no one in the Sheriff

12  Department asked you for a statement until six days

13  after the incident?

14     A.  Correct.

15     Q.  Okay.  Did you give any other statements?

16     A.  No.

17     Q.  When did you retain a lawyer?

18     A.  Oh, I had -- are you talking about this case

19  or --

20     Q.  This case.

21     A.  Yeah.

22           MS. MCGARVEY:  You're talking about this

23  case?

24           MR. LASSWELL:  You're talking about this

25  lawsuit?

```
 1                    MS. MCGARVEY:  The lawsuit?
 2                    MR. RICE:  I'm just --
 3                    THE WITNESS:  Yes, this -- yeah.
 4          Q.  (BY MR. RICE)  Not for this lawsuit.  When did
 5     you retain a -- well, okay.  When did you retain a
 6     lawyer for this lawsuit?
 7                    MR. LASSWELL:  No.  That's -- that's
 8     off-limits.
 9          Q.  (BY MR. RICE)  Did you ever retain an attorney
10     as far as a criminal matter?
11          A.  That day.
12          Q.  Okay.  So you retained an attorney criminally
13     that day.
14                    Did your mother speak to anyone about the
15     investigation?
16          A.  Not that I'm aware of.
17          Q.  What about your father?  Did he speak to anyone
18     about the investigation?
19          A.  Not that I'm aware of.
20          Q.  Okay.  Did you speak with your mother or father
21     about this investigation?
22          A.  They're my parents.  Of course I did.
23          Q.  Okay.  Did you speak with the District
24     Attorney's Office?
25          A.  No.
```

1      Q.  So you didn't speak to no one in the District

2   Attorney's Office?

3      A.  No.

4      Q.  They never asked you for a statement?

5      A.  No.

6      Q.  Okay.

7      A.  My report was -- I'm saying six days.  I had my

8   report ready to turn in when necessary.

9      Q.  Okay.  Okay.  Just kind of -- I'm going to

10   just -- kind of generally because I'm just trying to

11   comprehend just your understanding of deadly force.

12   When do you have the right to use deadly force?

13              MR. RUSSO:  Object to form.

14      A.  When there's a threat to the public.

15      Q.  (BY MR. RICE)  Okay.  What policy, sheriff

16   policy did you use to gather that understanding?

17              MR. LASSWELL:  Objection, form.

18      A.  When he posed a threat to the public.

19      Q.  (BY MR. RICE)  Okay.  When does a person have

20   the right to surrender?

21              MR. RUSSO:  Object to form.

22      A.  When they surrender.

23      Q.  (BY MR. RICE)  Did you give Mr. Benson a chance

24   to surrender?

25      A.  Yes, sir.

1      Q.  **When?**

2      A.  Ever since he ran.  My commands -- I gave him

3  many opportunities to stop, get on the ground, stay on

4  the ground, but he denied -- did not listen to my

5  commands.

6      Q.  **Okay.**

7      A.  He gave every -- every reason not to believe

8  that he would ever stop --

9      Q.  **Okay.**

10      A.  -- and surrender.

11      Q.  **All right.  I got not too many more questions**

12  **for you.**

13              **You were fired for Mr. Benson's shooting,**

14  **correct?**

15      A.  Yes.  But I was cleared by the public in the

16  grand jury.

17      Q.  **Okay.  Mr. Benson was not the first inmate you**

18  **let escape, correct?**

19              **MR. LASSWELL:**  Objection, form.

20      A.  I escorted an inmate to booking, but I wasn't

21  the cause.  I didn't let him out.

22      Q.  **(BY MR. RICE)  You were disciplined for**

23  **allowing an inmate to escape, correct?**

24      A.  For not reading his wristband.  Correct.

25      Q.  **It cost the County a lot of money and the Texas**

1   Rangers a lot of manpower to apprehend that escaped

2   individual, correct?

3                  MR. LASSWELL:  Objection, form.

4        A.  Yes.

5        Q.  (BY MR. RICE)  You were reprimanded for making

6   disparaging remarks to other deputies, correct?

7        A.  Yes.

8        Q.  Have you ever used a racial slur?

9        A.  No.

10       Q.  You never used a racial slur in your life?

11       A.  No.

12                 MR. LASSWELL:  Objection, form.

13       Q.  (BY MR. RICE)  Multiple deputies filed

14  complaints against you?  You're aware, correct?

15                 MR. LASSWELL:  Objection, form.

16       A.  At that point in time I was only aware of one.

17       Q.  (BY MR. RICE)  Okay.  You were reprimanded

18  before for missing rounds or not checking in at a proper

19  time, correct?

20       A.  Yes.

21       Q.  And that caused an inmate to escape, correct?

22  That's the reason for the checks, is to prevent escape?

23       A.  No.  They're -- these medical rounds they're

24  already in cells.

25       Q.  Okay.

```
 1        A.  Looking -- looking through windows.
 2        Q.  So there's really no need for it?  It's just a
 3   waste of your time, then?
 4        A.  No, sir.
 5        Q.  So what's the importance of it?
 6        A.  To make sure that they're okay.
 7        Q.  Okay.
 8        A.  I made the rounds.  They weren't -- according
 9   to the clock, possibly a minute, couple minutes off.
10   The rounds were made, just not in -- just not in the
11   time clock.
12        Q.  Okay.  You failed your sheriff deputy exam,
13   correct?
14        A.  Yes.
15        Q.  Sheriff Freddie Poor overrided that failing
16   grade and allowed you to enter the Sheriff Department,
17   correct?
18             MR. RUSSO:  Object to form.
19        A.  Yes.  Basically I -- if I would have had ample
20   time.
21        Q.  (BY MR. RICE)  Do you think it's fair that
22   other people failed the test and wasn't allowed the same
23   opportunity as you?
24             MR. RUSSO:  Object to form.
25        A.  I don't know.
```

```
 1        Q.  (BY MR. RICE)  Do you think that your mother
 2   and father has something to do with Mr. Poor accepting
 3   you into the Sheriff Department?
 4        A.  Absolutely not.
 5        Q.  Would it surprise you if someone named Rose
 6   emailed -- Rose, who was a good -- who claimed to be a
 7   20, 30 year friend of your mother and father, emailed
 8   the Sheriff Department about you failing your exam to
 9   try to get you some help?
10             MR. LASSWELL:  Objection, form.
11        A.  Repeat the question, please.
12        Q.  (BY MR. RICE)  Would it surprise you that if a
13   friend of your mother's named Rose emailed the Sheriff
14   Department to get you some help after you failed an
15   exam?
16             MR. LASSWELL:  Objection, form.
17        A.  I wouldn't be surprised, no, any family friend.
18        Q.  (BY MR. RICE)  Okay.  So you wouldn't be
19   surprised that happened?
20        A.  No.
21        Q.  Okay.
22        A.  But I'm not -- I wasn't aware of it.
23        Q.  Okay.  Let's see.  You've never passed your
24   deputy exam to this day?
25        A.  Yes.
```

1     Q.  So you did pass the exam?

2     A.  The corrections.  I passed the corrections

3 academy.

4     Q.  No, no, no.  The exam that you failed that they

5 sent you a letter that said that you were not allowed to

6 become a sheriff, did you ever pass that exam?

7     A.  I didn't -- I never had to retake it, no.

8     Q.  So to this day you've never passed a sheriff

9 exam to become a sheriff actually?

10         MR. LASSWELL:  Objection, form.

11     A.  No.

12     Q.  (BY MR. RICE)  Okay.  There was a written

13 section on the Sheriff Department exam, and it asked you

14 something along the lines of why do you think you

15 belonged, what could you do to help the Sheriff

16 Department, and a whole page was provided for you to

17 write a paragraph, and you only wrote two sentences,

18 correct?

19         MR. LASSWELL:  Objection, form.

20     A.  Not that I recall.

21     Q.  (BY MR. RICE)  There was a lot of -- of your

22 missed questions on your Sheriff Department exam had to

23 do with spelling, English, reading, writing.  Do you

24 have any troubles reading and writing?

25         MR. LASSWELL:  Objection, form.

```
 1        A.  No.
 2        Q.  (BY MR. RICE)  I noticed when you were spelling
 3   your name in the beginning you had to write it on the
 4   table.
 5        A.  To make sure it's correct.
 6        Q.  So you had to write your own name on the table
 7   to make sure it was correct?
 8        A.  Yes.
 9        Q.  Okay.  Your application was denied by the
10   Galveston Police Department for dishonesty, correct?
11             MR. LASSWELL:  Objection, form.
12        A.  What was --
13        Q.  (BY MR. RICE)  You left things off your
14   application for GPD?
15        A.  Not purposely.
16        Q.  Okay.  So you didn't leave those things off
17   purposely.  But you did leave things off, and you were
18   denied because of that, correct?
19             MR. LASSWELL:  Objection, form.
20        A.  No.  I -- I had an opportunity to go GPD -- to
21   apply for GPD.  I had an interview with GPD.
22        Q.  (BY MR. RICE)  And they didn't hire you because
23   of the dishonesty, correct?
24             MR. LASSWELL:  Objection, form.
25        A.  I don't know why they didn't hire me.  They
```

```
 1   didn't specify.
 2        Q.  (BY MR. RICE)  Okay.  You were involved in a
 3   hit and run in 2005, correct?
 4        A.  Yes.
 5        Q.  You fled the scene in your vehicle, correct?
 6        A.  Yes.
 7        Q.  The owner of the vehicle you hit had to chase
 8   you, correct?
 9        A.  Yes.
10        Q.  You were eventually stopped by an officer,
11   correct?
12        A.  Yes.
13        Q.  Who was that officer, that is now a sergeant in
14   internal affairs, what is his name, for the GPD?
15        A.  I don't know.
16        Q.  So you don't know the sergeant that stopped you
17   on that night, that now is in internal affairs at
18   Galveston Police Department, where your mother and
19   father worked, where you worked in the same building,
20   you don't know who that person is?
21        A.  No.
22             MR. RUSSO:  Object to form.
23        Q.  (BY MR. RICE)  Okay.  That officer stated that
24   you were intoxicated that night, correct?
25        A.  Yes.
```

1     Q.  So you hit a car drunk and drove off basically,
2   correct?
3     A.  Yes.
4     Q.  You wasn't taken to jail, was you?
5     A.  No.
6     Q.  Your mother and father were called to come pick
7   you up, correct?
8     A.  Yes.
9     Q.  So you committed a crime, you wasn't taken to
10  jail, your mother and father were called, who are
11  lifelong employees of the Galveston Police Department,
12  and you were allowed to be picked up, correct?
13    A.  Yes.
14    Q.  What charges did you receive from this
15  incident?
16    A.  I received a citation.
17    Q.  So you received a citation?
18    A.  Yes.
19    Q.  No DWI?
20    A.  No.
21    Q.  Okay.  You had another incident in 2010 where
22  you hit a parked car, correct?
23    A.  Yes.
24    Q.  What happened with that incident?
25    A.  I hit a parked car.

```
 1        Q.   Were you prosecuted?

 2        A.   No.

 3        Q.   Okay.  What happened with the Moody Gardens

 4   incident?

 5        A.   What Moody Gardens incident?

 6        Q.   It was an incident in your report.  It just had

 7   something wrote about Moody Gardens.  I'm not sure.  I

 8   haven't been able to dig into it.  I just thought I'd

 9   ask you.

10             MR. LASSWELL:  Objection, form.

11        Q.   (BY MR. RICE)  You don't remember?

12        A.   There was no incident at Moody Gardens.

13        Q.   Okay.  You spoke to Freddie Poor, who I believe

14   was the -- over the Sheriff Department at that time,

15   about your failing grade, correct?

16             MR. LASSWELL:  Objection, form.

17        A.   He called me.

18        Q.   (BY MR. RICE)  Okay.  You also lied on your

19   Sheriff Department application, correct?

20             MR. LASSWELL:  Objection, form.

21        A.   No.

22        Q.   (BY MR. RICE)  So you didn't have to resubmit

23   certain questions from your Sheriff Department exam?  I

24   mean, Sheriff Department application?

25        A.   There was stuff that needed to be added, but I
```

```
1    never purposely lied or left anything out on purpose.
2        Q.  Okay.  When did you apply for the Galveston
3    Police Department?  Was that before or after the Sheriff
4    Department?
5        A.  It was simultaneously.
6        Q.  Simultaneously?
7        A.  Yes.
8        Q.  So you put in both applications together?
9        A.  Yes.
10       Q.  When you were informed that you left things off
11   your Galveston Police Department application, did you
12   notify the Sheriff Department to change it then?
13               MR. LASSWELL:  Objection, form.
14       A.  They notified me.
15       Q.  (BY MR. RICE)  Okay.  They notified you that
16   you had left things off, correct?
17       A.  Yes.
18       Q.  And those things that happened to be left off
19   was the 2005 drunk driving incident, correct?
20               MR. LASSWELL:  Objection, form.
21       A.  Yes.
22       Q.  (BY MR. RICE)  The 2010 incident was also left
23   off, correct?
24       A.  I never received any citation on it.
25       Q.  But you still didn't put it on there, correct?
```

1      A.   Correct.

2      Q.   You also left off the fact that you lied about

3  using illegal drugs, correct?

4           MR. LASSWELL:  Objection, form.

5      A.   No.

6      Q.   (BY MR. RICE)  So you didn't admit to smoking

7  marijuana?

8      A.   I can't recall.

9      Q.   So you can't recall that you had to submit a

10  new answer in to the Galveston -- I mean, in to the

11  Sheriff Department stating that you misunderstood that

12  question and you had smoked marijuana in the past?  You

13  don't remember that?

14           MR. LASSWELL:  Objection, form.

15      A.   Repeat the question.

16      Q.   (BY MR. RICE)  You didn't -- you had to

17  submit -- certain answers on your Sheriff Department

18  application were inconsistent.  They gave you a chance

19  to change those answers.  One of those questions was had

20  you ever used illegal drugs.  You stated that you

21  thought they meant prescription drugs.  But you had used

22  marijuana, correct?

23           MR. LASSWELL:  Objection, form.

24      A.   In the past, yeah.

25      Q.   (BY MR. RICE)  So you have used marijuana in

1    the past, correct?

2         A.   Correct.

3         Q.   Freddie Poor at the time, in his official

4    capacity, knew that you failed your sheriff's exam,

5    correct?

6                   MR. LASSWELL:   Objection, form.

7         A.   Correct.

8         Q.   (BY MR. RICE)  He knew that you lied or left

9    things off your application, correct?

10                  MR. LASSWELL:   Objection, form.

11        A.   Correct.

12        Q.   (BY MR. RICE)  He knew that you failed to

13   mention to him that you used drugs, correct?

14                  MR. LASSWELL:   Objection, form.

15        A.   Correct.

16        Q.   (BY MR. RICE)  You failed to mention to him

17   that you were involved in an accident in 2010,

18   correct --

19                  MR. LASSWELL:   Objection, form.

20        Q.   (BY MR. RICE)  -- and you still was hired by

21   the Sheriff Department?  Correct?

22        A.   Correct.

23        Q.   Do you believe you should have been fired for

24   this incident?

25        A.   No.

1    Q.  Why?

2    A.  Because I protect the public.  I did my job.

3    Q.  You did your job?

4    A.  I did my job.

5    Q.  And that job was done with the training that

6    you learned from Galveston County Sheriff's Office,

7    correct?

8    A.  And the police academy I attended, Galveston

9    College.

10    Q.  And you believe that you followed their policy

11    and procedure and their training to a T, correct?

12    A.  Correct.

13    Q.  Let me see.  Do you know how many times you

14    were wrote up as a deputy?  Can you give me a number?

15              MR. LASSWELL:  Objection, form.

16    A.  The times we -- the times that we talked about.

17    Q.  (BY MR. RICE)  Okay.  Have you ever been

18    charged criminally with a crime, a felony or

19    misdemeanor?

20    A.  No.

21    Q.  Have you ever been the subject of a criminal

22    investigation?

23    A.  No.

24    Q.  You wasn't investigated criminally for the

25    shooting of Mr. Benson?

```
 1        A.  No.
 2        Q.  So Galveston County District Attorney's Office
 3   never interviewed you, never tried to interview you
 4   about shooting Mr. Benson?  The District Attorney's
 5   Office?
 6        A.  No.
 7             MR. RICE:  I think that will probably be
 8   it.  I have no further questions.
 9             MR. RUSSO:  Okay.  Can we take a quick
10   break?
11             MR. RICE:  All right.
12             (Recess from 10:25 a.m. to 10:40 a.m.)
13                      EXAMINATION
14   BY MR. RUSSO:
15        Q.  I think we're still in the morning.  Good
16   morning, Mr. Benavidez.  My name is Joseph Russo, Jr.,
17   and I represent Galveston County and Sheriff Trochesset
18   in this case.  You understand that, right?
19        A.  Yes, sir.
20        Q.  So I just wanted to talk to you about a few
21   things this morning in terms of your training and
22   policies at the Sheriff's Department.
23             During your time at the Sheriff's Office,
24   did you ever become aware of a policy at the Sheriff's
25   Office to permit excessive force against inmates or
```

1   detainees?

2        A.  No.

3        Q.  You never saw anything like that?

4        A.  No.

5        Q.  Are you aware as you sit here today of any

6   widespread practice of allowing excessive force to be

7   exercised on inmates or detainees?

8        A.  No.

9        Q.  You never saw that during your tenure there?

10       A.  No.

11            MR. LASSWELL:  Speak up.  Speak up because

12  you're turned away from him, just so he can --

13       Q.  (BY MR. RUSSO)  So as far as you're aware

14  there's no custom at the Sheriff's Department of

15  permitting excessive force to be used on inmates or

16  pretrial detainees at the jail; is that correct?

17       A.  Yes.

18       Q.  When you applied -- well, let me follow up --

19            MR. RUSSO:  Let me strike that.  I want to

20  ask you a different question.

21       Q.  (BY MR. RUSSO)  Are you aware of any sort of

22  persistent or well-settled practice at the Galveston

23  County Sheriff's Office related to excessive force or --

24  against detainees or inmates?  Is there a -- is that

25  kind of conduct permitted?

```
 1        A.   No.

 2        Q.   Is it encouraged?

 3        A.   Absolutely not.

 4        Q.   As you sit here today, would it be your

 5   testimony that using excessive force against inmates and

 6   detainees is frowned upon at the Sheriff's Office?

 7        A.   Yes.

 8        Q.   And if that kind of thing were to happen

 9   would -- in your experience that that would be -- or

10   jailers be reprimanded or disciplined?

11        A.   Yes.

12        Q.   All right.  So let's talk about your

13   application to work at the Galveston County Sheriff's

14   Department.  What year did you apply?  Do you recall?

15        A.   2011.

16        Q.   Okay.  And at that time were you enrolled in

17   some kind of police officer or peace officer training at

18   Galveston College?

19        A.   I already graduated.

20        Q.   Okay.  So by the time that you applied for your

21   position at the Galveston County Sheriff's Department

22   you had already graduated from Galveston College peace

23   officer training; is that right?  Is --

24        A.   Correct.

25        Q.   -- that what you're telling me?  How did you do
```

```
 1    in those courses generally?
 2         A.  Good.
 3         Q.  And I think we have a copy of your transcript
 4    that I can give you.  Did you provide the Sheriff's
 5    Office a copy of your transcript during your application
 6    process?
 7         A.  Yes.
 8         Q.  Let me show you what's been marked as Benson
 9    91.
10              MR. RUSSO:  I should have provided you that
11    first.  You can go ahead and mark that as -- what are we
12    doing?  Benavidez 1?  Does that work?
13              MR. LASSWELL:  Yeah.  That's fine with me.
14              MR. RUSSO:  Does that work for y'all?
15              MR. RICE:  That's fine.
16              MR. RUSSO:  Okay.
17         Q.  (BY MR. RUSSO)  The court reporter in a second
18    will mark that as Benavidez 1.  And it's Bates numbered
19    Benson 91.  Do you see the Bates number in the bottom of
20    that document?
21         A.  (Moving head up and down.)
22         Q.  Yes?
23         A.  Yes.
24         Q.  And what is that?
25         A.  This?
```

1        Q.  Yes.  What is that document?

2               MR. LASSWELL:  Just identify it.

3        A.  My college transcript.

4        Q.  (BY MR. RUSSO)  Okay.  And that's from your

5   classes taken at Galveston College?

6        A.  Yes.

7        Q.  And, again, you provided that to the Sheriff's

8   Office at the time that you applied?

9        A.  Yes.

10       Q.  Okay.  All right.  So on your transcript, in

11  the fall of 2010, right about in the middle of the page

12  on the right side, there's a couple of classes I just

13  wanted to ask you about.  Basic peace officer I and

14  basic peace officer II, do you see that?

15       A.  Yes.

16       Q.  And your grade was -- in those classes, what

17  did you make in those?

18               (Phone ringing.)

19               MR. LASSWELL:  Sorry.

20       Q.  (BY MR. RUSSO)  What was your grade in those

21  classes?

22       A.  A.

23       Q.  Okay.  And then there's a fitness -- it looks

24  like fitness training right below that, law enforcement

25  I, fitness training: law enforcement II.  What were your

```
 1    grades there?
 2         A.   A.
 3         Q.   So you did well in those --
 4         A.   Yes.
 5         Q.   -- classes, right?  In the peace officer I and
 6    peace officer II you got -- you made As in those
 7    classes, right?
 8         A.   Correct.
 9         Q.   And in those classes they, when you do your
10    peace officer training, taught y'all many -- many areas
11    related to peace officers, right?
12         A.   Yes.
13         Q.   And part of that is use of force training,
14    right?
15         A.   (Moving head up and down.)
16         Q.   Yes?
17         A.   Yes.
18         Q.   What are some of the other things that you
19    touched on, if you remember, in your basic peace officer
20    training?
21         A.   Traffic, penal code.
22         Q.   All right.
23         A.   It was a whole list.
24         Q.   Okay.  Yeah.  And I'm not going into a huge
25    amount of detail.  But the general premise of those
```

```
1    classes is to help you become a peace officer out in --
2    helping the public out, whether it be the Sheriff's
3    Office, police department, you're being trained for that
4    job, right?
5         A.  Yes.
6         Q.  Is it your understanding that the Sheriff's
7    Office when they hired you, they wanted your transcript
8    so that they would know you had this training?
9         A.  Yes.
10        Q.  As part of your application, right?
11        A.  Yes.
12        Q.  Yeah.  And is it your belief that you would
13   have been hired by the Sheriff's Office had you not
14   completed these courses?  Would you have been hired?  Do
15   you know?
16        A.  Yes.
17        Q.  You think you would have been hired without the
18   training you received at Galveston College?
19        A.  It was a help, yes.
20        Q.  Yeah.  So the -- when the Galveston County --
21   did they ask you for this transcript, or did you just
22   send it to them?
23        A.  As a -- I think -- I think they asked.
24        Q.  Okay.  So it was something they wanted to see?
25        A.  Yes.
```

1       Q.  All right.  I have a copy of a peace officer

2  course entitled "Chapter 28" --

3               MS. MCGARVEY:  Is that two-sided?

4               MR. RUSSO:  -- "Force Options."  Yeah, it

5  is.

6               MS. MCGARVEY:  Okay.

7               MR. RUSSO:  It is two-sided.

8               MS. MCGARVEY:  Just know it's two-sided

9  when you --

10              MR. RUSSO:  So -- you're not going to mark

11  that?

12              THE REPORTER:  Yeah.  I was going to ask

13  you, you want me to go ahead and mark that and then mark

14  that one, just so we keep them straight?

15              MR. RUSSO:  Yeah.  That's fine.

16            (Benavidez Exhibit Nos. 1 and 2 marked.)

17       Q.  (BY MR. RUSSO)  So the court reporter has

18  marked Benavidez 2.  And let me get the section you're

19  on, which is -- which is Chapter 28.  And the Bates

20  number at the bottom of that document is Benson 2214.

21  Do you see that?

22       A.  Yes.

23       Q.  Yeah.  And it goes through to -- if you look at

24  the last page -- Benson 2238.  Do you see that?

25       A.  Yes.

1     Q.  Yeah.  Okay.  And is the material -- you can

2  just look through it as much as you want.  I don't want

3  to limit that.  But just sort of peruse, look through

4  what I've given you, and let me know when you're done.

5           MS. MCGARVEY:  Can I see it for a second?

6           THE WITNESS:  Uh-huh.

7     Q.  (BY MR. RUSSO)  Are you ready?

8     A.  Uh-huh.

9     Q.  Okay.  So does that document, based upon your

10 review, basically is a discussion of topics on the use

11 of force, correct?

12    A.  Yes.

13    Q.  In various situations, right?

14    A.  Yes.

15    Q.  Does that document sort of refresh your

16 training that you received at Galveston Community

17 College related to use of force?

18    A.  Yes.

19    Q.  Do you better recollect what you were taught?

20    A.  Yes.

21    Q.  Does the document in front of you appear

22 consistent with what your -- sort of your understanding

23 is on use of force procedures?

24    A.  Yes.

25    Q.  And if there were a gap between what you

```
 1    remembered today and what you were likely taught you
 2    think this document would be a good representation of
 3    the training, teaching that you received at Galveston
 4    College?
 5         A.  Yes.
 6         Q.  Okay.  And, again, when you applied for your
 7    work at -- with Galveston Sheriff's Office, they
 8    received your transcript, right, and they -- right?
 9         A.  Yes.
10         Q.  And they knew that you took a class that taught
11    you at least what was contained in Benavidez No. 2,
12    correct?
13         A.  Yes.
14         Q.  Mr. Rice asked you a little bit about what he
15    called I think -- I don't want to mischaracterize it --
16    but the sheriff's exam.  Do you remember that
17    discussion?
18         A.  Yes.
19         Q.  And do you recall -- and I think what the
20    testimony was is that you didn't pass that test, right?
21         A.  Correct.
22         Q.  And can you tell me what is on that test, what
23    is the sheriff exam that y'all are -- the discussion was
24    about?  What's in this sheriff's exam?  What is it?
25         A.  Basically what I recall is basic mathematics
```

1   and corrections related questions.

2       Q.  Is it something that you might see sort of in

3   a -- like a GED, like a high school graduate type of

4   program to test how good you are in math?  Is that --

5       A.  Yes.

6       Q.  Is that a good characterization of it?

7       A.  Yes.

8       Q.  Do you know -- do you know what grade you

9   received?  Do you have any idea?

10      A.  I can't recall.

11      Q.  And I'm just wondering if you recall how close

12  you were to passing.

13      A.  From the conversation with Sheriff Poor if I

14  was to have ample time he was confident I would pass the

15  exam.  I offered to take the exam again to be totally

16  fair, and he stated that it was a constant problem, that

17  I'm not the only one that had that problem.  He was very

18  confident I would have passed the course, and he said

19  there was no need.

20      Q.  Okay.  And, in fact, again, if the County

21  needed sort of a -- needed to see where you were

22  proficiency wise in your ability to learn things, they

23  had your transcript from Galveston College, correct?

24      A.  Correct.

25      Q.  And at this time when you applied had you

1   graduated from Galveston College?  Had you received a

2   degree?

3        A.  No.

4        Q.  Had you received a certificate?

5        A.  Police academy.  Yes.

6        Q.  Okay.  So, again, by the time you had -- you

7   had applied to the Sheriff's Office you graduated from

8   high school, correct?

9        A.  Correct.

10       Q.  You received your diploma from Galveston Ball

11  High, right?

12       A.  Correct.

13       Q.  And you also spent sufficient time, over a

14  year, at Galveston Community College obtaining your

15  license as a peace officer; is that true?

16       A.  Correct.

17       Q.  All right.  Did you share Mr. Poor's view at

18  the time, that you believed if you took the test again

19  you would easily have passed it?

20       A.  Correct.

21       Q.  Okay.  And he believed that as well?

22       A.  Yes.

23       Q.  And how long was it between the time that you

24  joined the Sheriff's Office and had this incident that

25  is the subject of this case, how much time was that?

```
1        A.   At that point in my career eight years.

2        Q.   And so you had been on the force eight years

3   with the Sheriff's Department with minor issues, if any,

4   prior to this incident with Mr. Benson; is that correct?

5        A.   Yes.

6        Q.   Would you say that the idea or notion that you

7   didn't take the test, this exam again, do you think that

8   made you unable to exercise your duties as a sheriff's

9   officer?

10        A.   No.

11        Q.   It have any impact on your decisions made in

12   this case?

13        A.   No.

14        Q.   All right.  And you ultimately were hired by

15   the Sheriff's Department, correct?

16        A.   Yes.

17        Q.   And your orig -- your first position was what?

18   What did they call you?

19        A.   Deputy.

20        Q.   Okay.  Did they -- did they give you at that

21   time an employee manual?

22        A.   Yes.

23        Q.   Okay.  And what did you do with the manual?

24             MR. RUSSO:  And let me strike that

25   question.  Let me be more specific.
```

1        Q.  (BY MR. RUSSO)  Were you asked to review the

2    material in the manual?

3        A.  Yes.

4        Q.  Did you from time to time have training over

5    its contents?

6        A.  Yes.

7        Q.  And as one of the parts of the employee manual

8    it also has a -- sort of a use of force instruction or

9    policy in it as well, does it not?

10       A.  Yes.

11       Q.  Okay.  Let me show you what I'll have the court

12   reporter mark Benavidez 3.

13              (Benavidez Exhibit No. 3 marked.)

14       Q.  (BY MR. RUSSO)  And that document, Benavidez 3,

15   was marked by the court reporter.  It has Bates number

16   Benson 528; is that correct?

17       A.  Yes.

18       Q.  Now, to your recollection is this -- this is

19   not the entire policy manual?  Would you agree?

20       A.  Yes.

21       Q.  It is not?

22       A.  Yes.

23       Q.  The manual itself is much larger?

24       A.  Correct.

25       Q.  This is one of the sections, though, out of

1    that policy manual, correct?

2         A.  Yes.

3         Q.  And specifically it's titled "Use of Force,"

4    right?

5         A.  Correct.

6         Q.  So if you ever had a question about what the

7    County's policy was on use of force is this the document

8    you could and should refer to?

9         A.  Yes.

10        Q.  All right.  Are you aware of any other policy

11   written other than this on use of force as you sit here

12   today?

13        A.  No.

14             MS. MCGARVEY:  You mean like the

15   corrections' policies?

16             MR. RUSSO:  Yeah.

17             MS. MCGARVEY:  Okay.

18        Q.  (BY MR. RUSSO)  Let me phrase it this way.  Are

19   you aware of any unwritten policies at the Sheriff's

20   Office related to use of force in existence?

21        A.  No.

22        Q.  Okay.  So then -- again, for use of force this

23   is where you would go generally to find that information

24   if you had a question, right?

25        A.  Yes.

1    Q.   Okay.  Were you trained on use of force

2    procedures, like when you can use certain force against

3    detainees and inmates?

4    A.   Yes.

5    Q.   Okay.  And to your recollection were you

6    trained on these specific policies?

7    A.   Yes.

8    Q.   All right.  Did y'all -- do you recall any

9    refresher courses over the time, discussions about what

10   the policies are at the -- both at the jail and dealing

11   with inmates and detainees?  Were there any

12   refreshing -- refresher discussions over time?

13   A.   What do you -- how do you mean?

14   Q.   Well, did you ever have conversations with your

15   superiors about what the use of force policies are?

16   A.   Before shift they would have every -- a shift

17   meeting, you know.  And sometimes it would come up, and

18   we would all talk about it.

19   Q.   Okay.  And were those discussions relatively

20   consistent with what is in Benavidez 3 --

21   A.   Yes.

22   Q.   -- from your recollection?

23   A.   Yes.

24   Q.   All right.  Okay.  So from the time that you

25   started at the Sheriff's Office until the incident with

1    Mr. Benson as far as you know this is the Sheriff's

2    Office policy on how to deal with use of force

3    situations, right?

4         A.  Yes.

5         Q.  Okay.  And Mr. Rice asked you a question

6    earlier about whether you think you violated department

7    policy in this situation, right?

8         A.  Yes.

9         Q.  And you told him "no," correct?

10        A.  Correct.

11        Q.  And so I just wanted to explore why it is you

12   believe you did not violate the policy in this instance.

13   Is there specific language in the use of force manual

14   that you believe you followed in this case?  I may be

15   able to help direct you a little bit.

16        A.  Yeah.

17        Q.  If you look under 201.4, and then down to B,

18   which is on the second page, there's a --

19             MS. MCGARVEY:  That's what he's pointing

20   to.

21        A.  Yes.

22        Q.  (BY MR. RUSSO)  Okay.  Yeah.  There's a

23   discussion of --

24             MS. MCGARVEY:  He's already go it.

25             THE WITNESS:  Yes, I'm already there.  I'm

```
 1    just --
 2                    MS. MCGARVEY:  He's already looking at it.
 3         Q.  (BY MR. RUSSO)  Use of deadly force, right?
 4         A.  Correct.
 5         Q.  Okay.  And what language is it in that policy
 6    that makes you think you did not violate the policy
 7    based upon the facts as you know them?
 8         A.  B, "Use of Deadly Force," 1(a), "Protect the
 9    officer or others from what is reasonably believed to be
10    an immediate threat of death or serious bodily harm."
11         Q.  Okay.  And so the reason you believe that you
12    didn't violate the policy is you believe that Mr. Benson
13    at the time that you shot him represented an immediate
14    threat to others, right?
15         A.  Yes.
16         Q.  Not you, but some others in the vicinity,
17    correct?
18         A.  Correct.
19         Q.  Okay.  All right.  Now, I mean, and -- I don't
20    want to belabor the point.  But sitting here, I mean,
21    you know the Galveston Sheriff's Office did investigate
22    this incident, right?
23         A.  Yes.
24         Q.  They found otherwise, right?
25         A.  Yes.
```

```
 1        Q.  And the result of that investigation, as a

 2   result of it your employment with the Sheriff's Office

 3   was terminated, correct?

 4        A.  Correct.

 5        Q.  Which we understand your argument or your

 6   position is you didn't violate the policy.  They just

 7   found it differently, correct?

 8        A.  Correct.

 9        Q.  All right.  At the time of --

10   throughout your --

11               MR. RUSSO:  Strike that.

12        Q.  (BY MR. RUSSO)  Throughout your employment with

13   the Sheriff's Office would you say you were relatively

14   familiar with the language of the use of force policy?

15        A.  Yes.

16        Q.  All right.  And when you were employed by the

17   Sheriff's Office you first -- I think you told us

18   earlier that you had some training on corrections --

19   correctional specific procedures.  Right?

20        A.  Yes.

21        Q.  Do you remember getting like operating

22   procedures on jail procedures, jail processes?

23        A.  Yes.

24        Q.  Sort of a separate document from the employee

25   manual that we looked at earlier, right?
```

1       A.   Yes.

2       Q.   **Do you remember that?**

3       A.   (Moving head up and down.)

4            **MR. RUSSO:**  Okay.  Let me mark this as

5   Benavidez 4.

6            (Benavidez Exhibit No. 4 marked.)

7       Q.   **(BY MR. RUSSO)  All right.  Do you recognize --**

8            **MR. RUSSO:**  I'm sorry.  I didn't bring you

9   a copy.  I apologize for that.

10      Q.   **(BY MR. RUSSO)  Look at the document as much as**

11  **you need to, front to back.  I'll wait to ask you a**

12  **question about it.**

13           So looking at that document does that

14  appear to be the standard procedures for -- related to

15  jail processes at the County -- at the Sheriff's Office?

16      A.   Yes.

17      Q.   **It's a section of it anyway, right?**

18      A.   Yes.

19      Q.   **Do you recall -- and I'm asking you -- you**

20  **recall that that document is -- it's a larger document,**

21  **but it -- it contains that provision related to security**

22  **and control, and specifically escape, in the document I**

23  **gave you, right?**

24      A.   Yes.

25      Q.   **Okay.  Do you recall reviewing this document or**

1      looking at it at any time?  And you may have -- let me

2      just --

3               MR. RUSSO:  Strike that.

4          Q.  (BY MR. RUSSO)  Do you have any specific

5      recollection of reading through this document as you sit

6      here today?

7          A.  Once I received it, yes.

8          Q.  Okay.  And is it true that the Benavidez 4 is

9      the County's policy for dealing with -- again, read it

10     as much as you need to -- but dealing with sort of

11     either preventing or dealing with escaped detainees?

12         A.  Yes.

13         Q.  And I want you to look at -- the page marked

14     Benson 775, which I think is the second page of the

15     document I gave you, and under letter B.

16         A.  Yes.

17         Q.  Okay.  And there's -- and that's -- again, read

18     through that as much as you need to, and then I'll ask

19     you a question about it.

20               Does that paragraph seem to deal with how

21     you as a deputy deal with an escaping detainee at the

22     Sheriff's Office?

23               MR. LASSWELL:  Just section B.

24         Q.  (BY MR. RUSSO)  Yeah, just section -- I'm just

25     looking at --

1    A.  Yes.

2    Q.  -- part B.

3    A.  Yes.

4    Q.  And it looks like that section specifically

5    discusses what you do or how you deal with an escape,

6    correct?

7    A.  Yes.

8    Q.  Yeah.  And the reference there in that

9    paragraph is to -- on the third line down is -- it

10   actually starts end of the second line.  It says "GCSO

11   Policy GC.201 guides personnel in the use of force to

12   prevent the escape or recapture of inmates."  Do you see

13   that?

14   A.  Yes.

15   Q.  Do you know what that reference is to?

16        MR. RUSSO:  And strike that question.

17   Q.  (BY MR. RUSSO)  Does that reference relate to

18   the policy that you have in front of you, which is -- I

19   believe it's Benavidez --

20   A.  Yeah.

21   Q.  Does that match up to Benavidez 3?

22   A.  Yes.

23   Q.  Okay.  So in the event of an escaping inmate or

24   detainee the processes, as far as the documents in front

25   of you go, is you refer back to Galveston County's

```
 1    2.0 -- 2 point -- I'm sorry -- .201, which is Benavidez
 2    3?  Would you agree with that?
 3         A.  Yes.
 4         Q.  So it's the same process for dealing with
 5    escapees?  Correct?
 6         A.  Yes.
 7         Q.  Okay.
 8                   THE WITNESS:  Could I have a moment?
 9                   MR. RUSSO:  Yeah.
10                   THE REPORTER:  Go off the record, sir?
11                   MR. RUSSO:  Yeah.  Fine.  No problem.
12                   (Recess from 11:11 a.m. to 11:13 a.m.)
13         Q.  (BY MR. RUSSO)  Do you agree that when you were
14    hired by the Sheriff's Office that they provided you the
15    policy materials in front of you, Benavidez 2 and -- I'm
16    sorry -- Benavidez 3 and 4?
17                   Let me ask it this way.  When you were
18    hired by the Sheriff's Office, were you provided
19    Benavidez Exhibit 3 and 4, although it may have been in
20    a bigger manual, but were you given those documents?
21         A.  As I was hired in 2011.  I received these in
22    2013.
23         Q.  Okay.
24         A.  Yes.
25         Q.  Because on the top of the document it says it
```

1   was created or revised in 2013, correct?

2       A.  Yes.

3       Q.  Do you remember receiving an earlier version at

4   the time you were hired?

5       A.  Yes, with the -- with all the correction that I

6   received from the academy, correctional academy.

7       Q.  Perfect.  Okay.  Yeah.  Thank you for

8   clarifying that.

9       A.  Yes.

10      Q.  Okay.  And so you remember receiving this in --

11  the specific document in front of you sometime around

12  2013, or whenever it was put in place they gave you a

13  copy; is that right?

14      A.  Yes.

15      Q.  Okay.  Now, if you -- would you agree that

16  if -- I mean, if there's a -- sitting here today if

17  there's -- you know, if we have a lapse in memory in

18  relation to the training received, would these documents

19  be an accurate reflection, a more accurate reflection

20  than potentially your memory as to what you think the

21  training was at the time you joined the Sheriff's

22  Office?  Would the documents be a better representation?

23      A.  Yes.

24      Q.  And as you sit here you believe that the

25  materials that you've seen in Benavidez 3 and 4 is what

```
 1    you were taught?
 2         A.  Yes.
 3         Q.  And it is -- sitting here today you believe
 4    that those documents represent the policy of the
 5    Galveston County Sheriff's Office, right?
 6         A.  Yes.
 7         Q.  And you don't know of any unwritten policies
 8    that counter those or go against those documents; is
 9    that true?
10         A.  Yes, I don't.
11         Q.  Okay.  That's a bad question, but you answered
12    it perfectly.
13              Now, did the Sheriff's Office, did they
14    tell you to be -- that you're responsible for that
15    material in terms of being a deputy?
16         A.  Yes.
17         Q.  And they asked you to read through it, right?
18         A.  Yes.
19         Q.  Did you do that?
20         A.  Yes.
21         Q.  Did you do that periodically over time?
22         A.  Yes.
23         Q.  For refreshment?
24         A.  (Moving head up and down.)
25         Q.  Yes?
```

```
 1          A.   Yes.
 2          Q.   And at the time that you have the incident with
 3     Mr. Benson where he escaped custody and continued to
 4     flee from you, you were aware of the policies of the
 5     Galveston County Sheriff's Office, right?
 6          A.   Yes.
 7          Q.   And you understood what -- what the language
 8     was, right?
 9          A.   Yes.
10          Q.   All right.  And you considered it at the time
11     that you were dealing with Mr. Benson, true?
12          A.   Correct.
13          Q.   So I think Mr. Jarvis asked you about
14     whether -- I don't remember exactly how the question was
15     phrased -- but asked you whether the County leaves it to
16     you or any other deputies as to how you deal with your
17     weapons.  You remember that question?
18          A.   Yes.
19          Q.   And I think your answer was "yes."  And tell me
20     if I'm wrong.  But my question is aren't there policies
21     and procedures at the Galveston Sheriff's Office that
22     instruct you as to how you should and can use weapons in
23     your job?
24          A.   How do you mean?
25          Q.   Well, for example, we looked at the deadly
```

1    force procedures.  And there's a process, right, that

2    you must follow to comply with Galveston County policies

3    in order to use your weapon within their requirements?

4        A.   Yes.

5        Q.   Would you agree?

6        A.   Yes.

7        Q.   And so when you told Mr. Jarvis that the County

8    just lets you decide, or deputy decide how they want to

9    use your weapon, that's as long as it's within the

10   policies of the department?  Would that be true?

11       A.   Yes.

12       Q.   All right.  Because if you didn't use weapons

13   within department policy they would investigate it,

14   right?

15       A.   Correct.

16       Q.   And it might end up in a reprimand, correct?

17       A.   Correct.

18       Q.   It might end up in a termination, true?

19       A.   Yes.

20       Q.   So the truth is the County allows officers and

21   the deputies to use their weapons, again, as long as

22   it's within department policy, correct?

23       A.   Correct.

24       Q.   And is that true for a service weapon, a gun?

25       A.   Yes.

1        Q.  And any other types of weapons that deputies

2   might need to use, like a taser?

3        A.  Yes.

4        Q.  If you had one, there's policies about dealing

5   with those, correct?

6        A.  Yes.

7        Q.  All right.  In fact, I think Mr. Jarvis also

8   asked you about whether there was specific -- whether

9   Galveston County trained you to shoot at a fleeing

10  suspect.  Do you remember that question?

11       A.  Yes.

12       Q.  And, again, in terms of the policies in

13  existence, it's your testimony that you should follow

14  the policies in dealing with fleeing felons, right?

15       A.  Yes.

16       Q.  And that's the training you received, right?

17       A.  Yes.

18       Q.  "Follow our policies," and that's how you deal

19  with fleeing suspects, correct?

20       A.  Yes.

21       Q.  And you also were trained in past courses, I

22  believe at Galveston College, related to firearms

23  specific training, right?

24       A.  Correct.

25       Q.  And what types of things did you have to do

1    with your firearm or on a periodic or annual basis in

2    order to remain certified in firearm use?

3         A.   Firearms qualifications.

4         Q.   And tell me about that.  What is -- what's

5    firearms qualification?

6         A.   It's to qualify with your duty weapon.

7         Q.   And what do you do?  Like, what's the process?

8         A.   Go to the shooting range.

9         Q.   Okay.

10        A.   And there's a list of rounds that you go

11   through.

12        Q.   Okay.

13        A.   Complete a test.

14        Q.   And you have to have a certain competency with

15   the weapon demonstrated by your abilities annually,

16   correct?

17        A.   Correct.

18        Q.   All right.  Would you consider that -- that

19   process of firearms usage would you consider that part

20   of your training in dealing with a inmate or detainee if

21   you had to use deadly force on that individual?

22        A.   Yes.

23        Q.   Okay.  So the training, again, you received

24   related to -- I mean, you --

25                  MR. RUSSO:  Strike that question.

1    Q.  (BY MR. RUSSO)  You did receive training

2  related to dealing with fleeing suspects, correct?

3    A.  Yes.

4         MR. RUSSO:  Before I move on, let me mark

5  this document as Benavidez 5.

6         (Benavidez Exhibit No. 5 marked.)

7         MR. RUSSO:  And the Bates number on that

8  document is Benson 248.  And can you -- for the record

9  can you tell the court reporter what's the last Bates

10  number on the back of that, on the very last page?

11         MR. LASSWELL:  Is it single-sided or

12  double-sided?  Oh, okay.  Yeah.  The Bates number on

13  that one.

14         THE WITNESS:  Confidential Benson 317.

15    Q.  (BY MR. RUSSO)  Okay.  So that document is

16  Bates numbered 248 through 317, right?

17    A.  Yes.

18    Q.  And, again, look at that -- look through those

19  materials as much as you need to.  I'm going to ask you

20  not many questions.  But the first one being have you

21  ever seen that before?

22    A.  Yes.

23    Q.  And what does that pack of materials seem to be

24  to you?

25    A.  My records and certificates of the training.

1      Q.   Okay.  And does that appear to be a record of
2  your training --
3      A.   Yes.
4      Q.   -- over time?
5      A.   Yes.
6      Q.   And in that packet of material are some
7  specific certificates of classes that you passed,
8  correct?
9      A.   Yes.
10      Q.   That you were certified for, right?
11      A.   Correct.
12      Q.   So if we -- is that an accurate representation,
13  other than the fact that it's -- I think it's dated 2021
14  so -- it doesn't have anything that you've done since
15  2021.  But does that appear to be an accurate record of
16  your training history related to law enforcement up to
17  that time?
18      A.   Yes.
19      Q.   Okay.  And if you look at page -- the page
20  Bates numbered 250, do you see about three, four lines
21  down the peace officer license?  Do you see that?
22      A.   Intermediate?
23      Q.   Well, there's -- so it's at the top under
24  "Award."  It says temporary jailer's license, right?  Do
25  you see that?

1      A.  Yes.

2      Q.  And then below that a jailer's license?  Do you

3  see that?

4      A.  Yes.

5      Q.  Yeah.  And it looks like you received those in

6  2011?

7      A.  Yes.

8      Q.  All right.  And then a peace officer license,

9  which was also I think 2011.  Do you see that?

10      A.  Yes.

11      Q.  And then you have a -- then you have basic

12  jailer, and then you have a basic peace officer

13  certification.  You see that?

14      A.  Yes.

15      Q.  And stepping back and looking at this document

16  this is, generally speaking, a list of certifications

17  that you received during this time period, correct?

18      A.  Yes.

19      Q.  This is the work you did towards getting

20  trained as a peace officer, correct?

21      A.  Yes.

22      Q.  And that training is part of the training that

23  you had for becoming and working as a sheriff's deputy,

24  right?

25      A.  Yes.

```
1        Q.  On page -- turn back to page 249.  There's a --
2   how many hours did you have in higher education points
3   towards your peace officer licensing?
4        A.  Are you referring to the 81 college credits?
5        Q.  Yeah.  So we can start there.  You got total --
6   it says "Total Higher Education Hours," right, 81 hours?
7   Right?
8        A.  Yes.
9        Q.  And that's towards your peace officer or
10  officer training, right?
11       A.  Yes.
12       Q.  Then you also have under -- under "Branch," and
13  then there's "Military Service Time Credit" of 3840
14  hours, right?
15       A.  Correct.
16       Q.  Because you were in the military, true?  Before
17  you -- was that -- before you went to the Galveston
18  College you spent time in the military, right?
19       A.  Correct.
20       Q.  And this -- and you were trained there to use
21  firearms, correct?
22       A.  Correct.
23       Q.  And you didn't just forget all that training
24  when you came and applied to the Sheriff's Office, did
25  you?
```

1      A.  No, sir.

2      Q.  **And do you feel like that, the time in the**

3  **military, helped you be a better deputy?**

4      A.  Absolutely.

5      Q.  **And specifically in terms of dealing with**

6  **firearms?**

7      A.  Absolutely.

8      Q.  **But then you also have -- under "Branch" it**

9  **says "Total Higher Education Points 1620."  Do you know**

10 **what that refers to?**

11     A.  The class credits.

12     Q.  **And that's specifically classes outside of your**

13 **military experience, true?**

14     A.  Correct.

15     Q.  **Is that the class credits that you received at**

16 **Galveston College?**

17     A.  All over the place.

18     Q.  **Okay.**

19     A.  Online, Brazoria County, Texas City PD.

20     Q.  **What did you do in Brazoria County?**

21     A.  CIT.  The 40 hour CIT course.

22     Q.  **Is that Crisis --**

23     A.  Yes.

24     Q.  **Crisis --**

25     A.  -- Intervention Training.

1      Q.  -- Intervention?

2      A.  Yes.

3      Q.  And then what about in Texas City?  What was

4  that?

5      A.  I believe it was -- I took multiple courses in

6  Texas City, so I would have to refer to my training

7  record.

8      Q.  Okay.  But it would be in this document,

9  correct?

10      A.  Yes.

11      Q.  Yeah.  All right.  Do you know whether the

12  amount of higher education points, is that a high

13  number, 1620, or -- I mean, if you don't know, you don't

14  know; but I was just wondering.  In terms of the

15  deputies that you knew at the Sheriff's Office, is that

16  a significant number of hours or a low --

17      A.  I would believe it's pretty high.

18      Q.  To be high?

19      A.  Yes.

20      Q.  So you think that you actually had -- in terms

21  of deputies you had -- you certainly had sufficient

22  training to deal with your job?  You believe that?

23      A.  Yes.

24      Q.  Since you left the Galveston Sheriff's Office

25  have you done additional training as well related to

1   peace officer type of certifications?

2        A.   No.  But my time and service I applied -- I had

3   the credits and the experience to apply for my master

4   peace officer and jailer.

5        Q.   Okay.  Did you receive that?

6        A.   Yes.

7        Q.   So you have a master's in jailer certification

8   now?

9        A.   Yes.

10        Q.   And a master in peace officer certification?

11        A.   Yes.

12        Q.   Did the training that you received both prior

13   and during your time at the Sheriff's Office assist with

14   you obtaining the master's certificate you received?

15        A.   Yes.

16        Q.   You think it made it easier for you to receive

17   the master's certification afterwards?

18        A.   Yes.

19        Q.   All right.  Mr. Rice asked you a little bit

20   about this pass-over book or pass-over process.  Do you

21   remember that?

22        A.   Yes.

23        Q.   And I just need, I guess, a clarification on

24   that.  As you sit here today, is it your testimony that

25   there is a pass-over process at Galveston Sheriff's

```
 1   Department for moving information from one deputy to

 2   another in the event of shifts changing?

 3        A.  Yes.  Every shift is a pass-over.

 4        Q.  Okay.  And in this instance what was the

 5   pass-over process you used --

 6             MR. RUSSO:  Well, let me strike that.

 7        Q.  (BY MR. RUSSO)  What was the pass-over process

 8   used between you coming on duty and the deputy leaving

 9   duty with Mr. Benson at the -- at, I think, July 11th of

10   2019?  What was the pass-over process?

11        A.  Conversation.

12        Q.  Okay.  And is that acceptable?

13        A.  Yes.

14        Q.  Okay.  Was there anything -- was there any

15   written material passed between you and Deputy Steadham?

16        A.  Only what he gave me, his booking papers.

17        Q.  Okay.  So he had -- at the time that you came

18   on duty and took over guarding Mr. Benson there was

19   booking material already in -- it was in the possession

20   of Deputy Steadham, correct?

21        A.  Yes.

22        Q.  And so he gave you that material; is that true?

23        A.  Yes.

24        Q.  And then what else did he tell you about

25   Mr. Benson?
```

```
 1        A.   That he was high on drugs in court and needed
 2   to be cleared for incarceration, and when he's cleared
 3   the documents I received, give that to the booking
 4   staff.
 5        Q.   Okay.  And that was because the thought was
 6   that Mr. Benson was going to be cleared pretty soon, and
 7   y'all would be headed back to the jail, correct?
 8        A.   Correct.
 9        Q.   And so he thought that you probably might be
10   the one who's dealing with Mr. Benson on the way back
11   and then finishing the booking process; is that true?
12        A.   Correct.
13        Q.   Is that what you expected would happen as well?
14        A.   Yes.
15        Q.   And did Deputy Steadham tell you that he had
16   already taken Mr. Benson to the restroom once?
17        A.   Not that I recall.
18        Q.   You don't remember that?
19        A.   No.
20        Q.   During the incident in question where
21   Mr. Benson eventually broke away from your -- or freed
22   himself and started the process of getting away from
23   you, how many times would you estimate did you ask
24   Mr. Benson to stop what he was doing and he just ignored
25   you?
```

```
 1        A.   Numerous occasions.
 2        Q.   Can you count the number in your head?
 3        A.   No.
 4        Q.   Was it more than 10?
 5        A.   It was a lot.
 6        Q.   Do you think it was more than 10?
 7        A.   I would say so.
 8        Q.   Yeah.  And so -- and what were the commands
 9   that you gave him?  What were the various commands that
10   you gave him at different times?
11        A.   "Stop," "get on the ground," "please stop."
12        Q.   And did Mr. Benson ever comply with anything
13   you asked him to do?
14        A.   No.
15        Q.   At the time that he was in the parking lot was
16   it your belief that Mr. Benson was going to comply with
17   your continued requests that he stop?
18        A.   No.
19        Q.   And you, in fact, asked him to stay on the
20   ground; is that true?
21        A.   Correct.
22        Q.   And, as he had done numerous times before that,
23   he did not comply with your request, did he?
24        A.   No, he didn't comply.
25        Q.   Is it your belief that whether or not
```

1    Mr. Benson had both hands cuffed would have made a

2    difference on whether he would have escaped from UTMB?

3         A.   No.

4         Q.   Do you believe even if he had cuffs on both

5    hands he still would have escaped?

6         A.   Yes.

7         Q.   Most likely?

8         A.   Yes.

9              MR. RUSSO:   Can we take five minutes?

10             MR. LASSWELL:   Yeah.

11             (Benavidez Exhibit No. 6 marked.)

12        Q.   (BY MR. RUSSO)   Mr. Benavidez, the court

13   reporter has handed you what's been marked as Benavidez

14   6.   And it bears Bates numbers Benson 92 and 93.   You

15   have that in front of you?

16        A.   Yes.

17        Q.   Does that -- what does that document reflect?

18        A.   Passing my TCOLE to become a peace officer.

19        Q.   Okay.   And specifically that's your peace

20   officer licensing exam completion document, true?

21        A.   Yes.

22        Q.   Yeah.   So that reflects that you passed the

23   peace officer training as far as TCOLE is concerned back

24   in May of 2011, true?

25        A.   Correct.

 1        Q.  And the second page of that document has some
 2    percentages on particular areas that you were trained
 3    in, right?
 4        A.  Correct.
 5        Q.  And specifically use of force is one of those
 6    areas, right?
 7        A.  Yes.
 8        Q.  And I think that you have a ninety -- 89
 9    percent passage rate on that portion?
10        A.  Yes.
11        Q.  Okay.  So effectively that's a record of your
12    performance on the TCOLE examination related to peace
13    officer training at the time you were applying to the
14    Sheriff's Office, right?
15        A.  Correct.
16        Q.  I'm done with that document.  I just have a
17    couple more questions for you.
18                At the time that you had your interaction
19    with Mr. Benson did you feel like you were appropriately
20    trained or properly trained by the Sheriff's Office to
21    be able to deal with an escaping inmate or detainee?
22        A.  Yes.
23        Q.  Do you still feel like that today, sitting here
24    today, that you were properly trained by the Sheriff's
25    Office to deal with an escaping inmate or detainee?

1        A.  Yes.

2                MR. RUSSO:  Pass the witness.

3                        EXAMINATION

4    BY MR. LASSWELL:

5        Q.  Mr. Benavidez, I think it's already been

6    alluded to, the fact that there were some videos of the

7    actual events, correct?

8        A.  Correct.

9        Q.  And I think the source of those are some

10   surveillance cameras situated at UTMB, correct?

11       A.  Correct.

12       Q.  And some of those videos depict the events that

13   occurred after Mr. Benson had escaped from inside the

14   facility and he's running down the ramp towards the

15   parking garage, correct?

16       A.  Correct.

17       Q.  Okay.  And did you have a chance to take a look

18   at those during one of the breaks from the deposition

19   today?

20       A.  Yes.

21       Q.  Okay.  Do some of those videos depict the time

22   when you had the accidental misfire of your firearm?

23       A.  Yes.

24       Q.  Okay.  And did we watch those videos?

25       A.  Yes.

1    Q.   Okay.   And at any time after the accidental

2  discharge of your firearm does Mr. Benson ever stop

3  running?

4    A.   No.

5    Q.   Does he ever raise his hands up?

6    A.   No.

7    Q.   Okay.   Now, you were asked some of those

8  questions by Mr. Rice earlier, who implied that after

9  the accidental discharge of your firearm that

10 Mr. Benson -- he alleged that Mr. Benson stopped running

11 and started walking with his hands up.   Do you recall

12 those questions?

13   A.   Yes.

14   Q.   Okay.   Is that what happens in the video?

15   A.   No.

16   Q.   Okay.   Mr. Rice also implied that at some point

17 Mr. Benson started saying "okay, okay," as if he was

18 about to surrender.   Did we also watch the video that

19 actually captured the moments before and when you fired

20 your firearm at Mr. Benson?

21   A.   Yes.

22   Q.   Can you hear your voice yelling commands?

23   A.   Yes.

24   Q.   Do you hear Mr. Benson say anything?

25   A.   No.

```
 1        Q.  Okay.  Okay.  As we sit here today, do you
 2   believe that those videos are the more accurate
 3   reflection of the events that occurred as opposed to
 4   your memory?
 5        A.  Yes.
 6               MR. LASSWELL:  Okay.  I'll pass the
 7   witness.
 8                        EXAMINATION
 9   BY MR. RICE
10        Q.  Mr. Benavidez, so you're saying that Mr. Benson
11   never raised his hands while going down the ramp?
12        A.  Not on the videos, no.
13        Q.  Okay.  And he never -- he ran all the way down
14   to the bottom of the ramp?  He never was walking at one
15   point with you trailing behind him with the ankle and
16   shackle dragging on the ground with him kind of
17   stumbling with his hands up?
18        A.  No.
19        Q.  So that never happened?
20        A.  Yeah.  I was mistaken.
21        Q.  Okay.  So you haven't seen the video where
22   that's on there, is what you're saying?
23               MR. LASSWELL:  Objection, form.
24        A.  There is no video.
25        Q.  (BY MR. RICE)  Okay.  So just to kind of back
```

```
1    up and clear up a couple of things, you stated that you
2    believed that Galveston County properly trained you to
3    deal with a fleeing inmate, correct?
4         A.  Yes.
5         Q.  And you believe that you followed your training
6    and the policy manual to a T, correct?
7         A.  Yes.
8         Q.  So why did Galveston County find you negligent
9    in this situation when they trained you and you followed
10   their training?  How does that add up?
11              MR. LASSWELL:  Objection, form.
12              MR. RUSSO:  Object to form.
13        A.  You would have to ask them.
14        Q.  (BY MR. RICE)  Okay.  So do you believe that
15   you followed your training correct?
16        A.  Absolutely.
17        Q.  Do you believe that you should have been fired?
18        A.  No.
19        Q.  So if you followed your training correct and
20   Galveston County fired you for following their policy
21   and procedure then the policy and procedure must be
22   wrong, correct?
23              MR. LASSWELL:  Objection, form.
24              MR. RUSSO:  Object to form.
25        A.  I don't know.
```

1    Q.  (BY MR. RICE)  You don't know?  So if you

2    followed everything that you were told to do in your

3    training -- correct?

4    A.  Correct.

5    Q.  -- everything that was in the policy manual --

6    correct?

7    A.  Correct.

8    Q.  -- then you shouldn't have been fired, correct?

9    A.  Correct.

10    Q.  Galveston County, who trained you and who

11    issued the policy manual, should have seen that you

12    followed everything in that policy manual and your

13    training, and they shouldn't have fired you, correct?

14    A.  Correct.

15    Q.  So if for some reason that the shooting wasn't

16    proper then it would be on Galveston County because you

17    followed your training, correct?

18         MR. RUSSO:  Object to form.

19    A.  Correct.

20    Q.  (BY MR. RICE)  Correct?

21         MR. RUSSO:  Object to form.

22    A.  Correct.

23    Q.  (BY MR. RICE)  Well, let me rephrase that.  If

24    the shooting is unlawful, then it would be on Galveston

25    County because they're the ones that provided you with

```
 1   the training and that policy to handle that situation,
 2   correct?
 3                    MR. LASSWELL:  Objection, form.
 4                    MR. RUSSO:  Object to form.
 5        A.  Correct.
 6        Q.  (BY MR. RICE)  Okay.  You stated -- when I
 7   asked you a question did you remember anything about
 8   your training or the policy, you stated that you didn't,
 9   correct?
10                    MR. LASSWELL:  Objection, form.
11        A.  How do you mean?
12        Q.  (BY MR. RICE)  When questioned about your past
13   memory about training on deadly force, you responded
14   that you didn't remember the training, correct?
15                    MR. LASSWELL:  Objection, form.
16                    MR. RUSSO:  Object to form.
17        A.  Going to specifics?
18        Q.  (BY MR. RICE)  Yes.
19        A.  You asked me specifics.  I couldn't recall
20   verbatim what you were --
21        Q.  Okay.
22        A.  -- what you were asking.
23        Q.  And you were asked did you understand how the
24   Galveston County policy and procedures work as referring
25   one policy to another one just a few minutes ago,
```

```
 1    correct?
 2         A.   Yes.
 3         Q.   And could you explain to me how that procedure
 4    works?
 5         A.   Which one?
 6         Q.   The procedure of how one policy -- so, for
 7    instance, the deadly force policy refers back to the
 8    transporting of an inmate policy, how do those
 9    policies -- how are they cohesive?  How do they work?
10              MR. LASSWELL:  Objection, form.
11              MR. RUSSO:  Object to form.
12         A.   I don't understand how you mean.
13         Q.   (BY MR. RICE)  So you were asked a few minutes
14    ago about the deadly force policy, correct?
15         A.   Correct.
16         Q.   Then you were given another policy that dealt
17    with the transporting of an inmate, correct?
18              MR. RUSSO:  Object to form.
19              MR. LASSWELL:  Yeah.  Objection, form.
20    Here.  Let me just hand them to you.
21         Q.   (BY MR. RICE)  Let me see if I can see those.
22    I can probably point them out to you.
23              Okay.  Exhibit 3 and 4, can you explain to
24    me how those coincide with each other?
25              MR. LASSWELL:  Objection, form.
```

```
 1              MR. RUSSO:  Object to form.
 2       A.  How do you mean?
 3       Q.  (BY MR. RICE)  So if I'm reading this -- the
 4  Exhibit No. 4 --
 5       A.  Uh-huh.
 6       Q.  -- and it has a reference in it, what would I
 7  do at that point?  What would you do?  If you were going
 8  through this and you were using this to figure out a
 9  situation, and it had a reference in this policy, what
10  would you do at that point?
11              MR. RUSSO:  Object to form.
12       Q.  (BY MR. RICE)  You were questioned about it
13  earlier, and you answered that you understood.
14       A.  Yes.
15              MR. RUSSO:  Object to form.
16       Q.  (BY MR. RICE)  Could you explain that to me?
17       A.  To follow policy.
18       Q.  Yes.  Could you explain to me how that policy
19  is followed?  You were asked a specific question on a --
20  I believe the deadly force conduct policy referring, or
21  adding, or being used as it refers to the escape of an
22  inmate.  How does that work?
23       A.  A threat to the public.
24       Q.  So, just to be clear, this is a specific
25  policy.  If you're transporting an inmate, this policy
```

```
 1    doesn't deal with deadly force.  How would you know
 2    which policy to use?
 3                  MR. LASSWELL:  Objection, form.
 4                  MR. RUSSO:  Object to form.  You're
 5    pointing at Exhibit -- can you --
 6                  MR. RICE:  Oh.  Yeah.  I'm sorry.
 7                  MR. RUSSO:  -- for the record tell us what
 8    you're referring to?
 9         Q.  (BY MR. RICE)  For the record, Exhibit 4 and
10    Exhibit 3, how do those two exhibits relate to each
11    other, just to simplify it?
12                  MR. RUSSO:  Object to form.
13                  MR. LASSWELL:  Just go to the next page.
14    Look at the portion on escape, B.
15         A.  B, use of force.
16         Q.  (BY MR. RICE)  Okay.  My question is not
17    specifically on how do you get to B.  If it was a
18    totally different situation, how would you use those
19    two documents together?
20                  MR. RUSSO:  Object to form.  Calls for
21    speculation.
22                  MR. LASSWELL:  Same objection.
23                  MR. RUSSO:  Incomplete hypothetical.
24         Q.  (BY MR. RICE)  Okay.  So in the Dennis Benson
25    case when it came to making your decision and you had to
```

1    refer back to those pages what policy did you use in

2    making your decision, and how did you use those two

3    documents?

4                    MR. LASSWELL:  Objection, form.

5         A.  To prevent the escape and to protect the

6    public.

7         Q.  (BY MR. RICE)  Okay.  When you were questioned

8    earlier by the attorney about the use of those two

9    policies, you stated that you understood what he was

10   saying, correct?

11        A.  Yes.

12        Q.  So can you explain to me what he was asking you

13   with the use of those two policies?

14                    MR. LASSWELL:  Objection, form.

15                    MR. RUSSO:  Object to form.  Asked and

16   answered.

17        A.  I'm not understanding your interpretation.

18        Q.  (BY MR. RICE)  Okay.  The Galveston County

19   Sheriff's Department ever explain to you how their

20   policy manual works?

21                    MR. RUSSO:  Object to form.

22        A.  How do you mean?

23        Q.  (BY MR. RICE)  Did they ever explain to you how

24   to use the policy manual?

25        A.  You read it.  You study up on it.

```
1          Q.  So studying up on it.  If I were to read that
2     document that's in your hand, what reference material
3     would I use with that to make my decision?
4               MR. LASSWELL:  Objection, form.
5          A.  The manual.
6          Q.  (BY MR. RICE)  Okay.  You stated that you
7     were -- you took classes I believe at Galveston College,
8     the sheriff academy, the correctional academy.  Can you
9     tell me what you were taught about deadly force?
10              MR. LASSWELL:  Objection, form.
11         A.  To use it when necessary.
12         Q.  (BY MR. RICE)  So the only thing that you were
13    taught in all of your training was just to use it when
14    it was necessary?
15              MR. LASSWELL:  Objection to form.
16         A.  To protect the public.
17         Q.  (BY MR. RICE)  And to protect the public?
18              MR. RUSSO:  Object to form.
19         A.  Yes.
20         Q.  (BY MR. RICE)  You was given no other
21    information on how to use deadly force except to protect
22    the public and when it's necessary?
23              MR. LASSWELL:  Objection, form.
24              MR. RUSSO:  Object to form.
25         A.  I was given all types of -- how do you mean?
```

```
 1        Q.  (BY MR. RICE)  So all the classes that you
 2   took, can you explain to me what they taught you about
 3   excessive force?
 4                  MR. LASSWELL:  Objection, form.
 5                  MR. RUSSO:  Object to form.
 6                  MR. LASSWELL:  We're kind of getting
 7   repetitive here.
 8        A.  Excessive force is wrong, and it's not
 9   tolerated.  That's what I was taught.
10        Q.  (BY MR. RICE)  Okay.  And you also answered
11   that you were periodically refreshed on the use of
12   excessive force?
13        A.  Yes.
14        Q.  Over your eight-year period do you remember how
15   many times you were refreshed on that?
16        A.  Not specifically.
17                  MR. RUSSO:  Object to form.
18        Q.  (BY MR. RICE)  Okay.  The use of force policy
19   is vaguely just a half a page dealing with the use of
20   force, correct?
21                  MR. RUSSO:  Object to form.
22        A.  Yes.
23        Q.  (BY MR. RICE)  Can you explain to me today that
24   half a page use of force policy?
25                  MR. LASSWELL:  Objection, form.
```

1    A.   So being in corrections we have to deal with

2  inmates on a daily basis.   These inmates are very

3  behavioral, sometimes confrontational, and we have to

4  deal with them a certain way.   No matter how much we

5  assure them that their actions might lead to lockdown

6  sometimes they can't be calmed down, and a level of

7  force has to be used for the protection of the inmate

8  and the deputy.   And every time we go to a shift meeting

9  we sometimes talk about it, when a use of force happens,

10  very recently, to make sure that the deputies and the

11  inmates are safe.

12    Q.   (BY MR. RICE)   Okay.   On the date in question

13  of the incident, did you have full knowledge of the use

14  of force policy?

15    A.   Yes.

16    Q.   Do you have full knowledge of that policy

17  today?

18    A.   Yes.

19    Q.   The same knowledge that you have today of the

20  use of force policy is the same knowledge you had that

21  day?

22    A.   Yes.

23    Q.   And your testimony is that Mr. Benson never

24  stopped running down the ramp, correct?

25    A.   Correct.

1    **Q.  So at the point that he hops over the barrier**
2    **it was done in a running motion?**
3        A.  A continuous motion until he --
4        **Q.  Okay.**
5        A.  -- until he leaned up against that car.
6        **Q.  Okay.  And were you ever tested by the**
7    **Sheriff's Department on the use of force policy?**
8                **MR. RUSSO:**  Object to form.
9        A.  Only with the -- according to the academy.  I
10   took the TCLEOSE.
11       **Q.  (BY MR. RICE)  But nothing at the Sheriff's**
12   **Department --**
13       A.  Well, they --
14       **Q.  -- once you were there?**
15               **MR. RUSSO:**  Object to form.
16       A.  They test.  Once you go to the academy they
17   test similar to the peace officer.  The State of Texas
18   tests you.
19       **Q.  (BY MR. RICE)  And is that the test you failed?**
20       A.  No.
21       **Q.  Okay.  There was some questions about the test**
22   **you failed.  So with the test that you failed it was**
23   **referred to as sort of some -- like a general GED test**
24   **or something?**
25       A.  Correct.

1      Q.  If you failed that test --

2               MR. RICE:  Hold on.  Strike that.

3      Q.  (BY MR. RICE)  Let me ask it this way.  Is

4  passing that test a requirement to be hired or be

5  considered for the Sheriff's Department?

6               MR. RUSSO:  Object to form.  Calls for

7  speculation.

8      A.  I don't know.

9      Q.  (BY MR. RICE)  So if you failed the test did

10  you receive a letter saying that you had to wait six

11  months to take the test again and you was not accepted

12  into the Sheriff's Department?

13      A.  Yes.

14      Q.  So that means that you do know that if you fail

15  the test then you're not allowed in the Sheriff's

16  Department, correct?

17               MR. LASSWELL:  Objection, form.

18               MR. RUSSO:  Object to form.  Calls for

19  speculation.

20      A.  Allowed to retest.

21      Q.  (BY MR. RICE)  Okay.  But if you failed the

22  test you are not allowed at that point to enter the

23  Sheriff's Department, correct?

24               MR. RUSSO:  Object to form.

25      A.  At that point.

```
 1          Q.  (BY MR. RICE)  Okay.  Let's see.  And you
 2   stated that you believed that with proper studying that
 3   you could pass the test?
 4               MR. RUSSO:  Object to form.
 5       A.  If I had more time.
 6       Q.  (BY MR. RICE)  More time?
 7       A.  Yes.
 8       Q.  How much time did you have before you took the
 9   test the first time?
10       A.  I don't recall.
11       Q.  You don't recall?
12       A.  I don't recall.
13       Q.  What was going on in your life?
14       A.  How do you mean?
15       Q.  I'm asking you what were you doing before you
16   decided to take the sheriff exam?
17       A.  I don't know.
18       Q.  You don't know what you were doing before you
19   decided to take the sheriff exam?  Like, what were you
20   doing in your life?  Were you --
21       A.  I just graduated from the academy.
22       Q.  Okay.  You just graduated from the academy?
23       A.  Yes.
24       Q.  Did you have time to study?
25               MR. RUSSO:  Object to form.
```

```
 1        A.   There was no study material.
 2        Q.   (BY MR. RICE)   There's no study material for
 3   the police exam?
 4             MR. RUSSO:   Object to form.   Are you
 5   talking about -- are you talking about this -- the GED?
 6             MR. RICE:   Huh?
 7             MR. RUSSO:   You're talking about the GED
 8   part of his --
 9             MR. RICE:   Yes.   Yes.
10             MS. MCGARVEY:   And not the TCLEOSE?
11             MR. RICE:   Yeah.   The GED part of it.
12             MR. RUSSO:   Okay.
13             MR. RICE:   The test that he failed.
14             MS. MCGARVEY:   Oh.   Okay.
15             MR. RUSSO:   Sorry.
16        A.   No, no study material.
17        Q.   (BY MR. RICE)   There's no study material?
18        A.   No.
19        Q.   And you did state that you were told by
20   Mr. Poor that a lot of deputies fail that test?
21        A.   It's -- what I was told was it's a -- it has
22   happened before.
23        Q.   So you didn't say that it was -- he told you
24   that it was like prevalent, that it happened a lot?
25        A.   It's happened before.
```

1      Q.   It's happened before, or it happened a lot?

2   Because you said it happened a lot.

3                   MR. RUSSO:   Object to form.

4      A.   Yeah, it's happened before.   I don't know how

5   many times.   But it's something that he was going to

6   look into, extending the time for the -- for the test.

7      Q.   (BY MR. RICE)   Okay.

8      A.   For the entry exam.

9      Q.   Okay.   So basically --

10     A.   Because I offered to retake it.

11     Q.   Okay.   So --

12     A.   And --

13     Q.   Yes, sir?

14     A.   No.   Go ahead.

15     Q.   Oh.   So basically Sheriff Poor knew that it was

16  a problem with deputies failing the test, and they were

17  allowed to be hired anyway?

18                  MR. RUSSO:   Object to form.

19     A.   I have no knowledge to that.

20                  MR. RUSSO:   Speculation.

21     Q.   (BY MR. RICE)   Okay.   You failed the sheriff

22  exam, and you were allowed to be hired, correct?

23     A.   Correct.

24     Q.   Okay.   You worked for eight years for Galveston

25  County, correct?

```
 1        A.   Ten years.
 2        Q.   Ten years.  In those 10 years were you able to
 3   remember the -- memorize the policy manual?
 4        A.   Not verbatim.  But it's always talked about.
 5        Q.   Do you believe a sheriff deputy should be able
 6   to recite the policy manual verbatim?
 7             MR. RUSSO:  Object to form.
 8        A.   I don't think that one could.  It's a lot of
 9   information.  You read up on it, you become
10   knowledgeable, but recite it verbatim it would be
11   impossible.
12        Q.   (BY MR. RICE)  So you believe it's impossible
13   for a sheriff deputy to understand the policy manual and
14   be able to recite it?
15        A.   That's not what I said.
16             MR. RUSSO:  Object to form.
17        A.   They would be able to understand it.
18             MR. RUSSO:  Object to form.
19        A.   Not recite it --
20             MS. MCGARVEY:  He needs to get his
21   objection.
22             MR. RUSSO:  Thank you.  Let me get my
23   objection.  Objection to the form of the question.
24             MR. LASSWELL:  I'll join.
25             MR. RUSSO:  It calls for speculation and
```

1    it's compound and it mischaracterizes his testimony.

2                   MR. LASSWELL:  Yeah.

3                   MR. RUSSO:  Sorry.  Go ahead.

4         Q.  (BY MR. RICE)  So my question was that you were

5    not able to remember the policy offhand, the whole

6    policy?

7         A.  That's not what I said.  I'm able to understand

8    it, grasp the whole concept, but not recite it verbatim.

9         Q.  Okay.  Wouldn't you find it important if you're

10   having to deal with a case such as we're facing, where

11   you have a fleeing inmate, wouldn't you think knowing

12   that policy offhand would be important at that point?

13                  MR. RUSSO:  Object to form.  Calls for

14   speculation.

15        A.  Yes.

16        Q.  (BY MR. RICE)  You wouldn't -- did you have

17   time to pull out your policy manual and review it while

18   chasing Mr. Benson?

19        A.  Did you just think I said no?

20        Q.  No.  I'm asking you did you have time to pull

21   out your policy manual while chasing Mr. Benson?

22        A.  No.

23        Q.  So you had to go off of what you knew, correct?

24        A.  Correct.

25        Q.  Okay.  And as far as the policy are you aware

```
1    that there are some exclusions to the use of deadly

2    force in that policy?

3                 MR. RUSSO:  Object to form.  Vague.

4                 MR. LASSWELL:  Same objection.

5         Q.  (BY MR. RICE)  The page that you were shown by

6    the attorney that had the letter B on there, that was

7    pointed out to you what to read, that section --

8         A.  Uh-huh.

9         Q.  -- are you aware that right up under there

10   there are exclusions?

11        A.  Uh-huh.

12                MR. RUSSO:  Object to form.

13        Q.  (BY MR. RICE)  Could you tell me what those

14   exclusions are?  No.  Without looking.

15                MR. RUSSO:  Same objection.

16                MR. LASSWELL:  Objection, form.

17        A.  No.

18        Q.  (BY MR. RICE)  So you don't know what those

19   exclusions are?

20        A.  No.

21        Q.  So you're actually not that familiar with that

22   policy, because they're on the same page, correct?

23                MR. RUSSO:  Object to form.

24                MR. LASSWELL:  Objection, form.

25        A.  I'm familiar of the material, but I don't know
```

| | |
|---|---|
| 1 | verbatim.  I don't know the terminology verbatim. |
| 2 | Q.  (BY MR. RICE)  Okay.  Well, just explain to me |
| 3 | in your layman terms what you believe the exclusions |
| 4 | are. |
| 5 | MR. RUSSO:  Object to form. |
| 6 | A.  I don't at this time. |
| 7 | Q.  (BY MR. RICE)  Did you know at the time of the |
| 8 | incident what they were? |
| 9 | MR. RUSSO:  Object to form.  Assumes facts |
| 10 | not in evidence. |
| 11 | A.  I knew my job. |
| 12 | Q.  (BY MR. RICE)  That wasn't the question.  Did |
| 13 | you know at the time of the incident what the exclusions |
| 14 | for deadly force was? |
| 15 | MR. RUSSO:  Objection to form. |
| 16 | MR. LASSWELL:  Same objection. |
| 17 | MR. RUSSO:  Asked and answered. |
| 18 | MR. LASSWELL:  Yeah. |
| 19 | MR. RUSSO:  Assumes facts not in evidence. |
| 20 | A.  No. |
| 21 | Q.  (BY MR. RICE)  Okay.  Looking back on the |
| 22 | situation dealing with what you know now, everything |
| 23 | that's transpired with the firing and everything, do you |
| 24 | still think that -- well, let me ask you this.  Do you |
| 25 | think that if you had been given more legal terminology |

1    just so far as between the pretrial detainee and an

2    inmate by the County that it would have helped you make

3    a better decision on that day?

4                    MR. LASSWELL:  Objection, form.

5        A.  No.

6                    MR. RUSSO:  Object to form.  Assumes facts

7    not in evidence.

8        Q.  (BY MR. RICE)  Okay.  Do you think it's fair

9    that the County is basically saying that they're not

10   liable because you acted outside the scope of your duty,

11   meaning that you did not follow their policy, and you

12   did not follow their training?

13                   MR. LASSWELL:  Objection, form.

14                   MR. RUSSO:  Object to forms.  Assumes facts

15   not in evidence.  Mischaracterizes our position.

16       A.  Repeat the question, please.

17       Q.  (BY MR. RICE)  Do you believe that it is right

18   that the County and the Sheriff's Department that fired

19   you are saying that you did not do your job within their

20   policy or the law and they're the ones that trained you?

21                   MR. LASSWELL:  Objection, form.

22                   MR. RUSSO:  Object to form.

23       A.  No.

24                   MR. RUSSO:  Assumes facts not in evidence

25   and --

```
 1          Q.  (BY MR. RICE)  You don't think that's fair?
 2                  MR. RUSSO:  -- mischaracterizes our
 3     position.
 4          A.  No.
 5          Q.  (BY MR. RICE)  You do believe you did your job
 6     as you were trained, correct?
 7          A.  Correct.
 8                  MR. RICE:  No further questions.
 9                  MR. RUSSO:  I pass.
10                  MR. LASSWELL:  I don't have anything else.
11                  (Whereupon at 12:14 p.m. the
12                  deposition was concluded.)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1                    CHANGES AND SIGNATURE

2        **WITNESS NAME:**  EDWARD STEVEN BENAVIDEZ JR.

3             **DATE OF DEPOSITION:**  JUNE 30, 2022

4    PAGE LINE                   CHANGE              REASON

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____

```
 1          I, EDWARD STEVEN BENAVIDEZ JR., have read the
     foregoing deposition and hereby affix my signature that
 2   same is true and correct, except as noted above.

 3

 4

                            _____

 5                          EDWARD STEVEN BENAVIDEZ JR.

 6

 7

     THE STATE OF _____)

 8   COUNTY OF _____)

 9

10

            Before me, _____, on

11   this day personally appeared EDWARD STEVEN BENAVIDEZ
     JR., known to me (or proved to me under oath or through

12   _____) (description of identity
     card or other document) to be the person whose name is

13   subscribed to the foregoing instrument and acknowledged
     to me that they executed the same for the purposes and

14   consideration therein expressed.
            Given under my hand and seal of office this

15   _____ day of _____, _____.

16

17

                            _____

18                          NOTARY PUBLIC IN AND FOR
                            THE STATE OF _____

19                          COMMISSION EXPIRES: _____

20

21

22

23

24

25
```

```
 1                UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    GALVESTON DIVISION
 3

     DENNIS REYNARD BENSON        §
 4        Plaintiff,              §
                                  §
 5                                §
     V.                           §
 6                                § Civil Action No.
                                  §  3:21-cv-00200
 7   COUNTY OF GALVESTON, ET      §
     AL.                          §
 8        Defendants.             §
 9

10                REPORTER'S CERTIFICATION
            DEPOSITION OF EDWARD STEVEN BENAVIDEZ JR.
11                     JUNE 30, 2022
12

13        I, John G. Rochelle, Certified Shorthand Reporter
14   in and for the State of Texas, hereby certify to the
15   following:
16        That the witness, EDWARD STEVEN BENAVIDEZ JR., was
17   duly sworn by the officer and that the transcript of the
18   oral deposition is a true record of the testimony given
19   by the witness;
20        That the deposition transcript was submitted on
21   _____ to the witness or to the attorney for
22   the witness for examination, signature and return to
23   Worldwide Court Reporters, Inc., by _____;
24        That the amount of time used by each party at the
25   deposition is as follows:
```

1    Mr. Jarvis Rice - 01:43

2    Mr. Joseph R. Russo, Jr. - 01:07

3    Ms. Melissa E. Palmer - 00:00

4    Mr. Bryan R. Lasswell - 00:02

5    Ms. Genevieve Bacak McGarvey - 00:00

6    That pursuant to information given to the

7  deposition officer at the time said testimony was taken,

8  the following includes counsel for all parties of

9  record:

10    Mr. Jarvis Rice, Attorney for Plaintiff, Dennis

11  Reynard Benson;

12    Mr. Joseph R. Russo, Jr., Ms. Melissa E. Palmer,

13  Attorneys for Defendants, County of Galveston, Henry

14  Trochesset;

15    Mr. Bryan R. Lasswell, Ms. Genevieve Bacak

16  McGarvey, Attorney for Defendant, Edward Steven

17  Benavidez Jr.

18    That $_____ is the deposition officer's

19  charges to the Plaintiff for preparing the original

20  deposition transcript and any copies of exhibits;

21    I certify that a review of the transcript was

22  requested.

23    I further certify that I am neither counsel for,

24  related to, nor employed by any of the parties or

25  attorneys in the action in which this proceeding was

taken, and further that I am not financially or
otherwise interested in the outcome of the action.

Certified to by me this 13th day of July, 2022.

_____
JOHN G. ROCHELLE, Texas CSR 5644

Expiration Date:  10/31/23

Worldwide Court Reporters, Inc.

Firm Registration No. 223

3000 Weslayan, Suite 235

Houston, Texas 77027

(713) 572-2000

**A**

**a.m** 1:20 76:12
 76:12 98:12,12
**AAR** 19:14
**abilities** 104:15
**ability** 20:15
 86:22
**able** 16:11,12,13
 16:16 23:8
 40:1 41:5,22
 71:8 92:15
 116:21 135:2,5
 135:14,17
 136:5,7
**above-styled**
 1:18
**Absolutely** 66:4
 78:3 109:4,7
 120:16
**academy** 7:19
 9:14,20,22
 10:1,3,20,21
 10:23 11:4,5
 11:15 12:8,19
 13:2,3,9,16,19
 13:20 14:3
 15:9,13,18
 16:18,19 20:8
 24:13 51:12,14
 51:15,16,24
 52:25 53:8
 67:3 75:8 87:5
 99:6,6 127:8,8
 130:9,16
 132:21,22
**acceptable**
 112:12
**accepted** 131:11
**accepting** 66:2
**accident** 43:16
 74:17
**accidental** 59:2
 117:22 118:1,9
**accidentally**
 43:6
**accurate** 99:19

99:19 106:12
 106:15 119:2
**acknowledged**
 142:13
**act** 26:16
**acted** 139:10
**acting** 37:4
**action** 1:6 18:23
 18:24 19:8
 24:12 26:18
 143:6 144:25
 145:2
**actions** 54:9
 56:14 129:5
**actual** 117:7
**ad** 21:22
**Adams** 2:12
**add** 120:10
**added** 71:25
**adding** 124:21
**addition** 13:13
**additional** 7:15
 13:18,19
 110:25
**address** 5:3
**administrative**
 19:8 21:23
**admit** 73:6
**affairs** 69:14,17
**affix** 142:1
**afternoon** 32:17
**ago** 122:25
 123:14
**agree** 89:19 98:2
 98:13 99:15
 102:5
**agreed** 32:20
**ahead** 16:6
 79:11 83:13
 134:14 136:3
**aid** 54:21
**air** 44:9
**AL** 1:7 143:7
**Alexander** 1:22
 2:19 5:5
**allegations** 9:9
**alleged** 118:10

**allowed** 22:19
 56:21 65:16,22
 67:5 70:12
 131:15,20,22
 134:17,22
**allowing** 63:23
 77:6
**allows** 38:14
 102:20
**alluded** 117:6
**altercation**
 45:18
**ambulance**
 26:24
**amount** 22:4
 81:25 110:12
 143:24
**ample** 39:22
 65:19 86:14
**ankle** 119:15
**annual** 104:1
**annually** 104:15
**answer** 6:12
 73:10 101:19
**answered** 20:23
 100:11 124:13
 126:16 128:10
 138:17
**answers** 6:9
 73:17,19
**anybody** 49:9
 50:6,14 57:21
 57:21
**anyway** 95:17
 134:17
**Apffel** 1:22 5:5
**apologize** 95:9
**appear** 84:21
 95:14 106:1,15
**Appearances**
 3:2
**appeared** 37:1
 142:11
**Appfel** 2:19
**application** 68:9
 68:14 71:19,24
 72:11 73:18

74:9 78:13
 79:5 82:10
**applications**
 72:8
**applied** 13:5
 77:18 78:20
 80:8 85:6
 86:25 87:7
 108:24 111:2
**apply** 9:13 68:21
 72:2 78:14
 111:3
**applying** 116:13
**apprehend**
 58:13 64:1
**appropriately**
 116:19
**approximately**
 9:23
**area** 38:21
**areas** 81:10
 116:2,6
**argument** 94:5
**arms** 21:16
 41:13,23
**arrested** 28:24
 29:10 30:7
 32:24 35:20
**arrived** 32:14,15
 33:3
**asked** 32:23 45:2
 45:6 57:15,25
 58:6 60:10,12
 62:4 67:13
 82:23 85:14
 89:1 92:5
 100:17 101:13
 101:15 103:8
 111:19 114:13
 114:19 118:7
 122:7,19,23
 123:13 124:19
 126:15 138:17
**asking** 16:12,16
 32:18 57:21
 95:19 122:22
 126:12 132:15

136:20
**assigned** 24:8,9
 27:22 28:11,15
 29:20,23
**assist** 57:21
 111:13
**assistance** 27:19
**Assumes** 138:9
 138:19 139:6
 139:14,24
**assure** 129:5
**attached** 1:25
 39:19,19
**attack** 40:14
 48:23
**attacked** 48:16
 48:21
**attempt** 46:22
**attempted** 41:17
**attempting**
 39:20
**attend** 7:15
**attended** 75:8
**attention** 6:15
**attorney** 5:24
 61:9,12 126:8
 137:6 143:21
 144:10,16
**Attorney's**
 61:24 62:2
 76:2,4
**attorneyjarvis...**
 2:4
**attorneys** 9:1
 144:13,25
**Award** 106:24
**aware** 9:8 53:21
 54:2 61:16,19
 64:14,16 66:22
 76:24 77:5,13
 77:21 90:10,19
 101:4 136:25
 137:9

**B**

**B** 92:17 93:8
 96:15,23 97:2

125:14,15,17
137:6
**B-E-N-A-V-I-...**
5:20
**Bacak** 2:18
144:5,15
**back** 19:16 39:4
39:25 40:14
43:9 95:11
97:25 105:10
107:15 108:1
113:7,10
115:23 119:25
123:7 126:1
138:21
**background**
9:13
**bad** 100:11
**bailiff** 30:15
32:19
**balance** 37:21
**Ball** 7:14 87:10
**balls** 14:18
**barricade** 54:21
**barrier** 130:1
**based** 22:25
23:9,10 84:9
93:7
**basic** 3:16 26:20
28:2 80:13,14
81:19 85:25
107:11,12
**basically** 11:22
21:24 41:18,19
65:19 70:1
84:10 85:25
134:9,15 139:9
**basis** 104:1
129:2
**Bates** 3:14,17,20
3:23 4:2,5
79:18,19 83:19
89:15 105:7,9
105:12,16
106:20 115:14
**bears** 115:14
**becoming** 24:16

24:18 107:23
**bed** 39:20,20
**beginning** 68:3
**begins** 43:23
**behavior** 52:18
**behavioral**
129:3
**belabor** 93:20
**belief** 23:9 47:16
82:12 114:16
114:25
**believe** 9:19
22:10,13 32:6
32:9 40:25
44:23 50:23
63:7 71:13
74:23 75:10
92:12,14 93:11
93:12 97:19
99:24 100:3
103:22 110:5
110:17,22
115:4 119:2
120:5,14,17
124:20 127:7
135:5,12 138:3
139:17 140:5
**believed** 45:4,7
45:16 47:17
49:13 87:18,21
93:9 120:2
132:2
**belonged** 67:15
**Benavidez** 1:12
1:16 2:16 3:3
3:14 4:2,5 5:6
5:7,10,15 7:21
76:16 79:12,18
83:16,18 85:11
89:12,13,14
91:20 95:5,6
96:8 97:19,21
98:1,15,16,19
99:25 105:5,6
115:11,12,13
117:5 119:10
141:2 142:1,5

142:11 143:10
143:16 144:17
**Benson** 1:3 2:3
3:14,17,20,24
4:2,5 22:2,10
32:7,16,21
33:4,7,11 34:6
34:12 36:22
37:1,4,9 39:3,9
39:23 40:13,17
40:23 41:1,13
41:21 42:6,14
43:13,17,22
44:18 45:1
46:4,12,16,20
47:2,6,9,12
48:15,18,21
49:1,5,21 50:2
50:4,8,20 52:5
52:14 54:23
55:5,20 56:6,8
56:12 57:16
58:7,14,17,21
62:23 63:17
75:25 76:4
79:8,19 83:20
83:24 88:4
89:16 92:1
93:12 96:14
101:3,11 105:8
105:14 112:9
112:18,25
113:6,10,16,21
113:24 114:12
114:16 115:1
115:14 116:19
117:13 118:2
118:10,10,17
118:20,24
119:10 125:24
129:23 136:18
136:21 143:3
144:11
**Benson's** 43:9
63:13
**best** 20:19,20
**better** 84:19

99:22 109:3
139:3
**big** 17:17
**bigger** 98:20
**birth** 5:22
**bit** 9:12 10:18
18:9,9 19:18
20:14,14 59:20
85:14 92:15
111:19
**black** 36:23
**blocks** 52:11
**bodily** 93:10
**body** 41:17
43:25 44:4,6
**bond** 34:8
**book** 111:20
**booked** 34:6
**booking** 33:1
35:12 36:7
53:20 63:20
112:16,19
113:3,11
**bottom** 79:19
83:20 119:14
**Branch** 108:12
109:8
**Brazoria** 109:19
109:20
**break** 6:24,25
26:22 34:3
36:20 76:10
**breaks** 117:18
**breath** 45:17
**Breonna** 18:2
**brick** 46:4,7
**bring** 95:8
**brlasswell@m...**
2:18
**broke** 59:3
113:21
**Brown** 17:16
**Bryan** 2:17 5:7
144:4,15
**Buffalo** 56:20
**building** 42:24
69:19

**button** 43:3

———————

**C**

**C** 2:1
**call** 32:17 88:18
**called** 70:6,10
71:17 85:15
**calls** 53:3 125:20
131:6,18
135:25 136:13
**calmed** 129:6
**cameras** 117:10
**capacity** 74:4
**Captain** 8:10
**captured** 118:19
**car** 26:19 46:11
70:1,22,25
130:5
**card** 142:12
**career** 88:1
**case** 15:17,19,21
17:17,17,21
31:14 57:3
60:18,20,23
76:18 87:25
88:12 92:14
125:25 136:10
**Castile** 17:23
**catch** 41:5
**categories** 20:4
**category** 11:8
12:21
**cause** 1:19 63:21
**caused** 64:21
**cells** 64:24
**certain** 31:3
38:21 71:23
73:17 91:2
104:14 129:4
**certainly** 110:21
**certificate** 3:9
87:4 111:14
**certificates** 4:1
105:25 106:7
**certification**
107:13 111:7
111:10,17

143:10
**certifications**
107:16 111:1
**certified** 24:14
104:2 106:10
143:13 145:3
**certify** 143:14
144:21,23
**chance** 62:23
73:18 117:17
**change** 72:12
73:19 141:4
**Changes** 3:8
141:1
**changing** 112:2
**Chapter** 3:17,23
83:2,19
**characterizati...**
86:6
**charged** 75:18
**charges** 70:14
144:19
**chase** 69:7
**chasing** 58:25
136:18,21
**checking** 19:8
64:18
**checks** 64:22
**chief** 8:3
**church** 56:23
**CIT** 109:21,21
**citation** 70:16
70:17 72:24
**City** 109:19
110:3,6
**Civil** 1:6,24
143:6
**civilians** 24:16
24:18 42:16
**claimed** 37:22
66:6
**clarification**
26:7 111:23
**clarify** 26:15
36:8
**clarifying** 99:8
**class** 10:3 11:2

19:20 24:2,3
24:11 51:13
53:13 85:10
109:11,15
**classes** 20:1 80:5
80:12,16,21
81:5,7,9 82:1
106:7 109:12
127:7 128:1
**classroom** 10:8
**clear** 36:6,6
120:1 124:24
**cleared** 35:10
63:15 113:2,2
113:6
**climbed** 46:4,7
**clock** 65:9,11
**close** 58:24
86:11
**closely** 33:12
**closet** 41:11 43:1
48:22,23
**code** 81:21
**cohesive** 123:9
**coincide** 123:24
**college** 3:14 7:17
75:9 78:18,22
80:3,5 82:18
84:17 85:4
86:23 87:1,14
103:22 108:4
108:18 109:16
127:7
**come** 17:13
19:16 70:6
91:17
**comes** 22:15
53:22
**coming** 112:8
**command** 48:4,5
**commands**
44:17 46:17
47:4,13,14
48:7 63:2,5
114:8,9 118:22
**Commission** 4:4
142:19

**committed**
57:10 70:9
**Community**
84:16 87:14
**competency**
104:14
**complaints**
64:14
**Complete**
104:13
**completed** 82:14
**completion**
115:20
**complied** 47:14
**comply** 102:2
114:12,16,23
114:24
**compound** 11:7
136:1
**comprehend**
62:11
**concept** 136:8
**concerned** 53:6
115:23
**concluded**
140:12
**conclusion** 53:4
**condition** 27:21
**conditions** 6:16
**conduct** 77:25
124:20
**conference** 19:3
19:6,12
**confident** 47:15
86:14,18
**Confidential**
3:14,17,20,23
4:2,6 105:14
**confrontational**
129:3
**consequences**
12:6
**consider** 20:20
22:6 104:18,19
**consideration**
142:14
**considered** 17:1

22:12 101:10
131:5
**consist** 28:7
**consistent** 84:22
91:20
**consists** 10:8
28:8
**constant** 86:16
**contact** 58:24
**contained** 85:11
**contains** 95:21
**contents** 89:5
**continued** 101:3
114:17
**continuous**
130:3
**control** 3:23
95:22
**conversation**
33:6 35:5,6
86:13 112:11
**conversations**
91:14
**copies** 144:20
**copy** 79:3,5 83:1
95:9 99:13
**correct** 5:25
10:11 11:23
13:12 16:25
19:23 20:25
21:1 22:4,5
23:12 24:1
25:4,5,7,8
29:25 30:1,3,5
30:7,11 32:4
32:10,11 34:8
34:12,13,18,20
34:24 37:10,13
38:1,16 39:4,5
39:7,8,11,17
40:2,10,12
41:2,6,9,25
42:12,16,18,21
42:25 43:7,8
43:10,13,17,23
44:2,6,8,10,19
44:21,22,24,25

45:4,5,8,17,23
45:24 46:8,14
46:18,19,21,25
47:1,3,7,11,19
47:21,22,23
48:1,8 49:6,15
50:21,22 51:18
52:12 53:9,10
54:13,14,16,17
54:19 55:1,3,6
55:9,10,13,15
55:17,18,20,21
55:23,24 56:1
56:6,9,13,16
57:17,23 58:1
58:8,11,12,14
58:17,19,22,25
59:3 60:14
63:14,18,23,24
64:2,6,14,19
64:21 65:13,17
67:18 68:5,7
68:10,18,23
69:3,5,8,11,24
70:2,7,12,22
71:15,19 72:16
72:19,23,25
73:1,3,22 74:1
74:2,5,7,9,11
74:13,15,18,21
74:22 75:7,11
75:12 77:16
78:24 81:8
84:11 85:12,21
86:23,24 87:8
87:9,12,16,20
88:4,15 89:16
89:24 90:1,5
92:9,10 93:4
93:17,18 94:3
94:4,7,8 97:6
98:5 99:1
101:12 102:15
102:16,17,22
102:23 103:5
103:19,24
104:16,17

105:2 106:8,11
107:17,20
108:15,19,21
108:22 109:14
110:9 112:20
113:7,8,12
114:21 115:25
116:4,15 117:7
117:8,10,11,15
117:16 120:3,6
120:15,19,22
121:3,4,6,7,8,9
121:13,14,17
121:19,20,22
122:2,5,9,14
123:1,14,15,17
126:10 128:20
129:24,25
130:25 131:16
131:23 134:22
134:23,25
136:23,24
137:22 140:6,7
142:2
**correction** 23:14
23:15 99:5
**correctional**
10:23 13:9,15
13:20 14:3,5,5
15:8 16:19
19:20 20:2,2
24:1 51:12
53:13 94:19
99:6 127:8
**corrections**
24:13 51:22
67:2,2 86:1
94:18 129:1
**corrections'**
90:15
**cost** 63:25
**counsel** 144:8,23
**count** 114:2
**counter** 100:8
**County** 1:7 2:9
3:19,22 5:9 7:6
9:10 18:6

24:10 26:3
28:13,23 31:6
51:6 63:25
75:6 76:2,17
77:23 78:13,21
82:20 86:20
95:15 100:5
101:5,15 102:2
102:7,20 103:9
109:19,20
120:2,8,20
121:10,16,25
122:24 126:18
134:25 139:2,9
139:18 142:8
143:7 144:13
**County's** 90:7
96:9 97:25
**couple** 7:16 19:5
59:25 65:9
80:12 116:17
120:1
**course** 12:10,16
12:22 14:4
20:3 23:12
61:22 83:2
86:18 109:21
**courses** 10:9
15:13 17:12
79:1 82:14
91:9 103:21
110:5
**court** 1:1 5:2,2
15:17,19,21
28:22,25 29:11
30:7,10,16
32:24 34:7
35:20 79:17
83:17 89:11,15
105:9 113:1
115:12 143:1
143:23 145:9
**courtroom** 6:9
**created** 29:14,17
99:1
**Credit** 108:13
**credits** 108:4

109:11,15
111:3
**crime** 57:9 70:9
75:18
**criminal** 61:10
75:21
**criminally** 61:12
75:18,24
**Crisis** 109:22,24
**cross** 21:16
**CSR** 1:20 145:8
**cuff** 39:19,19,20
**cuffed** 22:8
115:1
**cuffs** 115:4
**currently** 7:3
**custody** 30:11
34:13 101:3
**custom** 77:14

_____

**D**

**daily** 129:2
**danger** 21:25
40:20 50:8
55:3,12 57:19
**date** 5:4,22 22:2
60:1 129:12
141:3 145:8
**dated** 106:13
**day** 1:19 16:7,12
16:14 25:3
28:17,20 29:5
29:9 30:2,12
32:13 33:15
34:23 35:7
61:11,13 66:24
67:8 129:21
139:3 142:11
142:15 145:3
**days** 11:8,11
59:25 60:3,12
62:7
**dead-end** 41:9
**deadly** 7:9,11
10:19 12:3,4,6
12:7,15 13:24
14:1 15:3,9,12

15:24 16:10,11
16:13,17 19:14
19:25 23:2
51:7,16,17
52:1 53:22
54:3,5 62:11
62:12 93:3,8
101:25 104:21
122:13 123:7
123:14 124:20
125:1 127:9,21
137:1 138:14
**deal** 14:6 92:2
96:20,21 97:5
101:16 103:18
110:22 116:21
116:25 120:3
125:1 129:1,4
136:10
**dealing** 10:21
11:25 14:11,19
54:3,4,5 91:10
96:9,10,11
98:4 101:11
103:4,14
104:20 105:2
109:5 113:10
128:19 138:22
**dealt** 123:16
**death** 93:10
**decide** 23:1,8
26:3 31:6
38:10,15 102:8
102:8
**decided** 132:16
132:19
**decision** 125:25
126:2 127:3
139:3
**decisions** 88:11
**deeper** 19:18
**defecate** 37:22
**Defendant** 2:16
144:16
**Defendants** 1:8
2:9 143:8
144:13

**degree** 87:2
**deliberate** 17:7
**demeaning**
19:13
**demonstrated**
104:15
**denied** 63:4 68:9
68:18
**Dennis** 1:3 2:3
125:24 143:3
144:10
**department** 7:9
10:8 13:12
17:9 19:19,22
20:1,10 23:7
23:13,14,15
31:20 32:3
34:22 37:17
38:9,14 51:20
62:6 65:16
66:3,8,14
67:13,16,22
68:10 69:18
70:11 71:14,19
71:23,24 72:3
72:4,11,12
73:11,17 74:21
76:22 77:14
78:14,21 82:3
88:3,15 92:6
102:10,13,22
112:1 126:19
130:7,12 131:5
131:12,16,23
139:18
**depends** 25:18
25:19 27:13
38:18
**depict** 117:12,21
**deposition** 1:12
1:16 5:6 6:1
8:25 31:12
117:18 140:12
141:3 142:1
143:10,18,20
143:25 144:7
144:18,20

**deputies** 24:20
24:22 25:6,16
64:6,13 101:16
102:21 103:1
110:15,21
129:10 133:20
134:16
**deputy** 13:8
18:10,11,17
19:13 21:2
23:8 24:21
25:4 32:16
33:5,6,10 35:2
35:3,3,6,6,23
36:1,2,8 65:12
66:24 75:14
88:19 96:21
100:15 102:8
107:23 109:3
112:1,8,15,20
113:15 129:8
135:5,13
**describe** 11:18
15:7,11
**description** 3:12
142:12
**designed** 39:6
**detail** 24:8,9
29:21,22,23,25
32:20 81:25
**detained** 28:22
29:10
**detainee** 52:22
53:2,9,14,17
53:23 54:4
96:21 97:24
104:20 116:21
116:25 139:1
**detainees** 77:1,7
77:16,24 78:6
91:3,11 96:11
**difference** 52:21
53:1,8,13,16
53:22 54:3
115:2
**different** 10:9
21:14 54:5

77:20 114:10
125:18
**differently** 94:7
**dig** 12:2 19:17
21:5 32:12
34:5 59:20
71:8
**diploma** 87:10
**direct** 92:15
**direction** 59:8
**disagree** 40:4
**discharge** 59:8
118:2,9
**Disciplinary**
18:24
**disciplined**
63:22 78:10
**discusses** 97:5
**discussion** 84:10
85:17,23 92:23
**discussions** 91:9
91:12,19
**dishonesty**
68:10,23
**disparaging**
64:6
**District** 1:1,1
61:23 62:1
76:2,4 143:1,1
**division** 1:2
30:15 143:2
**document** 3:16
3:19 4:5 79:20
80:1 83:20
84:9,15,21
85:2 89:14
90:7 94:24
95:10,13,20,20
95:22,25 96:5
96:15 98:25
99:11 105:5,8
105:15 107:15
110:8 115:17
115:20 116:1
116:16 127:2
142:12
**documents**

97:24 98:20
99:18,22 100:4
100:8 113:3
125:19 126:3
**doing** 33:22
79:12 113:24
132:15,18,20
**door** 25:23
42:25 43:6
56:1
**doors** 43:4 52:14
55:20 57:20
**double** 43:4,4
52:14 57:20
**double-sided**
105:12
**dragging** 119:16
**Drews** 32:18
34:17
**driving** 72:19
**drove** 70:1
**drugs** 22:4,10
28:1 32:22
37:18 73:3,20
73:21 74:13
113:1
**drugstore** 52:11
**drunk** 70:1
72:19
**due** 22:3 28:21
29:10 38:8
47:12,12
**duly** 1:18 5:11
143:17
**duties** 88:8
**duty** 28:11
104:6 112:8,9
112:18 139:10
**DWI** 70:19

─────── E ───────

**E** 2:1,1,11 31:11
144:3,12
**E-D-W-A-R-D**
5:20
**earlier** 45:1 92:6
94:18,25 99:3

118:8 124:13
126:8
**early** 32:17
**easier** 25:7
111:16
**easily** 87:19
**ed** 13:18
**education** 4:5
108:2,6 109:9
110:12
**Edward** 1:12,16
2:16 3:3,14 4:2
4:5 5:6,10,15
7:21 141:2
142:1,5,11
143:10,16
144:16
**effect** 6:9
**effectively**
116:11
**eight** 88:1,2
134:24
**eight-year**
128:14
**either** 9:16
16:18 27:6
45:17 58:24
96:11
**emailed** 66:6,7
66:13
**embarrassed**
56:9
**emergency**
42:15 43:5
49:2
**employed** 7:3
94:16 144:24
**employee** 19:2,6
19:12 88:21
89:7 94:24
**employees** 42:15
49:2 56:5
70:11
**employment**
36:24 94:2,12
**EMS** 27:5,6
28:22 32:22

**encounter** 41:25
**encouraged** 78:2
**ended** 34:13
**enforcement** 4:4
80:24,25
106:16
**English** 67:23
**enrolled** 78:16
**enter** 65:16
131:22
**entered** 28:21
**entering** 13:14
**enters** 31:11
**entire** 89:19
**entirety** 54:15
**entitled** 3:16,20
83:2
**entry** 134:8
**equipment** 31:1
31:7,14,16
**erratic** 37:5
**error** 43:18
**escape** 19:10
33:25 42:11
55:22 58:17
63:18,23 64:21
64:22 95:22
97:5,12 124:21
125:14 126:5
**escaped** 14:19
41:20 52:11,17
64:1 96:11
101:3 115:2,5
117:13
**escapees** 98:5
**escaping** 14:6,11
50:21,24 51:1
96:21 97:23
116:21,25
**escorted** 32:22
37:9 38:8
63:20
**escorting** 56:5
**especially** 27:5
**estimate** 11:14
12:13 13:21
113:23

**ET** 1:7 143:7
**evading** 28:11
**event** 97:23
  112:2
**events** 117:7,12
  119:3
**eventually** 69:10
  113:21
**evidence** 138:10
  138:19 139:7
  139:15,24
**exact** 60:1
**exactly** 11:23
  23:22 101:14
**exam** 65:12 66:8
  66:15,24 67:1
  67:4,6,9,13,22
  71:23 74:4
  85:16,23,24
  86:15,15 88:7
  115:20 132:16
  132:19 133:3
  134:8,22
**examination** 3:4
  3:5,6,7 5:12
  76:13 116:12
  117:3 119:8
  143:22
**example** 21:15
  101:25
**excessive** 9:9
  76:25 77:6,15
  77:23 78:5
  128:3,8,12
**exclusions** 137:1
  137:10,14,19
  138:3,13
**excuse** 19:11
**executed** 142:13
**exercise** 88:8
**exercised** 77:7
**exhausted** 46:2
**Exhibit** 3:13,16
  3:19,22 4:1,4
  83:16 89:13
  95:6 98:19
  105:6 115:11

  123:23 124:4
  125:5,9,10
**exhibits** 3:11
  125:10 144:20
**existence** 90:20
  103:13
**exit** 41:15 42:25
**exited** 43:5
**expected** 113:13
**experience** 78:9
  109:13 111:3
**Expiration**
  145:8
**EXPIRES**
  142:19
**explain** 9:25
  15:19 16:17,21
  21:12 29:3
  35:1 123:3,23
  124:16,18
  126:12,19,23
  128:2,23 138:2
**explaining** 12:5
  32:13
**explore** 92:11
**expressed**
  142:14
**extending** 134:6
**extensive** 17:10

---

**F**

**facilitating**
  28:24
**facilities** 37:24
**facility** 21:8,8,9
  25:11,13,16,20
  26:1,5 27:7,11
  27:23 28:15
  38:11,16
  117:14
**facing** 136:10
**fact** 73:2 86:20
  103:7 106:13
  114:19 117:6
**facts** 93:7 138:9
  138:19 139:6
  139:14,24

**fail** 131:14
  133:20
**failed** 65:12,22
  66:14 67:4
  74:4,12,16
  130:19,22,22
  131:1,9,21
  133:13 134:21
**failing** 65:15
  66:8 71:15
  134:16
**fair** 65:21 86:16
  139:8 140:1
**fall** 27:17 38:6
  38:20 80:11
**familiar** 17:16
  17:20 52:21
  56:19 57:2,5
  94:14 137:21
  137:25
**family** 66:17
**far** 10:25 14:19
  31:1,14 53:6
  61:10 77:13
  92:1 97:24
  115:23 136:25
  139:1
**father** 8:2,5 9:17
  61:17,20 66:2
  66:7 69:19
  70:6,10
**fatigued** 45:20
  45:23
**fault** 29:13,16
**feared** 55:8
**Feast** 18:5
**Federal** 1:24
**feel** 22:23 38:20
  38:20 40:20
  51:5 109:2
  116:19,23
**feeling** 23:1
**feet** 21:17 25:24
  26:25
**fell** 41:19 46:4,8
  46:16
**felon** 52:17

**felons** 103:14
**felony** 75:18
**fight** 45:17 46:1
**figure** 124:8
**filed** 18:22 64:13
**financially** 145:1
**find** 41:15 90:23
  120:8 136:9
**fine** 30:24 79:13
  79:15 83:15
  98:11
**finish** 7:11 9:23
  12:24
**finishing** 113:11
**fire** 31:25
**firearm** 104:1,2
  117:22 118:2,9
  118:20
**firearms** 103:22
  104:3,5,19
  108:21 109:6
**fired** 32:7 43:6
  55:25 63:13
  74:23 118:19
  120:17,20
  121:8,13
  139:18
**firing** 32:3
  138:23
**firm** 5:5 145:9
**first** 5:11 10:2
  26:8 37:10
  43:1 48:16
  55:25 57:20
  58:3 59:8,22
  63:17 79:11
  88:17 94:17
  105:20 132:9
**fit** 35:10 36:6
**fitness** 80:23,24
  80:25
**five** 33:2 115:9
**flail** 41:23
**flailed** 41:13
**fled** 49:11 69:5
**flee** 47:16,18,20
  101:4

**fleeing** 11:25
  28:10 32:1
  57:16 103:9,14
  103:19 105:2
  120:3 136:11
**Floor** 2:13
**focused** 50:4
**follow** 48:7
  77:18 102:2
  103:13,18
  124:17 139:11
  139:12
**followed** 48:4
  75:10 92:14
  120:5,9,15,19
  121:2,12,17
  124:19
**following** 32:6,9
  47:12 120:20
  143:15 144:8
**follows** 5:11
  143:25
**force** 3:17,20 7:9
  7:11 9:9 10:19
  10:19,22,25
  11:11,15 12:3
  12:4,6,7,15
  13:24 14:1
  15:3,9,12,24
  16:10,11,13,17
  19:14,25,25
  23:2,9 40:1
  51:8,16,17
  52:1 53:22
  54:3,5 62:11
  62:12 76:25
  77:6,15,23
  78:5 81:13
  83:4 84:11,17
  84:23 88:2
  89:8 90:3,7,11
  90:20,22 91:1
  91:2,15 92:2
  92:13 93:3,8
  94:14 97:11
  102:1 104:21
  116:5 122:13

123:7,14
124:20 125:1
125:15 127:9
127:21 128:3,8
128:12,18,20
128:24 129:7,9
129:14,20
130:7 137:2
138:14
**foregoing** 142:1
142:13
**forget** 108:23
**form** 18:12
22:18 23:3,16
24:23 25:9,17
26:6 28:16
29:1,18 30:4,8
31:9,10,17,23
34:2,9,14,19
35:25 36:12
38:12,17,25
39:12 40:3,11
42:1 43:24
44:7,11,15
45:9 46:9 48:2
48:9,10 49:7
49:22 50:3
51:2,21 52:13
53:3,11,18,24
53:25 54:7,8
55:14 56:3,11
56:17,24,25
57:13 58:4
59:4 60:5,9
62:13,17,21
63:19 64:3,12
64:15 65:18,24
66:10,16 67:10
67:19,25 68:11
68:19,24 69:22
71:10,16,20
72:13,20 73:4
73:14,23 74:6
74:10,14,19
75:15 119:23
120:11,12,23
120:24 121:18

121:21 122:3,4
122:10,15,16
123:10,11,18
123:19,25
124:1,11,15
125:3,4,12,20
126:4,14,15,21
127:4,10,15,18
127:23,24
128:4,5,17,21
128:25 130:8
130:15 131:6
131:17,18,24
132:4,25 133:4
134:3,18 135:7
135:16,18,23
136:13 137:3
137:12,16,23
137:24 138:5,9
138:15 139:4,6
139:13,21,22
**forms** 139:14
**found** 93:24
94:7
**four** 9:24 10:3
11:8,11 13:21
13:23 14:2
106:20
**Freddie** 65:15
71:13 74:3
**free** 42:7
**freed** 113:21
**friend** 66:7,13
66:17
**front** 21:17
84:21 95:11
97:18,24 98:15
99:11 115:15
**frowned** 78:6
**full** 5:14 6:15
11:1 129:13,16
**functions** 37:23
**further** 38:22
76:8 140:8
144:23 145:1

**G**

**G** 1:20 143:13
145:8
**Galveston** 1:2,7
1:23 2:9,13,20
3:19,22 5:8 7:6
7:17 8:2,4,6
9:10 18:6 51:6
68:10 69:18
70:11 72:2,11
73:10 75:6,8
76:2,17 77:22
78:13,18,21,22
80:5 82:18,20
84:16 85:3,7
86:23 87:1,10
87:14 93:21
97:25 100:5
101:5,21 102:2
103:9,22
108:17 109:16
110:24 111:25
120:2,8,20
121:10,16,24
122:24 126:18
127:7 134:24
143:2,7 144:13
**gap** 84:25
**garage** 49:15
117:15
**Gardens** 71:3,5
71:7,12
**Garner** 15:16
17:10
**gather** 62:16
**gathering** 45:17
**gbmcgarvey@...**
2:19
**GC.201** 97:11
**GCSO** 97:10
**geared** 14:4
53:19
**GED** 86:3
130:23 133:5,7
133:11
**general** 10:22
11:12,13 50:12
81:25 130:23

**generally** 62:10
79:1 90:23
107:16
**Genevieve** 2:18
5:8 144:5,15
**getting** 9:20
26:18 28:17
34:22 47:2,6
47:15,16,18
94:21 107:19
113:22 128:6
**give** 14:10 17:9
18:16 30:2
31:2,7,21 60:1
60:8,15 62:23
75:14 79:4
88:20 113:3
**given** 25:24
27:25 28:4
29:17 31:19,20
32:10 48:4
84:4 98:20
123:16 127:20
127:25 138:25
142:14 143:18
144:6
**giving** 6:15
29:24 46:17
**go** 9:2 10:24
13:24 14:2
16:6 18:8
19:17 29:6,25
33:24 68:20
79:11 83:13
90:23 92:24
97:25 98:10
100:8 104:8,10
125:13 129:8
130:16 134:14
136:3,23
**goes** 83:23
**going** 11:6 12:2
17:2 22:17
28:16 29:18
36:14 38:6,7
44:20,23 47:20
54:21 62:9

81:24 83:10,12
105:19 113:6
114:16 119:11
122:17 124:7
132:13 134:5
**good** 66:6 76:15
79:2 85:2 86:4
86:6
**gotten** 18:23
**GPD** 68:14,20
68:21,21 69:14
**grab** 41:12 42:9
**grade** 65:16
71:15 80:16,20
86:8
**grades** 81:1
**graduate** 10:5
86:3
**graduated** 78:19
78:22 87:1,7
132:21,22
**graduation** 7:16
**grand** 63:16
**grasp** 136:8
**Greer** 2:12
**grievance** 18:22
**ground** 46:17,21
47:10 63:3,4
114:11,20
119:16
**guard** 25:7,21
27:22 28:15
**guarding** 112:18
**guess** 111:23
**guide** 21:17
31:15,20
**guides** 31:1
97:11
**gun** 31:1,20,22
32:1 40:17
102:24
**gunshot** 44:14
**guy** 56:22

**H**

**half** 128:19,24
**hallway** 41:5,8

48:19,22
hamburger
  56:23
hand 21:18 27:4
  36:7 38:8 39:7
  123:20 127:2
  142:14
handcuff 38:10
  38:10,15,15
handcuffed
  25:12 27:8,12
  27:15 38:21
  39:9,24 41:22
  46:13 56:13
handcuffs 21:21
  33:14,17 39:6
  40:7,9,10
handed 115:13
handle 122:1
handling 26:20
hands 26:25
  39:3 40:2 42:7
  43:22 44:9
  56:13 115:1,5
  118:5,11
  119:11,17
hands-on 11:17
  11:19
happen 34:24
  78:8 113:13
happened 9:9
  16:8 18:6
  20:18 28:2
  32:14 33:25
  43:10 52:20
  54:18 58:19
  59:7,11,12,13
  66:19 70:24
  71:3 72:18
  119:19 133:22
  133:24,25
  134:1,1,2,4
happens 30:12
  118:14 129:9
hard 39:10
harder 41:24
  42:4 46:13

harm 17:3,5
  56:5 58:7,9
  93:10
harm's 58:5,11
harmed 57:12
head 28:17
  29:12,13,16,24
  30:3 32:23
  34:17,18,18
  35:8,9,15,16
  35:22,24 36:9
  36:10 57:4
  79:21 81:15
  95:3 100:24
  114:2
headed 41:4,5
  42:24 43:10
  113:7
heading 29:11
  29:11
headline 17:17
  18:3
headlines 17:25
hear 118:22,24
heard 15:16
  17:6,22 18:4
  44:14
heavily 45:19
heavy 52:18
help 9:19 37:21
  50:1 57:16,25
  58:6 66:9,14
  67:15 82:1,19
  92:15
helped 109:3
  139:2
helping 82:2
Henry 2:9 5:9
  144:13
hereto 1:25
Herz 2:12
high 7:11,14
  34:7 37:18
  86:3 87:8,11
  110:12,17,18
  113:1
higher 108:2,6

109:9 110:12
highest 8:8
highly 37:2
hire 68:22,25
hired 13:6,14
  74:20 82:7,13
  82:14,17 88:14
  98:14,18,21
  99:4 131:4
  134:17,22
history 27:22
  28:10,10,14
  33:11 106:16
hit 43:3 59:2
  69:3,7 70:1,22
  70:25
hold 38:5 131:2
holds 11:21
hops 130:1
hos 47:13
hospital 22:3,7
  22:11 26:10,19
  26:20 27:7
  28:2,21 29:6,7
  29:11 32:15
  33:2,3,15
  35:11,21 36:9
  36:22 37:18
  45:2,19 52:14
  55:11 56:5
  57:16,19 59:19
hostage 42:18
hostages 45:3
hour 32:18
  109:21
hours 11:1 19:24
  108:2,6,6,14
  110:16
Houston 5:3
  145:10
huge 81:24
Huh 133:6
Huh-uh 30:20
human 43:18
hypothetical
  125:23

**I**

idea 86:9 88:6
identify 80:2
identity 142:12
ignored 113:24
II 80:14,25 81:6
illegal 73:3,20
illnesses 6:19
immediate 50:8
  50:18 51:25
  52:4,9,15
  93:10,13
impact 88:11
implied 118:8,16
importance 65:5
important 33:21
  136:9,12
impossible 42:2
  42:3 135:11,12
incarceration
  35:10 36:7
  113:2
inch 54:13
incident 8:12,15
  20:17,18 25:3
  41:10 58:19
  59:25 60:4,13
  70:15,21,24
  71:4,5,6,12
  72:19,22 74:24
  87:24 88:4
  91:25 93:22
  101:2 113:20
  129:13 138:8
  138:13
includes 144:8
Incomplete
  125:23
inconsistent
  73:18
Incorrect 55:7
  56:2,7,10 59:5
INDEX 3:1
indifference
  17:7
individual 20:4

38:11,16 64:2
  104:21
inform 27:21
information
  28:8 29:7,10
  31:21 32:25
  34:23 36:4,7
  51:13 90:23
  112:1 127:21
  135:9 144:6
informed 28:9
  34:6 72:10
ingested 28:1
  32:21
ingesting 22:3
  22:10
initial 43:15
initially 46:7
  58:16
injure 38:22
injuries 54:15
injuring 38:24
injury 54:23,25
inmate 19:9,10
  24:7,20 25:7
  25:11,15 26:4
  26:20 27:16
  28:14 35:9,11
  35:20,23 37:18
  37:20 38:23
  48:6 52:22
  53:2,6,9,14,17
  53:23 54:4,11
  63:17,20,23
  64:21 97:23
  104:20 116:21
  116:25 120:3
  123:8,17
  124:22,25
  129:7 136:11
  139:2
inmate's 29:7
inmates 14:6,11
  14:20 21:7,9
  24:4 25:1,25
  76:25 77:7,15
  77:24 78:5

91:3,11 97:12
129:2,2,11
**inside** 21:7,9
24:7 48:16
55:11 117:13
**insinuated** 32:3
**instance** 1:17
25:22 92:12
112:4 123:7
**instances** 18:16
**instruct** 101:22
**instruction** 89:8
**instrument**
142:13
**intentionally**
55:25
**intentions** 42:22
45:10,12 47:21
52:8
**interaction**
116:18
**interested** 145:2
**Intermediate**
106:22
**internal** 69:14
69:17
**interpretation**
126:17
**intervene** 57:25
**Intervention**
109:25 110:1
**interview** 68:21
76:3
**interviewed**
76:3
**interviews** 8:22
**intoxicated** 37:2
69:24
**investigate**
93:21 102:13
**investigated**
75:24
**investigation**
8:19 59:21
61:15,18,21
75:22 94:1
**involved** 17:17

69:2 74:17
**issued** 121:11
**issues** 88:3

_____

**J**

**J-R** 5:21
**jail** 10:6 19:10
22:7 24:7
26:17,17,21
34:7 70:4,10
77:16 91:10
94:22,22 95:15
113:7
**jailer** 107:12
111:4,7
**jailer's** 106:24
107:2
**jailers** 24:18
78:10
**Jarvis** 2:4,5 26:6
101:13 102:7
103:7 144:1,10
**job** 33:22 75:2,3
75:4,5 82:4
101:23 110:22
138:11 139:19
140:5
**John** 1:20 5:1
143:13 145:8
**join** 135:24
**joined** 87:24
99:21
**Joseph** 2:10 5:9
76:16 144:2,12
**Joshua** 18:5
**Jr** 1:12,16 2:10
2:16 3:3,14 4:2
4:5 5:6,9,10,15
5:21 76:16
141:2 142:1,5
142:11 143:10
143:16 144:2
144:12,17
jrusso@greer...
2:11
**judge** 34:8
**July** 5:23 112:9

145:3
**June** 1:13,19 5:4
141:3 143:11
**jury** 63:16
**justified** 51:5,7
51:10

_____

**K**

**keep** 37:21
83:14
**kept** 23:18 44:18
**keys** 33:1
**kidnapped**
52:12
**killed** 57:10
**kind** 9:25 10:20
10:25 12:2
13:7 14:1,18
17:24 18:8,9
19:16,17 21:5
21:6 25:10,24
32:12,13 33:12
33:24 37:4
41:9,13,22
57:9 59:20
62:9,10 77:25
78:8,17 119:16
119:25 128:6
**knew** 45:7 74:4
74:8,12 85:10
110:15 134:15
136:23 138:11
**know** 6:22,25
7:1 12:11
15:14 18:22
21:16 23:17
28:13 34:12
42:22 43:16
45:3,10,11,13
47:2,6,8,9,20
47:21,24 49:17
52:8 53:16,19
54:18 56:16
65:25 68:25
69:15,16,20
75:13 82:8,15
83:8 84:4 86:8

86:8 91:17
92:1 93:7,21
97:15 99:17
100:7 109:9
110:11,13,14
120:25 121:1
125:1 131:8,14
132:17,18
134:4 137:18
137:25 138:1,7
138:13,22
**knowing** 136:11
**knowledge**
129:13,16,19
129:20 134:19
**knowledgeable**
135:10
**known** 142:11

_____

**L**

**labeled** 3:14,17
3:20,23 4:2,5
**lady** 52:12
**Lane** 2:5
**language** 92:13
93:5 94:14
101:7
**lapse** 99:17
**large** 22:3
**larger** 89:23
95:20
**Lasswell** 2:17
3:6 5:7 12:24
18:12 22:17
24:23 26:6,12
31:9,17,23
34:2,14 36:17
36:19 43:24
44:7,11 45:9
46:9 48:3,9
49:22 50:3
52:13 53:5,24
54:7 56:25
59:4 60:5,9,24
61:7 62:17
63:19 64:3,12
64:15 66:10,16

67:10,19,25
68:11,19,24
71:10,16,20
72:13,20 73:4
73:14,23 74:6
74:10,14,19
75:15 77:11
79:13 80:2,19
96:23 105:11
115:10 117:4
119:6,23
120:11,23
122:3,10,15
123:10,19,25
125:3,13,22
126:4,14 127:4
127:10,15,23
128:4,6,25
131:17 135:24
136:2 137:4,16
137:24 138:16
138:18 139:4
139:13,21
140:10 144:4
144:15
**lasted** 19:20
**late** 19:3
**laughing** 55:5
**law** 2:5 4:4 5:5
15:2 31:14
80:24,25
106:16 139:20
**lawsuit** 60:25
61:1,4,6
**lawyer** 60:17
61:6
**layman** 138:3
**lead** 129:5
**leading** 56:15
**leaned** 46:5
130:5
**leaning** 46:11
**learn** 51:11,12
51:13 86:22
**learned** 15:8
16:18 75:6
**leave** 22:25 23:5

29:7 68:16,17
**leaves** 23:7 26:3
  31:6 38:9
  101:15
**leaving** 7:7
  47:13 112:8
**left** 13:2 39:24
  43:11 52:14
  59:18 68:13
  72:1,10,16,18
  72:22 73:2
  74:8 110:24
**legal** 5:14 12:5
  14:10 31:14,21
  53:4 138:25
**legally** 53:1
**let's** 10:18 27:20
  36:21 66:23
  78:12 132:1
**letter** 67:5 96:15
  131:10 137:6
**level** 129:6
**levels** 54:5
**liable** 139:10
**license** 87:15
  106:21,24
  107:2,8
**licensing** 108:3
  115:20
**lied** 71:18 72:1
  73:2 74:8
**life** 40:20 55:3
  64:10 132:13
  132:20
**life-threatening**
  54:25
**lifelong** 70:11
**limit** 39:6 84:3
**line** 97:9,10
  141:4
**lines** 67:14
  106:20
**list** 81:23 104:10
  107:16
**listen** 63:4
**little** 9:12 10:18
  18:8,9 19:17

19:18 20:14
  36:19 59:20
  85:14 92:15
  111:19
**live** 14:19
**LLP** 2:12
**lockdown** 21:22
  129:5
**logically** 51:17
**long** 9:22 13:20
  60:7 87:23
  102:9,21
**look** 23:22 83:23
  84:2,3 92:17
  95:10 96:13
  105:18,18
  106:19 117:17
  125:14 134:6
**looked** 49:19,25
  94:25 101:25
**looking** 65:1,1
  93:2 95:13
  96:1,25 107:15
  137:14 138:21
**looks** 80:23 97:4
  107:5
**loose** 59:3
**lot** 22:10 41:18
  46:6 50:1,7,15
  50:17 52:6
  63:25 64:1
  67:21 114:5,15
  133:20,24
  134:1,2 135:8
**low** 110:16

---

## M

**ma'am** 18:20
**mace** 31:2
**machine** 1:21
**main** 55:20
**maintenance**
  41:11 43:1
  45:19
**making** 35:22
  64:5 125:25
  126:2

**male** 36:23
**manpower** 64:1
**manual** 23:22
  88:21,23 89:2
  89:7,19,23
  90:1 92:13
  94:25 98:20
  120:6 121:5,11
  121:12 126:20
  126:24 127:5
  135:3,6,13
  136:17,21
**Manvel** 2:6
**Manzanita** 2:5
**marijuana** 73:7
  73:12,22,25
**mark** 79:11,18
  83:10,13,13
  89:12 95:4
  105:4
**marked** 79:8
  83:16,18 89:13
  89:15 95:6
  96:13 105:6
  115:11,13
**Martin** 17:20
**mass** 56:20
**master** 111:3,10
**master's** 111:7
  111:14,17
**match** 97:21
**material** 8:24
  9:2 84:1 89:2
  100:15 106:6
  112:15,19,22
  127:2 133:1,2
  133:16,17
  137:25
**materials** 98:15
  99:25 105:19
  105:23
**math** 86:4
**mathematics**
  85:25
**matter** 7:1 57:6
  57:9 61:10
  129:4

**McGarvey** 2:18
  5:8 11:3 18:18
  18:24 19:1
  60:22 61:1
  83:3,6,8 84:5
  90:14,17 92:19
  92:24 93:2
  133:10,14
  135:20 144:5
  144:16
**McLeod** 1:22
  2:19 5:5
**mean** 8:19 18:18
  22:22 24:2,11
  26:16 27:24
  31:18 32:16
  35:2 48:23
  50:7 54:1
  71:24 73:10
  90:14 91:13
  93:19,20 99:16
  101:24 104:24
  110:13 122:11
  123:12 124:2
  126:22 127:25
  132:14
**meaning** 139:11
**means** 6:6
  131:14
**meant** 73:21
**medical** 6:15
  19:5 21:15,16
  21:19 27:1,4
  27:11 35:12
  64:23
**medications**
  6:18
**meeting** 91:17
  129:8
**meetings** 9:1
**Melissa** 2:11
  31:11 144:3,12
**memorize** 135:3
**memory** 99:17
  99:20 119:4
  122:13
**mental** 10:7

**mention** 33:9
  74:13,16
**met** 20:24
**Michael** 17:16
**middle** 80:11
**military** 108:13
  108:16,18
  109:3,13
**minor** 88:3
**minute** 65:9
**minutes** 65:9
  115:9 122:25
  123:13
**mischaracterize**
  85:15
**mischaracteri...**
  136:1 139:15
  140:2
**misdemeanor**
  75:19
**misfire** 43:18
  117:22
**missed** 19:5
  67:22
**missing** 64:18
**mistaken** 119:20
**misunderstood**
  73:11
**moment** 98:8
**moments** 118:19
**money** 63:25
**month** 24:2
**months** 9:24
  10:3 24:1
  131:11
**Moody** 2:13
  71:3,5,7,12
**morning** 76:15
  76:16,21
**mother** 8:3 9:17
  61:14,20 66:1
  66:7 69:18
  70:6,10
**mother's** 66:13
**motion** 130:2,3
**move** 105:4
**moved** 41:13

**movement** 39:7
40:8 43:25
44:4
**moves** 40:9
**moving** 44:6,18
57:4 79:21
81:15 95:3
100:24 112:1
**mpalmer@gre...**
2:12
**multiple** 64:13
110:5

**N**

**N** 2:1
**name** 5:1,14,18
5:19 68:3,6
69:14 76:16
141:2 142:12
**named** 66:5,13
**names** 7:20
**narcotics** 52:18
**national** 17:17
17:25 18:2
**nature** 31:15
**necessarily** 21:4
46:15 55:4
**necessary** 22:21
22:22 62:8
127:11,14,22
**need** 6:24 27:19
33:12,19 34:3
65:2 86:19
95:11 96:10,18
103:2 105:19
111:23
**needed** 38:5
71:25 86:21,21
113:1
**needs** 22:23
32:19 33:7
135:20
**negligent** 120:8
**neither** 144:23
**never** 29:12
33:10 38:6,7
43:25 44:3

49:24 55:3
58:5,10 62:4
64:10 66:23
67:7,8 72:1,24
76:3,3 77:3,9
119:11,13,14
119:19 129:23
**new** 73:10
**night** 69:17,24
**ninety** 116:8
**normal** 28:17
29:5
**Normally** 21:14
**Nos** 83:16
**NOTARY**
142:18
**noted** 142:2
**noticed** 68:2
**notified** 32:21
72:14,15
**notify** 72:12
**notion** 88:6
**number** 23:18
24:20 32:25
75:14 79:19
83:20 89:15
105:7,10,12
110:13,16
114:2
**numbered** 1:19
79:18 105:16
106:20
**numbers** 115:14
**numerous** 42:15
114:1,22
**nurses** 37:12
48:19
**nurses'** 37:12

**O**

**o'clock** 33:2
**oath** 6:4 142:11
**object** 11:6 17:2
21:11 22:18
23:3,16 25:9
25:17 28:16
29:1,18 30:4,8

31:10 34:9,19
35:25 36:12
38:12,17,25
39:12 40:3,11
42:1 44:15
48:2,10 49:7
51:2,21 53:3
53:11,18,25
54:8 55:14
56:3,11,17,24
57:13 58:4
62:13,21 65:18
65:24 69:22
120:12,24
121:18,21
122:4,16
123:11,18
124:1,11,15
125:4,12,20
126:15,21
127:18,24
128:5,17,21
130:8,15 131:6
131:18,24
132:4,25 133:4
134:3,18 135:7
135:16,18
136:13 137:3
137:12,23
138:5,9 139:6
139:14,22
**objecting** 36:14
**objection** 18:12
24:23 26:6
30:14,18 31:9
31:17,23 34:2
34:14 43:24
44:7,11 45:9
46:9 48:3,9
49:22 50:3
52:13 53:5,24
54:7 56:25
59:4 60:5,9
62:17 63:19
64:3,12,15
66:10,16 67:10
67:19,25 68:11

68:19,24 71:10
71:16,20 72:13
72:20 73:4,14
73:23 74:6,10
74:14,19 75:15
119:23 120:11
120:23 122:3
122:10,15
123:10,19,25
125:3,22 126:4
126:14 127:4
127:10,15,23
128:4,25
131:17 135:21
135:23,23
137:4,15,16,24
138:15,16
139:4,13,21
**obtaining** 87:14
111:14
**occasions** 114:1
**occupation** 7:22
7:25
**occurred** 41:10
117:13 119:3
**off-balance**
27:16 37:20
38:2,4
**off-limits** 61:8
**offered** 86:15
134:10
**offhand** 136:5
136:12
**office** 2:5 3:19
3:22 6:8 7:6
13:5,6,14,15
19:15 61:24
62:2 75:6 76:2
76:5,23,25
77:23 78:6
79:5 80:8 82:3
82:7,13 85:7
87:7,24 90:20
91:25 92:2
93:21 94:2,13
94:17 95:15
96:22 98:14,18

99:22 100:5,13
101:5,21
108:24 110:15
110:24 111:13
116:14,20,25
142:14
**officer** 3:16 4:4
8:2,6 17:17
69:10,13,23
78:17,17,23
80:13,14 81:5
81:6,10,19
82:1 83:1
87:15 88:9
93:9 106:21
107:8,12,20
108:3,9,10
111:1,4,10
115:18,20,23
116:3 130:17
143:17 144:7
**officer's** 144:18
**officers** 24:17,17
81:11 102:20
**official** 30:25
74:3
**officially** 35:12
**Oh** 12:18 13:17
14:13 26:11
36:2 60:18
105:12 125:6
133:14 134:15
**okay** 6:1,3 7:5,7
7:10,10,18,22
7:25 8:5,11,17
8:21,24 9:2,4,6
9:8,8,12,22
10:4,7,12,15
10:18,24 11:10
11:18 12:2,12
12:15,23 13:6
13:17,23 14:1
14:6,10,15,17
15:2,5,7,15,19
16:4,9,16,23
17:1,4,6,9,14
17:16,23 18:5

18:8,14 19:1,4
19:16 20:6,17
21:5,20,24
22:2,9,9,14,19
22:25 23:11,11
23:17 24:9,15
24:19,19 25:6
25:20 26:11,14
27:3,6,14,18
27:20,20 28:9
28:23 29:3,13
30:22 31:13
32:12 33:3,10
33:14,21 34:4
34:16,21 35:1
35:4,6,14,17
35:19 36:8,8
36:21 37:1,15
37:17,25 38:3
38:9,19,23
39:2,23 40:5
40:13,23 41:4
41:8,12,21
42:3,6,14 43:5
43:12,19,21
44:13,17,20,20
45:16,21,25
46:7,12,16
47:17 48:15
49:12,19 50:5
50:20 51:4,11
51:15,23,25
52:9,21 54:12
54:22,25 55:8
55:16 56:8
57:2,15 58:16
59:14,17,20
60:3,7,15 61:5
61:12,20,23
62:6,9,9,15,19
63:6,9,17
64:17,25 65:6
65:7,12 66:18
66:21,23 67:12
68:9,16 69:2
69:23 70:21
71:3,13,18

72:2,15 75:17
76:9 78:16,20
79:16 80:4,10
80:23 81:24
82:24 83:6
84:1,9 85:6
86:20 87:6,21
88:20,23 89:11
90:17,22 91:1
91:5,19,24
92:5,22 93:5
93:11,19 95:4
95:25 96:8,17
97:23 98:7,23
99:7,10,15
100:11 104:9
104:12,23
105:12,15
106:1,19
109:18 110:8
111:5 112:4,12
112:14,17
113:5 115:19
116:11 117:17
117:21,24
118:1,7,14,16
118:17,17
119:1,1,6,13
119:21,25
120:14 122:6
122:21 123:23
125:16,24
126:7,18 127:6
128:10,18
129:12 130:4,6
130:21 131:21
132:1,22
133:12,14
134:7,9,11,21
134:24 136:9
136:25 138:2
138:21 139:8
**old** 52:12
**once** 13:6,14,19
14:24,25 19:21
20:7,9 24:9
26:17,21,22,23

27:6 31:19
36:9 39:25
41:16 43:5
46:10 52:14
96:7 113:16
130:14,16
**ones** 121:25
139:20
**Online** 109:19
**open** 37:12 40:2
57:20
**operate** 31:7
**operating** 3:23
94:21
**opportunities**
63:3
**opportunity**
65:23 68:20
**opposed** 119:3
**Options** 3:17
83:4
**oral** 1:12,16
143:18
**order** 102:3
104:2
**orig** 88:17
**original** 144:19
**outcome** 145:2
**outside** 21:8
25:11,13,16,20
25:25 26:4,17
26:21 27:6,23
28:15 38:11,16
109:12 139:10
**overrided** 65:15
**overtime** 32:18
**owner** 69:7

—————————
**P**
—————————
**P** 2:1,1
**P.C** 1:22 2:19
5:5
**p.m** 1:20 140:11
**pack** 105:23
**packet** 106:6
**page** 3:1,12
67:16 80:11

83:24 92:18
96:13,14
105:10 106:19
106:19 108:1,1
116:1 125:13
128:19,24
137:5,22 141:4
**pages** 126:1
**paint** 14:18
**Palmer** 2:11
31:11 144:3,12
**papers** 112:16
**paragraph**
67:17 96:20
97:9
**parents** 61:22
**parents'** 7:20
**parked** 70:22,25
**parking** 46:6
49:8,15 50:1,7
50:15,17 52:6
114:15 117:15
**part** 33:17 81:13
82:10 97:2
104:19 107:22
133:8,11
**particular** 116:2
**parties** 144:8,24
**parts** 89:7
**party** 143:24
**pass** 10:13 67:1
67:6 85:20
86:14 117:2
119:6 132:3
140:9
**pass-over** 28:4,5
28:7,9,24 29:5
34:23 35:2,7
36:5 111:20,20
111:25 112:3,5
112:7,10
**passage** 116:9
**passed** 10:5
66:23 67:2,8
86:18 87:19
106:7 112:15
115:22

**passing** 42:15
86:12 115:18
131:4
**Patricia** 7:21
**pause** 36:14
**PD** 109:19
**peace** 3:16 24:17
24:17 78:17,22
80:13,14 81:5
81:6,10,11,19
82:1 83:1
87:15 106:21
107:8,12,20
108:3,9 111:1
111:4,10
115:18,19,23
116:12 130:17
**peak** 20:19,20
**penal** 81:21
**people** 30:6 49:3
50:7 54:6
56:21,22 57:10
65:22
**percent** 116:9
**percentages**
116:2
**Perfect** 99:7
**perfectly** 100:12
**performance**
116:12
**period** 24:1
107:17 128:14
**periodic** 104:1
**periodically**
100:21 128:11
**permit** 76:25
**permitted** 77:25
**permitting**
77:15
**persistent** 77:22
**person** 11:25
21:20 28:24
48:6 50:24
57:6,9 62:19
69:20 142:12
**personal** 23:1
**personally**

142:11
personnel 97:11
pertaining 15:12
peruse 84:3
Philando 17:23
Phone 2:6,14,21
80:18
phrase 90:18
phrased 101:15
physical 10:12
10:15 11:17,18
20:6,12,15,19
20:20,24
physically 21:3
49:20 58:25
pick 70:6
picked 70:12
picture 59:14
pillars 46:10,14
pipe 19:5
place 26:18 35:7
35:19 99:12
109:17
placed 56:4
Plaintiff 1:4,17
2:3 143:4
144:10,19
Plaza 2:13
please 5:17
16:15,21 29:15
36:16 38:13
43:14 66:11
114:11 139:16
point 20:21 22:6
26:25 29:14,17
38:4 39:10
40:6,18,21,24
41:6 43:9,21
44:10 45:14,25
47:3,7,10
48:13 50:9
51:6,8 55:5,17
57:7,11 58:15
58:22 64:16
88:1 93:20
98:1 118:16
119:15 123:22

124:7,10 130:1
131:22,25
136:12
pointed 137:7
pointing 92:19
125:5
points 37:7
108:2 109:9
110:12
police 7:19 8:2,3
12:8,19 13:3
15:18 17:24
18:3 51:14,15
51:16,24 68:10
69:18 70:11
72:3,11 75:8
78:17 82:3
87:5 133:3
policies 76:22
90:15,19 91:6
91:10,15 100:7
101:4,20 102:2
102:10 103:4
103:12,14,18
123:9 126:9,13
policy 7:9 19:14
21:23,25 22:14
23:18 24:24,25
25:15 30:25
31:3 32:6
37:17 51:6
62:15,16 75:10
76:24 89:9,19
90:1,7,10 92:2
92:7,12 93:5,6
93:12 94:6,14
96:9 97:11,18
98:15 100:4
102:13,22
120:6,20,21
121:5,11,12
122:1,8,24,25
123:6,7,8,14
123:16 124:9
124:17,18,20
124:25,25
125:2 126:1,20

126:24 128:18
128:24 129:14
129:16,20
130:7 135:3,6
135:13 136:5,6
136:12,17,21
136:25 137:2
137:22 139:11
139:20
Poor 65:15 66:2
71:13 74:3
86:13 133:20
134:15
Poor's 87:17
portion 10:2
116:9 125:14
pose 21:15
posed 19:9
62:18
poses 17:3
position 78:21
88:17 94:6
139:15 140:3
possession
112:19
Possible 40:12
possibly 56:18
65:9
potential 17:5
50:25 51:9
potentially
49:10,13,14
50:14,16 52:6
52:10 99:20
Powel 1:22 2:19
5:5
practice 77:6,22
premise 81:25
preparation 9:1
prepare 8:24
prepared 6:12
preparing
144:19
prescription
73:21
present 5:7,8
pretrial 52:22

53:1,9,14,17
53:23 54:4,10
77:16 139:1
pretty 11:8,20
58:19,24
110:17 113:6
prevalent
133:24
prevent 6:14
50:21 64:22
97:12 126:5
preventing
96:11
prior 28:10 88:4
111:12
priority 38:23
prisoner 25:20
25:21 26:17
27:23 28:1,3
48:7
prisoner's 27:21
39:6 40:8
probably 33:12
76:7 113:9
123:22
problem 86:16
86:17 98:11
134:16
procedure 1:24
3:23 24:19
27:21 28:23
35:19,21 75:11
120:21,21
123:3,6
procedures 21:9
21:13 22:14
23:18,21 25:25
26:20 84:23
91:2 94:19,22
94:22 95:14
101:21 102:1
122:24
proceeding
31:12 144:25
process 79:6
98:4 102:1
104:7,19

111:20,25
112:5,7,10
113:11,22
processes 94:22
95:15 97:24
produced 1:17
proficiency
86:22
program 86:4
proper 34:17,22
64:18 121:16
132:2
properly 31:21
33:7 116:20,24
120:2
prosecuted 71:1
protect 16:22,23
52:1 54:10
75:2 93:8
126:5 127:16
127:17,21
protection 129:7
protocol 22:7
proved 142:11
provide 34:17
79:4
provided 67:16
79:10 80:7
98:14,18
121:25
provision 95:21
provisions 1:24
public 126:22,23
17:3,5 38:24
48:13 49:2,8
50:10,11,12,15
50:18 51:9
52:2,5,15,19
54:10 55:9,12
56:4,5 57:23
57:25 58:3,5,6
58:8,9,10,13
62:14,18 63:15
75:2 82:2
124:23 126:6
127:16,17,22
142:18

**pull** 31:3 55:16
55:19 136:17
136:20
**pulled** 39:13,14
**punch** 42:7,7
**punching** 40:14
**purpose** 72:1
**purposely** 68:15
68:17 72:1
**purposes** 142:13
**pursuant** 1:23
144:6
**push** 39:22 40:1
47:10
**push-ups** 10:16
**pushed** 39:3,10
39:15 40:6,13
41:1 46:20
**pushing** 47:14
**put** 24:12 26:23
56:13 58:5,10
72:8,25 99:12
**puts** 43:22
**putting** 57:19
58:3

**Q**

**qualification**
104:5
**qualifications**
104:3
**qualify** 104:6
**question** 12:25
16:9 22:2,9
23:6 25:3
28:20 29:9
30:2 32:13
39:23 43:14
53:7 54:1 57:8
66:11 73:12,15
77:20 88:25
90:6,24 92:5
95:12 96:19
97:16 100:11
101:14,17,20
103:10 104:25
113:20 122:7

124:19 125:16
129:12 135:23
136:4 138:12
139:16
**questioned**
122:12 124:12
126:7
**questions** 6:12
6:21 63:11
67:22 71:23
73:19 76:8
86:1 105:20
116:17 118:8
118:12 130:21
140:8
**quick** 76:9
**quickly** 58:19

**R**

**R** 2:1,10,17 5:9
144:2,4,12,15
**racial** 64:8,10
**raise** 118:5
**raised** 119:11
**ramp** 43:10 44:2
55:6 117:14
119:11,14
129:24
**ran** 42:14 45:1
48:18 55:12
63:2 119:13
**range** 104:8
**Rangers** 64:1
**rank** 8:8
**rate** 116:9
**reach** 40:17
**read** 8:14,21
96:9,17 100:17
126:25 127:1
135:9 137:7
142:1
**reading** 34:11
63:24 67:23,24
96:5 124:3
**ready** 62:8 84:7
**really** 65:2
**reason** 7:7 35:15

51:17 63:7
64:22 93:11
121:15 141:4
**reasonable** 23:9
**reasonably** 93:9
**recall** 14:9 15:14
15:15 16:2,3,7
16:9 17:8
36:22 53:15
67:20 73:8,9
78:14 85:19,25
86:10,11 91:8
95:19,20,25
113:17 118:11
122:19 132:10
132:11,12
**recapture** 97:12
**receive** 9:16
10:21 12:5
28:20 29:9
70:14 105:1
111:5,16
131:10
**received** 12:3
29:5 70:16,17
72:24 82:18
84:16 85:3,8
86:9 87:1,4,10
96:7 98:21
99:6,18 103:16
104:23 107:5
107:17 109:15
111:12,14
113:3
**receiving** 99:3
99:10
**Recess** 76:12
98:12
**recite** 135:6,10
135:14,19
136:8
**recognize** 95:7
**recollect** 84:19
**recollection**
89:18 91:5,22
96:5
**record** 1:25 5:16

7:23 18:10
19:3,7,12,16
98:10 105:8
106:1,15 110:7
116:11 125:7,9
143:18 144:9
**records** 4:1
105:25
**refer** 90:8 97:25
110:6 126:1
**reference** 97:8
97:15,17 124:6
124:9 127:2
**referral** 9:16
**referred** 130:23
**referring** 108:4
122:24 124:20
125:8
**refers** 109:10
123:7 124:21
**reflect** 115:17
**reflection** 99:19
99:19 119:3
**reflects** 115:22
**refresh** 84:15
**refreshed**
128:11,15
**refresher** 91:9
91:12
**refreshing** 91:12
**refreshment**
100:23
**regardless** 44:3
54:9,10
**Registration**
145:9
**relate** 97:17
125:10
**related** 8:14
77:23 81:11
84:17 86:1
90:20 95:14,21
103:22 104:24
105:2 106:16
110:25 116:12
144:24
**relation** 99:18

**relatively** 91:19
94:13
**relieve** 32:15,16
**relieved** 32:19
**remain** 104:2
**remarks** 64:6
**remember** 14:8
14:9,15 15:3,6
15:8,21,24
17:14 59:21
71:11 73:13
81:19 85:16
94:21 95:2
99:3,10 101:14
101:17 103:10
111:21 113:18
122:7,14
128:14 135:3
136:5
**remembered**
85:1
**rendering** 54:20
**repeat** 6:22
16:15 23:4
38:13 43:14
54:1 57:8
66:11 73:15
139:16
**repetitive** 128:7
**rephrase** 6:22
30:9 121:23
**report** 8:16,17
18:21 19:8
27:25 34:11
62:7,8 71:6
**reported** 1:21
**reporter** 5:1,2
30:17,21,23
36:13,18 79:17
83:12,17 89:12
89:15 98:10
105:9 115:13
143:13
**Reporter's** 3:9
143:10
**Reporters** 5:2
143:23 145:9

**reports** 8:14,18
**represent** 76:17
  100:4
**representation**
  85:2 99:22
  106:12
**represented**
  5:24 93:13
**reprimand**
  102:16
**reprimanded**
  18:19 64:5,17
  78:10
**request** 114:23
**requested**
  144:22
**requests** 114:17
**require** 27:14
**required** 21:20
  24:20 25:12
  26:24 27:7,11
  33:17
**requirement**
  10:12,15 16:17
  20:24 131:4
**requirements**
  10:7 20:12
  102:3
**responded**
  122:13
**responsible**
  29:24 100:14
**restrained** 33:8
**restraints** 21:18
  27:4 38:8
**restrict** 40:7
**restroom** 37:9
  38:1 39:25
  113:16
**resubmit** 71:22
**result** 94:1,2
**retain** 60:17
  61:5,5,9
**retained** 61:12
**retake** 67:7
  134:10
**retest** 131:20

**retired** 7:24 8:1
**return** 143:22
**review** 84:10
  89:1 136:17
  144:21
**reviewing** 95:25
**revised** 99:1
**revoked** 34:8
**Reynard** 1:3 2:3
  143:3 144:11
**Rice** 2:4,5 3:4,7
  5:13 11:5,10
  13:1 17:4
  18:14,20,21,25
  19:4 21:12
  22:19 23:5,17
  24:25 25:10,19
  26:11,14,15
  28:19 29:3,21
  30:6,9,22,24
  30:25 31:13,19
  31:25 34:4,5
  34:11,16,21
  36:2,21 38:14
  38:19 39:2,14
  40:5,13 42:3
  44:1,9,13,17
  45:11 46:12
  48:6,12 49:12
  49:24 50:5
  51:4,23 52:16
  53:7,12,21
  54:2,12 55:16
  56:4,12,19
  57:2,15 58:7
  59:6 60:7,11
  61:2,4,9 62:15
  62:19,23 63:22
  64:5,13,17
  65:21 66:1,12
  66:18 67:12,21
  68:2,13,22
  69:2,23 71:11
  71:18,22 72:15
  72:22 73:6,16
  73:25 74:8,12
  74:16,20 75:17

76:7,11 79:15
85:14 92:5
111:19 118:8
118:16 119:9
119:25 120:14
121:1,20,23
122:6,12,18
123:13,21
124:3,12,16
125:6,9,16,24
126:7,18,23
127:6,12,17,20
128:1,10,18,23
129:12 130:11
130:19 131:2,3
131:9,21 132:1
132:6 133:2,6
133:9,11,13,17
134:7,21
135:12 136:4
136:16 137:5
137:13,18
138:2,7,12,21
139:8,17 140:1
140:5,8 144:1
144:10
**ricochet** 59:9
**right** 20:16
37:25 41:11
47:25 50:1,23
57:6,10 62:12
62:20 63:11
76:11,18 78:12
78:23 80:10,11
80:12,24 81:5
81:7,11,14,22
82:4,10 83:1
84:13 85:8,8
85:20 87:11,17
88:14 90:4,10
90:24 91:8,24
92:3,7 93:3,14
93:19,22,24
94:9,16,19,25
95:7,17,23
99:13 100:5,17
101:5,8,10

102:1,12,14
103:7,14,16,23
104:18 105:16
106:10,24
107:8,24 108:6
108:7,10,14,18
110:11 111:19
116:3,6,14
137:9 139:17
**ringing** 80:18
**Rochelle** 1:20
5:1 143:13
145:8
**room** 25:22
27:10,10 28:21
32:25 36:24
39:25 41:4,9
41:16 42:15
43:5 45:19
48:16 49:2
**Rose** 66:5,6,13
**Rosenberg** 1:23
2:20
**rounds** 19:5
64:18,23 65:8
65:10 104:10
**routinely** 30:6
**Rules** 1:24
**run** 42:20 45:17
46:1 69:3
**rundown** 28:2
**running** 10:16
28:14 33:11
43:22 44:1,13
45:20 49:1
117:14 118:3
118:10 129:24
130:2
**Russo** 2:10 3:5
5:9 11:6 17:2
21:11 23:3,16
25:9,17 28:16
29:1,18 30:4,8
30:14,20 31:10
34:9,19 35:25
36:12 38:12,17
38:25 39:12

40:3,11 42:1
44:15 48:2,10
49:7 51:2,21
53:3,11,18,25
54:8 55:14
56:3,11,17,24
57:13 58:4
62:13,21 65:18
65:24 69:22
76:9,14,16
77:13,19,21
79:10,14,16,17
80:4,20 83:4,7
83:10,15,17
84:7 88:24
89:1,14 90:16
90:18 92:22
93:3 94:11,12
95:4,7,8,10
96:3,4,24
97:16,17 98:9
98:11,13
104:25 105:1,4
105:7,15 112:6
112:7 115:9,12
117:2 120:12
120:24 121:18
121:21 122:4
122:16 123:11
123:18 124:1
124:11,15
125:4,7,12,20
125:23 126:15
126:21 127:18
127:24 128:5
128:17,21
130:8,15 131:6
131:18,24
132:4,25 133:4
133:7,12,15
134:3,18,20
135:7,16,18,22
135:25 136:3
136:13 137:3
137:12,15,23
138:5,9,15,17
138:19 139:6

139:14,22,24
140:2,9 144:2
144:12

**S**

**S** 2:1
**S-T-E-V-E-N**
5:20
**safe** 129:11
**safety** 11:20,21
37:21 38:8,24
55:9 57:23
58:3
**saw** 77:3,9
**saying** 26:7,16
28:25 29:2,4
30:18 40:8
44:20 48:8,12
49:12 50:17
51:18 52:12
59:11 62:7
118:17 119:10
119:22 126:10
131:10 139:9
139:19
**says** 27:25 51:7
97:10 98:25
106:24 108:6
109:9
**scare** 44:14
**scenario** 14:19
**scenarios** 56:19
**scene** 69:5
**school** 7:11,13
7:14,15 86:3
87:8
**scope** 139:10
**scrape** 54:13,18
**seal** 142:14
**second** 36:14
41:24 48:22
79:17 84:5
92:18 96:14
97:10 116:1
**secretary** 8:3
**section** 67:13
83:18 95:17

96:23,24 97:4
137:7
**sections** 89:25
**secure** 41:17
**security** 3:23
95:21
**see** 27:20 49:25
50:6 66:23
75:13 79:19
80:14 82:24
83:21,24 84:5
86:2,21 97:12
106:20,21,25
107:3,9,13
123:21,21
132:1
**seen** 49:8,18
59:14 99:25
105:21 119:21
121:11
**seg** 21:22
**segregation**
21:23
**Self-defense**
11:22
**semesters** 7:16
**send** 82:22
**sent** 67:5
**sentences** 67:17
**separate** 94:24
**sergeant** 29:20
29:23 32:17
34:17 69:13,16
**serious** 93:10
**service** 14:23
102:24 108:13
111:2
**setting** 14:5
**seven** 52:11
**shackle** 119:16
**shackled** 22:8
25:12 26:24
27:8,12,15
38:21 40:23
41:4
**shackles** 21:18
21:21 27:2

38:6,7 58:16
58:22 59:2,15
59:18
**shake** 41:22
**share** 87:17
**sheet** 28:17
29:12,14,16,24
30:3 32:23
34:18,18 35:8
35:9,16,16,22
35:24 36:9,10
**sheriff** 9:12,14
9:22 10:8,13
13:7,10,11
16:18 17:9
19:18,21 20:1
20:7,9,9,25
21:2 22:15
23:1,7,13
31:20 32:3
34:21 38:9,14
51:12 52:25
53:8 60:11
62:15 65:12,15
65:16 66:3,8
66:13 67:6,8,9
67:13,15,22
71:14,19,23,24
72:3,12 73:11
73:17 74:21
76:17 85:23
86:13 127:8
132:16,19
134:15,21
135:5,13
**sheriff's** 3:19,22
7:6 13:5,6,14
13:15 19:15
51:20 53:12
74:4 75:6
76:22,23,24
77:14,23 78:6
78:13,21 79:4
80:7 82:2,6,13
85:7,16,24
87:7,24 88:3,8
88:15 90:19

91:25 92:1
93:21 94:2,13
94:17 95:15
96:22 98:14,18
99:21 100:5,13
101:5,21
107:23 108:24
110:15,24
111:13,25
116:14,20,24
126:19 130:7
130:11 131:5
131:12,15,23
139:18
**shield** 42:21
**shift** 91:16,16
112:3 129:8
**shifts** 112:2
**shirt** 38:5
**shoot** 48:15,18
48:21,24 49:1
50:23 55:11
103:9
**shooting** 15:22
15:25 16:14
17:18,24 18:3
34:1 56:21
63:13 75:25
76:4 104:8
121:15,24
**shorthand** 1:22
143:13
**shot** 32:7 43:12
43:15,15,21
44:2 46:21,25
47:5,18 48:7
49:5,21 50:1
50:20 52:4
54:20 55:25
56:8,22 59:2
93:13
**shoulders** 41:14
**show** 30:7,10
79:8 89:11
**showed** 33:15
34:7
**shown** 137:5

**side** 57:4,4 80:12
**sight** 49:20
**signature** 3:8
141:1 142:1
143:22
**significant**
110:16
**similar** 130:17
**simplify** 125:11
**simulation**
14:17
**simultaneously**
72:5,6
**single** 12:21
**single-sided**
105:1
**sir** 6:2,5,7,11,13
6:17,20,23 7:2
7:4 9:21 10:14
12:9 13:4 18:1
28:19 30:17,23
36:13,15 62:25
65:4 76:19
98:10 109:1
134:13
**sit** 77:5 78:4
90:11 96:5
99:24 111:24
119:1
**sit-ups** 10:16
**sitting** 93:20
99:16 100:3
116:23
**situated** 117:10
**situation** 21:14
25:18,19 27:13
27:14 38:18
51:3 52:8 92:7
120:9 122:1
124:9 125:18
138:22
**situations** 84:13
92:3
**six** 60:3,12 62:7
131:10
**Slow** 12:24
**slur** 64:8,10

**smoked** 73:12
**smoking** 73:6
**someplace** 26:13
**soon** 113:6
**sorry** 30:23
  80:19 95:8
  98:1,16 125:6
  133:15 136:3
**sort** 77:21 84:3
  84:15,22 86:2
  86:21 89:8
  94:24 96:10
  130:23
**source** 117:9
**SOUTHERN**
  1:1 143:1
**speak** 61:14,17
  61:20,23 62:1
  77:11,11
**speaking** 36:23
  107:16
**special** 25:21
**specific** 88:25
  91:6 92:13
  94:19 96:4
  99:11 103:8,23
  106:7 124:19
  124:24
**specifically** 90:3
  95:22 97:4
  109:5,12
  115:19 116:5
  125:17 128:16
**specifics** 15:6
  16:7 122:17,19
**specify** 69:1
**speculating**
  29:19
**speculation**
  125:21 131:7
  131:19 134:20
  135:25 136:14
**spell** 5:16
**spelling** 67:23
  68:2
**spend** 11:10
**spent** 11:1,14

12:11,13,22
  19:24 87:13
  108:18
**spoke** 33:10
  71:13
**staff** 57:16,19
  113:4
**stages** 9:25
**stand** 25:22
**standard** 3:22
  95:14
**Standards** 4:5
**start** 9:23 10:20
  32:13 108:5
**started** 30:17
  47:10 91:25
  113:22 118:11
  118:17
**startled** 43:12
  43:17
**starts** 97:10
**state** 1:21 7:22
  49:19 130:17
  133:19 142:7
  142:18 143:14
**stated** 1:25
  23:11 28:8
  32:23 37:1,4
  39:2 43:6 45:1
  45:3,16 46:16
  46:20 50:20
  55:8 58:10
  69:23 73:20
  86:16 120:1
  122:6,8 126:9
  127:6 132:2
**statement** 9:5
  49:24 59:22
  60:8,12 62:4
**statements**
  19:13 60:15
**STATES** 1:1
  143:1
**stating** 73:11
**station** 37:12
**status** 21:22
  54:9

**statutes** 31:15
**stay** 25:24 46:17
  47:4 63:3
  114:19
**Steadham** 32:16
  33:5,7,10 36:1
  36:3,9 112:15
  112:20 113:15
**stepping** 107:15
**Steven** 1:12,16
  2:16 3:3 5:6,10
  5:15 141:2
  142:1,5,11
  143:10,16
  144:16
**stole** 49:13
**stop** 44:18 50:24
  50:25 51:1
  57:21 58:21
  63:3,8 113:24
  114:11,11,17
  118:2
**stopped** 22:24
  43:25 44:1,3
  69:10,16
  118:10 129:24
**stops** 43:22
**story** 34:12
**straight** 42:24
  83:14
**street** 52:12
**strike** 77:19
  88:24 94:11
  96:3 97:16
  104:25 112:6
  131:2
**strong** 20:21
  21:3
**stronger** 41:18
**strongest** 20:22
  20:23
**study** 126:25
  132:24 133:1,2
  133:16,17
**studying** 127:1
  132:2
**stuff** 10:9 71:25

**stumbled** 39:3
  40:14
**stumbling**
  119:17
**subject** 75:21
  87:25
**submit** 73:9,17
**submitted**
  143:20
**subscribed**
  142:13
**suffering** 6:18
**sufficient** 87:13
  110:21
**Suite** 5:3 145:10
**superiors** 91:15
**supposed** 15:12
**sure** 14:7 17:12
  35:22 36:15
  37:16 38:5,22
  59:6,7 65:6
  68:5,7 71:7
  129:10
**surprise** 60:4
  66:5,12
**surprised** 66:17
  66:19
**surrender** 44:21
  44:23 45:7,8
  47:3,7,15,25
  56:21 57:7,11
  62:20,22,24
  63:10 118:18
**surrendered**
  47:23
**surveillance**
  117:10
**suspect** 32:1
  103:10
**suspects** 103:19
  105:2
**sustain** 54:22
**sustained** 54:12
**sworn** 1:18 5:11
  6:6 143:17
**system** 34:22
  35:7

**T**

**T** 75:11 120:6
**table** 68:4,6
**take** 6:24,25
  20:1 24:2 27:4
  35:13 36:19
  38:7 42:18
  45:3 58:21
  76:9 86:15
  88:7 115:9
  117:17 131:11
  132:16,19
**taken** 1:18 6:1
  17:12 18:23
  30:11 49:10
  57:7,11 70:4,9
  80:5 113:16
  144:7 145:1
**takes** 26:18
**talk** 10:18 20:14
  21:7 76:20
  78:12 91:18
  129:9
**talked** 15:16
  75:16 135:4
**talking** 11:3
  26:8,9 60:18
  60:22,24 133:5
  133:5,7
**taser** 103:2
**tasers** 31:2
**taught** 10:9,25
  11:2,19 15:2
  25:21 51:15,16
  51:20,24 52:25
  53:8 81:10
  84:19 85:1,10
  100:1 127:9,13
  128:2,9
**Taylor** 18:2
**TCLEOSE**
  130:10 133:10
**TCOLE** 10:5
  115:18,23
  116:12
**teach** 24:3,6

**teaches** 24:10
**teaching** 85:3
**technique** 11:24
**techniques**
   11:17,19,20,22
**tell** 6:6,25 7:10
   16:10,12 19:24
   33:25 53:13
   85:22 100:14
   101:19 104:4
   105:9 112:24
   113:15 125:7
   127:9 137:13
**telling** 78:25
**tells** 23:22 31:3
**temporary**
   106:24
**Ten** 135:1,2
**Tennessee** 15:16
   17:10
**tenure** 77:9
**term** 17:6
**terminated** 94:3
**termination**
   102:18
**terminology**
   138:1,25
**terms** 76:21
   100:15 103:12
   109:5 110:14
   110:20 138:3
**test** 65:22 85:20
   85:22 86:4
   87:18 88:7
   104:13 130:16
   130:17,19,21
   130:22,23
   131:1,4,9,11
   131:15,22
   132:3,9 133:13
   133:20 134:6
   134:16
**tested** 14:25
   130:6
**testified** 5:11
**testimony** 78:5
   85:20 103:13

111:24 129:23
136:1 143:18
144:7
**tests** 130:18
**Texas** 1:1,21,23
   2:6,13,20 4:4
   5:4 63:25
   109:19 110:3,6
   130:17 143:1
   143:14 145:8
   145:10
**textbook** 11:16
**Thank** 30:21
   36:18 99:7
   135:22
**thing** 16:13 78:8
   127:12
**things** 10:10
   12:7 31:4,15
   68:13,16,17
   72:10,16,18
   74:9 76:21
   81:18 86:22
   103:25 120:1
**think** 21:3 34:2
   34:3 59:12,13
   65:21 66:1
   67:14 76:7,15
   79:3 82:17,23
   82:23 85:2,15
   85:19 88:7
   92:6 93:6
   94:17 96:14
   99:20 101:13
   101:19 103:7
   106:13 107:9
   110:20 111:16
   112:9 114:6
   116:8 117:5,9
   135:8 136:11
   136:19 138:24
   138:25 139:8
   140:1
**thinking** 26:12
   26:13
**third** 97:9
**thought** 26:9

45:25 71:8
73:21 113:5,9
**threat** 16:22,24
   17:1 21:16,25
   22:6,12,23
   48:13 50:18,25
   51:9 52:1,4,9
   52:10,15,19
   58:14 62:14,18
   93:10,14
   124:23
**three** 9:24 10:3
   10:6 11:8,10
   13:21,23 14:2
   19:21 23:12
   24:1,2,2 25:24
   106:20
**time** 6:24 11:14
   12:11,13,14,22
   15:20,21,25
   20:2,18 21:24
   31:12 32:14,15
   37:10 39:22
   40:6 44:10
   45:25 48:14,16
   48:22 49:18
   58:15,21,25
   64:16,19 65:3
   65:11,20 71:14
   74:3 76:23
   78:16,20 80:8
   86:14,25 87:6
   87:13,18,23,25
   88:21 89:4,4
   91:9,12,24
   93:13 94:9
   96:1 99:4,21
   100:21 101:2
   101:10 106:4
   106:17 107:17
   108:13,18
   109:2 111:2,13
   112:17 114:15
   116:13,18
   117:21 118:1
   129:8 132:5,6
   132:8,9,24

134:6 136:17
136:20 138:6,7
138:13 143:24
144:7
**times** 18:13,14
   18:15 38:4
   75:13,16,16
   113:23 114:10
   114:22 128:15
   134:5
**tired** 49:21 56:9
**titled** 90:3
**today** 5:24 6:12
   6:15 8:12,25
   16:10,16,19
   17:14 77:5
   78:4 85:1
   90:12 96:6
   99:16 100:3
   111:24 116:23
   116:24 117:19
   119:1 128:23
   129:17,19
**Today's** 5:4
**told** 60:3 92:9
   94:17 102:7
   121:2 133:19
   133:21,23
**tolerated** 128:9
**top** 41:19 42:6
   98:25 106:23
**topics** 84:10
**total** 23:12
   108:5,6 109:9
**totally** 86:15
   125:18
**touch** 18:9
**touched** 51:22
   81:19
**Traffic** 81:21
**trailing** 119:15
**train** 11:24
   14:22 31:25
**trained** 31:13
   82:3 91:1,6
   103:9,21
   107:20 108:20

116:2,20,20,24
120:2,9 121:10
139:20 140:6
**training** 4:1
   9:13 10:6,8,19
   10:19,21 11:11
   11:15 12:3,4
   13:7,10,11,12
   13:13,24 14:1
   14:10 15:25
   16:10 17:10
   19:18,25 20:6
   23:10,11,25
   32:9 75:5,11
   76:21 78:17,23
   80:24,25 81:10
   81:13,20 82:8
   82:18 84:16
   85:3 89:4
   94:18 99:18,21
   103:16,23
   104:20,23
   105:1,25 106:2
   106:16 107:22
   107:22 108:10
   108:23 109:25
   110:6,22,25
   111:12 115:23
   116:13 120:5
   120:10,15,19
   121:3,13,17
   122:1,8,13,14
   127:13 139:12
**transcript** 3:14
   79:3,5 80:3,10
   82:7,21 85:8
   86:23 143:17
   143:20 144:20
   144:21
**transfer** 21:6
   25:10
**transferring**
   21:7
**transpired**
   138:23
**transport** 23:18
   24:20 26:4,13

33:1 37:17
**transportation**
24:3 26:16
**transported**
22:3,11 26:23
27:10 28:1,22
32:22 35:21
**transporting**
21:9,15 22:8
23:21,25 24:4
24:6,10,25
25:11,15,25
26:8 123:8,17
124:25
**traveling** 26:13
**Trayvon** 17:20
**treat** 52:23,23
**tried** 41:1,12
42:11 58:17
76:3
**Trochesset** 2:9
5:9 76:17
144:14
**trouble** 18:10,17
18:23
**troubles** 67:24
**true** 87:15 96:8
100:9 101:11
102:10,18,24
108:16 109:13
112:22 113:11
114:20 115:20
115:24 142:2
143:18
**truth** 6:6 102:20
**try** 42:18,20
66:9
**trying** 35:10
41:15 45:2
62:10
**turn** 62:8 108:1
**turned** 41:16
77:12
**turns** 36:10
**two** 24:21 25:6
25:16,24 39:3
40:2 46:10

67:17 125:10
125:19 126:2,8
126:13
**two-man** 21:23
21:25 24:24,25
**two-sided** 83:3,7
83:8
**type** 86:3 111:1
**types** 103:1,25
127:25

———————
**U**
**Uh-huh** 29:8
43:2 84:6,8
124:5 137:8,11
**ultimately** 19:9
88:14
**unable** 88:8
**uncuffed** 37:23
37:25
**undergo** 13:7
**understand** 6:3
6:10,21 44:5
76:18 94:5
122:23 123:12
135:13,17
136:7
**understanding**
62:11,16 82:6
84:22 126:17
**understood**
101:7 124:13
126:9
**unhandcuffed**
37:10,19 56:6
**unharmed** 56:22
57:7
**uniform** 33:18
**UNITED** 1:1
143:1
**unlawful** 121:24
**unpredictable**
52:7,19
**unusual** 30:10
**unwritten** 90:19
100:7
**upper** 41:17

**usage** 104:19
**use** 3:20 8:24
10:19,22,25
11:11,15 12:6
15:12,24 16:10
16:11,13 19:25
19:25 22:15,20
23:1,8 31:1,4
31:14,16,21
37:22,23,23
42:20 51:16,17
52:1 53:22
62:12,16 81:13
84:10,17,23
89:8 90:3,7,11
90:20,22 91:1
91:2,15 92:2
92:13 93:3,8
94:14 97:11
101:22 102:3,9
102:12,21
103:2 104:2,21
108:20 116:5
125:2,15,18
126:1,2,8,13
126:24 127:3
127:11,13,21
128:11,18,19
128:24 129:9
129:13,20
130:7 137:1
**UTMB** 115:2
117:10

———————
**V**
**v** 1:5 15:16
17:10 143:5
**vague** 17:2
21:11 137:3
**vaguely** 128:19
**van** 26:23 33:1
**various** 84:13
114:9
**vehicle** 46:5 49:9
49:11,14 52:7
69:5,7
**vehicles** 49:10

**verbatim** 122:20
135:4,6,10
136:8 138:1,1
**version** 33:25
99:3
**vicinity** 93:16
**video** 118:14,18
119:21,24
**videos** 8:11 9:7
117:6,12,21,24
119:2,12
**view** 87:17
**violate** 92:12
93:6,12 94:6
**violated** 92:6
**violation** 7:9
19:14,14
**voice** 118:22

———————
**W**
**wait** 95:11
131:10
**walk** 21:18,19
37:22 43:23
44:2
**walking** 25:23
26:19 27:19
37:12 44:3,5,6
55:6 118:11
119:14
**wall** 46:4,8
**want** 18:8 19:17
21:5,7 26:4
27:16 32:12
38:21 77:19
83:13 84:2,2
85:15 93:20
96:13 102:8
**wanted** 32:18
76:20 80:13
82:7,24 92:11
**warrant** 30:11
**wasn't** 29:14,17
35:11 45:8
51:20 52:25
58:7 59:8
63:20 65:22

66:22 70:4,9
75:24 121:15
138:12
**waste** 65:3
**watch** 8:21
33:12 117:24
118:18
**watched** 8:11
**watching** 33:4
**way** 25:21 39:21
58:5,11 60:4
90:18 98:17
113:10 119:13
129:4 131:3
**we'll** 6:25
**we're** 6:8 8:12
21:6 76:15
128:6 136:10
**weak** 20:21
**weapon** 14:23
22:20 42:9
43:6 55:17,19
102:3,9,24
104:6,15
**weapons** 22:15
101:17,22
102:12,21
103:1
**week** 11:9,11
23:12 24:2
**weeks** 10:6
13:22,23 14:2
19:21
**well-settled**
77:22
**went** 9:25 13:15
14:12 20:4
35:12 38:1
108:17
**weren't** 50:7
65:8
**Weslayan** 5:3
145:10
**widespread** 77:6
**windows** 65:1
**wise** 12:5 86:22
**witness** 1:17

61:3 84:6
92:25 98:8
105:14 117:2
119:7 141:2
143:16,19,21
143:22
**witnesses'** 8:22
**wondering**
86:11 110:14
**work** 7:5 20:15
30:15,16,16
32:14 78:13
79:12,14 85:7
107:19 122:24
123:9 124:22
**worked** 69:19,19
134:24
**working** 9:10
107:23
**works** 123:4
126:20
**Worldwide** 5:2
143:23 145:9
**worried** 57:22
**wouldn't** 35:13
40:1 41:22
66:17,18 136:9
136:11,16
**wrist** 39:20
**wristband** 19:9
63:24
**write** 67:17 68:3
68:6
**writing** 67:23,24
**written** 19:2,6
19:12 67:12
90:11 112:15
**wrong** 32:4
101:20 120:22
128:8
**wrote** 18:21
67:17 71:7
75:14

---
**X**
---

---
**Y**
---

**y'all** 9:2 11:1,14
13:24 14:2,17
14:22 20:6
41:8 45:23
79:14 81:10
85:23 91:8
113:7
**yeah** 8:19 11:5
22:17 36:4,17
36:19 60:21
61:3 73:24
79:13 81:24
82:12,20 83:4
83:12,15,23
84:1 90:16
92:16,22 96:24
97:8,20 98:9
98:11 99:7
105:12 107:5
108:5 110:11
114:8 115:10
115:22 119:20
123:19 125:6
133:11 134:4
136:2 138:18
**year** 12:10,15,20
12:21 14:24,25
66:7 78:14
87:14
**years** 8:5 17:13
88:1,2 134:24
135:1,2,2
**yelling** 118:22
**you-all** 39:25

---
**Z**
---

---
**0**
---

**00:00** 144:3,5
**00:02** 144:4
**000091** 3:14
**000092** 4:5
**000093** 4:6
**000248** 4:2
**000317** 4:2
**000528** 3:20
**000531** 3:20

**000774** 3:24
**000778** 3:24
**00214** 3:17
**002238** 3:17
**01:07** 144:2
**01:43** 144:1

---
**1**
---

**1** 3:13 79:12,18
83:16
**1(a)** 93:8
**10** 114:4,6 135:2
**10/31/23** 145:8
**10:25** 76:12
**10:40** 76:12
**105** 4:1
**11:11** 98:12
**11:13** 98:12
**115** 4:4
**117** 3:6
**119** 3:7
**11th** 112:9
**12:14** 1:20
140:11
**13th** 145:3
**141-142** 3:8
**143** 3:9
**15** 57:10
**1620** 109:9
110:13
**18th** 2:13
**1983** 5:23

---
**2**
---

**2** 3:2,16 83:16
83:18 85:11
98:1,15
**2.0** 98:1
**20** 66:7
**2002** 7:12
**2005** 69:3 72:19
**201** 98:1
**201.4** 92:17
**2010** 70:21
72:22 74:17
80:11
**2011** 9:15 78:15

98:21 107:6,9
115:24
**2012** 19:2
**2013** 98:22 99:1
99:12
**2016** 19:5,7,11
**2019** 112:10
**2020** 19:11
**2021** 19:13
106:13,15
**2022** 1:13,19 5:4
141:3 143:11
145:3
**2214** 83:20
**223** 145:9
**2238** 83:24
**235** 5:3 145:10
**248** 105:8,16
**249** 108:1
**250** 106:20
**25th** 5:23
**28** 3:17 83:2,19

---
**3**
---

**3** 3:19 54:12
89:12,13,14
91:20 97:21
98:2,16,19
99:25 123:23
125:10
**3:21-cv-00200**
1:6 143:6
**30** 1:13 5:4 66:7
141:3 143:11
**3000** 5:3 145:10
**30th** 1:19
**317** 105:14,16
**3306** 2:5
**38** 8:7
**3840** 108:13

---
**4**
---

**4** 3:22 54:13
95:5,6 96:8
98:16,19 99:25
123:23 124:4
125:9

**4:30** 32:20
**40** 109:21
**409** 2:6,14,21

---
**5**
---

**5** 3:4 4:1 105:5,6
**5:00** 32:19
**528** 89:16
**5644** 145:8
**572-2000** 145:11

---
**6**
---

**6** 4:4 115:11,14

---
**7**
---

**713** 145:11
**76** 3:5
**763-2481** 2:21
**77027** 5:4
145:10
**775** 96:14
**77550** 1:23 2:13
2:20
**77578** 2:6
**79** 3:13
**797-3200** 2:14

---
**8**
---

**802** 1:23 2:20
**81** 108:4,6
**83** 3:16
**888-0006** 2:6
**89** 3:19 116:8

---
**9**
---

**9:05** 1:20
**91** 79:9,19
**92** 115:14
**93** 115:14
**95** 3:22